IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| FIELDWOOD ENERGY LLC, *et al.*, | § § | Case No. 18-30648 (DRJ) |
| | § § | (Jointly Administered) |
| Debtors.[1] | § § § | |

DECLARATION OF G.M. MCCARROLL IN SUPPORT OF
DEBTORS' CHAPTER 11 PETITIONS AND RELATED REQUESTS FOR RELIEF

I, G.M. McCarroll, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am President and Chief Executive Officer of Fieldwood Energy LLC ("**Fieldwood Energy**"), a wholly-owned indirect subsidiary of Fieldwood Holdings LLC ("**Fieldwood Holdings**"). Fieldwood is a privately owned oil and gas exploration and production company and is the largest operator of offshore assets on the Outer Continental Shelf of the Gulf of Mexico (the "**GOM Shelf**"). On February 15, 2018 (the "**Petition Date**"), Fieldwood Holdings and certain of its domestic subsidiaries (collectively with Fieldwood Holdings, the "**Debtors**" and, together with their non-debtor subsidiaries, the "**Company**") commenced in this Court voluntary cases under chapter 11 of title 11 of the United States Code

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Holdings LLC (9264); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

(the "**Bankruptcy Code**").   I am knowledgeable about and familiar with the Company's businesses and financial affairs.  I submit this declaration (this "**Declaration**") in support of the Debtors' voluntary petitions for relief and motions filed concurrently herewith (the "**First Day Motions**").  I am authorized to submit this Declaration on behalf of the Debtors.

2.      I have served as Fieldwood Energy's President and Chief Executive Officer since the Company's inception.  Prior to my employment by Fieldwood Energy, I was the founder and served as President and Chief Executive Officer of Dynamic Offshore Resources, another offshore exploration and production company.  Before working for Dynamic Offshore Resources, I served as President of Maritech Resources, and Senior Vice President at Plains Resources.  I hold a Bachelor of Science degree in business administration and finance from Louisiana State University.

3.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial condition, or my discussions with the Company's restructuring advisors, Weil, Gotshal & Manges LLP ("**Weil**"), Evercore Group LLC ("**Evercore**"), and Opportune LLP ("**Opportune**").   If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      This Declaration has been organized into five sections.  The first provides an overview of the Debtors and their Chapter 11 Cases,[2] including a description of the Plan.  The second provides background information on the Debtors' organizational structure and

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan (as defined below), file contemporaneously herewith.  To the extent any inconsistencies exist between this Declaration and the Plan, the Plan shall govern.

2

businesses.  The third describes the Debtors' capital structure.  The fourth describes the events leading to the filing of the Chapter 11 Cases and the Debtors' prepetition restructuring efforts. The fifth section summarizes the relief requested in, and the legal and factual bases supporting, the First Day Motions.

## I.  Overview

5.      Overview of Restructuring.  The Debtors commenced these Chapter 11 Cases to accomplish two important goals vital to the successful restructuring of their businesses:

- substantial deleveraging of their capital structure to reduce the go-forward cost of capital for their otherwise healthy businesses, and

- acquisition of certain strategic assets in the Gulf of Mexico that are projected to increase the Debtors' base of cash-flow positive assets meaningfully.

6.      The Debtors are pleased to announce that, after extensive negotiations with their stakeholders, they have in-hand (i) a fully negotiated consensual plan of reorganization (the "**Plan**")[3] and (ii) a restructuring support agreement ("**Restructuring Support Agreement**") that promises the overwhelming support of each of the key creditor groups in their capital structure to vote in favor of the Plan.  The transactions contemplated in the Plan strengthen the Company's balance sheet by substantially reducing its debt while increasing its cash flow on a go-forward basis, and will propel the Company forward in its growth strategy to be one of the leading operators in the Gulf of Mexico, as a whole, and will solidify its role as the leading operator on the GOM Shelf.

7.      In a nutshell, the Plan provides for a substantial reduction of the Debtors' existing funded debt by approximately $1.626 billion and a reduction of the Company's annual

---

[3] *See Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* and *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Fieldwood Energy LLC and its Affiliated Debtors* (the "**Disclosure Statement**"), each filed contemporaneously herewith.

debt service obligations by up to $128 million.  In addition, the amended and restated terms of the debt remaining on the Company's balance sheet will provide the Debtors greater certainty regarding their debt service going forward as the debt will not be subject to ongoing borrowing base redeterminations in the future.  The Plan also contemplates Fieldwood Energy's acquisition of certain deepwater assets located in the Gulf of Mexico from Noble Energy, Inc. ("**Seller**") pursuant to the *Purchase and Sale Agreement*, dated February 14, 2018, between Fieldwood Energy and Seller (including all schedules, exhibits, instruments, and other documents delivered in connection therewith, and as may be amended, restated, or modified, the "**Purchase Agreement**" and the assets identified therein, the "**Purchased Assets**").  Fieldwood Energy will acquire the Purchased Assets from Seller for a purchase price of $480 million, subject to customary price adjustments (including contingency payments) in accordance with the Purchase Agreement.  Fieldwood Energy intends to use a portion of the proceeds from the Rights Offering (as defined below) to fund obligations under the Purchase Agreement.

8.      The Purchased Assets will provide accretive value to the Debtors through operational efficiencies and synergies with the Debtors' existing assets and through the elimination of redundant costs.   The Purchased Assets have material organic growth opportunities, including a significant near-term development project, which if successfully developed could result in a significant increase in the total amount of proved reserves associated with the Purchased Assets.  The Purchased Assets also include significant physical equipment inventory and prospect inventory on 45 primary term leases.   The Debtors expect that development of the Purchased Assets will provide significant free cash flow for the Reorganized Debtors.   The Debtors do not anticipate any significant plugging and abandonment ("**P&A**") expenditures associated with the Purchased Assets for the next several years.

9.   The acquisition provides several significant benefits to the Company:

- Materially adds to the Company's producing asset base and cash flow with significant upside potential through development and exploration opportunities;

- The deepwater Purchased Assets are complementary to the Company's shallow-water operations;

- The Company will hire certain members of Seller's technical and operational teams to expand existing deepwater and subsea capabilities; and

- The transaction will reduce the Company's gross leverage from 5.9x 2018E EBITDA to 1.9x 2018E EBITDA.

10.   The Plan otherwise provides for a pure balance sheet restructuring.  All of the Debtors' unsecured creditors, such as trade vendors, employees, and landlords are unimpaired under the Plan and will be satisfied in full in the ordinary course of business, subject to the applicable contracts governing their relationship with the Company.  Trade contracts and terms will be maintained.  Leases will be assumed.  Operations, plugging and abandonment work, and drilling will continue in the ordinary course in accordance with the Company's business plan.  In addition, the Debtors' secured lenders have agreed to a transaction that will provide existing equity a recovery under the Plan.  The Debtors believe that the Plan and the commencement of these Chapter 11 Cases are positive milestones that allow the Company to reduce its debt to a sustainable level and set a course for a smooth exit from bankruptcy as a healthier enterprise, well-positioned to cement further its dominant position on the GOM Shelf.

11.   <u>Restructuring Support Agreement</u>.   The Plan is the result of months of negotiations among the (i) Debtors, (ii) Riverstone Holdings LLC (together with certain of its affiliates, "**Riverstone**") (the Company's prepetition equity sponsor and the single largest lender

holding SLTL Claims (as defined below))[4], (iii) an ad hoc group of lenders holding FLTL Claims (as defined below) (which includes both claims under the Prepetition RBTL Loans (as defined below) and the Prepetition FLTL Loans (as defined below)),[5] FLLO Claims (as defined below), and SLTL Claims (as defined below) (the "**Cross-Holder Group**"), and (iv) an ad hoc group of lenders holding FLTL Claims (the "**First Lien Group**"). The Debtors developed the Plan and their proposed restructuring in close consultation with their stakeholders. On February 14, 2018, the Debtors executed the Restructuring Support Agreement with the following parties: (i) Prepetition First Lien Term Lenders holding approximately 74.9% of the FLTL Claims, (ii) Prepetition FLLO Lenders holding approximately 71.6% of the FLLO Claims, (iii) Prepetition Second Lien Term Lenders and Prepetition Sponsor Second Lien Term Lenders (as defined below) holding approximately 88% of the SLTL Claims ((i) through (iii) collectively, the "**Consenting Creditors**") and (iv) Riverstone, as holder of substantially all the equity of Fieldwood Holdings. Under the Restructuring Support Agreement, the Consenting Creditors have agreed to vote in favor of and support confirmation of the Plan. Altogether, (i) Consenting Creditors holding approximately 55% in number and 75% in amount of FLTL Claims, 55% in number and 72% in amount of FLLO Claims, and 50% in number and 88% in amount of SLTL Claims, and (ii) the Consenting Sponsor, holding approximately 98% in amount of Existing Holdings Interests have committed to accept the Plan. On February 15, 2018, the Debtors began to solicit votes in connection with the Plan. The Debtors propose that the solicitation period for the Plan will remain open until March 14, 2018.

---

[4] A detailed description of the Company's prepetition capital structure is included *infra*.

[5] The Prepetition RBTL Loans and the Prepetition FLTL Loans are *pari passu* and are classified together under the Plan for treatment and voting purposes.

12.     <u>Proposed DIP Financing</u>.  Certain of the holders of the SLTL Claims have agreed to provide the Debtors with a $60 million debtor-in-possession multi-draw term loan facility (the "**DIP Facility**" and the loans provided thereunder, the "**DIP Loans**"), to support the Company's working capital needs during the Chapter 11 Cases.  The Debtors' obligations under the DIP Facility will be secured by liens on substantially all of the Debtors' assets, and will be junior in priority to the liens of (i) the Prepetition RBL Lenders, (ii) the Prepetition FLTL Lenders, (iii) third parties in existence as of the Petition Date and subsequently perfected pursuant to section 546(b) of the Bankruptcy Code, and (iv) hedge counterparties in connection with postpetition hedging transactions entered into by the Debtors, and will prime substantially all other liens.  Upon emergence from bankruptcy, the DIP Loans will be paid in full in cash or otherwise satisfied in accordance with the terms of the Plan.

13.     <u>Prepackaged Plan.</u>  Most significantly, the Plan provides for a transaction whereby the Company will acquire the Purchased Assets in cash for a purchase price, subject to certain adjustments, of $480 million (the "**Asset Purchase Transaction**").  The Asset Purchase Transaction will be funded by a portion of the proceeds from an equity rights offering to the Prepetition Second Lien Term Lenders and Prepetition Sponsor Second Lien Term Lenders issued on account of their SLTL Claims (the "**Rights Offering**").  Under the Rights Offering, the Prepetition Second Lien Term Lenders and Prepetition Sponsor Second Lien Term Lenders will have the opportunity to purchase, on a *pro rata* basis, 75% of the equity in reorganized Fieldwood Energy Inc. ("**Energy Inc.**") (subject to dilution by the Management Incentive Plan). The Rights Offering will be backstopped by certain Prepetition Second Lien Term Lenders and Prepetition Sponsor Second Lien Term Lenders (in such capacity, the "**Backstop Parties**"), in consideration for which the Backstop Parties will receive an amount of shares equal to 4.5% of

7

the New Equity Interests issued pursuant to the Rights Offering.   In addition to the Asset

Purchase Transaction and the Rights Offering, the Plan provides, among other things:

- Holders of Claims under the Prepetition RBL Credit Agreement (as defined below) will have their claims, if any, paid in cash in full.  The Prepetition RBL Facility (as defined below) is composed solely of undrawn but outstanding letters of credit, and on the Effective Date, the Debtors will enter into a new letter of credit facility (the "**Exit LC Facility**") to replace Prepetition RBL Facility.

- The holders of claims under the Prepetition First Lien Term Loan Agreement (as defined below) will receive their *pro rata* share of a $1.143 billion first lien last out term loan facility, and cash for all accrued and unpaid interest payable through the Effective Date.

- The holders of claims under the Prepetition FLLO Credit Agreement (as defined below) will receive their pro rata share of a $518 million second lien term loan facility  and cash for all accrued and unpaid interest payable through the Effective Date.

- Holders of SLTL Claims (as defined below) will receive in the aggregate their pro rata share of (i) 20.25% of New Equity Interests and (ii) the right to purchase an additional 75% of the New Equity Interests offered pursuant to the $525 million Rights Offering, in each case the New Equity Interests are subject to dilution by the Management Incentive Plan.  The management incentive plan will provide for the issuance of awards of an aggregate of 10% of New Equity Interests, which will dilute all other New Equity Interests issued pursuant to the Plan, pursuant to the Rights Offering, and under the Backstop Commitment Agreement.

- Holders of General Unsecured Claims will be paid cash in full in the ordinary course of business.

- Fieldwood Holdings, as the sole holder of equity of Energy Inc., will receive 0.25% of the New Equity Interests to be issued on the Effective Date, subject to dilution by a management incentive plan.

- After the Effective Date, Fieldwood Holdings will be dissolved and any remaining proceeds or assets will be vested in Energy Inc., other than the 0.25% of the New Equity Interests distributed to Fieldwood Holdings pursuant to the Plan, which shall be distributed to the holders of the equity of Fieldwood Holdings (which includes Riverstone), in accordance with Fieldwood Holdings' organizational documents and applicable law.   Holders of Fieldwood Holdings'

equity will receive no other distribution or consideration under the Plan.

14.    The effect of the restructuring on the Company's capital structure is summarized as follows:

| **Prepetition Capital Structure** | **Post-Restructuring Capital Structure** |
| --- | --- |
| *Prepetition First Lien Term Loans and Reserve Based Term Loans*<br><br>~$1.143 billion in term loans | *Exit First Lien Term Loans*<br><br>~$1.143 billion in term loans |
| *Prepetition FLLO Loans*<br><br>~$518 million in term loans | *Exit Second Lien Term Loans*<br><br>~$518 million in term loans |
| *Prepetition Second Lien Term Loans and Prepetition Sponsor Second Lien Term Loans*<br><br>~$1.626 billion in term loans | Equity in Energy Inc. |
| ***Total Current Funded Debt = ~$3.287 billion*** | ***Total Reorganized Funded Debt = ~$1.660 billion*** |
| *Prepetition RBL Facility*<br><br>~$148 million in undrawn letters of credit | *Exit LC Facility*<br><br>~$148 million in undrawn letters of credit |

15.    In light of the Restructuring Support Agreement, the Debtors expect that the votes tabulated and received from each of the classes entitled to vote will be sufficient to confirm the Plan.  I am advised that, even if the Plan is not unanimously accepted by the voting classes, the Plan nevertheless satisfies the requirements of the Bankruptcy Code and can be confirmed.

16.    <u>Proposed Timeline</u>.  The Debtors believe that, to be successful, these Chapter 11 Cases must proceed in the most expeditious manner permitted by the Bankruptcy Code.  The terms of the Restructuring Support Agreement reflect that belief.  And the Debtors have agreed to certain milestones contained in the Restructuring Support Agreement, regarding,

among other things, a deadline for entry of an order by the Bankruptcy Court approving the Disclosure Statement and solicitation procedures and confirming the Plan within 75 calendar days after the Petition Date.  To meet this deadline, the Debtors propose the following timeline for these Chapter 11 Cases (subject to the Court's calendar):

| **Proposed Timeline** | |
| --- | --- |
| Commencement of Solicitation | February 15, 2018 |
| Petition Date | February 15, 2018 |
| Proposed Mailing of Combined Notice | February 20, 2018 |
| Rights Offering Record Date | February 22, 2018 |
| Rights Offering Launch Date | February 23, 2018 |
| Plan Supplement Filing Deadline | March 7, 2018 |
| Plan Voting Deadline and Subscription Expiration Time | March 14, 2018 at 5:00 p.m. (Prevailing Central Time) |
| Plan and Disclosure Statement Objection Deadline | March 21, 2018, at 4:00 p.m. (Prevailing Central Time) |
| Reply Deadline | March 28, 2018, at 5:00 p.m. (Prevailing Central Time) |
| Combined Hearing | April 2, 2018, at 10:00 a.m. (Prevailing Central Time) |

17.     A quick resolution to these cases is essential to the preservation of the value of their assets and estates.  The Company's stakeholders have supported the Company's businesses leading up to the filing in anticipation of a balance sheet restructuring that does not risk the erosion of the Company's asset base, reputation, and business relationships.  To ensure that result, the Debtors negotiated a favorable transaction with the Consenting Creditors.  In

exchange for that consideration, the Consenting Creditors have insisted that chapter 11 costs be minimized and that the transaction be effectuated promptly to avoid delay, disruption to operations, and degradation of value.  Additionally, the Purchase Agreement contains milestones that are consistent with the milestones in the Restructuring Support Agreement that must be satisfied to comply with the Purchase Agreement.   The Asset Purchase Transaction is a cornerstone of the Debtors' reorganization strategy and the Company must meet the deadlines in the Purchase Agreement to achieve its restructuring goals.

## II.  The Debtors' Businesses

18.     Fieldwood Energy was established in December 2012 as a portfolio company of certain energy funds of Riverstone, a private energy and power-focused investment firm.  Also, at this time Fieldwood Holdings and Energy Inc. (formerly Fieldwood Managing Member LLC) were created as holding companies for Fieldwood Energy.  The Company operates an energy business focused on the acquisition, development, exploitation, and production of oil and natural gas properties.  Their oil and natural gas assets consist primarily of producing oil and natural gas properties located off-shore in the GOM Shelf.  Fieldwood Energy was initially capitalized in September 2013 in connection with the acquisition of GOM Shelf assets from Apache Corporation (together with its subsidiaries and affiliates, "**Apache**" and, the transaction, the "**Apache Transaction**").[6]  In early 2014, the Company completed an acquisition of certain Gulf of Mexico assets from SandRidge Energy, Inc.[7]  Since then, the Company has completed additional smaller bolt-on transactions, and has, in the aggregate, completed approximately $5 billion in acquisitions, making Fieldwood Energy the largest oil and gas exploration and production company in the GOM Shelf.

19.     The Company, an integrated enterprise, maintains a robust acquisition program pursuant to which it attempts to identify underworked assets, motivated sellers, and circumstances in which the Company can mitigate pricing risk.  Once the Company acquires assets, the Company's operating strategy is to pursue a balanced mix of lower risk development

---

[6] Debtor GOM Shelf LLC also was acquired in this acquisition.  The majority of the Company's employees are former Apache employees who came to the Company in connection with this transaction.

[7] The following Debtors were acquired in this transaction:  Dynamic Offshore Resources NS, LLC, Fieldwood Energy Offshore LLC, Fieldwood Onshore LLC, Fieldwood SD Offshore LLC, FW GOM Pipeline, Inc., Bandon Oil and Gas GP, LLC, Bandon Oil and Gas, LP, Fieldwood Energy SP LLC, Galveston Bay Pipeline LLC, and Galveston Bay Processing LLC.

opportunities alongside its exploration program and to optimize its production efforts without lowering safety and compliance standards. By focusing on controlling fixed operating costs and eliminating redundant operations, the Company can maximize profits from any incremental production results. The following map illustrates the locations of the Debtors' oil and natural gas properties:



20.     As of the date hereof, the Debtors have over 500 operated platforms spread across over two million gross acres. The Debtors employ approximately 700 employees, on a daily basis, and over 2,500 additional contractor personnel on their facilities. The Debtors maintain operational control over approximately 95% of their diversified asset base. In 2017, the Debtors produced on average approximately 75,000 barrels of oil equivalent per day. The average production was lower in 2017 compared to 2016 as a result of unique downtime issues related to multiple named windstorms in the Gulf of Mexico, various pipeline shut-ins that were outside the Debtors' control, and lack of available capital to enhance production. In a typical year, the Debtors employ multiple lift boats, helicopters, drilling rigs, and various marine vessels to support operations, which include support for producing fields, workovers, recompletions,

ongoing maintenance, drilling, and decommissioning activities.  The Debtors believe that they have a deep inventory of higher risk, higher return exploration opportunities as well as many lower risk development opportunities.  The Debtors develop their inventory in an opportunistic manner based on, among other things, access to infrastructure, current commodity prices, lease expirations, and availability and cost of equipment.

21.    Additionally, as the largest facility, pipeline, and well owner in the GOM Shelf, the Debtors have one of the most extensive P&A and decommissioning programs.  The Company maintains a robust staff specifically dedicated to managing P&A and decommissioning operations including estimating future liabilities on current and acquired properties. Additionally, the Company performs all well P&A work in-house using Company-owned spreads and specialized employees at rates favorable to current market rates.  In a typical year, the Company will plug and abandon hundreds of wells and will decommission approximately half of all facilities decommissioned in the GOM Shelf.  The Company views its approach to P&A and decommissioning operations as a strength and a differentiating factor from its peers and a successful strategy to mitigate liabilities when acquiring other GOM Shelf assets.

22.    The Company prides itself on being an industry leader in establishing vigorous systems to manage its risk associated with offshore Gulf of Mexico operations effectively, and is committed to maintaining safe and efficient operations, with the paramount goal of protecting the environment, personnel, and its facilities.  To mitigate risk and support the Company's daily operations, the Company maintains a robust multi-tier insurance program.  The Company's current energy package policy includes insurance coverage for pollution as well as third-party pollution liabilities, control of well, and property damage from operational and windstorm risk.  In addition, the Company requires each of its contractors working on its

facilities to maintain insurance coverage appropriate for the services provided and to name the Company as an additional insured party for the risks associated with the operations as well as to provide contractual indemnification to the Company for injuries or death to its personnel or for damage to its equipment.

**A.     Regulation of Debtors' Businesses and Decommissioning Obligations**

23.     The Debtors are subject to the local, state, and federal laws and regulations in the jurisdictions where they operate.  The laws and regulations that impact the Debtors' operations include those relating to the operation of wells and facilities (including platforms, pipelines, and gathering or processing units,) environmental protection, health and safety, and oil and natural gas exploration and development.

24.     The Company's operations in the Gulf of Mexico include a substantial number of oil and gas leases situated in federal waters and issued by the U.S. Department of the Interior.  Specifically, the Company owns an interest in approximately 575 oil, gas, and mineral leases ("**Oil and Gas Leases**"), and is party to approximately 550 joint operating agreements, unitization agreements, and farmout agreements governing operations of the Oil and Gas Leases. Of their Oil and Gas Leases, approximately 70% are offshore leases granted by the Bureau of Ocean Energy Management ("**BOEM**").   Operation of the Oil and Gas Leases is subject to regulation by the BOEM and the Bureau of Safety and Environmental Enforcement ("**BSEE**"), and requires compliance with BOEM and BSEE regulations and orders issued pursuant to various federal laws, including the Outer Continental Shelf Lands Act.  For offshore operations, lessees must obtain BOEM approval for exploration, development, and production plans before the commencement of such operations.  In addition to permits required from other agencies such as the U.S. Environmental Protection Agency, lessees must obtain a permit from BSEE before commencing drilling and must

comply with regulations governing, among other things, engineering and construction specifications for production facilities, safety procedures, P&A of wells, and removal of infrastructure facilities.

<u>**Obligations to United States Government**</u>

25.     To cover the various obligations of lessees, such as the cost to plug and abandon wells and decommission and remove platforms and pipelines at the end of production on a lease, BOEM generally requires that lessees post surety bonds or other acceptable financial assurances that such obligations will be met unless BOEM exempts the lessee from such requirements.  As of the Petition Date, the Debtors have obtained approximately $184 million in surety bonds for the benefit of BOEM to secure the Debtors' P&A obligations.  For properties acquired from third parties, BOEM may require surety bonds but also may rely on adequate assurances that the obligations are covered based on the contractual arrangement between the parties.

<u>**Obligations to Third Parties, including Apache**</u>

26.     Pursuant to BOEM regulations, the Company is jointly and severally liable for its P&A obligations with all current and prior owners in the chain of title who were owners at the time and after such facilities and wells were put in place.  Therefore, in connection with many of their acquisitions of oil and gas properties, the Company has entered into various arrangements with the sellers that establish how the decommissioning of the subject oil and gas properties will be addressed in compliance with BOEM regulations, including (as discussed below) with Apache.

27.     <u>Obligations to Third Parties Excluding Apache</u>.  As stated, the Debtors have entered into various arrangements with third parties to cover P&A obligations assumed or that may arise during the Debtors' ownership of any acquired assets.  In connection with the P&A obligations to third parties (other than Apache), the Debtors have obtained approximately $162 million in surety bonds and have deposited less than $20 million into escrow, in each case for the benefit of such third parties.

16

28.     <u>Obligations to Apache</u>.   In 2013, the Company purchased a significant portfolio of oil and gas properties from Apache and agreed to assume decommissioning liabilities for certain properties that Apache previously owned and operated (the purchased portfolio together with the abandoned properties, the "**Apache Properties**").   The Debtors' decommissioning obligations with respect to the Apache Properties is governed by the provisions of that certain *Decommissioning Agreement*, dated as of September 30, 2013 (as amended, the "**Decommissioning Agreement**").

29.     Under the Decommissioning Agreement, the Debtors and Apache must agree to a three-year rolling decommissioning plan in connection with the Apache Properties.   If the Company fails to perform the decommissioning as prescribed, Apache may perform the decommissioning itself and seek reimbursement from the Company.   If the Debtors fail to reimburse Apache, then Apache may then seek reimbursement first from proceeds held in two trusts in which Apache holds beneficial interests in (each an "**Apache Trust**" and together, the "**Apache Trusts**") and then from certain letters of credit issued for its benefit and described below.   Any amounts collected by Apache under the letters of credit are required to be deposited into the Apache Trusts.

30.     Under the Decommissioning Agreement and related documents, the Company provided Apache with the following security and credit support relating to decommissioning of the Apache Properties:

- Approximately $498 million in letters of credit;

- The conveyance of net profits interests into the Apache Trusts;

- A first-priority springing lien on the assets of the Apache Trusts upon certain conditions being fulfilled; and

- A third-priority springing lien over the Apache Properties triggered upon a default under the Decommissioning Agreement.

31.     Each month, the Debtors are obligated to deposit certain of the net profits generated by certain of the Apache Properties into the Apache Trusts.  Certain funds in the Apache Trusts are used to reimburse the Debtors each month for decommissioning work performed on the Apache Properties, and other funds in the Apache Trusts continue to accrue until the amounts therein equal approximately $300 million.  As the Company decommissions the Apache Properties, funds in the Apache Trust and the amount of the letters of credit may be reduced if they together exceed 125% of the Debtors' remaining decommissioning liabilities under the Decommissioning Agreement.  Under this decommissioning program, the Company has performed almost $1 billion of decommissioning work with respect to the Apache Properties, and have plugged and abandoned over 775 wells, 200 pipelines, and 250 platforms and other facilities.

32.     In connection with the restructuring contemplated under the Plan, the Debtors and Apache have reached a consensual agreement (the "**Apache Agreement**") regarding an amendment to the Decommissioning Agreement (such amendment, the "**Apache Decommissioning Agreement Amendment**").  The material terms of the Apache Agreement are as follows:

- The Debtors will have the right to replace up to $150 million of letters of credit with an equivalent amount of surety bonds in form and substance acceptable to Apache;

- Apache will release its third-priority lien over the Apache Properties;

- The Debtors will be relieved of certain financial covenants under the Decommissioning Agreement;

- The Debtors will take assignment of record title to the Apache Properties not previously assigned to the Debtors; and

- The Debtors will spend $100 million on decommissioning in 2018, and will spend $80 million per year for each of years 2019 through 2022.  Any unspent

amounts will be deposited into an Apache Trust in accordance with the Apache Decommissioning Agreement Amendment.

33.     The Debtors anticipate that the Reorganized Debtors will be able to perform all obligations in connection with the Apache Agreement.

**B.     Other Matters**

34.     Fieldwood Energy is the indirect owner of economic interests in approximately 10% of Fieldwood Energy E&P Mexico, S. de R.L. de C.V. ("**Fieldwood Mexico**"), with the remaining 90% owned primarily by Riverstone V FW Holdings, LLC and its affiliates.  Fieldwood Mexico is not a debtor in these Chapter 11 Cases.  Fieldwood Mexico is the designated operator of the undeveloped Ichalkil and Pokoch fields in Mexico and splits all costs and profits equally with its Mexican partner, PetroBal, S.A.P.I. de C.V.  Fieldwood Energy manages Fieldwood Mexico pursuant to various service agreements on arm's-length terms.  The Plan provides that Fieldwood Energy will continue managing Fieldwood Mexico consistent with any prepetition agreements.

### III.  Corporate and Capital Structure

**A.  Corporate Structure**

35.     Fieldwood Holdings is 97.963% owned by Riverstone V FW Holdings Sub, LLC and approximately 2.037% owned by Fieldwood Management LLC.  All of the other Debtors are wholly-owned direct or indirect subsidiaries of Fieldwood Holdings.  Fieldwood Holdings' Board of Directors (the "**Board**") functions as the Debtors' governing board with respect to the decision-making underlying these Chapter 11 Cases.

36.     The Debtors are controlled by the Board at Fieldwood Holdings, although each separate Debtor is either a member-managed or manager-managed limited liability company or

19

a corporation with a one-person or two-person board of directors.  The Fieldwood Holdings' Board consists of seven members, who are listed below:

| Name | Position |
|---|---|
| G.M. McCarroll | Chairman |
| Pierre F. Lapeyre, Jr. | Director |
| David M. Leuschen | Director |
| N. John Lancaster | Director |
| Brett Staffieri | Director |
| Alan J. Carr | Independent Director |
| John T. Rynd | Independent Director |

37.     The Debtors have highly experienced managers for their Gulf of Mexico operations, with their headquarters in Houston, Texas, and an office in Lafayette, Louisiana to support offshore operations.  The Debtors' core management team consists of the following individuals:

| Name | Position |
|---|---|
| G.M. McCarroll | President and Chief Executive Officer |
| Michael Dane | Senior Vice President and Chief Financial Officer |
| Richard Black | Senior Vice President and General Counsel |
| John Smith | Senior Vice President, Land and Business Development |
| Gary Janik | Senior Vice President, Asset Management |
| John Seeger | Senior Vice President, Decommissioning and Deepwater Operations |
| Paul Gluth | Senior Vice President, Production and Construction |

38.     Collectively, the Debtors consist of 14 entities registered under the laws of Delaware, Texas, and Louisiana.  The Debtors also own two wholly-owned, immaterial, non-debtor affiliates incorporated in Delaware.  A chart illustrating the Debtors' organizational structure as of the Petition Date is attached as **Exhibit A** to this Declaration.

**B.  Capital Structure**

39.     The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting

20

forth the specific terms of such obligations and their respective related agreements.  As of the date hereof, the Debtors had outstanding approximately $148 million in outstanding but undrawn letters of credit issued under the Prepetition RBL Facility as well as funded debt obligations in the aggregate amount of approximately $3.286 billion, which amount consists of (i) approximately $755 million in Prepetition First Lien Term Loans, (ii) approximately $388 million in reserve based term loans, (iii) approximately $518 million in Prepetition FLLO Loans, (iv) approximately $846 million in Prepetition Second Lien Term Loans, and (v) approximately $781 million in Prepetition Sponsor Second Lien Term Loans.

40.    ***Prepetition RBL Facility***.  Certain of the Debtors are parties to that certain *Credit Agreement*, dated as of September 30, 2013 (as amended, the "**Prepetition RBL Credit Agreement**") between Fieldwood Energy, as borrower, Citibank N.A. ("**Citibank**"), as administrative agent and collateral agent (in its capacity as such, the "**Prepetition RBL Agent**"), and the Prepetition RBL Lenders.  All of the remaining Debtors are guarantors under the RBL Facility.  The Prepetition RBL Credit Agreement establishes a letter of credit facility that matures in September 2018 (the "**Prepetition RBL Facility**"), pursuant to which approximately $148 million in letters of credit remain outstanding but are undrawn as of the Petition Date, plus any applicable interest, fees, and other amounts.  Substantially all of the letters of credit under the Prepetition RBL Facility are issued in favor of Apache.  The RBL Claims are secured by a first-priority lien on substantially all of the Company's property and the proceeds (the "**Collateral**") in favor of the Prepetition RBL Agent and the Prepetition RBL Lenders.

41.    The borrowing base under the Prepetition RBL Credit Agreement is redetermined by the Prepetition RBL Agent on a semi-annual basis and such redeterminations

become effective in April and October of each year; however, the borrowing base was fixed at $1.3 billion until May 2018 pursuant to an amendment to the Prepetition RBL Credit Agreement in 2016.

42. ***Prepetition First Lien Term Loans***.  Certain of the Debtors are parties to that certain *First Lien Term Loan Agreement*, dated as of September 30, 2013 (as amended, the "**Prepetition First Lien Term Loan Agreement**"), between Fieldwood Energy, as borrower, Citibank, as administrative agent (in such capacity, the "**Prepetition First Lien Term Agent**"), the other banks and financial institutions party thereto, and the lenders party thereto from time to time holding the Prepetition First Lien Term Loans (the "**Combined Prepetition FLTL Lenders**").  Pursuant to the Prepetition First Lien Term Loan Agreement, the Debtors are obligated on approximately $1.14 billion, composed of (i) approximately $755 million of principal amount of senior first-lien secured term loans outstanding as of the date hereof (the "**Prepetition FLTL Loans**"), and (ii) approximately $388 million of reserve-based term loans outstanding as of the Petition Date (the "**Prepetition RBTL Loans**" and, with the Prepetition FLTL Loans, the "**Prepetition First Lien Term Loans**") (the claims arising under the Prepetition First Lien Term Loan Agreement, the "**FLTL Claims**").  The FLTL Claims are secured by a first-priority lien on the Collateral and are *pari passu* with the Prepetition RBL Facility.

43. ***Prepetition FLLO Loans***.  Certain of the Debtors are parties to that certain *First Lien Last Out Term Loan Agreement*, dated as of May 27, 2016 (as amended, the "**Prepetition FLLO Credit Agreement**"), between Fieldwood Energy, as borrower, Cortland Capital Market Services LLC ("**Cortland**"), as administrative agent and collateral agent (in such capacity, the "**Prepetition FLLO Agent**"), the other banks and financial institutions party thereto, and the Prepetition FLLO Lenders, pursuant to which the Company

issued term loans in the principal amount of approximately $518 million (the "**Prepetition FLLO Loans**"), all of which remain outstanding as of the Petition Date, plus any applicable interest, fees, and other amounts (the claims arising under the Prepetition FLLO Credit Agreement, the "**FLLO Claims**").  The FLLO Claims are secured by a first-priority lien on the Collateral, but are subordinate in right of payment to the RBL Claims and the FLTL Claims.

44.     *Prepetition Second Lien Term Loans*.  Certain of the Debtors are parties to that certain *Second Lien Term Loan Agreement*, dated as of September 30, 2013 (as amended from time to time including pursuant to (i) that certain *Amendment No. 1 to Second Lien Term Loan Agreement*, dated as of February 25, 2014, (ii) that certain A*mendment No. 2 and Limited Waiver to Second Lien Term Loan Agreement*, dated as of May 27, 2016, and (iii) that certain *Amendment No. 3 and Limited Waiver to Second Lien Term Loan Agreement*, dated as of May 27, 2016, the "**Prepetition Second Lien Credit Agreement**"), between Fieldwood Energy, as borrower, Cortland, as administrative agent and collateral agent (in such capacity, the "**Prepetition Second Lien Term Agent**"), the other banks and financial institutions party thereto, and the Prepetition Second Lien Term Lenders, pursuant to which approximately $846 million of second lien term loans are outstanding as of the Petition Date, plus any applicable interest, fees, and other amounts (the "**Prepetition Second Lien Term Loans**").  The Prepetition Second Lien Term Loans are secured by a second-priority lien on the Collateral.

45.     *Prepetition Sponsor Second Lien Term Loans*.  Certain of the Debtors are parties to that certain *Sponsor Second Lien Term Loan Agreement*, dated as of May 27, 2016 (as amended, the **Prepetition Sponsor Second Lien Credit Agreement**), between Fieldwood Energy, as borrower, Cortland, as successor administrative agent and successor collateral agent (in such capacity, the "**Prepetition Sponsor Second Lien Term Loan Agent**"), the other banks

23

and financial institutions party thereto, and the lenders party thereto (the "**Prepetition Sponsor Second Lien Term Lenders**"), pursuant to which approximately $781 million in principal amount of second lien term loans are outstanding as of the Petition Date, plus any applicable interest, fees, and other amounts (the "**Prepetition Sponsor Second Lien Term Loans**" and the claims arising under the Prepetition Sponsor Second Lien Credit Agreement together with the claims arising under the Prepetition Second Lien Credit Agreement, the "**SLTL Claims**").  The Prepetition Sponsor Second Lien Term Loans are secured by a second-priority lien on the Collateral, which lien is *pari passu* with the liens securing the Prepetition Second Lien Term Loans.

46.     ***Intercreditor Agreements***.  The rights of the Debtors' prepetition secured parties with respect to the Collateral are governed by three intercreditor agreements (collectively, the "**Intercreditor Agreements**"):

- the rights of the *pari passu* first lien secured parties as to each other are governed by that certain *Pari Passu Intercreditor Agreement*, dated as of September 30, 2013, between Fieldwood Holdings, Energy Inc., Fieldwood Energy, and Citibank as the agent on behalf of the first lien secured parties;

- the rights of the first lien secured parties as to the remaining secured parties are governed by that certain *Intercreditor Agreement*, dated as of September 30, 2013, between Citibank as the Prepetition RBL Agent and Prepetition First Lien Term Agent, Cortland as successor Prepetition FLLO Agent, Prepetition Second Lien Term Agent, and Prepetition Sponsor Second Lien Term Loan Agent, Apache as a party in interest, and Fieldwood Holdings, Energy Inc., and Fieldwood Energy; and

- the rights of the second lien secured parties as to each other are governed by the *Pari Passu Intercreditor Agreement*, dated as of May 27, 2016, between Cortland as Prepetition Second Lien Term Agent and Prepetition Sponsor Second Lien Term Loan Agent and Fieldwood Energy.

47.     The Intercreditor Agreements govern, among other things, the priority of distribution of the Collateral and proceeds thereof between the prepetition secured parties.

24

48.     ***Interests in Fieldwood Holdings.***  Fieldwood Holdings was formed in late 2012 as the holding company for Fieldwood Energy and is owned by Riverstone and its affiliates and members of management of Fieldwood Energy.  Pursuant to its governing documents, equity ownership of Fieldwood Holdings is represented by Series A Units:  97.963% held by non-Debtor Riverstone V FW Holdings Sub, LLC and 2.037% held by non-Debtor Fieldwood Management LLC.  The Debtors, from time to time, have granted profit participation rights as part of certain employees' prepetition compensation arrangements.  Unfortunately, the profit participation rights are out of the money and will not receive any distribution under the Plan.

49.     Each of the Debtors other than Fieldwood Holdings is directly or indirectly wholly-owned by Fieldwood Holdings.

50.     ***Surety Bonds***.  The Company has approximately $700 million in surety bonds that it maintains to satisfy various contractual and regulatory requirements.  As stated, this includes approximately $184 million in surety bonds for the benefit of BOEM to secure the Debtors' P&A obligations.  This also includes $350 million in surety bonds and contracts similar to surety bonds that the Company has issued to Deutsche Bank as collateral for an equal dollar amount of letters of credit that Deutsche Bank has issued to Apache on the Company's behalf.  Any amounts collected by Apache under these letters of credit are required to be deposited in the Apache Trusts.

### IV.  Key Events Leading to Chapter 11

51.     As is well-documented, the distressed market conditions in the oil and gas industry have negatively impacted all levels of the industry, including on upstream companies that produce oil and gas.  As evidenced by the regular chapter 11 filings or other announcements of debt restructurings in the industry, the impact of the volatility of the commodity markets on the Debtors' businesses is clear.  Notably, natural gas prices have been depressed for a significant period of time and the precipitous decline in crude oil prices since 2014 has been

virtually unprecedented, with prices well below what anyone in the business could have reasonably anticipated, resulting in a substantial decline in revenue, reserves and asset values across the spectrum.  For example, in 2014, the West Texas Intermediate ("**WTI**") spot price averaged approximately $93 per barrel ("**Bbl**").  In contrast, in 2015, the WTI spot price averaged approximately $48 per Bbl, and in 2016, the WTI spot price dropped at one point to below $27 per Bbl.  In 2017, the WTI spot price stabilized at around $50 Bbl, and crossed $60 Bbl at the end of 2017, but has not returned to its 2014 values.

52.     The Debtors, of course, have not been immune to these adverse market conditions and the impact on their reserves, cash flow, borrowing capacity, and ability to service their outstanding indebtedness.  As with many of their peers, this drastic and prolonged drop in prices and the severe dislocations it caused to the Debtors' operations have put the Debtors in a stressed liquidity situation for an extended period of time.

53.     The Company took several steps to try to address its capital structure and liquidity needs without a comprehensive in-court restructuring prior to commencing these Chapter 11 Cases.  Through vendor cost reduction initiatives, business optimization, and general efficiencies, the Company has significantly reduced its cash operating cost structure.  For example, the Company reduced its 2017 operating expenses by approximately 33% relative to 2014, including a reduction in lease operating expenses from approximately $692 million in 2014 to approximately $472 million in 2017.  Also, the Company refinanced certain of its secured debt facilities in 2016, which set the Company's borrowing base at $1.3 billion through May 2018 and relieved some of the covenant pressure under its credit agreements.  Prior to that, the Company refinanced a portion of its letters of credit obligations to Apache by using letters of credit backed by surety bonds or contracts similar to surety bonds (as described above).  Also,

the Company acquired P&A spreads so that it could perform all well P&A work in-house at favorable costs.

54.     Despite these efforts, however, and the stabilization of oil prices in 2017, it became apparent that the Debtors' revenue and cash flow generating capacity would not be sufficient to service their outstanding debt on a long-term basis and to maintain the liquidity necessary to operate their businesses and preserve their long-term viability and enterprise value. Thus, the Company determined that a deleveraging transaction was necessary to right-size its balance sheet and position itself for long term success.   In August and September 2017, respectively, the Debtors retained Weil as counsel and Evercore as investment banker to explore strategic alternatives and assist them in developing and implementing a comprehensive plan to restructure its balance sheet, whether in court or out-of-court.   In October 2017, the Debtors retained Opportune LLP as financial advisor to assist them in preparing their operations for a potential chapter 11 restructuring as part of their contingency plan.

55.     After retaining advisors, the Company began to reach out to its major creditor constituencies to negotiate a deleveraging transaction.  The Company executed non-disclosure agreements with the advisors to Riverstone, the advisors to the Cross-Holder Group, the advisors to the First Lien Group, and certain members of each of the foregoing economic constituencies.  The Company also established a data room to facilitate providing diligence to the lenders and advisors who executed non-disclosure agreements, held a number of diligence calls with management, and participated in a number of in-person meetings to discuss a potential prepackaged restructuring.   The Company and its advisors solicited offers for postpetition financing from parties both inside and outside its capital structure.   The Company and its

advisors also solicited proposals for refinancing transactions from multiple parties and considered them appropriately.

56.     In September 2017, because of the support received from key constituencies, it became clear that the appropriate course of action was for the Company to agree with its stakeholders on a restructuring plan that would be implemented as a prepackaged chapter 11 restructuring and that more time was needed to negotiate a fully consensual plan.  To extend the Company's liquidity runway and facilitate further out-of-court negotiations with the Company's key constituencies, Riverstone determined that it would be in the best interest of the Company for Riverstone to elect to defer the payment date for Riverstone's portion of the interest payment due September 29, 2017.  Riverstone and the Company agreed to exchange all of Riverstone's Prepetition Second Lien Term Loans, approximately $781 million in principal amount, for a corresponding amount of Prepetition Sponsor Second Lien Term Loans,[8] which allowed Riverstone to elect to defer the payment date on its portion of the September 29 interest payment, which amounted to approximately $17 million.

57.     After the Company made the remaining September 29 interest payments, it continued to negotiate with the lenders in the Cross-Holder Group and First Lien Group.  The Company also began to engage with other key constituents, such as the lenders under its Prepetition RBL Facility, Apache, and Seller.

58.     Before the terms of a restructuring could be agreed upon, the Company was facing yet another possible interest payment on December 29, 2017, in the amount of approximately $62 million.  Without the liquidity to make the full interest payment and with the

---

[8] The Prepetition Sponsor Second Lien Term Loan Facility was put in place in 2016 to provide Riverstone Fund V with the ability to defer interest payments.  However, the Prepetition Sponsor Second Lien Term Loan Facility was not used until 2017.

specter of a potential chapter 11 filing, certain of the Company's secured lenders agreed to provide the Company the additional runway it needed to finish the out-of-court discussions by providing forbearances and waivers in connection with the upcoming interest payments.   On December 29, 2017, the Company entered into certain forbearance and waiver agreements with its secured lenders pursuant to which the Prepetition FLLO Lenders, the Prepetition Second Lien Term Lenders, and the Prepetition Sponsor Second Lien Term Lenders agreed to forbear until January 31, 2018, from the exercise of remedies in connection with the Company's failure to make a portion of the December 29 interest payments,[9] and the Combined Prepetition FLTL Lenders and Prepetition RBL Lenders agreed to temporarily waive any payment cross-defaults under their respective facilities.

59.    On January 31, 2018, the Prepetition FLLO Lenders, the Prepetition Second Lien Term Lenders, and the Prepetition Sponsor Second Lien Term Lenders agreed to further extend their forbearances to February 15, 2018.[10]   The extensions provided sufficient time for the parties to reach a comprehensive deal.   On February 14, 2018, the Debtors, the Consenting Creditors, and Consenting Sponsor signed the Restructuring Support Agreement.   On February 15, 2018, the Debtors commenced the solicitation of votes on the Plan and filed these Chapter 11 Cases.

60.    During the course of negotiations with its creditors, the Company determined that it could benefit from acquiring the Purchased Assets, including through operational efficiencies and synergies with the Debtors' existing assets and through the

---

[9] The Debtors made approximately $17 million of payments to the Combined Prepetition FLTL Lenders in connection with the December 29 interest payment due date.

[10] The Prepetition First Lien Lenders and Prepetition RBL Lenders' temporary waivers were automatically extended to February 15, 2018, upon the extension of the forbearances.

elimination of redundant costs.  The Purchased Assets consist of highly productive, cash flowing assets in deepwater Gulf of Mexico.  The Purchased Assets also have material organic opportunities, including a significant near-term development project, which, if successful and after substantial capital investment, could result in a significant increase in the total amount of proved reserves associated with the Purchased Assets.  The Company concluded that the acquisition and development of the Purchased Assets would provide it significant free cash flow that could help facilitate and support the already ongoing discussions to restructure the Company's balance sheet.

61.    The Company determined that it would fund the Asset Purchase Transaction through the Rights Offering, which would also be used to pay off the DIP Facility, fund Plan distributions, and serve the Company's working capital needs on a post-emergence basis.  Both Riverstone and the members of the Cross-Holder Group expressed interest in participating in the Rights Offering and negotiated its terms extensively with the Debtors.

62.    The Restructuring Support Agreement provides for various termination events.  Depending on the termination event, Consenting Second Lien Creditors (as defined in the Restructuring Support Agreement) holding a majority of the aggregate outstanding principal amount of the Prepetition Sponsor Second Lien Term Loans or Prepetition Second Lien Term Loans, or the Debtors, may terminate the Restructuring Support Agreement.  The Restructuring Support Agreement could be terminated by the Consenting Second Lien Creditors upon the occurrence of various events or the Debtors' failure to satisfy certain milestones in the Chapter 11 Cases, including, among other things, if:

- the Company fails to commence the solicitation of votes on the Plan on or before February 15, 2018;

- the Company fails to commence chapter 11 cases on or before February 18, 2018, as such date may be extended by the Requisite Creditors (as defined in the Restructuring Support Agreement);

- the DIP Facility is not approved on an interim basis within five days of the Petition Date;

- the DIP Facility is not approved on a final basis within 30 days of the Petition Date;

- the Plan is not confirmed within 75 days of the Petition Date;

- the Effective Date does not occur within 20 days after the Bankruptcy Court's entry of the order confirming the Plan; and

- the Effective Date has not occurred, by June 30, 2018.

63.     The Restructuring Support Agreement and the obligations of all parties thereto may also be terminated by mutual agreement among the Debtors and the Requisite Creditors.

64.     The Debtors believe that the deleveraging transaction contemplated by the Restructuring Support Agreement and the Plan is the best approach for relieving the Company from the constraints that currently restrict its continued growth and success.  Not only will the contemplated transaction lower the Company's debt obligations, it will also significantly improve its asset base.  The restructuring will allow the Company to emerge as a stronger company with a healthy balance sheet that can focus on expansion rather than on managing burdensome debt payments.  Most importantly, the Company will have the capital needed to invest in its businesses to continue to compete effectively in the Gulf of Mexico, support thousands of jobs in the communities in which it operates, and maintain high-quality, safe, and reliable operations.

## V.  The First Day Motions

65.     The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful reorganization of the Debtors, and best serves the Debtors' estates and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.  Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motions.  Below is an overview of each of the First Day Motions.

### A.     Joint Administration Motion

66.     Pursuant to the *Emergency Motion of Debtors Pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1 for Order Directing Joint Administration of Chapter 11 Cases* filed concurrently herewith, the Debtors request entry of an order directing consolidation of these chapter 11 cases for procedural purposes only.  There are 14 Debtors, and I have been informed that there are thousands of creditors and other parties in interest in these cases.  I believe that joint administration of these cases would save the Debtors and their estates substantial time and expense because it would remove the need to prepare, replicate, file, and serve duplicative notices, applications, motions, and orders.  Further, I believe that joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  The United States Trustee for Region 7 and other parties in interest would similarly benefit from joint administration of these cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

32

67.     I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes.  It does not seek substantive consolidation of the Debtors' estates. Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**B.     _Scheduling Motion_**

68.     Pursuant to the _Emergency Motion of Debtors for Order (I) Scheduling Combined Hearing to Consider (A) Approval of Disclosure Statement and (B) Confirmation of Plan; (II) Establishing Deadline to Object to Disclosure Statement and Plan and Form of Notice Thereof; (III) Approving Solicitation Procedures and Forms of Ballots and Notice of Non-Voting Status; (IV) Conditionally Waiving Requirement of Filing Schedules and Statements and of Convening Section 341 Meeting of Creditors; (V) Approving Rights Offering Procedures; and (VI) Granting Related Relief_ filed contemporaneously herewith (the "**Scheduling Motion**"), the Debtors request an order of the Bankruptcy Court (i) scheduling a combined hearing (the "**Combined Hearing**") to (a) the Disclosure Statement and (b) consider confirmation of the Plan; (ii) establishing a deadline to object to the adequacy of the Disclosure or Confirmation of the Plan; (iii) approving the Solicitation Procedures (as defined in the Scheduling Motion) with respect to the Plan, including the forms of ballots and notice of non-voting status; (iv) approving the form and manner of the Combined Notice (as defined in the Scheduling Motion); (v) extending the time for the Debtors to file schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules and Statements**") and conditionally waiving the requirement that the Debtors file the Schedules and Statements upon confirmation of the Plan; (vi) conditionally waiving the requirement to convene the meeting of creditors under section 341 of the Bankruptcy Code; and (vii) approving the Rights Offering Procedures.

33

69.     The table above in paragraph 16 of this Declaration summarizes the relevant dates related to the Solicitation Procedures and the Rights Offering and sets forth the Debtors' proposed dates for the Combined Hearing and related objection deadline, as well as the mailing of the Combined Notice of the Combined Hearing and commencement of the Debtors' chapter 11 cases.  The Debtors anticipate that notice of the Combined Hearing will be published and mailed to all known holders of claims or interests at least 28 days before the date by which objections must be filed with the Bankruptcy Court.

**C.     Creditor List Motion**

70.     Pursuant to the *Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to File a Consolidated Creditor Matrix and a Consolidated List of the 30 Largest Unsecured Creditors and (II) Authorizing Debtors to Redact Certain Personal Identification Information of Employees* filed concurrently herewith, the Debtors seek entry of an order authorizing the Debtors to (i) file a consolidated creditor matrix and list of the 30 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor and (ii) redact certain personal identification information for individual creditors.

71.     I am advised that Bankruptcy Rule 1007(a)(1) requires a debtor to file "a list containing the name and address of each entity included or to be included on Schedules D, E/F, G, and H . . . ."  I understand that, although a list of creditors is usually filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may file a consolidated creditor matrix (a "**Consolidated Creditor Matrix**").  Because the preparation of separate lists of creditors for each Debtor would be unduly expensive, time consuming, and administratively burdensome, the Debtors request authority to file a single Consolidated Creditor Matrix for all Debtors.

72.     Further, I am advised that, pursuant to Bankruptcy Rule 1007(d), a debtor generally must file "a list containing the name, address and claim of the creditors that hold the 20 largest unsecured claims, excluding insiders . . . .". Because a large number of creditors may be shared among the Debtors, the Debtors request authority to file a single, consolidated list of the top 30 unsecured creditors for all Debtors collectively. Such a list would help alleviate undue administrative burdens, costs, and the possibility of duplicative service.

73.     Finally, I am advised that section 107(c)(1)(A) of the Bankruptcy Code provides that the Court "for cause, may protect an individual" with respect to the following types of information "to the extent the court finds that disclosure of such information would create undue risk of identity theft . . . [a]ny means of identification . . . contained in a paper filed," or to be filed, in a case under the Bankruptcy Code. Here, I believe the Debtors seek to redact the address information of individual creditors and interest holders from the Consolidated Creditor Matrix because such information could be used to perpetrate identity theft.

**D.     DIP/Cash Collateral Motion**

74.     Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders Approving Postpetition Financing Arrangements and Use of Cash Collateral* filed contemporaneously herewith (the "**DIP Motion**") the Debtors request approval of and authority to enter into a $60 million secured multi-draw term loan facility with certain Prepetition Second Lien Term Lenders and Prepetition Sponsor Second Lien Term Lenders, including members of the Cross-Holder Group and Riverstone (in such capacity as providers of postpetition financing, the "**DIP Lenders**") and to use Cash Collateral to fund their operations and pursue the restructuring contemplated under the Plan through expedited chapter 11 cases in this Court. Fieldwood Energy LLC will be the borrower, and the remaining Debtors will be guarantors

under the DIP Facility.  The DIP Facility, along with the use of Cash Collateral, will provide the Company with the necessary liquidity and time to implement its restructuring strategy.

75.     Obligations under the DIP Facility will be secured by, among other things, a lien junior to the liens of the Prepetition RBL Lenders and the liens of the Prepetition First Lien Term Lenders but senior to the liens of the Prepetition FLLO Lenders, the Prepetition Second Lien Term Lenders, and the Prepetition Sponsor Second Lien Term Lenders.  In addition, the Debtors' prepetition secured parties will be granted various forms of adequate protection on account of their interests in the prepetition collateral, including through superpriority administrative expense claims, replacement liens, and (for certain parties) payment of postpetition interest.

76.     As set forth in the declaration of David Ying filed in support of the DIP Motion (the "**Ying Declaration**"), the DIP Facility was procured after an extensive marketing and negotiating process lead by Evercore.  The DIP Facility is the best available financing option for the Debtors for several reasons:

i.     First, the incremental availability under the DIP Facility provide the Company with the financial flexibility necessary to continue operating their business in the ordinary course and to confirm and consummate the Plan, which will maximize recoveries for all creditors.

ii.     Second, the terms of the DIP Facility are competitive and less costly than alternative postpetition financing options.  The Debtors are not required to draw any amounts under the DIP Facility, and other than the upfront fee, will only pay a modest unused commitment fee.

iii.     Third, obtaining a DIP Facility from a group comprised of the Debtors' Prepetition Second Lien Term Lenders and Prepetition Sponsor Second Lien Term Lenders on a basis junior to the claims of the Prepetition RBL Lenders and Prepetition First Lien Term Lenders allows the Debtors to avoid a costly priming dispute that could disrupt the Debtors' restructuring and sale efforts and ultimately be far more costly for all parties-in-interest in these chapter 11 cases.

36

77.     I believe that approval of the DIP Facility is in the best interests of the Debtors, their estates, and their creditors, and will provide for a steady path toward an operational restructuring as contemplated under the Plan.   The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral, and the incurrence of new indebtedness under the DIP Facility is vital to the Debtors' ability to pursue their chapter 11 strategy.

78.     Furthermore, the Debtors have an immediate need to obtain access to the DIP Facility and continued use of Cash Collateral.   By entering into the DIP Facility, the Debtors will be able to, among other things, demonstrate their financial wherewithal to vendors, employees, and stakeholders, preserve the Debtors' going concern value, fund the costs of funding these chapter 11 cases, and pay adequate protection to their prepetition secured parties.

79.     I believe that the inability to access the Cash Collateral—even for a limited period of time—would immediately and likely irreparably harm the Debtors' business operations, which would be to the detriment of the Debtors' estates and their economic stakeholders.   In addition, the Company has an immediate need to have available the DIP Facility in case that the Cash Collateral is insufficient to meet their capital and liquidity needs. Accordingly, access to the DIP Facility and the use of Cash Collateral is critical to preserve and maintain the value of the Debtors' assets.

80.     One of the Debtors' primary challenges in finding postpetition financing was overcoming the fact that the liens of the prepetition secured parties encumber substantially all of the Debtors' assets, such that either (i) the liens of the prepetition secured parties would have to be primed to obtain postpetition financing from a third party, or (ii) the Debtors would have to find a postpetition lender willing to extend credit that would be junior to the liens of the

prepetition secured parties, or on an unsecured basis.  Based on my experience, I do not believe that the prepetition secured parties would have consented to being primed by another lender group or with respect to the use Cash Collateral.

81.     For the reasons set forth herein, in the DIP Motion, and in the Ying Declaration, I believe that access to the DIP Facility and to the use of Cash Collateral is in the best interests of the Debtors' estates and all stakeholders, is fair and appropriate under the circumstances, and therefore should be approved.

**E.      Hedging Motion**

82.     Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 365, and 1107 and Fed. R. Bankr. P. 4001, 6003, and 6004 and Local Rules 4001-1 and 9013-1 for (A) Interim and Final Orders Authorizing Debtors to (I) Continue Performing Under Their Prepetition Hedging Agreement, (II) Enter Into and Perform Under New Postpetition Hedging Agreements, (III) Grant Related Liens and Superpriority Claims, (B) Interim and Final Orders Modifying Automatic Stay, and (C) a Final Order Authorizing Debtors to Assume Prepetition Hedging Agreement* filed contemporaneously herewith (the "**Hedging Motion**"), the Debtor seek authority to:

  i. continue to perform under a financial derivative contract with BP Energy Company ("**BP**") entered into prior to the Petition Date primarily to hedge the Debtors' exposure to commodity price risks in the oil and gas markets (the "**Prepetition Hedging Agreement**");

  ii. enter into and perform under new financial derivative contracts (the "**Postpetition Hedging Agreements**" and, collectively with Prepetition Hedging Agreement, the "**Hedging Agreements**") in the ordinary course of business to hedge the Debtors' exposure to commodity price risks in the oil and gas markets and minimize the impact of floating interest rates on their businesses;

  iii. grant superpriority administrative claims (the "**Superpriority Claims**") that are *pari passu* with the Unprimed Prepetition Secured Party Adequate Protection Claims provided under the DIP Order and first-priority liens in the Collateral *pari passu* with the prepetition first-priority liens (the "**First-**

**Priority Liens**") to secure and otherwise ensure payment of the obligations under the Postpetition Hedging Agreements;

iv. honor, pay, or otherwise satisfy all obligations, liabilities, and indebtedness of the Debtors arising under the Hedging Agreements (the "**Hedging Obligations**") as they come due;

v. modify the automatic stay provisions of section 362, solely to the extent necessary to permit (a) the Hedge Counterparties (as defined below) to exercise and enforce their rights and remedies under the Hedging Agreements, including upon the occurrence of an event of default or termination event under the Hedging Agreements and (b) the Postpetition Hedge Counterparties (as defined below) to take all actions to validate and perfect the First-Priority Liens; and

vi. assume the Prepetition Hedging Agreement pursuant to a final order.

83. As described more fully in the Hedging Motion, the Debtors have historically entered into financial derivative contracts primarily to hedge the Debtors' exposure to commodity price risks to their cash flows (collectively, the "**Customary Hedging Agreements**" and the activities related thereto, the "**Hedging Activities**") with secured lenders under the Prepetition RBL Facility as well as other credit worthy third parties pursuant to the Hedge Practices (as defined below). I believe that the Debtors' Hedging Activities are vital to the success of the Debtors' business and directly affect the ability of the Debtors to generate stable cash flows to fund their operating and corporate expenses. Through the Hedging Activities, the Debtors are able to reduce their exposure to commodity price fluctuations, provide long-term cash flow predictability to manage their businesses, and thereby protect the economic value of their operations by preventing substantial declines in cash flows. The Debtors have historically entered into Customary Hedging Agreements to manage their liquidity. It is my understanding that companies in the Debtors' industry routinely enter financial derivative contracts like the Customary Hedging Agreements to mitigate their exposure to fluctuating commodity prices and to stabilize their cash flows.

39

84.     Historically, the Debtors' have hedged 30%-60% of their projected oil and natural gas production for one to two years in the future with commodity swaps and costless put/call "collars" (as further described in the Hedging Motion).   The Debtors secured the prepetition Customary Hedging Agreements on a first lien basis under the Prepetition RBL Facility with a security interest in the Collateral.   During the four years prior to the Petition Date, the Company's Hedging Activities generated significant value, realizing a total of approximately $688,865,000 in hedge related gains.

85.     It is my understanding that as of the Petition Date, the Debtors have sixteen ISDA's outstanding with third-party lenders, but do not currently have any active hedge positions.   In August 2017, the Debtors elected to unwind its then-outstanding hedges for proceeds of approximately $30 million dollars due to lower than expected commodity prices and in an effort to improve their near term liquidity.   In the months before the Petition Date, the counterparties have been reluctant to engage in new Hedging Activities prior to the stabilization of the Debtors' businesses.   Shortly before the Petition Date, the Debtors entered into the Prepetition Hedging Agreement with BP, which amended and restated the Debtors' prior ISDA with BP and provided the Debtors the ability to enter into Customary Hedging Agreements after the Petition Date as Management deems appropriate and prudent.   The Prepetition Hedging Agreement is secured on a first lien basis by the collateral under the Debtors' Prepetition RBL Facility.

86.     The board of directors for Fieldwood Energy has delegated authority to engage in Hedging Activities as Management deems appropriate.   As is typical in the Debtors' industry, Management has established certain customary practices (the "**Hedge Practices**") to

ensure that the Company's Hedging Activities are in the best interests of all the company's stakeholders.  The Hedging Practices are described below.

87.    ***Limited Scope of Hedging Activities***.  Historically, Management has limited Customary Hedging Agreements to (i) swaps, (ii) swaptions, (iii) costless put/call collars, and (d) put options.

88.    ***Approval Process***.  The Debtors entry into Hedging Agreements requires the approval of myself, the Debtors' President and Chief Executive Officer, and the Debtors' Senior Vice President and Chief Financial Officer.

89.    ***Reporting***.  Reports on Hedging Activities are provided quarterly to the board of directors of Fieldwood Energy and include disclosures regarding:  (i) monthly operating revenue related to hedge settlements; (ii) the percent of production hedged; and (iii) estimated monthly cash flow forecasts related to hedge settlements.  The Debtors also provide semiannual reports on Hedging Activities to the Debtors' secured lenders as part of their reserve report certificates, which include disclosures regarding:  (i) a list of all material commodity Customary Hedging Agreements and their material terms and (ii) the net mark to market value of such hedge agreements.

90.    The Debtors do not engage in speculative Hedging Activities.  The Hedging Activities are directly tied to the Debtors' forecasted future oil and gas production levels.  Management continually assesses the appropriate level of production to hedge and bases its decisions on a variety of factors, including current and future expected commodity market prices, cost and availability of costless put/call collars and swap contracts, forecasted drilling activity, liquidity, and the level of acquisition activity.  I believe that continuation of the Debtors'

Hedging Activities pursuant to the Hedging Practices is critical to maximizing the value of their estates.

91.     Consistent with their past practices, the Debtors target hedging between 30%-70% of their oil and natural gas production over the next two years.  In addition, the Debtors may seek to enter into postpetition hedging arrangements in the form of floating interest rate swaps and collars to manage their exposure to floating interest rates under their current and future secured debt facilities and thereby minimize the impact of fluctuating interest rates on their businesses.  Importantly, the parties to the Restructuring Support Agreement, which include each of the key creditor groups in the Debtors' capital structure, support the resumption of Hedging Activities consistent with the Debtors' past practices and the Debtors entering into interest rate hedges.

92.     Prepetition the Customary Hedging Agreements and Hedging Activities provided the Debtors with cash flow protections and significant liquidity.  It is my understanding from discussions with potential third-party hedge counterparties (collectively, the "**Postpetition Hedge Counterparties**" and, together with BP, the "**Hedge Counterparties**") that prior to entering into Postpetition Hedging Agreements with the Debtors such counterparties would require (i) assurance that the Debtors would be able to secure and otherwise ensure payment of the Hedging Obligations by providing Superpriority Claims and First-Priority Liens and (ii) other protections set forth in the proposed interim order attached to the Hedging Motion that are customary in orders regarding the continuation of prepetition derivatives contracts and entry into new derivatives contracts postpetition.

93.     In light of the foregoing, the Debtors seek authority to continue performance under and to assume the Prepetition Hedging Agreement and to enter into

Postpetition Hedging Agreements in the ordinary course of their business. The Hedging Agreements are essential to the continued prudent operation of the Debtors' businesses and provide revenue and cash flow stability for the Debtors' estates. Without the ability to continue and maintain Hedging Activities postpetition, the Debtors would be vulnerable to fluctuations in interest rates and in the prices of oil and natural gas that could result in significant diminution in the value of their estates. Accordingly, I believe the relief requested in the Hedging Motion will yield benefits that are in the best interests of the Debtors, their estates, and all parties in interest.

**F.**     **Cash Management Motion**

94.     Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363(b)(1), 363(c)(1), and 364(a) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Its Existing Cash Management System, (B) Maintain Existing Business Forms, (C) Continue Intercompany Arrangements, and (D) Continue Using Credit Cards; (II) Waiving Requirements of Rule 7(b) of Procedures for Complex Chapter 11 Bankruptcy Cases; and (III) Granting Related Relief* filed contemporaneously herewith (the "**Cash Management Motion**"), the Debtors request interim and final (i) authority to (a) continue to operate their existing cash management system (the "**Cash Management System**"), as described herein, including the continued maintenance of existing bank accounts (the "**Bank Accounts**") with Capital One, National Association, JPMorgan Chase Bank, National Association, and U.S. Bank National Association (collectively, the "**Banks**"), (b) maintain existing business forms; (c) continue certain intercompany arrangements, including transferring funds among the Debtors and certain non-Debtor affiliates in the ordinary course of business; and (d) continue using credit cards and pay all obligations related thereto; (ii) waiver of Rule 7(b) of the Complex Case Procedures (as defined below); and (iii) related relief. The Debtors also request that the Court authorize the Banks to continue to

charge bank fees and to charge back returned items to the bank accounts, whether such items are dated before, on, or after the commencement of these chapter 11 cases.

95.     As described more fully in the Cash Management Motion, in the ordinary course of their businesses, the Debtors have historically used the Cash Management System to collect receipts and to fund their operations, as well as the operations of certain Non-Debtor Affiliates.  The Cash Management System is tailored to meet the Debtors' needs as an owner and operator of, among other assets, oil and natural gas producing properties.  It allows the Debtors to efficiently collect and transfer the cash generated by their businesses and pay their financial and other obligations.  It also enables the Debtors to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of Bank Accounts.

96.     The Cash Management System includes ten Bank Accounts.  Of those Bank Accounts, (i) one Bank Account serves as the Debtors' main revenue collecting and concentration account; (ii) one Bank Account serves as the Debtors' main operating and disbursement account; (iii) two Bank Accounts serve to accrue interest on the Debtors' concentrated or escrowed cash; (iv) one Bank Account serves to facilitate certain employee benefits; (v) two Bank Accounts were opened before the Petition Date to facilitate the Debtors' various cash obligations during the pendency of these chapter 11 cases; and (vi) the remaining three Bank Accounts are escrow accounts that the Debtors maintain in connection with certain contractual and/or governmental obligations that require the Debtors to segregate certain funds. All of the Bank Accounts are maintained at authorized bank depositories (each, an "**Authorized Depository**") under the Operating Guidelines and Reporting Requirements for Debtors in

Possession and Trustees (the "**UST Operating Guidelines**") published by the Office of the United States Trustee for Region 7 (the "**U.S. Trustee**").

97.     In addition, the Debtors maintain company-paid Credit Cards (as defined in the Cash Management Motion).  In general, the Credit Cards are used for various corporate expenses, including but not limited to certain regulatory permit fees, office supplies, pool-vehicle maintenance, and other required business expenses.  As more fully described in the Cash Management Motion, the Debtors request authority to continue to pay all prepetition obligations and to make all payments on a postpetition basis in the ordinary course of business and consistent with the Debtors' past practices.

98.     In the ordinary course of business, intercompany transactions (collectively, "**Intercompany Transactions**," and each intercompany receivable and payable generated pursuant to an Intercompany Transaction, an "**Intercompany Claim**") occur when, among other things, (i) FWE receives funds on behalf of Debtor and Non-Debtor Affiliates, (ii) FWE makes payments and disbursements on behalf of Debtor and Non-Debtor Affiliates, and (iii) funds are transferred between and among the Debtors and the Non-Debtor Affiliates.  The Debtors maintain records of all transactions processed through their Cash Management System.  During these chapter 11 cases, the Debtors will keep records of any postpetition Intercompany Transactions and implement any additional accounting procedures required to identify and distinguish between prepetition and postpetition Intercompany Transactions.

99.     Out of an abundance of caution, the Debtors request express authority to engage in Intercompany Transactions postpetition in the Cash Management Motion.  The Debtors also request that the Court grant administrative expense status to all Intercompany Claims against a Debtor by another Debtor or Non-Debtor Affiliate that arise postpetition as a

result of an Intercompany Transaction; *provided, however*, that nothing therein shall authorize the payment by any of the Debtors of prepetition or postpetition obligations owed by any of the Debtors inconsistent with the Debtors' past practices.  If Intercompany Claims are accorded such status, each entity using funds that flow through the Cash Management System will continue to bear the ultimate responsibility for its ordinary-course transactions with affiliates.

100.    I am advised by the Debtors' attorneys that the Bank Accounts are required to comply with section 345(b) of the Bankruptcy Code unless the Court orders otherwise for "cause."  All of the Debtors' active Bank Accounts are maintained with Authorized Depositories under the UST Operating Guidelines.   Accordingly, I believe that the funds deposited into such Bank Accounts comply with section 345 of the Bankruptcy Code.

101.    I am also advised by the Debtors' counsel that the Procedures for Complex Chapter 11 Bankruptcy Cases for the United States Bankruptcy Court for the Southern District of Texas (the "**Complex Case Procedures**") require, among other things, that debtors who own or operate oil, gas, or mineral leases maintain a segregated account for funds received after the petition date that are attributable to Interest Owner Payments (as defined below).  As more fully described in the Cash Management Motion, requiring the Debtors to implement new procedures for the segregation of all Interest Owner Payments at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption to the Debtors and their estates.   Any such disruption would adversely, and perhaps irreparably, impact the Debtors' ability to reorganize and maximize value of their estates for the benefit of the Debtors' creditors and other parties in interest.  Accordingly, the Debtors request a waiver of Rule 7(b) of the Complex Case Procedures.  The Debtors will hold approximately $1.7 million in prepetition suspense obligations in a separate account.

102.    The Debtors further request that the Court authorize the Banks to receive, process, honor, and pay, at the Debtors' direction and to the extent of funds on deposit, any and all checks drawn or electronic funds transfers requested or to be requested by the Debtors relating to the relief sought in the First Day Motions.  Without the ability to transfer funds through banks and financial institutions, the Debtors will not be able to operate or reorganize.

103.    I believe that any disruption to the Debtors' Cash Management System would have a severe and adverse impact upon the Debtors' reorganization efforts.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and all parties in interest and should be granted.

**G.    Wages Motion**

104.    Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363(b), and 507 and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (B) Maintain Employee Benefit Programs and Pay Related Obligations, and (C) Pay Prepetition Employment and Training Expenses, and (II) Directing Financial Institutions to Honor and Pay All Related Checks Presented and Funds Transfer Requests* filed concurrently herewith (the "**Wages Motion**"), the Debtors request authority to, in their sole discretion:  (i) pay, all prepetition amounts required under or related to Employee Compensation Obligations (including Supplemental Workforce Obligations), Employee Benefit Obligations, and Employee Onboarding Obligations (each as defined in the Wages Motion and together with all fees, costs, and expenses incident thereto, including amounts owed to third-party administrators, the "**Employee Obligations**"); and (ii) maintain, continue to honor, and pay amounts with respect to, the Debtors' business practices, programs, and policies for their

47

employees as such were in effect as of the commencement of these chapter 11 cases and as such may be modified or supplemented from time to time in the ordinary course of business. The Debtors further request that the Court authorize financial institutions to receive, process, honor, and pay all checks presented for payment and to honor all funds transfer requests related to such obligations.

105. As described more fully in the Wages Motion, compensation of the Debtors' approximately 700 employees (each, an "**Employee**"), and a Supplemental Workforce (as defined below) of 2,500 to 3,000 personnel, is critical to the Debtors' continued operations and reorganization. Over half of the Employees are offshore workers—workers and other skilled professionals who either (i) perform rotations on various offshore platforms and wells related to drilling, safety, maintenance, and decommissioning work or (ii) perform functions related to offshore operations and that are based at onshore field locations—all of which are critical to the ongoing business operations of the Debtors. The remaining Employees are office workers, who provide a variety of engineering, management, administrative, and other support services in offices in Houston, Texas and Lafayette, Louisiana. Collectively, the Employees' skills and knowledge of the Debtors' infrastructure, customers, and business operations are essential to the continued operation of the Debtors' business. Without the Employees' continued, uninterrupted services, an effective reorganization of the Debtors will not be possible. In addition to their Employees, through the Employment Firms (as defined in the Wages Motion), the Debtors generally employ a substantial number of skilled laborers necessary for of their offshore operations and, on occasion, administrative staff on a temporary basis (the "**Supplemental Workforce**").

106.    The Debtors' workforce is the most important part of their business.  I believe that any delay in paying or failure to pay prepetition Employee Obligations could irreparably impair the morale of the Debtors' workforce at the time when their dedication, confidence, retention, and cooperation are most crucial.  Failure to pay the Employee Obligations could also inflict a significant financial hardship on the Employees' and the Supplemental Workforce personnel's families.  The Debtors cannot risk such a substantial disruption to their business operations, and it is inequitable to put Employees and the Supplemental Workforce at risk of such hardship.  Without this relief, otherwise-loyal Employees may seek other work opportunities, thereby putting at risk the Debtors' continued operation as a reorganized enterprise.  Payment of these obligations in the ordinary course of business would enable the Debtors to focus on completing a successful reorganization, which would benefit all parties in interest.

107.    I believe that payment of prepetition Expenses (as defined in the Wages Motion) is necessary because any other treatment of Employees would be highly inequitable and risk alienation of the Debtors' workforce.  Employees who have incurred reimbursable Expenses should not be forced personally to bear the cost, especially because those Employees incurred such Expenses for the Debtors' benefit, in the course of their employment by the Debtors, and with the understanding that they would be reimbursed for doing so.

108.    In the ordinary course of business, the Debtors are required by law to deduct from Employees' gross pay including, without limitation, garnishments, child support, spousal support, service charges and similar deductions, and other pre- and after-tax deductions payable pursuant to certain employee benefit plans discussed in the Wages Motion (collectively, the "**Deductions**").  In addition to the Deductions, certain laws require the Debtors to withhold

amounts from the Employees' gross pay related to federal, state, and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "**Withholdings**"), which the Debtors must match, from their own funds, amounts for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively with the Withholdings, the "**Payroll Taxes**").  I believe that disbursement of the Deductions and payment of the Payroll Taxes would not prejudice other creditors because I have been informed by counsel that such obligations generally give rise to priority claims under section 507(a) of the Bankruptcy Code.

109.    The Debtors also make employee benefits available to eligible Employees. The benefits fall within the following categories:  (i) paid time off, including personal time off and holidays;  (ii) medical, dental, vision, and prescription drug benefits, life insurance, accidental death and dismemberment insurance, disability insurance, and health savings accounts;  (iii) retirement savings plans including a 401(k) plan (collectively, the "**Employee Benefits**").  Although most eligible Employees participate in the Employee Benefits, certain Employees elect to opt-out of particular programs.  I believe that maintaining the Employee Benefits are critical for maintaining Employee morale during these chapter 11 cases, and to prevent Employees from seeking employment from other companies that offer similar benefits.

110.    As described in the Wages Motion, the Debtors pay fees to third-party administrators and servicers of Employee Compensations Obligations and the Employee Benefits.  Third-party administrators assist the Debtors with, among other things, servicing the Health Benefits Claims (as defined in the Wages Motion) and administering of the Employee Benefits, and also assist with payroll servicing and payroll transfer administration in connection

with Employee Obligations.  I believe that continued payment to third-party administrators is necessary, and without the continued service of these administrators, the Debtors will be unable to continue honoring their obligations to Employees in an efficient and cost-effective manner.

111.   With respect to the Supplemental Workforce Obligations, I believe that the Debtors require the services provided by the Supplemental Workforce engaged through the Employment Firms to perform their offshore operations.  Given the great number of personnel provided by the Employment Firms for the Supplemental Workforce, the Debtors would likely be unable to replace such personnel in a timely manner if the Employment Firms no longer provided such personnel due to lack of payment.  The Debtors would also be unable to find replacement Employment Firms that could provide personnel for the Supplemental Workforce in numbers sufficient to operate the Debtors' offshore operations.  Moreover, the knowledge base and geographical location of the existing personnel structure for the Supplemental Workforce is critical to running the Debtors' offshore operations efficiently, competently, and in an economically advantageous manner.  Finally, even if the Debtors are not contractually prohibited from using alternative Employment Firms in lieu of payment, the Debtors would be forced to cease, or substantially curtail, certain or most of their offshore operations while they attempt to locate such replacement Employment Firms that could supply personnel for a Supplemental Workforce in sufficient numbers.  Accordingly, I believe that the relief sought to continue to make payments on account of the Supplemental Workforce Obligations and to pay any prepetition amounts related thereto, as set forth in the Wages Motion, is necessary and critical to avoid immediate and irreparable harm to the Debtors, and is in the best interests of the Debtors, their estates, and all parties in interest.

112.    I believe that no Employees are owed prepetition amounts exceeding the $12,850 cap imposed by section 507(a)(4) of the Bankruptcy Code and that, accordingly, the Debtors are not seeking relief to pay prepetition Employee Obligations to any individual Employee or Contractor in excess of such cap on an interim or final basis.    Furthermore, although there is a key employee retention program in place for certain Employees, I am advised that the Debtors are not seeking authority to pay any amounts that are subject to the restrictions of section 503(c) of the Bankruptcy Code, and that no amounts under such program are to become due and payable during these chapter 11 cases.    I also believe that the total amount sought to be paid by the Wages Motion is modest compared to the magnitude of the Debtors' overall business.    Furthermore, the Debtors have sufficient funds to pay the Employee Obligations in the ordinary course using cash maintained by the Debtors and cash generated through operations.    Accordingly, I believe the relief requested in the Wages Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

## H.    Insurance and Surety Bond Motion

113.    Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), and 503(b) and Fed. R. Bankr. P. 4001, 6003, and 6004 for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs, Surety Bond Program, and Letters of Credit, and (B) Pay All Obligations with Respect Thereto; (II) Granting Relief from the Automatic Stay with Respect to Workers' Compensation Claims; and (III) Directing Financial Institutions to Honor and Pay All Related Checks Presented and Funds Transfers Requests* filed contemporaneously herewith (the "**Insurance & Surety Bond Motion**"), the Debtors request interim and final authority to (i) continue their Insurance Programs, Surety Bond Program, and Letters of Credit (each as defined below) in accordance

52

with their applicable insurance policies and indemnity agreements and authority to continue to perform their obligations with respect thereto during these chapter 11 cases, and pay any prepetition obligations arising under the Insurance Programs, Surety Bond Program, or Letters of Credit, if any; and (ii) modification of the automatic stay to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Insurance (as defined below).

114.     In the ordinary course of business, the Debtors maintain workers' compensation insurance, third-party liability, property, and other insurance programs (collectively, the "**Insurance Programs**,") and incur certain obligations to pay premiums and other obligations related thereto, including, but not limited to, any broker or advisor fees, taxes, other fees, and deductibles, through several insurance carriers (each, an "**Insurance Carrier**"). Each of these is described below and more fully in the Insurance & Surety Bond Motion.

115.     The Debtors' Insurance Programs include:  (i) coverage of workers' compensation and employer's liability (the "**Workers' Compensation Insurance**"); (ii) coverage of potential third-party liability in connection with the Debtors' business; (iii) coverage of the Debtors' vehicles; (iv) coverage for liability from the Debtors' use of non-Debtor owned aircraft; (v) coverage evidencing the Debtors' financial responsibility in the event of an offshore oil spill or other oil pollution event, as required under the Oil Pollution Act of 1990; (vi) coverage for losses from named windstorms or operational risks and hazards; (vii) coverage for risks and damages arising from data breaches and other data losses; (viii) coverage for losses of office property and equipment; (ix) coverages of management liability and directors and officers liability; (x) umbrella and excess coverage for various casualty Insurance Policies, as described below; and (xi) coverage as primary additional assureds with the

insurance carriers for various independent contractors who the Debtors employ in the course of their business operations.

116.    In the ordinary course of business, the Debtors maintain Workers' Compensation Insurance for claims arising from or related to employment by the Debtors (the "**Workers' Compensation Claims**").  In many instances, applicable law in the jurisdictions in which the Debtors operate—including Texas and Louisiana for their onshore and corporate operations and the federal government for their offshore operations in the Gulf of Mexico— requires that the Debtors maintain Workers' Compensation Insurance.    The Workers' Compensation Insurance covers, among other things, statutory workers' compensation and employer liability claims generally arising from accidents, disability, death, or disease sustained by employees in the course of their employment with the Debtors.  The Workers' Compensation Insurance requires no deductible from the Debtors on account of any Workers' Compensation Claims.  Although unlikely, it is possible that an event giving rise to an obligation of the Debtors or their Insurance Carriers to make such a payment—for example, due to injury or disease of an employee—could have occurred prepetition without the Debtors' knowledge.   Accordingly, pursuant to the Insurance & Surety Bond Motion, the Debtors seek relief from the automatic stay with respect to payment of Workers' Compensation Claims.

117.    The Debtors retain (i) in the United States; USI Southwest, Marsh USA Inc., JLT Specialty USA, Alliant, Inc., and Willis Towers Watson, and (ii) in the United Kingdom; Price Forbes & Partners Ltd and Alsford Page & Gems Limited, to serve as their insurance brokers and consultants for the Insurance Programs (each in such capacity, an "**Insurance Broker**").   The Debtors pay the Insurance Brokers commissions up-front as policies are renewed each year, based on the aggregate amount of the Debtors' insurance

premiums.  As of the Petition Date, the Debtors do not owe any prepetition commissions to the Insurance Brokers.

118.    In the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties to secure the Debtors' payment or the enforcement of certain obligations (the "**Surety Bond Program**").  The Surety Bond Program covers obligations in connection with two general categories of third parties:  (i) federal and state governmental units and other public agencies and (ii) contract counterparties for whom the Debtors have agreed to perform such counterparties' various plugging, abandonment, and decommissioning obligations in connection with offshore properties.  Accordingly, the obligations secured by the Surety Bond Program relate to, among other things, (i) oil and natural gas drilling and exploration operations, (ii) conservation, (iii) rights-of-way, (iv) land use, (v) taxes, and (vi) utilities.

119.    In accordance with the Surety Bond Program, the Debtors generally agree to indemnify the surety from any loss, cost, or expense that the surety may incur on account of the issuance of any surety bonds on behalf of the Debtors (the "**Indemnity Obligations**"). Sureties are also generally permitted to request collateral security from the Debtors from time to time in connection with the Indemnity Obligations.   The premiums for the surety bonds (the "**Surety Premiums**" and, together with the Indemnity Obligations, the "**Surety Bond Obligations**") are generally determined on an annual basis.  The Debtors remit payment when the bonds are issued and annually upon each renewal, typically 90 days prior to such renewal. As of the Petition Date, the Debtors have approximately $700 million in outstanding surety bonds.  Certain surety bonds in the Surety Bond Program are scheduled to expire and renew within the next six months.  Accordingly, the Debtors anticipate the Surety Bond Obligations over the next six months will amount to approximately $3,000,000.

120.    As discussed further above, the Debtors have caused Deutsche Bank to issue an aggregate amount of $350,000,000 in various letters of credit (the "**Letters of Credit**") in favor of Apache, pursuant to the Decommissioning Agreement, all of which remain outstanding as of the Petition Date.  The Letters of Credit are secured in Deutsche Bank's favor through surety bonds in the same amount.  As of the Petition Date, the Debtors believe that no amounts are outstanding with respect to the Letter of Credit Obligations (as defined in the Insurance & Surety Bond Motion).  Out of an abundance of caution, the Debtors request authority to maintain, in the Debtors' discretion, the Letters of Credit in the ordinary course of business and pay all Letter of Credit Obligations related thereto.

121.    In light of the risks applicable to the Debtors' operations and the critical need for the Debtors to protect their assets from such risks, I believe it essential that the Debtors maintain the Insurance Programs, the Surety Bond Program, and the Letters of Credit, and that they obtain authority to pay all obligations related thereto, including outstanding payments to the Insurance Brokers.  Without authority to maintain and pay amounts owed in connection with the Insurance Programs, the Surety Bond Program, and the Letters of Credit, the ability of the Debtors to conduct business operations in many locations would come to a halt to the detriment and prejudice of all parties in interest.   Additionally, based on the Debtors' current circumstances, I believe it is unlikely that the Debtors would be able to renew or replace their existing Insurance Programs, surety bonds, or the Letters of Credit on more favorable terms. Furthermore, I understand that the Debtors must maintain most or all of the Insurance Programs, the Surety Bond Program, and the Letters of Credit to comply with the U.S. Trustee's operating guidelines, applicable state and federal laws, requirements from state and federal regulatory agencies, and other prepetition contracts.  Based on the foregoing, I believe that the relief

requested in the Insurance & Surety Bond Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

## I.    **JIB/Royalty Interests Motion**

122.    Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 541 and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders Authorizing (I) Debtors to Pay Prepetition Interest Owner Obligations, Joint Interest Billings, and Gathering, Transportation, Processing and related Costs and (II) Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor all Funds Transfer Requests Related to Such Obligations* filed contemporaneously herewith (the "**JIB/Royalty Interest Motion"**), the Debtors request authority to pay in the ordinary course of business amounts payable to (i) holders of royalty, working, and other interests as required by the Debtors' various leases and related agreements (each as herein defined, and collectively, the "**Interest Owner Payments**"); (ii) operators for unpaid joint interest billings and related obligations (the "**Joint Interest Billings**"); and (iii) third parties for gathering, transportation, and processing costs and related adjustments (the "**GTP Costs and Adjustments**" and, together with the Joint Interest Billings and Interest Owner Payments, the "**Obligations**").  The Debtors further request that the Court authorize financial institutions to receive, process, honor, and pay all checks presented for payment and to honor all funds transfer requests related to such obligations.

123.    As of the Petition Date, the Debtors estimate the aggregate amount of Prepetition Obligations is approximately $70.5 million, of which approximately $48 million will come due in the first 30 days of these chapter 11 cases.  The components of the Obligations are described below.

124.    <u>Joint Interest Billings</u>.   The Debtors hold working interests and similar operating rights interests (collectively, the "**Working Interests**") in various Oil and Gas Leases. Generally, a working interest entitles the owner of that interest to a portion of the mineral production from the property or the proceeds thereof subject to the costs of exploration, development, and operation of the property.   Certain of the Debtors' Working Interests are subject to net profits interests ("**NPIs**")—the holders of which are entitled to a share of the profits from the Debtors' Working Interests.   The Debtors hold Operating and Non-Operating Working Interests (including operating rights interests).   In respect of their Non-Operating Working Interests, in the twelve months preceding the Petition Date, the Debtors paid approximately $50 million in Joint Interest Billings.   Joint Interest Billings vary in amount and are not entirely predictable on a month-to-month basis.   It is my understanding that failure to timely pay the Joint Interest Billings may provide grounds for contractual or statutory lien rights in favor of the Operator against the Debtors' Non-Operating Working Interest in the associated Oil and Gas Lease or the Debtors' *pro rata* portion of the production therefrom.

125.    I understand that, as of the Petition Date, the Debtors estimate they owe approximately $21 million in Joint Interest Billings under the terms of their Operating Agreements with respect to the period prior to the Petition Date, approximately $15 million of which will become due and owing during the first 30 days of these chapter 11 cases.

126.    Payment of Joint Interest Billings is necessary to prevent Operators from ceasing or altering their revenue payments to the Debtors and potentially asserting liens against the Debtors' property.   Payment of Joint Interest Billings is also necessary to maintain strong working relationships with the Debtors' partners during and after these chapter 11 cases.

127.    <u>Obligations to Mineral and Other Interest Owners</u>.    The Debtors' leasehold interests are subject to or burdened by mineral interests retained by the lessor (a "**Royalty Interest**"), fractional interests in the right to participate or receive proceeds from the sale of oil and gas (an "**Overriding Royalty Interest**" or "**ORRI**") and/or Working Interests. The Debtors are obligated to remit to holders of Royalty Interests, ORRIs, Working Interests, and NPIs (collectively, the "**Interest Owners**") their share of revenue from the producing wells located on the respective leases (collectively, the "**Interest Owner Payments**").

128.    It is my understanding that failure to make all required Interest Owner Payments could have a material adverse effect upon the Debtors and their operations, including, without limitation, potential cancellation, forfeiture, or termination of Oil and Gas Leases, penalties and interest, turnover actions, conversion and constructive trust claims, assertion of significant secured claims against property of the Debtors' estates, litigation, and, in some instances, attempted removal of the Debtors as operator.  In certain circumstances, the Debtors have received payment for the share of proceeds due to Interest Owners; however, due to timing, such Interest Owner Payments were not made prior to the Petition Date.

129.    The Debtors make Interest Owner Payments each month.  Such payments are generally paid two months in arrears.  Amounts owed are calculated as provided for in the underlying Oil and Gas Lease, Operating Agreement, or other underlying contract, and are typically based on the production revenue received by the Debtors from purchasers, less applicable severance taxes and, in some instances, certain post-production charges.

130.    I understand that, as of the Petition Date, the Debtors estimate that they owe approximately $40 million on account of accrued and undisputed Interest Owner Payments,

of which approximately $28 million will come due within the first 30 days of these chapter 11 cases.

131.    The Debtors hold certain Interest Owner Payments in "suspense" when (i) they are too small to warrant payment under the terms of an Operating Agreement or other applicable agreement, (ii) the Debtors have determined they should not be paid because of a dispute or for other legal reasons, or (iii) the Debtors are unable to identify or properly pay the relevant Interest Owner (such amounts held in suspense, the "**Suspense Obligations**").

132.    The Suspense Obligations are accrued but unpaid liabilities of the Debtors. The Debtors estimate that approximately $50,000 out of the total $1.7 million in Suspense Obligations will become due and payable in the ordinary course of the Debtors' business and operations (either through accrual of additional royalties or resolution of a dispute or other issue barring payment) within the first 30 days of these chapter 11 cases.  The Debtors do not anticipate being obligated to pay the full amount of remaining Suspense Obligations during these chapter 11 cases; however, in light of the difficulty in estimating precisely when and to what extent Suspense Obligations will become due and payable, and out of an abundance of caution, the Debtors seek authority in the Proposed Interim Order to continue to negotiate, resolve, settle, and honor the full amount of outstanding Suspense Obligations in the ordinary course whether such amounts relate to the prepetition or postpetition period.

133.    Gathering, Transportation, Processing and Related Costs.    Where production is sold at the wellhead, the purchaser of the production takes ownership at the wellhead and the Debtors do not incur transportation costs.  In instances where production is not sold at the wellhead, the Debtors are obligated under various agreements to pay certain costs associated with the transportation, gathering and processing of oil and gas including settlement,

if required, of monthly pipeline imbalances (the "**GTP Costs**").   In addition, certain pipelines have established quality banks, systems designed to measure quality changes across crude production in common stream operations.   Based on the calculated differences, the pipelines collect from, and remit monetary adjustments to, the crude oil shippers (the "**Quality Bank Adjustments**" and, together with the GTP Costs, the "**GTP Costs and Adjustments**").

134.    It is my understanding that the Debtors owe approximately $7.5 million in prepetition GTP Costs and Adjustments.  Of this amount, approximately $5 million will become due and owing during the first 30 days of these chapter 11 cases.

135.    Payment of the GTP Costs and Adjustments is necessary to prevent counterparties from ceasing or altering their relationships with Debtors and potentially asserting liens against the Debtors' property.   Payment is also necessary to maintain strong working relationships with the Debtors' partners during and after these chapter 11 cases.

## J.    Trade Creditors Motion

136.    Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders Authorizing Payment of Prepetition Trade Claims in Ordinary Course of Business* filed contemporaneously herewith (the "**Trade Creditors Motion**"), the Debtors request interim and final authority to pay, in the ordinary course of business, undisputed prepetition trade claims (collectively, the "**Trade Claims**") of general secured and unsecured creditors that provide goods or services related to the Debtors' operations (collectively, the "**Trade Creditors**").

137.    To operate in the ordinary course of their businesses, the Debtors utilize a number of Trade Creditors, including various vendors and suppliers that provide goods or services essential to the Debtors' extensive oil and gas operations.   Such essential goods and services include, but are not limited to, well equipment and services; logistics and transportation

services; gas, fuel and power; health and safety equipment and services; construction equipment and services; vessels and diving services, and food, supplies, and other support for the offshore crews.  Many of the Trade Creditors could refuse to continue doing business with the Debtors without the risk of incurring material damages or other contractual obligations.  Such actions, however, would cause significant disruption or cessation of the Debtors' business, negatively affecting the Debtors' income and, potentially, the Debtors' employees and the environment.  I am mindful of my fiduciary obligations to preserve and maximize the value of the Debtors' bankruptcy estates.  The importance of preserving key business relationships and minimizing the effects of the chapter 11 process on the Debtors' operations cannot be understated, and are among my primary goals as the Debtors transition into chapter 11 to pursue consummation of the Plan.

138.    The Debtors incur numerous liquidated and undisputed payment obligations to the Trade Creditors in the ordinary course of business.  During the 12 months before the Petition Date, the Debtors paid Trade Creditors on average approximately $40 million each month.   The Debtors estimate that, as of the Petition Date, they owe a total of approximately $60 million on account of undisputed Trade Claims and approximately $41 million in Trade Claims will become due and payable within the first 30 days of these chapter 11 cases.  Approximately $10 million of the $60 million outstanding is subject to reimbursement from counterparties to the Debtors' joint operating agreements.  Below is a chart detailing the Trade Claim categories:

| Category | Description | Amount Accrued as of the Petition Date | Amount Payable in the Interim Period |
|---|---|---|---|
| Logistics and Transportation | Transportation (helicopters, vessels and trucks) of equipment, personnel and supplies to and from | $10,400,000 | $6,900,000 |

| Category | Description | Amount Accrued as of the Petition Date | Amount Payable in the Interim Period |
|---|---|---|---|
| | offshore platforms | | |
| Fuel and Power | Bulk purchases for vessels and platforms | $900,000 | $900,000 |
| Well and Offshore Service Providers | Various services including wireline and downhole work, dock services, cleaning, engineering, and other offshore work | $14,500,000 | $9,700,000 |
| Construction Equipment and Services | Equipment and services used for platform maintenance and repairs | $12,000,000 | $8,000,000 |
| Mechanical and Instrumentation Equipment and Services | Equipment and services provided to operate the platforms including compressors, generators, pumps, and other operating supplies | $12,100,000 | $8,100,000 |
| Chemicals | Chemicals used in the production of hydrocarbons and facility operations | $2,700,000 | $2,700,000 |
| Vessels and diving services | Specialized equipment and vessels including liftboats, diving operations, and remote operated vehicles used in maintaining facilities and decommissioning operations | $3,700,000 | $2,500,000 |
| Health, safety, and employee support | Vendors and service providers supporting ongoing safety and compliance staff and operations | $ 3,400,000 | $2,300,000 |
| **Total:** | | **$59,700,000** | **$41,100,000** |

139.    I believe that payment of the Trade Claims as they become due in the ordinary course of business is a sound exercise of the Debtors' business judgment because doing so will avoid a value-destructive business interruption and reflects only a difference in when Trade Creditors will be paid, not in how much.   As indicated above, through the Plan, the Debtors intend to deleverage their balance sheet without interruption to their business operations. The relief sought in the Trade Creditors Motion is an essential component of the Debtors' restructuring plan; disruption to the Debtors' timely receipt of necessary goods and services

could negatively impact the Debtors' operations.  The Consenting Creditors have agreed to the unimpaired treatment of Other Secured Claims, Other Priority Claims, and General Unsecured Claims under the Plan—one of which applies to each of the Trade Claims.

140.    Further, the goods and services secured by satisfaction of the Trade Claims are necessary for the continued operation of the Debtors' businesses including their continued performance under their oil and gas leases and joint operating agreements, among other critical contracts.  I anticipate that failure to pay the Trade Claims as they become due may result in an inability to secure vital goods and services required to maintain the Debtors' operations.  I believe that failure to satisfy the Trade Claims could thus jeopardize the Debtors' emergence from these cases and result in the destruction of the Debtors' going-concern value, to the detriment of their estates, their stakeholders, and all parties in interest.

141.    In addition, because the Trade Creditors are already familiar with the Debtors' assets and business needs, often as a result of years-long relationships, I believe they are in the best position to provide the necessary goods and services to the Debtors and are the most likely to do so on commercially reasonable terms.  Further, certain Trade Creditors provide specialized goods and services and are the sole source of such goods and services in particular areas of the Gulf of Mexico in which the Debtors operate.  Forcing the Debtors to obtain replacement goods and services, if replacement is an option, would likely cause substantial delay and significant costs.

142.    In accordance with the above, I believe that paying the Trade Claims—approximately (2%) of the total debt in these chapter 11 cases—in the ordinary course is prudent when compared to the amount the Debtors' stakeholders stand to lose if the Debtors' businesses were to be interrupted.  Therefore, payment of the Trade Claims is a sound exercise of the

Debtors' business judgment.   Accordingly, I believe that the relief requested in the Trade Creditors Motion furthers the Debtors' overarching restructuring goals without prejudice to the Debtors' stakeholders, and should be approved.

**K.**     **Taxes Motion**

143.    Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a), and 541(d) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Assessments, and (II) Authorizing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Funds Transfer Requests Related to Such Obligations* (the "**Taxes Motion**") filed concurrently herewith, the Debtors request (i) interim and final authority to satisfy all Taxes (as defined below) due and owing to various local, state, and federal taxing and governmental authorities (collectively, the "**Taxing Authorities**") that arose prior to the Petition Date, including all Taxes subsequently determined by audit or otherwise to be owed for periods prior to the Petition Date, and (ii) that the Court authorize, but not direct, the Banks to receive, honor, process, and pay all checks issued or to be issued and electronic funds transfers requested or to be requested relating to the above.

144.    I understand that the Taxes the Debtors typically incur generally fall into the following categories:  Franchise Taxes, Severance Taxes, Property Taxes/Ad Valorem Taxes, Income Taxes, and Regulatory Assessments (each as defined in the Taxes Motion and collectively, the "**Taxes**").   I understand that approximately $100,000 in Severance Taxes will come due in the 30 days following the Petition Date.  I understand that substantially all of those amounts are on account of prepetition obligations.

145.    Further, I understand that failure to pay the aforementioned Taxes may cause the Taxing Authorities to take precipitous action, including, but not limited to, filing liens,

preventing the Debtors from conducting business in the ordinary course in the applicable jurisdictions in which they operate, and potentially holding directors and officers personally liable, all of which would disrupt the Debtors' day-to-day business operations, potentially impose significant costs of the Debtors' estates and their creditors, and hinder the Debtors' efforts to successfully reorganize. Based on the foregoing, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

## L.   __Utilities Motion__

146.   Pursuant to the *Emergency Motion of Debtors' Pursuant to 11 U.S.C. §§ 366 and 105(a) and Fed. R. Bank. P. 6003 and 6004 and Local Rule 9013-1 for an Order (I) Authorizing the Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service* filed concurrently herewith (the "**Utilities Motion**"), the Debtors request a final order (i) authorizing the Debtors' proposed form of adequate assurance of payment to Utility Companies (as defined below); (ii) establishing procedures for resolving objections by Utility Companies relating to the adequacy of the proposed adequate assurance; and (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to the Debtors.

147.   As more fully described in the motion, the Debtors obtain telecommunications, information technology services, water, fuel and power, electricity and other utility services (collectively, the "**Utility Services**") from various utility companies (collectively, the "**Utility Companies**"). I believe that uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of these Chapter 11 Cases. Should any Utility Company alter, refuse, or discontinue service, even briefly, the Debtors' business

operations could be severely disrupted.  The Debtors operate a complex business with significant operations throughout the Gulf of Mexico and along the Gulf Coast of Texas and Louisiana. Interruption of the Utility Services provided at any of their locations would disrupt necessary communication and coordination between the Debtors' employees, vendors, customers, and various regulatory authorities, and would prevent the provision of necessary support to these same parties.  I believe that any such disruption would jeopardize the Debtors' ability to manage their reorganization efforts.   As a result, it is essential that the Utility Services continue uninterrupted during the Chapter 11 Cases.

148.    I believe that there are no material defaults or significant arrearages with respect to the undisputed invoices for prepetition Utility Services.  Based on a monthly average for the twelve months prior to the Petition Date, the Debtors estimate that their aggregate cost of Utility Services for the next 30 days will be approximately $975,000.

149.    I believe and am advised that the Adequate Assurance Procedures are necessary to the success of the Debtors' Chapter 11 Cases because if such procedures are not approved, the Debtors could be forced to address numerous requests by Utility Companies for adequate assurance in a disorganized manner during the critical first weeks of the Chapter 11 Cases.  Discontinuation of Utility Service could disrupt operations and jeopardize the Debtors' reorganization efforts and, ultimately, the value of the Debtors' estates and stakeholders' recoveries.

150.    Based on the foregoing, I believe that the relief requested in the Utilities Motion would ensure the continuation of the Debtors' businesses at this critical juncture as the Debtors transition into chapter 11.  Furthermore, I believe that the relief requested provides the Utility Companies with a fair and orderly procedure for determining requests for additional

adequate assurance.  Accordingly, I believe that the relief requested in the Utilities Motion should be granted in all respects.

**M.**     **Claims Agent Retention Application**

151.    Pursuant to Debtors' *Emergency Application of Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. §§ 105(a) and 327, Fed. R. Bankr. P. 2002(f), 2014(a), 2016, 6003, and 6004 and Local Rule 2014-1 for Entry of an Order Authorizing the Retention and Appointment of Prime Clerk LLC as Claims, Noticing, and Solicitation Agent, Nunc Pro Tunc to the Petition Date* filed concurrently herewith (the "**Claims Agent Retention Application**"), the Debtors request entry of an order appointing Prime Clerk LLC ("**Prime Clerk**") as the claims, noticing, and solicitation agent ("**Claims Agent**") for the Debtors in their chapter 11 cases, effective as of the Petition Date.

152.    As more fully described in the Claims Agent Retention Application, the Claims Agent will, among other tasks, (i) serve as the noticing agent to mail notices to creditors and other parties in interest; (ii) provide computerized claims, objection, solicitation, and balloting database services; and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to these chapter 11 cases, pursuant to the provisions of the Engagement Agreement (as defined in the Claims Agent Retention Application).

153.    The Debtors' counsel has informed me that, pursuant to noticing requirements, the Debtors will be required to provide notice to thousands of persons and entities during the pendency of these chapter 11 cases.  The appointment of Prime Clerk as the Claims Agent will provide the most effective and efficient means of providing that notice, as well as soliciting and tabulating votes on the proposed plan of reorganization, thereby relieving the Debtors of the administrative burden associated with all of these necessary tasks.  In addition, by

appointing Prime Clerk as the Claims Agent in these chapter 11 cases, the distribution of notices will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of noticing. Accordingly, I believe the Claims Agent Retention Application should be granted in all respects.

**N.**     **Request for Emergency Consideration**

154.     Pursuant to the *Request for Emergency Consideration of Certain "First Day" Matters* filed concurrently herewith, the Debtors request emergency consideration of the Joint Administration Motion; the Scheduling Motion; the Creditor List Motion; the DIP/Cash Collateral Motion; the Hedging Motion; the Cash Management Motion; the Insurance and Surety Bond Motion; the Taxes Motion; the Wages Motion; the JIB/Royalty Interests Motion; the Trade Creditors Motion; the Utilities Motion, and the Claims Agent Retention Application. I believe that, based on the complexity of these chapter 11 cases (as explained to me by the Debtors' counsel) and the Debtors' urgent need to continue operations during these cases, emergency consideration of such motions is warranted.

## Conclusion

155.     The above describes the Debtors' businesses and capital structure, the factors that precipitated the commencement of these chapter 11 cases, the terms of the Debtors' balance sheet restructuring, and the critical need for the Debtors to restructure their financial affairs and operations. The provisions of the Bankruptcy Code will assist the Debtors in achieving their financial reorganization and reestablishing themselves as a healthy economic enterprise able to effectively compete in their industry for the benefit of their economic stakeholders and employees.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 15, 2018
        Houston, Texas

                               */s/ G.M. McCarroll*

                               G.M. McCarroll
                               President and Chief Executive Officer
                               Fieldwood Energy LLC

**<u>Certificate of Service</u>**

I hereby certify that on February 15, 2018, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.


   */s/ Alfredo R. Pérez*
Alfredo R. Pérez

## **Exhibit A**

Fieldwood Organizational Chart

