

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

ENTERED
04/02/2018

| | | |
|---|---|---|
| **In re:** | § § § | **Chapter 11** |
| **FIELDWOOD ENERGY LLC,** *et al.*, | § § | **Case No. 18-30648 (DRJ)** |
| | § § | **(Jointly Administered)** |
| **Debtors.**[1] | § § § | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER (I) APPROVING DEBTORS' DISCLOSURE STATEMENT AND (II) CONFIRMING PREPACKAGED CHAPTER 11 PLAN OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS

WHEREAS, Fieldwood Energy LLC and its debtor affiliates in the above-captioned cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), as debtors and debtors in possession (collectively, the "**Debtors**"), and "proponents of the plan" within the meaning of section 1129 of the Bankruptcy Code having proposed and filed (i) the *Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors*, dated February 14, 2018 (D.I. 36), (as may be amended, modified, supplemented, or restated, the "**Plan**"), a copy of which is annexed hereto as **Exhibit A**,[2] and those certain supplements to the Plan, dated and filed with the Bankruptcy Court on March 9, 2018 (D.I. 176), March 21, 2018

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Holdings LLC (9264); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed in the Plan.

(D.I. 235), and March 28, 2018 (D.I. 248) (as the documents contained therein have been or may be further amended or supplemented, the "**Plan Supplement**"), and (ii) the *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors*, dated February 14, 2018 (D.I. 34) (the "**Disclosure Statement**"); and

        WHEREAS, on February 16, 2018, the Bankruptcy Court entered the *Order (I) Scheduling Combined Hearing to Consider (A) Approval of Disclosure Statement and (B) Confirmation of Plan; (II) Establishing Deadline to Object to Disclosure Statement and Plan and Form of Notice Thereof; (III) Approving Solicitation Procedures and Forms of Ballots and Notice of Non-Voting Status; (IV) Conditionally Waiving Requirement of Filing Schedules and Statements and of Convening Section 341 Meeting of Creditors; (V) Approving Rights Offering Procedures; and (VI) Granting Related Relief* (D.I. 71) (the "**Scheduling Order**"), which (i) scheduled a combined hearing (the "**Combined Hearing**") to consider approval of the Disclosure Statement and confirmation of the Plan, (ii) established procedures for objecting to approval of the Disclosure Statement and confirmation of the Plan, (iii) approved the Debtors' solicitation procedures (the "**Solicitation Procedures**") with respect to the Plan, including forms of ballots (the "**Ballots**") [3] transmitted to classes of Claims for voting on the Plan and the notice of non-voting status (the "**Notice of Non-Voting Status**")[4] transmitted to holders of Claims and Interests not entitled to vote on the Plan, (iv) approved the form, manner, and sufficiency of the notice of the Combined Hearing (the "**Combined Notice**"), which included, among other things, information with respect to the commencement of these chapter 11 cases (the "**Chapter 11**

---

[3] The Ballots were attached as Exhibits 2-4 to the Scheduling Order.

[4] The Notice of Non-Voting Status was attached as Exhibit 5 to the Scheduling Order.

Cases"), (v) waived the requirement to schedule a meeting of creditors pursuant to section 341(a) of the Bankruptcy Code unless the Plan was not confirmed on or before April 19, 2018, (vi) extended the time for the Debtors to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules and SOFAs**"), and waived the requirement that the Debtors file the Schedules and SOFAs unless the Plan was not confirmed on or before April 19, 2018, (vii) approved procedures for the conduct of an equity rights offering to the Prepetition Second Lien Term Lenders issued on account of their Claims (the "**Rights Offering**" and the procedures therefor, the "**Rights Offering Procedures**"), and (viii) granted related relief; and

WHEREAS, the Debtors, through their solicitation and balloting agent Prime Clerk, LLC ("**Prime Clerk**"), duly caused the transmittal of Plan solicitation materials, including the notice of Combined Hearing, the Notice of Non-Voting Status, the Disclosure Statement, the Plan, and the Ballots as described in the *Affidavit of Service of Solicitation Materials*, filed on February 20, 2018 (D.I. 115), the *Affidavit of Service of Solicitation Materials,* filed on February 21, 2018 (D.I. 120), the *Affidavit of Service*, filed February 21, 2018 (D.I. 122), the *Affidavit of Service,* filed February 26, 2018 (D.I. 141), the *Affidavits of Service for Mailing for the Period from March 8, 2018 through March 14, 2018*, filed March 19, 2018 (D.I. 218), and the *Affidavit of Service*, filed March 28, 2018 (D.I. 244) (collectively, the "**Affidavits of Service**") evidencing the timely service of, as applicable, the Disclosure Statement, the Plan, and related solicitation materials and (i) the Combined Notice having been served on parties in interest, (ii) the Disclosure Statement, the Plan, and appropriate Ballots having been duly transmitted to holders of Class 4 Claims (FLTL Claims), holders of Class 5 Claims (FLLO Claims), and holders of

Class 6 Claims (SLTL Claims), respectively (collectively, the "**Voting Classes**"), and (iii)  the

Notice of Non-Voting Status having been served on holders of Claims in Class 1 (Priority Non-

Tax Claims), Class 2 (Other Secured Claims), Class 3 (RBL Claims), Class 7 (General

Unsecured Claims), and Class 9 (Existing Holdings Interests). As set forth in the Affidavits of

Service, and in compliance with the Solicitation Procedures and such service was adequate as

provided by Bankruptcy Rule 3017(d); and

WHEREAS, on February 23, 2018 and February 26, 2018, the Debtors, through

Prime Clerk, duly caused the materials related to the Rights Offering to be transmitted as set

forth in the *Corrected Affidavit of Service*, filed February 28, 2018 (D.I. 148); and

WHEREAS, on March 6, 2018, the Debtors, through Prime Clerk, duly caused

the *Notice of Proposed Assumption of Executory Contracts and Unexpired Leases* (the "**Cure**

**Notice**") to be served on the counterparties to such executory contracts and unexpired leases as

set forth in the *Affidavit of Service*, filed March 9, 2018 (D.I. 175) (the "**Cure Affidavit**"); and

WHEREAS, the Debtors, through Prime Clerk, duly caused the transmittal of the

Plan Supplement as set forth in the (i) *Affidavits of Service for Mailing for the Period from

March 8, 2018 through March 14, 2018*, filed March 19, 2018 (D.I. 218) and (ii) *Affidavits of

Service for Mailing for the Period from March 15, 2018 through March 21, 2018*, filed

March 27, 2018 (D.I. 241) (collectively, the "**Plan Supplement Affidavit**"); and

WHEREAS, on March 28, 2018, Prime Clerk filed the *Declaration of James

Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast

on the Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors*,

4

(D.I. 247) (the "**Voting Certification**") attesting and certifying the method and results of the tabulation for the Classes of Claims entitled to vote to accept or reject the Plan; and

WHEREAS, on April 2, 2018, the Bankruptcy Court held the Combined Hearing after due and sufficient notice was given to all parties on the creditor matrix in accordance with the Scheduling Order, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), in each case established by the Affidavits of Service filed with the Bankruptcy Court, including the *Affidavit of Service of Solicitation Materials* (D.I. 120), the *Affidavit of Service* (D.I. 122), and the Plan Supplement Affidavit (D.I. 218 and 241), and such notice being sufficient under the circumstances and no further notice being required; and based upon and after full consideration of the entire record of the Combined Hearing, including:  (i) the Disclosure Statement, the Plan, the Plan Supplement, and the Voting Certification; (ii) the Debtors' *Memorandum of Law in Support of (I) Approval of Disclosure Statement, (II) Confirmation of Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors, and (III) Approval of Asset Purchase Transaction*, dated March 28, 2018 (D.I. 246) (the "**Confirmation Brief**"); (iii) oral representations, affidavits, testimony, documents, filings, and other evidence regarding confirmation; (iv) statements, arguments, and objections, if any, made by counsel regarding confirmation; and (v) the Affidavits of Service; and the Bankruptcy Court being familiar with the Disclosure Statement and the Plan and other relevant factors affecting the Chapter 11 Cases, and the Bankruptcy Court being fully familiar with, and having taken judicial notice of, the entire record of the Chapter 11 Cases; and upon the arguments of counsel and the evidence proffered and adduced at the

Combined Hearing; and the Bankruptcy Court having found and determined that the Disclosure Statement should be approved and the Plan should be confirmed as reflected by the Bankruptcy Court's rulings made herein and at the Combined Hearing;

NOW, THEREFORE, based on the foregoing; and after due deliberation thereon and sufficient cause appearing therefor:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY FOUND AND DETERMINED THAT:

A.     <u>Findings of Fact and Conclusions of Law</u>.  The findings and conclusions set forth herein and in the record of the Combined Hearing constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     <u>Jurisdiction, Venue, Core Proceeding (28 U.S.C. §§ 157(b)(2), 1334(a))</u>. The Bankruptcy Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334.  Approval of the Disclosure Statement and the Solicitation Procedures and confirmation of the Plan are core proceedings pursuant to 28 U.S.C. § 157(b) and this Bankruptcy Court has jurisdiction to enter a final order with respect thereto.  Venue is proper before this Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtors are eligible debtors under section 109 of the Bankruptcy Code.  The Debtors are proper plan proponents under section 1121(a) of the Bankruptcy Code.

C.     <u>Chapter 11 Petition</u>.     The Chapter 11 Cases commenced on February 15, 2018 (the "**Petition Date**").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases pursuant to section 1104 of the Bankruptcy Code.  No statutory committee has been appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.  The Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

D.     <u>Judicial Notice</u>.  The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Bankruptcy Court, including all pleadings and other documents filed, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of these Chapter 11 Cases.  Any resolution of objections to confirmation of the Plan explained on the record at the Combined Hearing is hereby incorporated by reference. All unresolved objections, statements, informal objections, and reservation of rights, if any, related to the Plan or confirmation of the Plan are overruled on the merits in their entirety.

E.     <u>Burden of Proof</u>.  The Debtors have the burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.  With respect to each Debtor and each element of sections 1129(a) and (b) of the Bankruptcy Code, the Debtors have met their burden.

F.     <u>Adequacy of Disclosure Statement</u>.  The Disclosure Statement (i) contains adequate information of a kind generally consistent with the disclosure requirements of all applicable non-bankruptcy law, including the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa (as

7

amended from time to time, the "**Securities Act**"), (ii) contains "adequate information" (as such term is defined in section 1125(a)(1) and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein, and (iii) is approved in all respects.

       G.    <u>Solicitation</u>.  Prior to the commencing these Chapter 11 Cases, the Debtors, through Prime Clerk, caused the Plan, Disclosure Statement (which included as exhibits thereto, among other things, the Restructuring Support Agreement, a Valuation Analysis, a Liquidation Analysis, Financial Projections, the Rights Offering Procedures, the Purchase Agreement, the Term Sheet for the Apache Decommissioning Amendment (as each term is described in the Disclosure Statement), and the Ballots (collectively the "**Solicitation Package**"), to be transmitted and served in compliance with sections 1125(g) and 1126(b) of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Scheduling Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws, and regulations applicable to such solicitation.  As set forth in the Affidavits of Service, on February 15, 2018, the Solicitation Package was transmitted to and served on eligible holders of Claims in the Voting Classes.  Each eligible holder of a Claim in the Voting Classes received a Ballot.  The forms of the Ballots adequately addressed the particular needs of the Chapter 11 Cases and were appropriate for holders of Claims in the Voting Classes.  The instructions on the Ballots advised parties that for a Ballot to be counted, the Ballot must be properly executed, completed, and delivered to Prime Clerk so that it was received by Prime Clerk no later than 5:00 p.m. (Prevailing Central Time) on March 14, 2018 (the "**Voting Deadline**"), unless such time was extended by the Debtors.  The period during which the Debtors solicited acceptances to the Plan

8

was a reasonable period of time for eligible holders of Claims in the Voting Classes to make an informed decision to accept or reject the Plan.  The Debtors were not required to solicit votes from the holders of Claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 3 (RBL Claims), Class 7 (General Unsecured Claims), Class 8 (Intercompany Claims), Class 9 (Existing Holdings Interests), and Class 11 (Intercompany Interests) (collectively, the "**Unimpaired Classes**"), as each such class is Unimpaired under the Plan.  The Debtors also were not required to solicit votes from Fieldwood Holdings as the sole holder of Interests in Class 10 (Existing Energy Inc. Interests) because Fieldwood Holdings is a Debtor in the Chapter 11 Cases and a proponent of the Plan and is thus conclusively deemed to accept the Plan.  As described in and as evidenced by the Voting Certification and the Affidavits of Service, the transmittal and service of the Solicitation Package (all of the foregoing, the "**Solicitation**") was timely, adequate, and sufficient under the circumstances and no other or further Solicitation was or shall be required.  The Solicitation complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, was conducted in good faith and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Scheduling Order, and any other applicable rules, laws, and regulations.

H.    <u>Mailing and Publication of Combined Notice</u>.    As described in and evidenced by the Affidavits of Service, the Debtors caused to be mailed the Combined Notice on all parties in interest as set forth in the Scheduling Order in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Scheduling Order, and the Solicitation Procedures.  In accordance with the Scheduling Order, the Combined Notice, with all other

notices, motions and other documents filed in these Chapter 11 Cases, were published on Prime Clerk's website at http://cases.primeclerk.com/fieldwood. The Debtors have given proper, adequate, timely, and sufficient notice of the Combined Hearing, as required by the Bankruptcy Rules and the Scheduling Order, and proper, adequate, timely, and sufficient notice of the Disclosure Statement, the Plan, the deadlines for filing objections to the Disclosure Statement and Plan, the deadline for voting on the Plan, and the deadline for exercising Subscription Rights has been given to all known holders of Claims or Interests and all parties in interest, substantially in accordance with the Scheduling Order. No other or further notice was or shall be required.

I. <u>Tabulation Results</u>. On March 28, 2018, the Debtors filed the Voting Certification (D.I. 247) certifying the method and results of the Ballots tabulated for the Voting Classes. As of the Voting Deadline, 100% in amount and 100% in number of holders of Claims in Class 4 (FLTL Claims) that timely voted on the Plan voted to accept the Plan, 100% in amount and 100% in number of holders of Claims in Class 5 (FLLO Claims) that timely voted on the Plan voted to accept the Plan, and 100% in amount and 100% in number of holders of Claims in Class 6 (SLTL Claims) that voted on the Plan voted to accept the Plan. Accordingly, pursuant to the requirements of section 1126 of the Bankruptcy Code, the Bankruptcy Court finds that Class 4 (FLTL Claims), Class 5 (FLLO Claims), and Class 6 (SLTL Claims) accepted the Plan. All procedures used to tabulate the Ballots were fair, reasonable, and conducted in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Scheduling Order, and all other applicable rules, laws, and regulations.

J. <u>Rights Offering</u>. The Rights Offering was conducted in accordance with the Rights Offering Procedures and the Scheduling Order. The Debtors solicited subscriptions to

10

the Rights Offering in good faith and in compliance with the Rights Offering Procedures, applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any applicable non-bankruptcy laws, rules, or regulations.

    K. <u>Asset Purchase Transaction</u>. The Debtors, their management, and their boards of directors, or equivalent governing bodies and Noble Energy, Inc. ("**Noble**") and its management, board of directors, or equivalent governing body, officers, directors, employees, agents, members, managers and representatives, respectively, acted in good faith.  The Purchase Agreement between Noble and the Debtors was negotiated and entered into based upon arm's-length bargaining, without collusion or fraud, and in good faith as that term is used in section 363(m) of the Bankruptcy Code.

    L. <u>Plan Supplement</u>. The Debtors filed the Plan Supplement consisting of drafts of the (i) Exit First Lien Credit Agreement, (ii) the Exit Second Lien Credit Agreement, (iii) Exit LC Credit Agreement, (iv) New Intercreditor Agreements, (v) Apache Decommissioning Agreement Amendment[5] and any other related documents (collectively, the "**Apache Documents**"), which include, but are not limited to the following documents filed with the Plan Supplement:   (a) Third Amendment to Purchase and Sale Agreement, (b) Assignment, Amendment and Partial Release of Net Profits Overriding Royalty Interest, (c) Third Supplement to Recharacterization Mortgage (d) Subordination Agreement, (e) Full Release of Decommissioning Mortgage (LA), (f) Full Release of Decommissioning Mortgage (AL, MA, TX), and  (g) Termination of Collateral Agreement, (vi) Document Identifying

---

[5] The Apache Decommissioning Agreement Amendment is **<u>Exhibit E-2</u>** in the Plan Supplement and referred to as the Fifth Amendment to Decommissioning Agreement.

Officers and Directors of Reorganized Debtors in accordance with section 1129(a)(5) of the Bankruptcy Code (as updated, modified, or supplemented, the "**Notice of D&O**"), (vii) New Corporate Governance Documents, including, without limitation, the Stockholders Agreement for Fieldwood Energy Inc. (the "**Stockholders Agreement**"), (viii) Registration Rights Agreement for Fieldwood Energy Inc. (the "**Registration Rights Agreement**"), and (ix) Schedule of Retained Causes of Action.  All such materials comply with the terms of the Plan, and the filing and notice of such documents as set forth in the Plan Supplement Affidavit was good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable rules, laws, and regulations and no other or further notice is or shall be required.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  The Debtors reserve the right to alter, amend, update, or modify the Plan Supplement prior to the Effective Date subject to the terms of this Order (which may be referred to as "**Order**" or "**Confirmation Order**" herein), the Restructuring Support Agreement, and the term sheet for the Apache Decommissioning Agreement Amendment attached as **Exhibit H** to the Disclosure Statement.

M.    <u>Modifications of the Plan</u>.  Pursuant to and in compliance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors proposed certain modifications to the Plan as reflected herein and/or in the amended version of the Plan Supplement filed with the Bankruptcy Court prior to entry of this Order (collectively, the "**Plan Modifications**").  In accordance with Bankruptcy Rule 3019, the Plan Modifications do not (i) constitute material modifications of the Plan under section 1127 of the Bankruptcy Code, (ii) cause the Plan to fail to meet the requirements of sections 1122 or 1123 of the Bankruptcy

Code, (iii) materially and adversely change the treatment of any Claims, (iv) require re-solicitation of any holders of Claims or Interests, or (v) require that any holders of Claims in the Voting Classes be afforded an opportunity to change previously cast acceptances or rejections of the Plan.  Under the circumstances, the form and manner of notice of the proposed Plan Modifications are adequate, and no other or further notice of the proposed Plan Modifications is necessary or required.  In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all holders of Claims who voted to accept the Plan or who are conclusively presumed to have accepted the Plan are deemed to have accepted the Plan as modified by the Plan Modifications.  No holder of a Claim that has voted to accept the Plan shall be permitted to change its acceptance to a rejection as a consequence of the Plan Modifications.

N.    <u>Bankruptcy Rule 3016</u>.  In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as proponents of the Plan.  The Debtors appropriately filed the Disclosure Statement and the Plan with the Bankruptcy Court, thereby satisfying Bankruptcy Rule 3016(b).  The discharge, release, injunction, and exculpation provisions of the Plan are set forth in bold and with specific and conspicuous language, thereby complying with Bankruptcy Rule 3016(c).

**Compliance with Requirements of Section 1129 of Bankruptcy Code**

O.    <u>Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>. The Plan complies with the applicable provisions of the Bankruptcy Code and thereby satisfies section 1129(a)(1) of the Bankruptcy Code.  More particularly:

(i)    <u>Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1))</u>.  In addition to Administrative Expense Claims (Section 2.1 of the Plan), Fee Claims (Section 2.2 of the Plan),

13

DIP Facility Claims (Section 2.3 of the Plan), fees, expenses, or disbursements required to by paid under the terms of the DIP Facility Order (Section 2.4 of the Plan), and Priority Tax Claims (Section 2.5 of the Plan), which need not be classified, Articles III and IV of the Plan classify eleven (11) Classes of Claims and Interests of the Debtors.  The Claims or Interests placed in each Class are substantially similar to the other Claims or Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims or Interests created under the Plan, the classifications were not implemented for improper purposes, and such Classes do not unfairly discriminate between holders of Claims or Interests.  The Plan therefore satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(ii)       Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2)).  Articles III and IV of the Plan specify that holders of Claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 3 (RBL Claims), Class 7 (General Unsecured Claims), Class 8 (Intercompany Claims), Class 9 (Existing Holdings Interests), and Class 11 (Intercompany Interests) are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

(iii)       Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).  Articles III and IV of the Plan designate holders of Claims and Interests in Class 4 (FLTL Claims), Class 5 (FLLO Claims), and Class 6 (SLTL Claims), and Class 10 (Existing Energy Inc. Interests) as Impaired within the meaning of section 1124 of the Bankruptcy Code and specify the treatment of the Claims and Interests in those Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

(iv)     No Discrimination (11 U.S.C. § 1123(a)(4)).  The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

(v)     Implementation of Plan (11 U.S.C. § 1123(a)(5)).  The Plan, including the various documents and agreements set forth in the Plan Supplement, provides adequate and proper means for the implementation of the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code, including:  (1) the continued corporate existence of the Reorganized Debtors; (2) the general authority for the Debtors to take all actions necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate Plan, as set forth more fully in Article V of the Plan; (3) the entry into the Purchase Agreement and the authorization and consummation of the Asset Purchase Transaction; (4) issuance of the New Equity Interests; (5) entry into the Exit LC Credit Agreement; (6) entry into the Exit First Lien Documents; (7) entry into Exit Second Lien Documents; (8) entry into the New Intercreditor Agreements; (9) entry into the Apache Documents; (10) the cancellation of all agreements, instruments, and other documents evidencing any prepetition Claim or Interest (other than certain Intercompany Interests that are not modified by the Plan and except as otherwise provided herein); (11) the conduct and consummation of the Rights Offering, including the issuance of the New Equity Interests thereunder; (12) any provisions governing distributions under the Plan; (13) the authorization, adoption, and entry into the New Corporate Governance Documents; (14) the appointment of the New Board; and (15) the settlement and discharge of Allowed Claims, Allowed Interests, any other existing indebtedness of the Debtors and, in each

15

case, any agreements and obligations related thereto.  Moreover, the Debtors or the Reorganized Debtors, as applicable, will have sufficient Cash to make all Plan Distributions required as of the applicable date of such Plan Distribution pursuant to the terms of the Plan.

(vi)      Non-Voting Equity Securities/Allocation of Voting Power (11 U.S.C. § 1123(a)(6)).  Section 5.10 of the Plan provides that Reorganized Energy Inc. is authorized to issue the New Equity Interests.  The issuance of the New Equity Interests complies with section 1123(a)(6) of the Bankruptcy Code.  The certificates of incorporation, articles of incorporation, articles of amendment and restatement, bylaws, or similar governing documents, as applicable, of the Debtors have been or will be amended on or prior to the Effective Date to prohibit the issuance of non-voting equity securities in accordance with section 1123(a)(6) of the Bankruptcy Code.

(vii)      Designation of Directors and Officers (11 U.S.C. § 1123(a)(7)).  On March 9, 2018, the Debtors filed with the Bankruptcy Court the Notice of D&O as **Exhibit F** to the Plan Supplement (D.I. 176), and on March 28, 2018, the Debtors filed with the Bankruptcy Court a supplemental Notice of D&O as **Exhibits F and F-1** to the Plan Supplement (D.I. 248) identifying the directors and officers who will serve in such capacity with respect to the Reorganized Debtors.  The Plan provisions governing the manner of selection of any officer, director, or manager under the Plan are consistent with the interests of creditors and equity security holders and with public policy in accordance with section 1123(a)(7) of the Bankruptcy Code.

(viii)      Impairment/Unimpairment of Classes of Claims or Interests (11 U.S.C. § 1123(b)(1)).  As contemplated by section 1123(b)(1) of the Bankruptcy Code, and pursuant to

16

section 1124 of the Bankruptcy Code, Articles III and IV of the Plan classify and describe the treatment for the Unimpaired Classes and Impaired Classes.

(ix)     <u>Assumption and Rejection (11 U.S.C. § 1123(b)(2))</u>.  Article VIII of the Plan governing the assumption or rejection of executory contracts and unexpired leases satisfies the requirements of sections 365(b) of the Bankruptcy Code and 1123(b)(2) of the Bankruptcy Code.  In accordance with Section 8.2 of the Plan, the Debtors served, as set forth in the Cure Affidavit, the Cure Notice (attached as **<u>Exhibit B</u>** to the Cure Affidavit) on counterparties to executory contracts and unexpired leases to be assumed reflecting the Debtors' intention to assume the executory contract or unexpired lease in connection with the Plan and setting forth the proposed Cure Amount (if any).  The Cure Notice complied with the terms of the Plan, and the filing and service of the Cure Notice was good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable rules, laws, and regulations and no other or further notice is or shall be required.

(x)     <u>Retention of Causes of Action/Reservation of Rights (11 U.S.C. § 1123(b)(3))</u>.  On March 9, 2018, the Debtors filed with the Bankruptcy Court a Schedule of Retained Causes of Action as **<u>Exhibit L</u>** to the Plan Supplement (D.I. 176), and on March 28, 2018, the Debtors filed with the Bankruptcy Court a revised Schedule of Retained Causes of Action as **<u>Exhibit L</u>** to the Plan Supplement (D.I. 248).  Pursuant to Section 10.11 of the Plan and in compliance with section 1123(b)(3)(B) of the Bankruptcy Code, except as otherwise set forth in or released by the Plan, the Plan preserves the Debtors' rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the

Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law.

(xi)     Modification of Rights (11 U.S.C. § 1123(b)(5)). The Plan modifies the rights of holders of Claims or Interests, as applicable, in Class 4 (FLTL Claims), Class 5 (FLLO Claims), Class 6 (SLTL Claims), and Class 10 (Existing Energy Inc. Interests), and leaves Unimpaired the rights of holders of Claims or Interests, as applicable, in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 3 (RBL Claims), Class 7 (General Unsecured Claims), Class 8 (Intercompany Claims), Class 9 (Existing Holdings Interests), and Class 11 (Intercompany Interests).

(xii)    Additional Plan Provisions (11 U.S.C. § 1123(b)(6)). The provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code and applicable law, including (1) the release, discharge, injunction, and exculpation provisions set forth in Article X of the Plan, (2) the exemption, pursuant to section 1145 of the Bankruptcy Code, of the offer, issuance, and distribution of the New Equity Interests pursuant to Sections 4.6(a)(i) and 4.10(a) of the Plan, which securities, following the issuance thereof, may be resold without registration under (x) the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, and (y) state securities laws pursuant to various exemptions provided by the respective laws of the several states, and (3) the exemption, pursuant to section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, of the offer, issuance, distribution, and sale of the Subscription Rights and New Equity Interests pursuant to the Rights Offering, and to

the Backstop Parties under the Backstop Commitment Agreement (including the New Equity Interests comprising the Backstop Commitment Premium), which securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

(xiii)     Debtors Are Not Individuals (11 U.S.C. § 1123(c)).  The Debtors are not individuals and, accordingly, section 1123(c) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

(xiv)     Cure of Defaults (11 U.S.C. § 1123(d)).  Section 8.2 of the Plan provides for the satisfaction of default claims associated with each executory contract and unexpired lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code. All Cure Amounts will be determined in accordance with the underlying agreements and applicable nonbankruptcy law.  Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

P.     Debtors' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)). The Debtors have complied with the applicable provisions of the Bankruptcy Code.  Specifically:

(i)     each of the Debtors is an eligible debtor under section 109 of the Bankruptcy Code; and

(ii)     the Debtors have complied with the applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Bankruptcy Court, including sections 1125 and 1126(b), the Bankruptcy Rules, Local Rules, the Scheduling Order, applicable non-bankruptcy law and all other applicable laws, rules, and regulations in

19

transmitting the Plan, Plan Supplement, Disclosure Statement, Ballots, and related documents and notices and in soliciting and tabulating the votes on the Plan.

      Q.    <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>.  The Debtors have proposed the Plan (including all documents necessary to effectuate the Plan), the Plan Supplement, and the Plan Documents in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  The Debtors' good faith is evident from the facts and record of the Chapter 11 Cases, the Disclosure Statement, and the record of the Combined Hearing and other proceedings held in the Chapter 11 Cases.  The Plan (including all documents necessary to effectuate the Plan), the Plan Supplement, and the Plan Documents were proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates and to effectuate a successful reorganization of the Debtors.  The Plan (including all documents necessary to effectuate the Plan), the Plan Supplement, and the Plan Documents were negotiated in good faith and at arm's length among the Debtors, each of the Consenting Creditors, and the Consenting Sponsor, and, with respect to certain of the Plan Documents, Noble and Apache, as applicable.  Further, the Plan's classification, indemnification, exculpation, release, and injunction provisions have been negotiated in good faith and at arm's length, are consistent with sections 105, 1122, 1123(b)(6), 1123(b)(3)(A), 1129, and 1142 of the Bankruptcy Code, and are each integral to the Plan, supported by valuable consideration, and necessary for the Debtors' successful reorganization.  The Exculpated Parties have participated in good faith and in compliance with the provisions of the applicable laws with regard to the solicitation of, and the distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any

applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  The definition of "Exculpated Parties" as used in this Order and in the Plan shall include any Issuing Bank (as such term is defined in the Exit LC Credit Agreement).

R.      Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)). Any payment made or to be made by the Debtors for services or for costs and expenses of the Debtors' professionals in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by or is subject to the approval of the Bankruptcy Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

S.      Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).   The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code.  The Plan provides that, from and after the Effective Date, the board of directors and officers of the Reorganized Debtors shall consist of those individuals listed in the Notice of D&O, which includes information about the directors' and officers' affiliations and constitutes adequate disclosure of such information.  The Plan provisions governing the manner of selection of the members of the Reorganized Debtors' board of directors are consistent with the interests of holders of Claims against or Interests in the Debtors and with public policy in accordance with section 1123(a)(7) of the Bankruptcy Code. Such directors and officers will serve in accordance with the terms of the New Corporate Governance Documents.

T.      No Rate Changes (11 U.S.C. § 1129(a)(6)).  The Plan does not provide for rate changes by any of the Reorganized Debtors.  Thus, section 1129(a)(6) of the Bankruptcy Code is not applicable in the Chapter 11 Cases.

21

U.     Best Interest of Creditors (11 U.S.C. § 1129(a)(7)).   The Plan satisfies section 1129(a)(7) of the Bankruptcy Code.  The liquidation analysis included in the Disclosure Statement (i) is persuasive and credible, (ii) has not been controverted by other evidence, and (iii) establishes that each holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

V.     Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).   Holders of Claims in the Unimpaired Classes are not Impaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Fieldwood Holdings is the sole holder of Interests in Class 10 (Existing Energy Inc. Interests), a Debtor in these Chapter 11 Cases, and a proponent of the Plan and is thus conclusively deemed to accept the Plan.

W.     Treatment of Administrative Expense Claims, Priority Tax Claims, DIP Claims, and Other Priority Claims (11 U.S.C. § 1129(a)(9)).   The treatment of Allowed Administrative Expense Claims, Fee Claims, and DIP Facility Claims, and Priority Tax Claims pursuant to Sections 2.1, 2.2, 2.3, and 2.4 of the Plan satisfies the requirements of section 1129(a)(9)(A) of the Bankruptcy Code.  The treatment of Priority Non-Tax Claims pursuant to Section 4.1 of the Plan satisfies the requirements of section 1129(a)(9)(B) of the Bankruptcy Code.  The treatment of Priority Tax Claims pursuant to Section 2.5 of the Plan satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code.

X.  Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)). Class 4 (FLTL Claims), Class 5 (FLLO Claims), and Class 6 (SLTL Claims) are Impaired and each voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code, determined without including any acceptance of the Plan by any insider, thereby satisfying the requirements of section 1129(a)(10) of the Bankruptcy Code.

Y.  Feasibility (11 U.S.C. § 1129(a)(11)). The information in the Disclosure Statement (i) is persuasive and credible, (ii) has not been controverted by other evidence, and (iii) together with the record of the Chapter 11 Cases and the evidence presented at the Combined Hearing, establishes that the Plan is feasible, that there is a reasonable prospect of the Reorganized Debtors being able to meet their financial obligations under the Plan and of their businesses in the ordinary course, that the incurrence of the obligations contemplated by the Plan will not result in the insolvency of the Debtors, and that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtors, thereby satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

Z.  Payment of Statutory Fees (11 U.S.C. § 1129(a)(12)). All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Code, have been or will be paid on or before the Effective Date pursuant to Section 2.1 of the Plan, thereby satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

AA.  Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)). Section 8.5 of the Plan provides that on the Effective Date, and subject to the limitations set forth in Section 8.5, the Reorganized Debtors shall be deemed to have assumed all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees,

23

consultants, contractors, and non-employee directors, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans (collectively, the "**Employee Arrangements**").  Accordingly, section 1129(a)(13) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

BB.    No Domestic Support Obligations (11 U.S.C. § 1129(a)(14)).  The Debtors are not required by a judicial or administrative order, or by statute, to pay any domestic support obligations.  Accordingly, section 1129(a)(14) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

CC.    Debtors are Not Individuals (11 U.S.C. § 1129(a)(15)).  The Debtors are not individuals, and accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

DD.    No Applicable Nonbankruptcy Law Regarding Transfers (11 U.S.C. § 1129(a)(16)).  The Debtors are each a moneyed, business, or commercial corporation, and accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

EE.    No Unfair Discrimination, Fair and Equitable.  None of the Classes have rejected or are deemed to reject the Plan, and accordingly, section 1129(b) of the Bankruptcy Code is inapplicable to the Plan.

FF.    Only One Plan (11 U.S.C. § 1129(c)).  The Plan is the only plan filed in the Chapter 11 Cases and, accordingly, section 1129(c) of the Bankruptcy Code is inapplicable.

GG.    Principal Purpose of Plan (11 U.S.C. § 1129(d)).  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the

Securities Act and no governmental entity has objected to the confirmation of the Plan on any such grounds. The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

HH. <u>Good Faith Solicitation (11 U.S.C. § 1125(e))</u>. Based on the record before the Bankruptcy Court in these Chapter 11 Cases, including evidence presented at the Combined Hearing, the Debtors and the other Exculpated Parties (i) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the development of the Plan, all their respective activities relating to the solicitation of acceptances to the Plan, and their participation in the activities described in section 1125 of the Bankruptcy Code, including, without limitation, the execution, delivery, entry into and performance of the Restructuring Support Agreement, the Backstop Commitment Agreement, the New Corporate Governance Documents, any other Plan Documents and Agreements, the extension of financing under the DIP Facility, the participation in the Rights Offering, consummation of the Restructuring Transactions, and appointment of the New Board, and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of the securities under the Plan, and are entitled to the protections afforded by

section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Section 10.8 of the Plan.

II.     Satisfaction of Confirmation Requirements.   Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

JJ.     Implementation.   All documents and agreements necessary to implement the Plan, including, without limitation, the documents contained in and contemplated by the Plan Supplement, the Purchase Agreement, the New Corporate Governance Documents, the Backstop Commitment Agreement, and any other Plan Documents, and all other relevant and necessary documents and agreements that are necessary to implement the Plan (collectively, the "**Plan Documents and Agreements**") are essential elements of the Plan.   Consummation of each such Plan Document and Agreement is in the best interests of the Debtors, the Debtors' Estates, and holders of Claims and Interests and such Plan Documents and Agreements are incorporated by reference, are approved in all respects, and constitute an integral part of this Order.   The Debtors have exercised reasonable business judgment in determining to enter into the Plan Documents and Agreements, and the Plan Documents and Agreements have been negotiated in good faith, at arm's length, are fair and reasonable, are supported by reasonably equivalent value and fair consideration, and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.

KK.     Executory Contracts and Unexpired Leases.   The Debtors have exercised reasonable business judgment in determining whether to assume or reject executory contracts and unexpired leases pursuant to Article VIII of the Plan.   Each assumption of an executory

contract or unexpired lease pursuant to Article VIII of the Plan shall be legal, valid, and binding upon the Debtors or Reorganized Debtors and their successors and assigns and all non-Debtor parties and their successors and assigns to such executory contract or unexpired lease, all to the same extent as if such assumption were effectuated pursuant to an order of the Bankruptcy Court under section 365 of the Bankruptcy Code entered before entry of this Order. Moreover, the Debtors have cured, or provided adequate assurance that the Debtors or Reorganized Debtors or their successors and assigns, as applicable, will cure defaults (if any) under or relating to each of the executory contracts and unexpired leases that are being assumed by the Debtors pursuant to the Plan.

LL.     <u>Injunction, Exculpation, and Releases</u>.    The Bankruptcy Court has jurisdiction under sections 1334(a) and (b) of title 28 of the United States Code and authority under section 105 of the Bankruptcy Code to approve the injunctions or stays, injunction against interference with the Plan, releases, and exculpation set forth in the Plan, including in Sections 10.5, 10.6, 10.7, 10.8, and 10.9 of the Plan, respectively. As has been established based upon the record in the Chapter 11 Cases and the evidence presented at the Combined Hearing, such provisions (i) were given in exchange for good and valuable consideration, (ii) were integral to the agreements among the various parties in interest and are essential to the formulation and implementation of the Plan, as provided in section 1123 of the Bankruptcy Code, (iii) confer substantial benefits on the Debtors' Estates, (iv) are fair, equitable, and reasonable, (v) are in the best interests of the Debtors, their Estates, and parties in interest, and (vi) failure to implement the injunctions, exculpation, and releases would seriously jeopardize the Debtors' ability to confirm and implement the Plan. Pursuant to section 1123(b)(3) of the

27

Bankruptcy Code and Bankruptcy Rule 9019(a), the injunctions, releases, and exculpation set forth in the Plan and implemented by this Order are fair, equitable, reasonable, and in the best interest of the Debtors, the Reorganized Debtors, and their Estates, creditors, and equity holders and supported by adequate consideration.

(i)      The releases granted by the Debtors and their Estates under Section 10.7(a) of the Plan (the "**Debtors' Release**") represent a valid exercise of the Debtors' business judgment.  For the reasons set forth on the record of these Chapter 11 Cases and the evidence proffered or adduced at the Combined Hearing, such release is an integral and necessary part of the Plan and is fair, reasonable, and in the best interests of the Debtors, the Estates, and holders of Claims and Interests.  Also, the Debtors' Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Released Claims released by the Debtors, the Reorganized Debtors, and the Estates; (3) given and made after due notice and opportunity for hearing; and (4) a bar to any of the Debtors, the Reorganized Debtors, or the Estates asserting any Claim or Cause of Action released pursuant to the release described in Section 10.7(a) of the Plan, except as otherwise set forth in the Plan.

(ii)      The releases contained in Section 10.7(b) of the Plan (the "**Third Party Release**") are appropriate.  Creditors were duly informed of the Third Party Release and given the opportunity to opt out.  The Combined Notice sent to all holders of Claims and Interests expressly included in bold and capitalized font the terms of the Third Party Release, as set forth in Section 10.7(b) in the Plan.  In addition, the Notice of Non-Voting Status sent to all holders of Claims or Interests in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class

3 (RBL Claims), Class 7 (General Unsecured Claims), and Class 9 (Existing Holdings Interests) expressly included in bold and capitalized font the terms of the Third Party Release. The Ballots sent to all holders of Claims in the Voting Classes included the Third Party Release in the same manner as the notices and set forth the procedures for opting-out of such Third Party Release if such holders did not wish to be bound. The release, exculpation, and injunction provisions, including the Third Party Release, were emphasized with bold and capitalized font in the Plan, the Disclosure Statement, the Ballots, the Combined Notice, and the Notice of Non-Voting Status.

(iii)    The Third Party Release is: (1) in exchange for good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Third Party Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release, except as otherwise set forth in the Plan. The Third Party Release is an integral part of the Plan that is overwhelmingly supported by the Voting Classes. Like the Debtors' Release, the Third Party Release facilitated participation in both the Debtors' Plan and the chapter 11 process generally. The Third Party Release is instrumental to the Plan and was critical in incenting the parties, including the Consenting Creditors and Consenting Sponsor, to support the Plan. The Third Party Release was a core negotiation point in connection with the Restructuring Support Agreement and instrumental in developing a Plan that maximized value for all of the Debtors' stakeholders. The Third Party Release is appropriately tailored under the facts and circumstances of these Chapter

29

11 Cases.  Parties-in-interest have had a full opportunity to object to and/or opt out of the Third Party Release and/or the other release and exculpation provisions set forth in Article X of the Plan; certain of such objections and/or opt-outs have been consensually resolved or allowed and any additional objections and/or opt-outs filed after the objection deadline of 4 p.m. (Prevailing Central Time) on March 21, 2018, or as otherwise previously agreed with the Debtors, are deemed not timely.  As such, the Third Party Release appropriately offers certain protections to parties that constructively participated in the Debtors' restructuring process by, among other things, supporting the Plan and the Restructuring Transactions.

(iv)     Moreover, the Released Parties have made a substantial contribution to the Debtors' reorganization. Among other things, (i) the Restructuring Support Parties negotiated a Restructuring Support Agreement with the Debtors under which the Consenting Second Lien Creditors (as defined in the Restructuring Support Agreement) agreed to equitize 100% of their SLTL Claims while leaving unsecured creditors unimpaired, (ii) the Plan has been unanimously accepted and approved among voting holders of Allowed FLTL Claims, Allowed FLLO Claims and Allowed SLTL Claims, (iii) the Backstop Parties guaranteed the successful consummation of the Rights Offering by entering into the Backstop Commitment Agreement, and (iv) the DIP Commitment Parties (as defined in the Restructuring Support Agreement) supported the Debtors' businesses during the Chapter 11 Cases by providing access to the DIP Facility.

(v)     The exculpations granted under the Plan are reasonable in scope and do not relieve any party of liability for an act or omission to the extent such act or omission is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.

(vi)      The record of the Combined Hearing and the Chapter 11 Cases is sufficient to support the injunctions, releases, and exculpation provided for in the Plan, including Sections 10.5, 10.6, 10.7, 10.8, and 10.9 of the Plan.  Accordingly, based upon the record of the Chapter 11 Cases, the representations of the parties, and/or the evidence proffered, adduced, and/or presented at the Combined Hearing, the injunctions, exculpation, and releases set forth in Article X of the Plan are consistent with the Bankruptcy Code and applicable law and are approved.

MM.    Good Faith.  The Debtors and the Released Parties have been and will be acting in good faith if they proceed to (i) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby and (ii) take the actions authorized and directed by this Order.

NN.    Valuation.  Based on the valuation analysis set forth in the Disclosure Statement and the testimony induced at the Combined Hearing, which the Bankruptcy Court has determined to be credible and based on appropriate assumptions and valid analysis and methodology, the Bankruptcy Court finds that the valuation implied by the Restructuring Transactions is the best measure of the Reorganized Debtors' value given the facts and circumstances of the Chapter 11 Cases.

OO.    Exemption from Securities Laws.  The offer, issuance, and distribution of the New Equity Interests to holders of SLTL Claims and Existing Energy Inc. Interests under Sections 4.6(a)(i) and 4.10 of the Plan, respectively, shall be exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under (i) the Securities Act and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer,

31

issuance, or distribution of securities.  The New Equity Interests will be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to underwriters in section 2(a)(11) of the Securities Act; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (iii) the restrictions on transferability of such securities set forth in the New Corporate Governance Documents; and (iv) applicable regulatory approval.  All securities described above were (or are designated to be) offered, distributed, and sold pursuant to the Plan.  The offer, issuance, sale, and distribution of Subscription Rights and the New Equity Interests pursuant to the Rights Offering, and to the Backstop Parties under the Backstop Commitment Agreement (including the New Equity Interests comprising the Backstop Commitment Premium), shall be exempt from registration, in reliance on the exemption set forth in section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder.  Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or an available exemption from the registration requirements of the Securities Act and subject to (i) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (ii) the restrictions on transferability of such securities set forth in the New Corporate Governance Documents, and (iii) applicable regulatory approval. Each New Equity Interest issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable. Each distribution and issuance of the New Equity Interests shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by

the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each entity receiving New Equity Interests.

PP.    <u>Conditions Precedent to Confirmation and Effective Date</u>.  The conditions precedent to the confirmation of the Plan and the Effective Date set forth in Section 9.1 of the Plan may be waived in writing by the Debtors, the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders without leave of or order of the Bankruptcy Court.

QQ.    <u>Retention of Jurisdiction</u>.  The Bankruptcy Court may properly, and upon the Effective Date shall, retain exclusive jurisdiction over all matters arising in or related to, the Chapter 11 Cases, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

RR.    <u>Waiver of Stay</u>.  Given the facts and circumstances of the Chapter 11 Cases, it is appropriate that this Order shall not be stayed pursuant to Bankruptcy Rules 3020(e), 6004(g), 6006(d), or 7062, and the Confirmation Order shall take effect immediately upon its entry.

## **ORDER**

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

1.    <u>Findings of Fact and Conclusions of Law</u>.  The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014.   All findings of fact and

conclusions of law announced by the Bankruptcy Court at the Combined Hearing in relation to confirmation of the Plan are hereby incorporated into this Order.  To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be deemed so, and vice versa.

2. <u>Combined Notice</u>.  The Combined Notice complied with the terms of the Scheduling Order, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law.

3. <u>Solicitation</u>.  The solicitation of votes on the Plan complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Scheduling Order, and applicable non-bankruptcy law. To the extent that the Debtors' solicitation was deemed to constitute an offer of new securities, such solicitation is exempt from registration pursuant to section 4(a)(2) and Regulation D of the Securities Act.  Specifically, section 4(a)(2) and Regulation D of the Securities Act creates an exemption from the registration requirements under the Securities Act for transactions not involving a "public offering."   15 U.S.C. § 77d(a)(2).  The Debtors have complied with the requirements of section 4(a)(2) and Regulation D of the Securities Act as the prepetition solicitation of acceptances would constitute a private placement of securities.  The solicitation was made only to those holders of Class 6 (SLTL Claims) and Class 10 (Existing Energy Inc. Interests) who are "Accredited Investors" (within the meaning of rule 501(a) of Regulation D of the Securities Act), and such holders were required to certify on their Ballots that they belonged to such category.

4.       Solicitation of Disclosure Statement.      The Disclosure Statement (i) contains adequate information of a kind that is consistent with the disclosure requirements of applicable non-bankruptcy law, including the Securities Act, (ii) contains "adequate information" (as such term is defined in section 1125(a)(1) and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein, and (iii) is approved in all respects.

5.       Confirmation of Plan.   The Plan and each of its provisions shall be, and hereby are, CONFIRMED under section 1129 of the Bankruptcy Code.   The documents contained in or contemplated by the Plan, including, without limitation, the Plan Supplement, Plan Documents and Agreements, and Purchase Agreement, are hereby authorized and approved. The terms of the Plan are incorporated by reference into and are an integral part of this Order.

6.       Objections.    All objections to confirmation of the Plan and other responses, statements, or reservations of rights with respect to confirmation of the Plan, the Plan Supplement, or the injunctions, releases, and exculpation provided for in the Plan (i) have been withdrawn, waived, or otherwise resolved by the Debtors prior to entry of this Order, or (ii) to the extent that any objections (including any reservations of rights contained therein) to confirmation of the Plan or the Plan Supplement or other responses or reservations of rights with respect to confirmation of the Plan or the Plan Supplement have not been withdrawn prior to entry of this Order, such objections shall be, and hereby are, overruled on the merits.

7.       Binding Effect.   As of the Effective Date, the Plan and this Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and all holders of Claims against and Interests in the Debtors and their respective

successors and assigns, whether or not any such holders were (i) Impaired or Unimpaired under the Plan, (ii) deemed to accept or reject the Plan, (iii) failed to vote to accept or reject the Plan, (iv) voted to reject the Plan, or (v) opted out of the injunctions, releases, and exculpation provided for in the Plan, including Sections 10.6, 10.7, and 10.8 of the Plan.

8.    <u>Free and Clear</u>.  Except as otherwise specifically provided in this Order, the Plan, the Plan Documents and Agreements, or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, including, but not limited to, the Exit LC Facility Documents, the Exit First Lien Documents, the Exit Second Lien Documents, and the Apache Decommissioning Agreement Amendment, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.  In addition and for the avoidance of doubt, on the Effective Date, all of Apache's mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates of the Debtors or Reorganized Debtors shall be fully released and discharged, except for (i) any liens on property in The Fieldwood Decommissioning Trust A, a Delaware statutory trust, (ii) the "Recharacterization Mortgages" as defined in the

36

Decommissioning Agreement dated September 30, 2013, between Apache, Fieldwood Energy LLC, and GOM Shelf LLC, as amended by the Apache Documents, and (iii) any other mortgages, deeds of trust, Liens, pledges, or other security interests expressly preserved in the Apache Decommissioning Agreement Amendment or other Apache Documents.  On and after the Effective Date, the Reorganized Debtors may take any action, including, without limitation, the operation of its business, the use, acquisition, sale, lease, and disposition of property and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided in this Order or the Plan.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

9.      <u>Treatment of Certain Classes</u>.  For the avoidance of doubt, Allowed RBL Claims, Allowed FLTL Claims and Allowed FLLO Claims include, without limitation, accrued and unpaid interest, including without limitation, any default interest, outstanding under the Prepetition RBL Credit Agreement, Prepetition First Lien Term Loan Agreement, and Prepetition FLLO Credit Agreement, as applicable, payable though the Effective Date, which accrued and unpaid interest shall be paid in Cash on the Effective Date.  Notwithstanding anything to the contrary in the Plan or the DIP Facility Orders, any Cash payments under the

Plan to holders of Allowed RBL Claims, Allowed FLTL Claims and Allowed FLLO Claims (collectively, the "**Prepetition First Lien Secured Parties**"), as applicable, shall be reduced by any distributions made, prior to the Effective Date, as adequate protection cash payments pursuant to section 13(c) or 14(c) under the DIP Facility Orders to such Prepetition First Lien Secured Party.

          10.   <u>Approval of the New Corporate Governance Documents</u>.   The New Corporate Governance Documents, including, without limitation, the Stockholders Agreement and the Registration Rights Agreement, are hereby approved.  The Debtors and the Reorganized Debtors, as applicable, are authorized, without further approval of the Bankruptcy Court or any other party, to execute and deliver all agreements, documents, instruments, and certificates relating to the New Corporate Governance Documents, including the Stockholders Agreement and Registration Rights Agreement, and take such other actions as reasonably deemed necessary to perform their obligations thereunder.  The Stockholders Agreement shall be effective on the Effective Date of the Plan, operative and binding on, and enforceable against, the Company and on all "Stockholders" as such term is defined in the Stockholders Agreement who are Stockholders on the Effective Date, whether or not such Stockholders manually execute the Registration Rights Agreement.  The Registration Rights Agreement shall be effective on the Effective Date of the Plan, operative and binding on, and enforceable against, the Company and on all "Stockholders" as such term is defined in the Registration Rights Agreement who are Stockholders on the Effective Date, whether or not such Stockholders manually execute the Registration Rights Agreement.

11.     <u>Designation of Directors and Officers Approved</u>.  On the Effective Date, the initial board of directors and officers of the Reorganized Debtors shall consist of those individuals identified in the Notice of D&O, and such directors and officers shall be deemed elected or appointed (as applicable) and authorized to serve as directors or officers of the Reorganized Debtors pursuant to the terms of the New Corporate Governance Documents.  Such appointment and designation is hereby approved and ratified as being in the best interests of the Debtors and creditors and consistent with public policy, and such directors hereby are deemed elected and appointed to serve in their respective capacities as of the Effective Date without further action of the Bankruptcy Court, the Reorganized Debtors, or their security holders.

12.     <u>Exit LC Credit Agreement Approved</u>.  The Exit LC Facility Documents are an essential element of the Plan, are necessary for confirmation and the consummation of the Plan and are critical to the overall success and feasibility of the Plan. Entry into the Exit LC Facility Documents and the related transactions is in the best interests of the Debtors, their Estates and all holders of such Claims or Interests. The Debtors have exercised reasonable business judgment in determining to enter into the Exit LC Facility Documents and have provided sufficient, timely and adequate notice of the material terms of the Exit LC Facility Documents, which material terms were filed as part of the Plan and Plan Supplement. The terms and conditions of the Exit LC Facility Documents are fair and reasonable, and the Exit LC Facility Documents were negotiated in good faith and at arm's length.  The Bankruptcy Court hereby (i) approves the Exit LC Facility Documents, and all transactions and fees contemplated thereby and thereof, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors contemplated thereby and (ii) authorizes the Reorganized

Debtors, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform its obligations under the Exit LC Facility Documents.  Upon entry of this Order, the Debtors or Reorganized Debtors, as applicable, are authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute the Exit LC Facility Documents in accordance with the Plan and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder.  On the Effective Date, the Exit LC Facility Documents shall constitute legal, valid, binding, and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan, or this Order.  On the Effective Date, all Liens and security interests granted pursuant to, or in connection with, the Exit LC Credit Agreement: shall (i) be reaffirmed and ratified by the applicable Reorganized Debtors and continue in full force and effect pursuant to the Exit LC Credit Agreement, and (ii) be deemed granted by the Reorganized Debtors pursuant to the Exit LC Credit Agreement. On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the Exit LC Credit Agreement, as applicable, (including any Liens and security interests granted on the Purchased Assets) (i) shall be valid, binding, perfected, enforceable Liens and security interests in the property described in the Exit LC Credit Agreement and the other "Loan Documents" (as defined therein), with the priorities established in respect thereof under applicable non-bankruptcy law and the applicable New Intercreditor Agreements and (ii) shall

40

not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or this Order.  Pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors and the Reorganized Debtors have waived any discharge of the Claims and obligations arising under the Prepetition RBL Credit Agreement as modified by the Exit LC Credit Agreement.

13.   Exit First Lien Term Loan Facility and Exit Second Lien Term Loan Facility.  The Exit First Lien Documents and the Exit Second Lien Documents (collectively, the "**Exit Senior Secured Documents**") are each an essential element of the Plan, are necessary for confirmation and the consummation of the Plan, and are critical to the overall success and feasibility of the Plan. Entry into each of the Exit Senior Secured Documents and the related transactions are in the best interests of the Debtors, their Estates and all holders of such Claims or Interests.  The Debtors have exercised reasonable business judgment in determining to enter into each of the Exit Senior Secured Documents and have provided sufficient, timely and adequate notice of the material terms of each of the Exit Senior Secured Documents, which material terms were filed as part of the Plan and Plan Supplement.  The terms and conditions of each of the Exit Senior Secured Documents are fair and reasonable, and each of the Exit Senior Secured Documents were negotiated in good faith and at arm's length.  The Bankruptcy Court hereby (i) approves the Exit First Lien Term Loan Facility and Exit Second Lien First Lien Facility, and all transactions and fees contemplated thereby and thereof, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors contemplated thereby and (ii) authorizes the Reorganized Debtors, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further

corporate or shareholder action, to enter into, deliver, and fully perform its obligations under the Exit Senior Secured Documents.  Upon entry of this Order, the Debtors or Reorganized Debtors, as applicable, are authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute and deliver the Exit Senior Secured Documents in accordance with the Plan and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder.  Upon the satisfaction of all applicable conditions, the Exit First Lien Term Loan Agent, the Exit First Lien Term Loan Lenders, the Exit Second Lien Term Loan Agent, and the Exit Second Lien Term Loan Lenders shall be deemed, as applicable, to have executed and entered into the Exit Senior Secured Documents.  On the Effective Date, the Exit Senior Secured Documents shall constitute legal, valid, binding, and authorized joint and several obligations of the Reorganized Debtors, enforceable in accordance with their terms, and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan, or this Order.  On the Effective Date, all Liens and security interests granted pursuant to, or in connection with, the Prepetition First Lien Credit Agreement and Prepetition FLLO Credit Agreement shall (i) be reaffirmed and ratified by the Reorganized Debtors and continue in full force and effect pursuant to the Exit First Lien Credit Agreement and Exit Second Lien Credit Agreement, as applicable, and (ii) be deemed granted by the Reorganized Debtors pursuant to the Exit First Lien Credit Agreement and Exit Second Lien Credit Agreement, as applicable.  On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the Exit First Lien Credit Agreement and Exit Second Lien Credit Agreement, as applicable, (including any Liens and

security interests granted on the Purchased Assets) (i) shall be valid, binding, perfected, enforceable Liens and security interests in the property subject to a security interest granted by the applicable Reorganized Debtors pursuant to the Exit First Lien Credit Agreement and Exit Second Lien Credit Agreement and the "Loan Documents" (as defined in each of the Exit First Lien Credit Agreement and the Exit Second Lien Credit Agreement), as applicable, with the priorities established in respect thereof under applicable non-bankruptcy law and the applicable New Intercreditor Agreements and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

14.     _Apache Documents Approved_.  The Bankruptcy Court hereby (i) approves the Apache Documents, and all transactions contemplated thereby and thereof, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors contemplated thereby and (ii) authorizes the Reorganized Debtors, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform its obligations under the Apache Documents.   Upon entry of this Order, the Debtors or Reorganized Debtors, as applicable, are authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute and deliver the Apache Documents in accordance with the Plan and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder.  On the Effective Date, the Apache Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance

with their terms, and such obligations of the Reorganized Debtors and transactions contemplated thereby shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination by the Reorganized Debtors under applicable law, the Plan, or this Order.   Subject to paragraph 8 hereof, on the Effective Date, all Liens and security interests granted pursuant to, or in connection with, the Apache Documents shall be deemed granted by the Reorganized Debtors pursuant to the Apache Documents, as applicable.   Subject to paragraph 8 hereof, on the Effective Date, all Liens and security interests granted pursuant to, or in connection with Apache Documents, as applicable, (i) shall be valid, binding, perfected, enforceable Liens and security interests in the property subject to a security interest granted by the applicable Reorganized Debtors pursuant to the Apache Documents, as applicable, with the priorities established in respect thereof under applicable non-bankruptcy law and the Apache Documents, including, but not limited to, the Third Supplement to Recharacterization Mortgage and Subordination Agreement including in the Apache Documents, and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination by the Reorganized Debtors under applicable law, the Plan, or this Order.   For the avoidance of doubt, the Liens and security interests granted to Apache pursuant to the Recharactarization Mortgage (as such term is defined in the Decommissioning Agreement, as amended from time to time, and as supplemented by the Third Supplement to the Recharactarization Mortgage) upon any reharacterization of the Trust A or Trust A-1 NPIs (as such term is defined in the Decommissioning Agreement, as amended from time to time, and as supplemented by the Third Supplement to the Recharactarization Mortgage) shall be senior in all respects to any Liens and security interests granted to the LC Facility Agent (for itself and on behalf of the LC Facility

Secured Parties), First Lien Agent (for itself and on behalf of the First Lien Secured Parties) or Second Lien Agent (for itself and on behalf of the Second Lien Secured Parties) on the NPI Collateral (as such term is defined in the Subordination Agreement attached as Exhibit E-5 to the Plan Supplement).

15.     Plan Distributions.    The Debtors are authorized to make all Plan Distributions pursuant to the terms of the Plan and to pay any other applicable fees and expenses approved by any other order of this Bankruptcy Court, including, without limitation, adequate protection payments under the DIP Facility Orders.

16.     Issuance of New Equity Interests.   On the Effective Date, the Debtors or Reorganized Debtors, as applicable, are authorized to issue or cause to be issued and shall issue the New Equity Interests in accordance with the terms of the Plan without the need for any further corporate or shareholder action.

17.     Approval of Asset Purchase Transaction.  The Asset Purchase Transaction is approved and authorized pursuant to section 363 of the Bankruptcy Code under the terms and conditions of the Purchase Agreement.   The Purchase Agreement was negotiated and is undertaken by the Debtors and Noble at arm's-length without collusion or fraud, and in good faith.  The consideration provided by the Debtors and Reorganized Debtors for the Assets under the Purchase Agreement shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.  Subject to and in connection with the occurrence of the Effective Date, upon the satisfaction or waiver of each of the conditions set forth in Section 9.1 of the Plan and the applicable conditions of the Purchase Agreement, the Debtors and Reorganized Debtors and Noble shall take all such actions

45

as may be necessary or appropriate to effect the Asset Purchase Transaction on the terms and subject to the conditions set forth in the Purchase Agreement.  Without limiting the generality of the immediately preceding sentence, on the Effective Date the Debtors and Reorganized Debtors and Noble shall take or cause to be taken all actions, including making appropriate filings or recordings, that may be required by applicable law in connection with the Asset Purchase Transaction.  In the event of any conflict whatsoever between the terms of the Plan and the Purchase Agreement with respect to the Asset Purchase Transaction, the terms of the Purchase Agreement shall control, and the Plan shall be deemed to incorporate in their entirety the terms, provisions, and conditions of the Purchase Agreement.

18.     <u>Cancellation of Liens</u>.  Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

19.     <u>Cancellation of Certain Existing Securities and Agreements</u>.  Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtors on the Effective Date, or in any Plan Document and Agreement, on the Effective Date, all agreements, instruments, and other documents evidencing any prepetition Claim or Interest (other than certain Intercompany Interests that are not modified

by the Plan) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation shall have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.

20.   <u>Assumption of Contracts and Leases</u>.  Pursuant to Article VIII of the Plan, as of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which the Debtors are party, including the Employee Arrangements (subject to Section 8.5 of the Plan), shall be deemed assumed except for any executory contract or unexpired lease that (i) previously has been assumed or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, *provided*, that the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders consent with respect to the Debtors' rejection of such contracts and leases. Subject to the occurrence of the Effective Date, entry of this Order by the Bankruptcy Court shall constitute approval of the assumptions provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.  Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in

accordance with its terms, except as modified by the provision of the Plan, this Confirmation Order, or any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

21.     Subject to resolution of any dispute regarding any Cure Amount and except as otherwise provided herein, all Cure Amounts shall be satisfied by the Debtors or Reorganized Debtors, as the case may be, upon assumption or assignment, as applicable, of the underlying contracts and unexpired leases.  Except as otherwise provided herein, assumption or assignment, as applicable, of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption or assumption and assignment, as applicable.   Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assigned shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other entity, upon the deemed assumption of such contract or unexpired lease

22.     Rights Offering.  Reorganized Energy Inc. shall consummate the Rights Offering in accordance with the Rights Offering Procedures, the Scheduling Order, and the Plan. The Rights Offering was conducted, and the New Equity Interests shall be issued to the Backstop Parties and the holders of SLTL Claims that exercise their respective Subscription Rights pursuant to, and in compliance with, the Rights Offering Procedures, the Backstop Commitment Agreement, and the Plan.  The consummation of the Rights Offering is conditioned on the

consummation of the Plan, the Rights Offering Procedures, and any other condition specified in the Backstop Commitment Agreement. Amounts held by the Subscription Agent with respect to the Rights Offering prior to the Effective Date shall not be entitled to any interest on account of such amounts. On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, are authorized to pay any fees, indemnities, and expenses set forth in the Backstop Commitment Agreement, including the Restructuring Expenses set forth in section 2(d) of the Backstop Commitment Agreement, each in accordance with its terms and as and when required by the Backstop Commitment Agreement, without further application to or order of the Bankruptcy Court. For the avoidance of doubt, section 2(d) of the Backstop Commitment Agreement is hereby approved. On the Effective Date, in exchange for agreeing to backstop the Rights Offering, which backstop commitment was negotiated at arms' length and in good faith and was provided in exchange for the Backstop Parties' commitment to ensure that the Debtors had sufficient liquidity to emerge from chapter 11, and pursuant to the terms and conditions of the Backstop Commitment Agreement, the Backstop Parties shall receive the New Equity Interests constituting the Backstop Commitment Premium.

23.     _Restructuring Expenses_.     On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, are authorized to pay in full in Cash the Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement and Backstop Commitment Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or

approval.  In addition, the Debtors and the Reorganized Debtors (as applicable) are authorized to continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation, and defense of the Plan whether incurred before, on, or after the Effective Date.

24.  <u>Professional Compensation</u>.  All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall file, on or before the date that is forty five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred.  Any objections to Fee Claims shall be served and filed (i) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (ii) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

25.  <u>Compromise and Settlement of Claims, Interests, and Controversies</u>.  Pursuant to section 1123(b)(3)(a) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of this Order constitutes approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding

that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

26.   <u>Discharge of Claims and Termination of Interests</u>.   Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan or in this Confirmation Order, each holder (as well as any representatives, trustees, or agents on behalf of such holder) of a Claim or Interest, where such Claim or Interest has been fully paid or otherwise satisfied in accordance with the Plan, and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date.   Except as otherwise provided in the Plan or in this Confirmation Order, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor.

27.   <u>Term of Pre-Confirmation Injunctions and Stays</u>.   Unless otherwise provided in the Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of this Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

28.   <u>Release and Exculpation Provisions</u>.   All injunctions, releases, and exculpation provisions set forth in the Plan, including but not limited to those contained in

51

Sections 10.5, 10.6, 10.7, 10.8, and 10.9 of the Plan, are approved and shall be effective and binding on all persons and entities, to the extent provided therein, and as if fully set forth herein.

29.    _Retention of Causes of Action/Reservation of Rights_.  Except as otherwise provided in the Plan, including, without limitation, Sections 10.5, 10.6, 10.7, 10.8, and 10.9 of the Plan, nothing contained in the Plan or this Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.  Notwithstanding the foregoing, for the avoidance of doubt, the Debtors and the Reorganized Debtors shall not retain any claims or Causes of Action released pursuant to Section 10.6 of the Plan against the Released Parties.

30.    _Survival of Debtors' Indemnification Obligations_.  Pursuant to Section 8.4 of the Plan, subject to the occurrence of the Effective Date, any obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by the Plan; _provided_, that the Reorganized Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action arising out of or relating to any act

52

or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors.  Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

31.    <u>Insurance Policies</u>.  All insurance policies to which any Debtor is a party as of the Effective Date, including the D&O Policy, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.  Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in the D&O Policy.  In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

32.    <u>Exemption from Securities Laws</u>.  The offer, issuance, and distribution of the New Equity Interests to holders of SLTL Claims and Existing Energy Inc. Interests under Sections 4.6(a)(i) and 4.10 of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under (i) the Securities Act, and all rules and regulations promulgated thereunder or other federal securities laws pursuant to the exemption provided by

section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, and (ii) state securities laws pursuant to various exemptions provided by the respective laws of the several states. The offer, issuance, sale, and distribution of Subscription Rights and the New Equity Interests pursuant to the Rights Offering, and to the Backstop Parties under the Backstop Commitment Agreement (including the New Equity Interests comprising the Backstop Commitment Premium), shall be exempt from registration, in reliance on the exemption set forth in section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, which securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

33.     _Exemption from Certain Transfer Taxes_.  Pursuant to section 1146 of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments, or documents, (ii) the creation of any Lien, mortgage, deed of trust, or other security interest, (iii) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan (including the Asset Purchase Transaction), (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of collateral under the Exit LC Credit Agreement, Exit First Lien Credit Agreement, Exit Second Lien Credit Agreement, or the Apache Decommissioning Agreement Amendments, and (vi) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery, or recording of any deed or other instrument of transfer under,

54

in furtherance of, or in connection with, the Plan, including, without limitation, this Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded is ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

34.   <u>Plan Implementation</u>.

(i)      In accordance with section 1142 of the Bankruptcy Code and any provisions of the business corporation law of any applicable jurisdiction (collectively, the "**Reorganization Effectuation Statutes**"), without further action by the Bankruptcy Court or the equity holders, officers, or directors of any of the Debtors or Reorganized Debtors, the Debtors and the Reorganized Debtors, as well as the officers of the Debtors or Reorganized Debtors are authorized to:  (1) take any and all actions necessary or appropriate to implement, effectuate and consummate the Plan, the Plan Supplement, the Plan Documents and Agreements, this Order, and the transactions contemplated thereby or hereby, including, without limitation, the transactions identified in Article V of the Plan and (2) execute and deliver, adopt or amend, as the case may be, any contracts, instruments, releases, agreements, and documents necessary to implement, effectuate, and consummate the Plan, the Plan Supplement, and the Plan Documents

and Agreements, including, without limitation, those contracts, instruments, releases, agreements, and documents identified in Article V of the Plan.

(ii)     Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan, the Plan Supplement, and the Plan Documents and Agreements including, without limitation, (1) the adoption or assumption, as appropriate, of any Executory Contracts, (2) issuances and distributions of New Equity Interests, and (3) entry into any contracts, instruments, releases, agreements, and documents necessary to implement, effectuate, and consummate the Plan, including, without limitation, those contracts, instruments, releases, agreements, and documents identified in Article V of the Plan, shall be effective prior to, on, or after the Effective Date pursuant to this Order, without further notice, application to, or order of this Bankruptcy Court, or further action by the respective managers, officers, directors, members, or equity holders of the Debtors or Reorganized Debtors.

(iii)    To the extent that, under applicable non-bankruptcy law, any of the foregoing actions would otherwise require the consent or approval of the equity holders, members, managers, or directors of any of the Debtors or Reorganized Debtors, this Order shall, pursuant to section 1142 of the Bankruptcy Code and the Reorganization Effectuation Statutes, constitute such consent or approval, and such actions are deemed to have been taken by unanimous action of the directors, managers, members, and equity holders of the appropriate Debtors or Reorganized Debtors, as applicable.

(iv)    All such transactions effected by the Debtors during the pendency of the Chapter 11 Cases from the Petition Date through the Confirmation Date (or as otherwise contemplated by this Order) are approved and ratified, subject to the satisfaction of any

applicable terms and conditions to effectiveness of such transactions and the occurrence of the Effective Date.

35.  _Payment of Statutory Fees_.  On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the Chapter 11 Cases.  Each and every one of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until such time as a final decree is entered closing that particular Debtor's case, a Final Order converting the Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Debtor's case is entered.

36.  _Samson Agreement_.  The Asset Purchase Agreement between Samson Contour Energy E&P, LLC and Dynamic Offshore Resources, LLC n/k/a Fieldwood Energy Offshore, LLC, dated June 11, 2010 (the "**Samson Agreement**") is hereby assumed in its entirety, including but not limited to the Debtors' P&A obligations under the Samson Agreement.  The parties reserve all rights with respect to any General Unsecured Claims under the Samson Agreement and agree that the legal, equitable, and contractual rights of the parties under the Samson Agreement are unaltered by the Plan.

37.  _Governmental Lease Interests_.   The Debtors shall not abandon or otherwise reject any of their interests in any state or federal oil and/or gas leases, rights-of-use and easement, grants of rights-of-way, or state or federal oil and/or gas lease related obligations (collectively, the "**Governmental Lease Interests**") pursuant to this Confirmation Order, the Plan, the Plan Supplement, and/or any other Plan-related document (collectively for purposes of

paragraphs 37 through 42 of this Order, the "**Confirmation Documents**").  Nothing in the Confirmation Documents shall serve or be deemed to create, enlarge, or modify any interest in property related to the Governmental Lease Interests that did not otherwise exist under applicable non-bankruptcy law as of the Petition Date.  For the avoidance of doubt, "Governmental Lease Interests" include, without limitation, plugging and abandonment and decommissioning obligations related to the Debtors' prior interests in state or federal oil and/or gas leases.

38.    The Reorganized Debtors shall assume and succeed to all obligations in connection with the Governmental Lease Interests assumed pursuant to the Plan, which shall include all obligations due under the applicable statutes, regulations, and Notices to Lessees. The regulatory and lease obligations being assumed by the Reorganized Debtors in this paragraph include, but are not limited to, financial assurance obligations, maintenance and monitoring obligations, and decommissioning obligations (including, without limitation, plugging and abandonment and decommissioning obligations related to the Debtors' prior interests in state or federal oil and/or gas leases).

39.    Any amounts owed to any "governmental unit" as defined in 11 U.S.C. § 101(27) ("**Governmental Unit**") by the Reorganized Debtors under any Governmental Lease Interests shall be paid in full when due in the ordinary course, and nothing in the Confirmation Documents shall be interpreted to set cure amounts with respect to any Governmental Unit, or require any Governmental Unit to approve of the assumption and/or assignment of any of the Governmental Lease Interests except pursuant to existing regulatory requirements and applicable law.

40.    <u>Interior/ONRR Audit</u>.    Notwithstanding any other provision of the Confirmation Documents, the Department of the Interior ("**Interior**") shall retain the right, under applicable law, to perform any audit and/or compliance review on the Governmental Lease Interests, and if appropriate, collect from the Reorganized Debtors any additional monies owed by the Debtors or Reorganized Debtors to the Office of Natural Resources Revenue ("**ONRR**") on the Governmental Lease Interests, without those rights being adversely affected by these bankruptcy proceedings.  ONRR's rights shall be preserved in full as if this bankruptcy had not occurred.  The Reorganized Debtors will retain all defenses, other than defenses arising from the bankruptcy; provided, however, that any challenge based on a defense must be raised in the United States' administrative review process unless ONRR asserts or attempts to enforce any claim arising from any audit or compliance review in a court outside of Interior's administrative review process.   The audit and compliance period shall remain open for the full statute of limitations period established by applicable law.

41.    Notwithstanding anything to the contrary in the Confirmation Documents, the Purchase Agreement, the Apache Decommissioning Agreement Amendment, and/or the Restructuring Support Agreement, nothing shall:  (i) release, preclude or enjoin the Debtors' or Reorganized Debtors' compliance with all applicable legal requirements under applicable non-bankruptcy law governing transfers or assignments of Governmental Lease Interests including, without limitation, as provided for in the Outer Continental Shelf Lands Act (the "**OCSLA**") and 30 CFR Part 556; and/or (ii) preclude, limit, waive, impact, or affect, in any way, the rights of Interior or the State of Texas to consent to, or withhold consent to, the assignment of any

Governmental Lease Interests in its regulatory discretion solely to the extent provided for in applicable laws and regulations.

42. <u>Governmental Units</u>. Notwithstanding anything to the contrary in the Confirmation Documents, nothing shall release, discharge, limit, preclude, or enjoin: (i) any liability to any "Governmental Unit that is not a Claim set forth in 11 U.S.C. § 101(5); (ii) any Claim of a Governmental Unit arising on or after the Effective Date; (iii) any liability to a Governmental Unit on the part of any Person other than the Debtors or Reorganized Debtors; (iv) any police or regulatory liability to a Governmental Unit that any entity would be subject to as an owner or operator of property after the Effective Date; (v) any obligations to a Governmental Unit under the Debtors' Governmental Lease Interests including, *without limitation*, any decommissioning obligations and financial assurance obligations set forth in OCSLA and its implementing regulations found in 30 CFR Part 250 Subpart Q and 30 CFR Part 556; and/or (vi) any right of setoff or recoupment by any Governmental Unit; provided, further, that nothing in the Confirmation Documents shall divest any tribunal of jurisdiction to adjudicate the matters described in (i) – (vi) above or any other Claims, causes of action or rights of Governmental Units. With respect to Governmental Units, Section 10.8 of the Plan shall not exculpate any third party or non-debtor entity from any liability, claim, action, proceeding, or cause of action brought, or that may be brought, by the United States or the State of Texas except to the extent that such non-debtor third party was acting in its fiduciary capacity to the Debtors' Estates as explicitly provided for in the Bankruptcy Code, *provided however*, that nothing in the Confirmation Documents shall exculpate any entity or party with respect to any violation of any laws intended to protect the public health and safety.

60

43.     Notwithstanding anything to the contrary elsewhere in the Confirmation Documents, paragraphs 37 through 42 of this Confirmation Order shall expressly supersede and control to the extent that any conflict is deemed to exist between paragraphs 37 through 42 herein and any other provision in the Confirmation Documents.

44.     State of Louisiana.   Notwithstanding any other provision of the Plan Documents and Agreements, the State of Louisiana shall retain the right to perform any audit through the Office of Mineral Resources, Department of Natural Resources ("**DNR**") for the purposes of balancing accounts of the Debtors and identifying "[a]ll bonus, rentals, royalties, shut-in payments or other sums payable to the state as the lessor under the terms of valid existing mineral leases," pursuant to L.A. R.S. 30:136 (the "**DNR Audit**"), and if appropriate, collect from the Reorganized Debtors any additional monies owed by the Debtors or Reorganized Debtors, without those rights being adversely affected by these bankruptcy proceedings.   DNR's rights to perform the DNR Audit shall be preserved in full as if this bankruptcy had not occurred and the Reorganized Debtors will retain all defenses.   The DNR Audit period shall remain open for the full statute of limitations period established by applicable law.

45.     Archrock:     The Master Compression Services Agreement between Archrock Partners Operating LLC (f/k/a EXLP Operating LLC), and Fieldwood Energy LLC, dated January 1, 2014 and each of the thirty-three operative Schedule A's thereto (collectively, the "**MCSA**") and the Master Services Contract between Archrock Services LP (f/k/a Exterran Energy Solutions LP), and Fieldwood Energy LLC, dated January 1, 2014   (the "**MSA**") are hereby deemed assumed.   The parties reserve all rights with respect to any Cure Amount relating to the MCSA and MSA, and agree that the legal, equitable, and contractual rights of the Debtors

and Archrock under the MCSA and MSA, including any statutory lien rights of Archrock, are unaltered by the Plan, the Confirmation Order, or any other Plan Document, and any disputes thereunder will be resolved in the ordinary course of business as if the Chapter 11 Cases had never commenced.

46.     Stone and Talos.   Contracts or other agreements between (i) any of the Debtors, on the one hand, and Stone Energy Corporation and its affiliates (collectively "**Stone**"), on the other (the "**Stone Agreements**") and (ii) any of the Debtors, on the one hand, and Talos Energy LLC and its affiliates (collectively "**Talos**"), on the other (the "**Talos Agreements**") are hereby deemed assumed without the need for payment of any cure amount.   The parties reserve all rights with respect to any General Unsecured Claims under the Stone Agreements and the Talos Agreements and agree that the legal, equitable, and contractual rights of (i) the Debtors and Stone under the Stone Agreements and (ii) the Debtors and Talos under the Talos Agreements are unaltered by the Plan and any disputes thereunder will be resolved in the ordinary course of business as if the Chapter 11 Cases had never commenced.

47.     Nexen.   Nexen Petroleum Offshore U.S.A. Inc. ("**Nexen**") is a party with certain Debtor entities in the following executory contracts:   (i) an Aspen Production Handling Agreement, effective October 1, 2001, and subsequently amended from time to time, and currently expiring February 1, 2019 ("**Aspen PHA**"); (ii) an Operating and Administrative Management Agreement between Panther Operating Company, LLC and Owners of the High Island Pipeline System effective June 1, 2015, as may be updated and amended from time to time ("**HIPS Agreement**"); (iii) an Owners Agreement between the Owners of the High Island Pipeline System dated June 1, 2009, as may be updated and amended ("**Owners Agreement**");

(iv) an Operating Agreement Block A-489, High Island Area, South Addition, Offshore Texas, as may be updated and amended ("**A-489 Agreement**"); (v) an Operating Agreement Block A-474, High Island Area, South Addition, Offshore Texas, as may be updated and amended ("**A-474 Agreement**," and collectively with the Aspen PHA, HIPS Agreement, Owners Agreement, A-489 Agreement, the "**Nexen Agreements**").

48.    In resolution of *Nexen's Objection to Plan, Objection to any Deemed Cure Amount, and Notice of Non-Consent to Third Party Releases, Exculpatory Clause, and Related Injunctions Contained in the Debtors's Plan* (D.I. 227), Debtors and Nexen agree that pursuant to, and upon the Effective Date of, the Plan, the Nexen Agreements shall each be assumed by the applicable counterparty Debtor entity under Bankruptcy Code section 365, and all rights, liabilities and obligations of the parties to each Nexen Agreement, including without limitation any rights, liabilities, and obligations with respect to plugging and abandonment, shall be governed by the terms of the applicable Nexen Agreements and enforceable by each party to the applicable Nexen Agreements according to their terms, notwithstanding any language contained in the releases set forth in sections 10.7(b) of the Plan.  In addition, Nexen is deemed to have opted out of the releases set forth in Section 10.7(b) of the Plan and so is not included in the definition of Releasing Parties in the Plan and shall not be a Released Party or otherwise receive the benefit of any releases under the Plan or this Order.

49.    <u>Energy XXI Entities and Nippon</u>.  In resolution of the *Limited Objection To (A) Confirmation Of The Debtors' Joint Prepackaged Chapter 11 Plan Of Fieldwood Energy LLC And Its Affiliated Debtors And (B) Proposed Assumption Of Executory Contracts* (the "Energy XXI-Nippon Objection") (D.I. 229) filed by Energy XXI GOM, LLC, Energy XXI

Gulf Coast, Inc., Energy XXI Onshore, LLC, Energy XXI Pipeline, LLC, Energy XXI Pipeline I, LLC, Energy XXI Pipeline II, LLC, M21K, LLC, and EPL Oil & Gas, Inc. (the "**Energy XXI Entities**"), and JX Nippon Oil Exploration (U.S.A.) Limited (f/k/a Nippon Oil Exploration U.S.A. Limited) ("**Nippon**"), and notwithstanding anything to the contrary contained in the Plan, any Plan Supplement, this Order or otherwise:  (i) all executory contracts between any of the Debtors and any of the Energy XXI Entities (the "**Debtor-Energy XXI Contracts**") and between any of the Debtors and Nippon (the "**Debtor-Nippon Contracts**") shall be assumed by the respective Debtors.  The parties reserve all rights with respect to any Cure Amount relating to the Debtor-Energy XXI Contracts and the Debtor-Nippon Contracts, as applicable, and agree that the legal, equitable, and contractual rights of the Debtors, Energy XXI Entities, and Nippon, are unaltered by the Plan, the Confirmation Order, or any other Plan Document, and any disputes thereunder will be resolved in the ordinary course of business.

50.    <u>XTO</u>.  The Confirmation Order shall not act to determine the amount, if any, of the XTO Cure Amount[6] as to any of the XTO Executory Contracts.  Hereafter, XTO and the Reorganized Debtors shall endeavor to reach agreement as to the XTO Cure Amount applicable to each XTO Executory Contract.   If XTO and the Debtors are able to reach agreement as to any XTO Cure Amount, then no further action need be taken before the Court. After ninety (90) days of entry of this Order, if XTO and the Reorganized Debtors are unable to

---

[6] As used in this Order, the term "**XTO**" shall include XTO Energy Inc., XTO Offshore, Inc. and ExxonMobil Corporation, as well as all subsidiaries, parents or affiliates of any of such companies.  The term "**XTO Executory Contracts**" shall refer to any executory contracts or unexpired leases to which any of the XTO entities are the counterparties with any of the Debtors.   The term "**XTO Cure Amount**" shall mean the cure amount or compensation, if any, required to satisfy sections 365(b)(1)(A) and (B) of the Bankruptcy Code as to any of the XTO Executory Contracts.

agree as to any XTO Cure Amount, then either the Reorganized Debtors or XTO may, on notice to the Reorganized Debtors or XTO, as applicable, apply to the Court for a determination of the amount of any such XTO Cure Amount.

51.     The Confirmation Order shall not (i) alter any of XTO's rights of setoff or recoupment to the extent such rights may exist under any XTO Executory Contract or applicable law or the Debtors or Reorganized Debtors claims or defenses any such rights of setoff or recoupment, or (ii) impair or release any lien or security interest, if any, in favor of XTO in any XTO Executory Contract.

52.     Surety Bond Obligations.  Notwithstanding any other provisions of the Plan, this Order, or any other order of this Bankruptcy Court, on the Effective Date, all rights and obligations of any party related to the (i) Debtors' surety bonds maintained in the ordinary course of business, (ii) surety payment and indemnity agreements, setting forth a surety's rights against the Debtors, and the Debtors' obligations to pay and indemnify such surety from any loss, cost, or expense that the surety may incur, in each case, on account of the issuance of any surety bonds on behalf of the Debtors, (iii) surety collateral agreements governing collateral, if any, in connection with the Debtors' surety bonds, and/or (iv) ordinary course premium payments to the sureties for the Debtors' surety bonds (collectively, the "**Surety Bond Program**," and the Debtors' obligations arising therefrom, the "**Surety Bond Obligations**") shall be reaffirmed and ratified by the applicable Reorganized Debtors and continue in full force and effect and are not discharged or released by the Plan in any way.  On the Effective Date, all liens and security interests, if any, granted pursuant to or in connection with the Surety Bond Program shall be valid, binding, perfected, enforceable liens and security interests with the priorities established in

respect thereof under applicable non-bankruptcy law, and shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or this Order.  The Surety Bond Program and all Surety Bond Obligations related thereto shall be treated by the Reorganized Debtors in the ordinary course of business as if these Chapter 11 Cases had not been commenced.  For the avoidance of any doubt, with a reservation of rights to all parties, and only to the extent applicable, any agreements related to the Surety Bond Program are assumed by the Debtors and the Reorganized Debtors pursuant to section 365 of the Bankruptcy Code upon the Effective Date.  Nothing in the Plan or this paragraph shall affect in any way any surety's rights against any non-debtor, or any non-debtor's rights against a surety, including under the Surety Bond Program or with regard to the Surety Bond Obligations.

53.    Contract Counterparties.  Notwithstanding any other language in the Plan, Plan Documents and Agreements, or this Order, all agreements (including all agreements, contracts, leases, or purchase and sale and similar agreements), regardless of whether any particular agreement is subject to assumption and cure under section 365 of the Bankruptcy Code, as between one or more of the Debtors, on one hand, and any Contract Counterparty[7] who was deemed to have accepted the Plan, on the other hand, shall continue in full force and effect, and the obligations of the parties to such agreements are not impaired, discharged, or released by

---

[7] "**Contract Counterparties**" means, collectively, ConocoPhillips Company and its affiliates, Merit Energy Company and its affiliates, McMoRan Oil & Gas, LLC and its affiliates, W&T Offshore, Inc. and its affiliates, W&T Energy VI LLC and its affiliates, Hoactzin Partners, L.P. and its affiliates, Cox Operating LLC and its affiliates, The Louisiana Land and Exploration Company LLC and its affiliates, Burlington Resources Oil & Gas Company LP. and its affiliates, Burlington Resources Offshore Inc. and its affiliates, Chevron U.S.A. Inc., Chevron Pipe Line Company, Whitecap Pipeline Company, L.L.C., Union Oil Company of California, Unocal Pipeline Company.

the Plan, Plan Documents and Agreements, or this Order.  For the avoidance of doubt and notwithstanding anything to the contrary in the Plan, Plan Documents and Agreements, or this Order, the Debtors, Reorganized Debtors, and the Contract Counterparties shall retain all legal, equitable, and contractual rights and remedies, and shall not be enjoined in any way, with respect to the agreements as if the Chapter 11 Cases had never been commenced.  Further, the Contract Counterparties are deemed to have opted out of the releases, exculpations, and injunctions set forth in Sections 10.5, 10.6, 10.7, 10.8, and 10.9 of the Plan, and the Contract Counterparties shall not be "Released Parties" or "Exculpated Parties" or otherwise receive the benefits of any of those provisions.

54.  <u>Prepetition Loan Documents</u>.  Notwithstanding anything to the contrary in the Plan or this Confirmation Order (including, without limitation, sections 5.6, 10.6, 10.7(b), 10.8, and 10.9 of the Plan) any indemnification and reimbursement provisions under:  (i) the Prepetition RBL Credit Agreement or any of the other documents evidencing Obligations (as such term is defined in the Prepetition RBL Credit Agreement) governed by the Prepetition RBL Credit Agreement (such documents, collectively with the Prepetition RBL Credit Agreement, the "**Prepetition RBL Documents**"); (ii) the Prepetition First Lien Credit Agreement or any of the other documents evidencing Obligations (as term is defined in the Prepetition First Lien Credit Agreement) governed by the Prepetition First Lien Credit Agreement (such documents, collectively with the Prepetition First Lien Credit Agreement, the "**Prepetition First Lien Loan Documents**"); (iii) the Prepetition FLLO Credit Agreement or any of the other documents evidencing Obligations (as term is defined in the Prepetition FLLO Credit Agreement) governed by the Prepetition FLLO Credit Agreement (such documents, collectively with the Prepetition

FLLO Credit Agreement, the "**Prepetition FLLO Loan Documents**"); (iv) the Prepetition Second Lien Credit Agreement or any of the other documents evidencing Obligations (as such term is defined in the Prepetition Second Lien Credit Agreement) governed by the Prepetition Second Lien Credit Agreement (such documents, collectively with the Prepetition Second Lien Credit Agreement, the "**Prepetition Second Lien Loan Documents**"); or (v) the Prepetition Sponsor Second Lien Term Loan Agreement or any of the other documents evidencing Obligations (as such term is defined in the Prepetition Sponsor Second Lien Term Loan Agreement) governed by the Prepetition Sponsor Second Lien Term Loan Agreement (such documents, collectively with the Prepetition Sponsor Second Lien Term Loan Agreement, the "**Prepetition Sponsor Second Lien Term Loan Documents**") shall survive the occurrence of the Effective Date and the discharge and cancellation of any of the Prepetition RBL Documents, Prepetition First Lien Loan Documents, Prepetition FLLO Loan Documents, Prepetition Second Lien Loan Documents, or Prepetition Sponsor Second Lien Term Loan Documents (collectively, the "**Prepetition Loan Documents**") solely to the extent that such indemnification or reimbursement provisions, as applicable, would survive the repayment, satisfaction, or discharge of the loans or other Obligations (as defined therein) under the applicable Prepetition Loan Documents, provided that, the Reorganized Debtors shall not be held liable under any such surviving provisions unless the Debtors would have otherwise been liable pursuant to the terms of the applicable Prepetition Loan Documents.  For the avoidance of doubt, nothing in this paragraph 54 shall affect any other provision under the Prepetition RBL Documents that survives the cancellation of the Prepetition RBL Documents.  Inclusion of this paragraph within the Confirmation Order shall not be deemed an "opt out" by the Prepetition

RBL Agent, Prepetition First Lien Term Loan Agent, Prepetition FLLO Agent, Prepetition Second Lien Term Loan Agent, or Prepetition Sponsor Second Lien Term Loan Agent, or impair the qualification of any such agent as a Released Party under the Plan.

55.    <u>Seismic</u>.  Notwithstanding anything in the Plan, the Plan Documents, the Purchase Agreement, and this Order or otherwise, the Debtors are not taking assignment from Noble of seismic licenses, or the data or derivatives subject to such seismic licenses (the "**Seismic**"), between WesternGeco, L.L.C., the TGS Entities, Fairfield Industries, Incorporated, or predecessors or affiliates thereof, on the one hand, and Noble or its predecessors or affiliates thereof, on the other, and such Seismic is not part of the Purchased Assets or part of the Asset Purchase Transaction and may not be provided or disclosed to the Debtors in violation of such seismic licenses.  WesternGeco, L.L.C., the TGS Entities, and Fairfield Industries, Incorporated's objections (D.I. 223, 224) are deemed withdrawn and, the seismic license agreements between the Debtors on the one hand, and WesternGeco, L.L.C., the TGS Entities, or Fairfield Industries, on the other hand, are hereby deemed assumed without the need for payment of any cure amount, consent fee, transfer payment, or otherwise.

56.    <u>REP Management Company V, LLC Services Agreement</u>.  The Amended and Restated Services Agreement (the "**Management Services Agreement**") between REP Management Company V, LLC ("**Riverstone**") and Fieldwood Holdings LLC, dated September 30, 2013, as amended, and the Amended and Restated Transaction Fee Agreement between Riverstone and Fieldwood Holdings LLC, dated September 30, 2013, shall be terminated on the Effective Date.  Riverstone's General Unsecured Claims under the Management Services Agreement shall be paid in full in cash on the Effective Date.

57.   <u>Seitel</u>.   The objections (the "**Seitel Cure/Assumption Objections**") of (i) Seitel Data, Ltd., Seitel Data Corp., Seitel Delaware, Inc., Seitel Offshore Corp., Seitel Canada Ltd. (f/k/a Olympic Seismic Ltd.), affiliated companies (collectively, the "**Seitel Cure/Assumption Objectors**"), are hereby withdrawn as to confirmation of the Plan and approval of the Disclosure Statement; *provided*, *however*, that (1) no modification to any of the Seitel Cure/Assumption Objectors' respective agreements with the Debtors (the "**Seismic Agreements**") is being affected by this Order or confirmation of the Plan; and (2) neither the Plan nor this Order shall effectuate an assumption and/or assignment of any of the Seitel Cure/Assumption Objectors' Seismic Agreements by the Debtors or the Reorganized Debtors until such respective Seitel Cure/Assumption Objection is resolved between the parties in the ordinary course of business or as otherwise ordered by the Bankruptcy Court.   In the event the parties hereto are unable to (i) determine or otherwise resolve the cure amounts, if any, due or owing or (ii) any other issue raised by the Seitel Cure/Assumption Objections, if any, with respect to the Seismic Agreements within sixty (60) days from the date of this Order, the cure amounts due or owing and any other issue with respect to the Seismic Agreements shall be determined by the Court upon motion filed by the Seitel Cure/Assumption Objectors not earlier than the sixty-first (61st) day following the date of this Order.

58.   <u>Documents, Mortgages, and Instruments</u>.   Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Order.

59.    <u>Reversal/Stay/Modification/Vacatur of Confirmation Order</u>.   Except as otherwise provided in this Order, if any or all of the provisions of this Order are hereafter reversed, modified, vacated, or stayed by subsequent order of this Bankruptcy Court, or any other court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors, the Reorganized Debtors, or any other party authorized or required to take action to implement the Plan, as applicable, prior to the effective date of such reversal, stay, modification, or vacatur.   Notwithstanding any such reversal, stay, modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Order and the Plan or any amendments or modifications thereto.

60.    <u>Retention of Jurisdiction</u>.   On and after the Effective Date, pursuant to sections 105 and 1142 of the Bankruptcy Code, this Bankruptcy Court, except as otherwise provided in the Plan or in this Order, shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases including, but not limited to, jurisdiction over the matters set forth in Article XI of the Plan.

61.    <u>Modifications and Amendments</u>.   After entry of this Order, the Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court, subject to the written consent of the Requisite Second Lien Term Lenders, Requisite

Sponsor Second Lien Term Lenders, and the other Requisite Creditors (in the case of the Requisite Creditors, solely to the extent such amendments, modifications and supplements materially affect in any respect any rights or treatment of such Requisite Creditors under the Plan) in accordance with the Restructuring Support Agreement and Apache in accordance with the term sheet for the Apache Decommissioning Agreement Amendment attached as **Exhibit H** to the Disclosure Statement.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with the consent of the Requisite Second Lien Term Lenders, Requisite Sponsor Second Lien Term Lenders, and Apache, if applicable, may remedy any defect or omission or reconcile any inconsistencies in the Plan or this Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

62.    Provisions of Plan and Confirmation Order Nonseverable and Mutually Dependent.  The provisions of the Plan and this Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent.

63.    Applicable Non-bankruptcy Law.  Pursuant to section 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Order, the Plan and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

64.    Governing Law.  Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document and Agreement provides

otherwise, the rights, duties, and obligations arising under the Plan and the Plan Documents and Agreements shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

65.     <u>Waiver of Filings</u>.  Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Bankruptcy Court or the Office of the U.S. Trustee (except for monthly operating reports or any other post-confirmation reporting obligation to the U.S. Trustee) is hereby waived as to any such list, schedule, or statement not filed as of the Confirmation Date.

66.     <u>Waiver of Section 341 Meeting</u>.  Any requirement under section 341(e) for the U.S. Trustee to convene a meeting of creditors or equity holders is permanently waived as of the Confirmation Date.

67.     <u>Governmental Approvals Not Required</u>.  Without limiting any other part of this Order, this Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or other governmental authority with respect to the implementation or consummation of the Plan and Disclosure Statement, any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

68.     <u>Notice of Entry of Confirmation Order and Effective Date</u>.  In accordance with Bankruptcy Rules 2002 and 3020(c), as soon as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry of this Order and notice of the Effective Date, substantially in the form annexed hereto as **<u>Exhibit B</u>** to all parties who hold a Claim or Interest

in these cases, the U.S. Trustee, and other parties in interest.  Such notice is hereby approved in all respects and shall be deemed good and sufficient notice of confirmation of the Plan, entry of this Order, and the occurrence of the Effective Date.

69.     Substantial Consummation.   On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

70.     Final Order.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

71.     Inconsistency.  To the extent of any inconsistency between this Order and the Plan, this Order shall govern.

72.     No Stay of Confirmation.   The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen (14) days after entry of the order are hereby waived.  This Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 3020(e), 6004(g), 6006(d), 7062, or otherwise.

73.     No Waiver.  The failure to specifically include any particular provision of the Plan in this Order will not diminish the effectiveness of such provision nor constitute a waiver thereof, it being the intent of this Bankruptcy Court that the Plan is confirmed in its entirety and incorporated herein by this reference.

74.     Closure of the Chapter 11 Cases.  As soon as practicable after the Effective Date, the Reorganized Debtors are authorized, but not directed, to submit an order to the Bankruptcy Court under certification of counsel that is in form and substance acceptable to the U.S. Trustee that closes and issues a final decree for each of the Chapter 11 Cases.

**Signed:  April 02, 2018.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

**<u>Exhibit A</u>**

**Plan**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC,** *et al.*, | § | **Case No. 18-_____ (___)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| Debtors.[1] | § | |

# JOINT PREPACKAGED CHAPTER 11 PLAN OF
## FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (*pro hac vice* pending)
Ray C. Schrock, P.C. (*pro hac vice* pending)
Jessica Liou (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

Dated:   February 14, 2018
　　　　　Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Holdings LLC (9264); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway, S., Suite 1200, Houston, TX  77042.

**Table of Contents**

ARTICLE I.      Definitions and Interpretation. ..........................................................................1

    1.1          Definitions.............................................................................................1

    1.2          Interpretation; Application of Definitions; Rules of Construction. ................16

    1.3          Reference to Monetary Figures.....................................................................16

    1.4          Consent Rights of Restructuring Support Parties. .........................................16

    1.5          Controlling Document. .................................................................................16

ARTICLE II.      Administrative Expense Claims, Fee Claims, DIP Facility Claims, and
Priority Tax Claims. ........................................................................................17

    2.1          Treatment of Administrative Expense Claims. ...............................................17

    2.2          Treatment of Fee Claims...............................................................................17

    2.3          Treatment of DIP Facility Claims. .................................................................18

    2.4          Payment of Fees and Expenses under DIP Facility Order. .............................18

    2.5          Treatment of Priority Tax Claims. .................................................................19

ARTICLE III.      Classification of Claims and Interests.............................................................19

    3.1          Classification in General. ..............................................................................19

    3.2          Formation of Debtor Groups for Convenience Only. .....................................19

    3.3          Summary of Classification of Claims and Interests........................................19

    3.4          Special Provision Governing Unimpaired Claims..........................................20

    3.5          Separate Classification of Other Secured Claims. ..........................................20

    3.6          Elimination of Vacant Classes. .....................................................................20

    3.7          Voting; Presumptions; Solicitation.................................................................20

    3.8          Cramdown.....................................................................................................21

    3.9          No Waiver......................................................................................................21

ARTICLE IV.      Treatment of Claims and Interests..................................................................21

    4.1          Class 1:  Priority Non-Tax Claims.................................................................21

4.2        Class 2: Other Secured Claims. ...........................................................................21

4.3        Class 3: RBL Claims...........................................................................................22

4.4        Class 4: FLTL Claims..........................................................................................22

4.5        Class 5: FLLO Claims. ........................................................................................23

4.6        Class 6: SLTL Claims. .........................................................................................23

4.7        Class 7: General Unsecured Claims....................................................................24

4.8        Class 8: Intercompany Claims. ...........................................................................24

4.9        Class 9: Existing Holdings Interests. ..................................................................24

4.10       Class 10: Existing Energy Inc. Interests. ...........................................................25

4.11       Class 11: Intercompany Interests. ......................................................................25

4.12       Treatment of Vacant Classes. .............................................................................25

**ARTICLE V.      Means for Implementation.....................................................................................25**

5.1        Compromise and Settlement of Claims, Interests, and Controversies..............25

5.2        Continued Corporate Existence. .........................................................................26

5.3        Corporate Action.................................................................................................27

5.4        Asset Purchase Transaction. ...............................................................................27

5.5        Plan Funding. ......................................................................................................27

5.6        Cancellation of Existing Securities and Agreements..........................................28

5.7        Cancellation of Certain Existing Security Interests. ..........................................28

5.8        Officers and Boards of Directors. .......................................................................28

5.9        Management Incentive Plan.................................................................................28

5.10       Authorization, Issuance, and Delivery of New Equity Interests.........................29

5.11       Exit LC Credit Agreement....................................................................................29

5.12       Exit First Lien Term Loan Facility and Exit Second Lien Term Loan Facility.29

5.13       New Intercreditor Agreements.............................................................................30

5.14       Rights Offering. ........................................................................................30

5.15       Intercompany Interests; Corporate Reorganization. ..........................................31

5.16       Restructuring Transactions. ........................................................................31

5.17       Restructuring Expenses..............................................................................31

5.18       Separability. ............................................................................................31

**ARTICLE VI.       Distributions. ..........................................................................................32**

6.1        Distributions Generally...............................................................................32

6.2        Postpetition Interest on Claims. ...................................................................32

6.3        Date of Distributions...................................................................................32

6.4        Distribution Record Date. ............................................................................32

6.5        Disbursing Agent. .......................................................................................32

6.6        Delivery of Distributions. .............................................................................33

6.7        Unclaimed Property. ....................................................................................33

6.8        Satisfaction of Claims...................................................................................33

6.9        Manner of Payment under Plan.....................................................................33

6.10       Fractional Shares and De Minimis Cash Distributions.....................................34

6.11       No Distribution in Excess of Amount of Allowed Claim................................34

6.12       Allocation of Distributions between Principal and Interest............................34

6.13       Exemption from Securities Laws....................................................................34

6.14       Setoffs and Recoupments..............................................................................35

6.15       Rights and Powers of Disbursing Agent........................................................35

6.16       Withholding and Reporting Requirements. .....................................................35

**ARTICLE VII.      Procedures for Resolving Claims. ............................................................36**

7.1        Disputed Claims Process................................................................................36

7.2        Estimation of Claims.....................................................................................37

7.3        Claim Resolution Procedures Cumulative. .......................................................37

7.4        No Distributions Pending Allowance. ..............................................................37

7.5        Distributions after Allowance. .........................................................................38

**ARTICLE VIII.  Executory Contracts and Unexpired Leases. ........................................38**

8.1        General Treatment. ...........................................................................................38

8.2        Determination of Cure Disputes and Deemed Consent. ...................................39

8.3        Rejection Damages Claims. ..............................................................................39

8.4        Survival of the Debtors' Indemnification Obligations......................................39

8.5        Compensation and Benefit Plans. .....................................................................40

8.6        Insurance Policies. ...........................................................................................40

8.7        Reservation of Rights........................................................................................40

**ARTICLE IX.  Conditions Precedent to the Occurrence of the Effective Date. ...............41**

9.1        Conditions Precedent to the Effective Date. .....................................................41

9.2        Waiver of Conditions Precedent. ......................................................................42

9.3        Effect of Failure of a Condition. ......................................................................42

**ARTICLE X.  Effect of Confirmation........................................................................43**

10.1        Binding Effect. .................................................................................................43

10.2        Vesting of Assets. .............................................................................................43

10.3        Discharge of Claims against and Interests in the Debtors. ...............................43

10.4        Pre-Confirmation Injunctions and Stays...........................................................44

10.5        Injunction against Interference with Plan. ........................................................44

10.6        Plan Injunction. ................................................................................................44

10.7        Releases............................................................................................................45

10.8        Exculpation. .....................................................................................................50

10.9        Injunction Related to Releases and Exculpation...............................................50

| | | |
|---|---|---:|
| 10.10 | Subordinated Claims. | 51 |
| 10.11 | Retention of Causes of Action and Reservation of Rights. | 51 |
| 10.12 | Ipso Facto and Similar Provisions Ineffective. | 51 |
| 10.13 | Indemnification and Reimbursement Obligations. | 51 |
| **ARTICLE XI.** | **Retention of Jurisdiction.** | **52** |
| 11.1 | Retention of Jurisdiction. | 52 |
| **ARTICLE XII.** | **Miscellaneous Provisions.** | **54** |
| 12.1 | Exemption from Certain Transfer Taxes. | 54 |
| 12.2 | Request for Expedited Determination of Taxes. | 54 |
| 12.3 | Dates of Actions to Implement Plan. | 54 |
| 12.4 | Amendments. | 54 |
| 12.5 | Revocation or Withdrawal of Plan. | 55 |
| 12.6 | Severability. | 55 |
| 12.7 | Governing Law. | 56 |
| 12.8 | Immediate Binding Effect. | 56 |
| 12.9 | Successors and Assigns. | 56 |
| 12.10 | Entire Agreement. | 56 |
| 12.11 | Computing Time. | 56 |
| 12.12 | Exhibits to Plan. | 56 |
| 12.13 | Notices. | 56 |
| 12.14 | Reservation of Rights. | 58 |

Each of Dynamic Offshore Resources NS, LLC; Fieldwood Energy LLC, Fieldwood Holdings LLC, Fieldwood Energy Inc., Fieldwood Energy Offshore LLC, Fieldwood Onshore LLC, Fieldwood SD Offshore LLC, FW GOM Pipeline, Inc., GOM Shelf LLC, Bandon Oil and Gas GP, LLC, Bandon Oil and Gas, LP, Fieldwood Energy SP LLC, Galveston Bay Pipeline LLC, and Galveston Bay Processing LLC (each, a "*Debtor*" and collectively, the "*Debtors*") proposes the following joint prepackaged chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in section 1.1 below.

# ARTICLE I.        DEFINITIONS AND INTERPRETATION.

### 1.1    *Definitions.*

The following terms shall have the respective meanings specified below:

*Administrative Expense Claim* means any Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code (other than DIP Facility Claims), including, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Fee Claims; and (c) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

*Allowed* means, with respect to any Claim or Interest (a) as to which the Debtors and the holder of the Claim agree to the amount of the Claim or a court of competent jurisdiction has determined the amount of the Claim by Final Order; (b) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors, as applicable, in a Final Order of the Bankruptcy Court; (c) any Claim that is listed in the Schedules, if any are filed, as liquidated, non-contingent and undisputed; or (d) any Claim or Interest expressly allowed hereunder; *provided* that, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to the Plan; *provided further* that, no Claim shall be "Allowed" if it is subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

*Amended By-Laws* means, with respect to a Reorganized Debtor, such Reorganized Debtor's amended or amended and restated by-laws or operating agreement, a substantially final form of which shall be contained in the Plan Supplement to the extent they contain material changes to the existing documents.

*Amended Certificate of Incorporation* means, with respect to each Reorganized Debtor, such Reorganized Debtor's amended or amended and restated certificate of incorporation or certificate of formation, a substantially final form of which shall be contained in the Plan Supplement to the extent they contain material changes to the existing documents.

*Apache* means, collectively, (a) Apache Corporation, (b) Apache Shelf, Inc., (c) Apache Deepwater LLC and (d) Apache Shelf Exploration LLC.

**Apache Decommissioning Agreement Amendment** means an amendment to the *Decommissioning Agreement* dated September 30, 2013 between Apache, Fieldwood Energy LLC, and GOM Shelf LLC, a substantially final form of which shall be contained in the Plan Supplement, and which shall be in form and substance substantially consistent with the term sheet attached as **Exhibit H** to the Disclosure Statement and in form and substance reasonably acceptable to the Debtors, Apache, the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders.

**Asset** means all of the right, title, and interest of a Debtor in and to property of whatever type or nature (including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property).

**Asset Purchase Transaction** means the Purchaser's purchase from Seller of the Purchased Assets, pursuant to the Plan and the Purchase Agreement.

**Backstop Commitment Agreement** means that certain Backstop Commitment Agreement entered into by Fieldwood Holdings LLC, Fieldwood Energy Inc. and the Backstop Parties before the Petition Date in the form attached to the Restructuring Support Agreement as **Exhibit E** thereof, with such modifications as are permitted under the Restructuring Support Agreement.

**Backstop Commitment Premium** means the Backstop Commitment Premium (as defined in the Backstop Commitment Agreement) to be paid to the Backstop Parties on the Effective Date in the form of New Equity Interests pursuant to the Backstop Commitment Agreement.

**Backstop Parties** means those parties that agree to backstop the Rights Offering pursuant to the Backstop Commitment Agreement, each in its respective capacity as such.

**Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to these Chapter 11 Cases.

**Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

**Business Day** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

***Cash*** means legal tender of the United States of America.

***Cause of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, proceeding, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims.

***Chapter 11 Case*** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

***Claim*** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

***Class*** means any group of Claims or Interests classified under the Plan pursuant to section 1122(a) of the Bankruptcy Code.

***Collateral*** means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid and has not been avoided under the Bankruptcy Code or applicable nonbankruptcy law.

***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance reasonably acceptable to the Debtors, the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders.

***Consenting Creditors*** has the meaning set forth in the Restructuring Support Agreement.

**Consenting Second Lien Term Lenders** has the meaning set forth in the Restructuring Support Agreement.

**Consenting Sponsor** has the meaning set forth in the Restructuring Support Agreement.

**Cure Amount** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (b) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**D&O Policy** means any insurance policy, including tail insurance policies, for directors', members', trustees', and officers' liability maintained by the Debtors and in effect or purchased as of the Petition Date.

**Debtor** has the meaning set forth in the introductory paragraph of the Plan.

**Debtor in Possession** means, with respect to a Debtor, that Debtor in its capacity as a debtor in possession pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

**DIP Facility** means the secured multi-draw term loan facility approved in the DIP Facility Order.

**DIP Facility Agent** means Cortland Capital Market Services LLC, solely in its capacity as administrative agent under the DIP Facility Loan Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Facility Loan Agreement.

**DIP Facility Claim** means a Claim held by the DIP Facility Lenders or the DIP Facility Agent arising under or relating to the DIP Facility Loan Agreement or the DIP Facility Order, including any and all fees, interests, and accrued but unpaid interest and fees arising under the DIP Facility Loan Agreement.

**DIP Facility Lenders** means the lenders party to the DIP Facility Loan Agreement.

**DIP Facility Loan Agreement** means the Senior Secured Debtor-in-Possession Term Loan Credit Agreement to be dated after the Petition Date, by and among Fieldwood Energy LLC, as borrower, the DIP Facility Agent, and the DIP Facility Lenders, with any amendments, modifications or supplements thereto as permitted by the DIP Facility Order.

**DIP Facility Order** means (a) the *Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (b) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(a) and (c)* and (b) a Final Order entered by the Bankruptcy Court

authorizing the Debtors to enter into the DIP Facility Loan Agreement and access the DIP Facility, with such modifications as are permitted under the Restructuring Support Agreement.

**Disbursing Agent** means any entity in its capacity as a disbursing agent under section 6.5 hereof, including any Debtor or Reorganized Debtor, as applicable, that acts in such a capacity.

**Disclosure Statement** means the Disclosure Statement for the Plan, as supplemented from time to time, which is prepared and distributed in accordance with sections 1125, 1126(b), or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, or other applicable law.

**Disputed** means, with respect to a Claim, (a) any Claim, which Claim is disputed under section 7.1 of the Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (b) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed; (c) any Claim that is listed in the Schedules, if any are filed, as unliquidated, contingent or disputed, and as to which no request for payment or proof of claim has been filed; or (d) any Claim that is otherwise disputed by any of the Debtors or Reorganized Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

**Distribution Record Date** means, except as otherwise provided in the Plan, the Effective Date.

**DTC** means the Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

**Effective Date** means the date which is the first Business Day selected by the Debtors in consultation with the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders, on which (a) all conditions to the effectiveness of the Plan set forth in Section 9.1 of the Plan have been satisfied or waived in accordance with the terms of the Plan and (b) no stay of the Confirmation Order is in effect.

**Estate** means the estate of a Debtor created under section 541 of the Bankruptcy Code.

**Exculpated Parties** means, collectively, and in each case in their capacities as such during the Chapter 11 Cases: (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Disbursing Agent, (iv) the Restructuring Support Parties, (v) the Exit First Lien Term Loan Agent, (vi) the Exit First Lien Term Loan Lenders, (vii) the Exit Second Lien Term Loan Agent, (viii) the Exit Second Lien Term Loan Lenders, (ix) the Exit LC Facility Agent, (x) the Exit LC Facility Lenders, (xi) the DIP Facility Agent, (xii) the DIP Facility Lenders and (xiii) the Backstop Parties, and in respect to the entities referenced in clauses (i) through (xiii) hereof, such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, and all of their respective current and former officers and directors, principals, shareholders

(regardless of whether such interests are held directly or indirectly), members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

> ***Existing Energy Inc. Interests*** means all Interests in Fieldwood Energy Inc.

> ***Existing Holdings Interests*** means all Interests in Fieldwood Holdings.

> ***Exit First Lien Credit Agreement*** means that certain Amended and Restated First Lien Last-Out Term Loan Agreement, to be dated as of the Effective Date, by and among Reorganized Energy LLC, Reorganized Energy Inc., the Exit First Lien Term Loan Agent, and the Exit First Lien Term Loan Lenders, the form of which shall be contained in the Plan Supplement, and which shall otherwise be in form and substance substantially consistent with the Exit First Lien Term Sheet.

> ***Exit First Lien Documents*** means, collectively, the Exit First Lien Credit Agreement and all other "Loan Documents" (as defined therein) required to be delivered by Reorganized Energy LLC and any other Reorganized Debtor to the Exit First Lien Term Loan Agent on the Effective Date, in each case, which shall otherwise be (a) in form and substance substantially consistent with the Exit First Lien Term Sheet, (b) in form and substance reasonably acceptable to the Debtors and the Exit First Lien Term Loan Agent and (c) in form and substance reasonably acceptable to the Requisite First Lien Lenders, the Requisite Second Lien Term Lenders, and Requisite Sponsor Second Lien Term Lenders.

> ***Exit First Lien Term Loan Agent*** means the administrative agent under the Exit First Lien Credit Agreement.

> ***Exit First Lien Term Loan Facility*** means the term loan facility arising pursuant to the Exit First Lien Credit Agreement, consisting of commitments for term loans in an aggregate principal amount of approximately $1.143 billion.

> ***Exit First Lien Term Loan Lenders*** means the lenders party to the Exit First Lien Credit Agreement.

> ***Exit First Lien Term Sheet*** means that certain term sheet attached to the Restructuring Support Agreement as **Exhibit C** that sets forth the principal terms of the Exit First Lien Term Loan Facility.

> ***Exit LC Credit Agreement*** means the credit agreement to be dated as of the Effective Date, by and among Reorganized Energy LLC, as borrower, the Exit LC Facility Agent, and the Exit LC Facility Lenders, the form of which shall be contained in the Plan Supplement, and which shall otherwise be in form and substance substantially consistent with the Exit LC Facility Term Sheet.

*Exit LC Facility* means the letter of credit facility established under the Exit LC Credit Agreement.

*Exit LC Facility Agent* means the administrative agent under the Exit LC Credit Agreement.

*Exit LC Facility Documents* means, collectively, the Exit LC Credit Agreement and all other "Loan Documents" (as defined therein) required to be delivered by Reorganized Energy LLC and any other Reorganized Debtor to the Exit LC Facility Agent on the Effective Date, in each case, which shall otherwise be (a) in form and substance substantially consistent with the Exit LC Facility Term Sheet, (b) in form and substance reasonably acceptable to the Debtors and the Exit LC Facility Agent, (c) in form and substance reasonably acceptable to the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders, and (d) to the extent such documents materially and adversely affect their economic treatment under the Plan, in form and substance reasonably acceptable to the Requisite First Lien Term Lenders.

*Exit LC Facility Lenders* means the lenders party to the Exit LC Credit Agreement.

*Exit LC Facility Term Sheet* means that certain term sheet attached to the Restructuring Support Agreement as **Exhibit B** that sets forth the principal terms of the Exit LC Facility.

*Exit Second Lien Credit Agreement* means that certain Amended and Restated Second Lien Term Loan Agreement, to be dated as of the Effective Date, by and among Reorganized Energy LLC, as borrower, the Exit Second Lien Term Loan Agent, and the Exit Second Lien Term Lenders, the form of which shall be contained in the Plan Supplement, and which shall otherwise be in form and substance substantially consistent with the Exit Second Lien Term Sheet.

*Exit Second Lien Documents* means, collectively, the Exit Second Lien Credit Agreement and all other "Loan Documents" (as defined therein) required to be delivered by Reorganized Energy LLC and any other Reorganized Debtor to the Exit Second Lien Term Loan Agent on the Effective Date, in each case, which shall otherwise be (a) in form and substance substantially consistent with the Exit Second Lien Term Sheet, (b) in form and substance reasonably acceptable to the Debtors and the Exit Second Lien Term Loan Agent, (c) in form and substance reasonably acceptable to the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders, and (d) to the extent such documents materially and adversely affect their economic treatment under the Plan, in form and substance reasonably acceptable to the Requisite First Lien Term Lenders.

*Exit Second Lien Term Loan Agent* means the administrative agent under the Exit Second Lien Credit Agreement.

*Exit Second Lien Term Loan Facility* means the term loan facility arising under the Exit Second Lien Credit Agreement, consisting of commitments for term loans in an aggregate principal amount of approximately $518 million.

*Exit Second Lien Term Loan Lenders* means the lenders party to the Exit Second Lien Credit Agreement.

*Exit Second Lien Term Sheet* means that certain term sheet attached to the Restructuring Support Agreement as **Exhibit D** that sets forth the principal terms of the Exit Second Lien Credit Agreement.

*Fee Claim* means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by Professional Persons.

*Fee Escrow Account* means an interest-bearing account in an amount equal to the total estimated amount of Fee Claims and funded by the Debtors on the Effective Date.

*Fieldwood Holdings* means Fieldwood Holdings LLC.

*Fieldwood Holdings LLC Agreement* means that certain Amended and Restated Limited Liability Company Agreement of Fieldwood Holdings LLC, dated as of September 30, 2013.

*Final Order* means an order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that: (a) is in full force and effect; (b) is not stayed; and (c) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of *certiorari; provided*, that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order.

*FLLO Claim* means any Claim arising under the Prepetition FLLO Credit Agreement.

*FLTL Claim* means any Claim arising under the Prepetition First Lien Term Loan Agreement.

*General Unsecured Claim* means any Claim, other than an RBL Claim, FLTL Claim, FLLO Claim, SLTL Claim, Other Secured Claim, Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, DIP Facility Claim, or Intercompany Claim that is not entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court.

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*Intercompany Claim* means any Claim against a Debtor held by another Debtor.

*Intercompany Interest* means an Interest in a Debtor other than Fieldwood Holdings or Fieldwood Energy Inc. held by another Debtor or an affiliate of a Debtor.

*Interest* means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all ordinary shares, units, common stock, preferred

stock, membership interest, partnership interest or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the Effective Date.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Management Incentive Plan* means the post-restructuring management incentive plan to be adopted by the New Board on the Effective Date, a substantially final form of which will be filed with the Plan Supplement, and shall be (a) consistent in form and substance with the term sheet attached as **Exhibit F** to the Restructuring Support Agreement and (b) in form and substance reasonably acceptable to the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders.

*New Board* means the initial board of directors of Reorganized Energy Inc.

*New Corporate Governance Documents* means (a) the Amended By-Laws, (b) the Amended Certificate of Incorporation, (c) the shareholders agreement and (d) any other applicable material governance and/or organizational documents of the Reorganized Debtors, which, in each case, shall be in form and substance reasonably acceptable to the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders and, solely to the extent materially and adversely impacting the rights of the Requisite First Lien Term Lenders as an appointer of a Director of Reorganized Energy Inc., such documents shall be in form and substance reasonably acceptable to the Requisite First Lien Term Lenders.

*New Equity Interests* means the shares of common stock, par value $0.001 per share, of Reorganized Energy Inc. to be issued (a) on the Effective Date, (b) upon implementation of the Management Incentive Plan, or (c) as otherwise permitted pursuant to the New Corporate Governance Documents of Reorganized Energy Inc., in each case subject to the terms of the Amended Certificate of Incorporation and Amended By-Laws of Reorganized Energy Inc.

*New Intercreditor Agreements* means (i) that certain Intercreditor Agreement, to be dated as of the Effective Date, by and among the Exit LC Facility Agent and the Exit First Lien Term Loan Agent, and (ii) that certain Intercreditor Agreement, to be dated as of the Effective Date, by and among the Exit LC Facility Agent, Exit First Lien Term Loan Agent, Exit Second Lien Term Loan Agent, and the Reorganized Debtors, the form of which shall be contained in the Plan Supplement and reasonably acceptable to the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders.

*Other Secured Claim* means any Secured Claim against a Debtor other than an RBL Claim, FLTL Claim, FLLO Claim, SLTL Claim, or a DIP Facility Claim.

*Person* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other entity (as defined in section 101(15) of the Bankruptcy Code).

**Petition Date** means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

**Plan** means this joint prepackaged chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as may be modified from time to time in accordance with the Bankruptcy Code, the terms hereof, and the terms of the Restructuring Support Agreement.

**Plan Distribution** means the payment or distribution of consideration to holders of Allowed Claims and Allowed Interests under the Plan.

**Plan Document** means any of the documents, other than the Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including, without limitation, the documents to be included in the Plan Supplement, the Exit LC Credit Agreement, the Exit First Lien Credit Agreement, the Exit Second Lien Credit Agreement, the New Intercreditor Agreements, the New Corporate Governance Documents, and the Management Incentive Plan, subject to the consent rights regarding material documents set forth in the Restructuring Support Agreement and as may be modified consistent with the Restructuring Support Agreement.

**Plan Supplement** means a supplemental appendix to the Plan containing, among other things, substantially final forms (in each case, subject to the consent rights set forth in the Restructuring Support Agreement and as may be modified consistent with the Restructuring Support Agreement) of the Exit LC Credit Agreement (exclusive of all ancillary documents), the Exit First Lien Credit Agreement (exclusive of all ancillary documents), the Exit Second Lien Credit Agreement (exclusive of all ancillary documents), the New Intercreditor Agreements, the Apache Decommissioning Agreement Amendment, the New Corporate Governance Documents, the slate of directors to be appointed to the New Board and, with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, and the Management Incentive Plan; *provided*, that, through the Effective Date, the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Restructuring Support Agreement. The Plan Supplement shall be filed with the Bankruptcy Court not later than five (5) calendar days before the deadline to object to the Plan.

**Prepetition First Lien Term Lenders** means the Lenders (as defined in the Prepetition First Lien Term Loan Agreement) holding Prepetition First Lien Term Loans immediately prior to the Effective Date.

**Prepetition First Lien Term Loan Agent** means Citibank, N.A., solely in its capacity as administrative agent under the Prepetition First Lien Term Loan Agreement.

**Prepetition First Lien Term Loan Agreement** means that certain First Lien Term Loan Agreement, dated as of September 30, 2013, by and among Fieldwood Energy LLC, as borrower, the Lenders thereunder and as defined therein, the Prepetition First Lien Term Loan Agent, and the other parties thereto, as in effect immediately prior to the Effective Date.

***Prepetition First Lien Term Loans*** means the Loans (under and as defined in the Prepetition First Lien Term Loan Agreement) outstanding immediately prior to the Effective Date.

***Prepetition FLLO Agent*** means Cortland Capital Market Services LLC, solely in its capacity as successor administrative agent under the Prepetition FLLO Credit Agreement.

***Prepetition FLLO Credit Agreement*** means that certain First Lien Last-Out Term Loan Agreement, dated as of May 27, 2016 (as amended), by and among Fieldwood Energy LLC, as borrower, the Lenders thereunder and as defined therein, the Prepetition FLLO Agent, and the other parties thereto as in effect immediately prior to the Effective Date.

***Prepetition FLLO Lenders*** means the Lenders (as defined in the Prepetition FLLO Credit Agreement) holding Prepetition FLLO Loans immediately prior to the Effective Date.

***Prepetition FLLO Loans*** means the Loans (under and as defined in the Prepetition FLLO Credit Agreement) outstanding immediately prior to the Effective Date.

***Prepetition RBL Agent*** means Citibank, N.A., as administrative agent, solely in its capacity as administrative agent under the Prepetition RBL Credit Agreement.

***Prepetition RBL Credit Agreement*** means that certain Credit Agreement, dated as of September 30, 2013 (as amended), by and among Fieldwood Energy LLC, as borrower, the Prepetition RBL Agent, the Lenders thereunder and as defined therein and the other parties thereto, as in effect immediately prior to the Effective Date.

***Prepetition RBL Facility*** means the revolving credit facility arising under the Prepetition RBL Credit Agreement.

***Prepetition RBL Lenders*** means the Lenders (as defined in the Prepetition RBL Credit Agreement) party to the Prepetition RBL Credit Agreement immediately prior to the Effective Date.

***Prepetition Second Lien Term Lenders*** means the Lenders (as defined in the Prepetition Second Lien Term Loan Agreement) holding Prepetition Second Lien Term Loans immediately prior to the Effective Date.

***Prepetition Second Lien Term Loan Agent*** means Cortland Capital Market Services LLC, solely in its capacity as successor administrative agent under the Prepetition Second Lien Term Loan Agreement.

***Prepetition Second Lien Term Loan Agreement*** means that certain Second Lien Term Loan Agreement, dated as of September 30, 2013 (as amended), by and among Fieldwood Energy LLC, as borrower, the Lenders thereunder and as defined therein, the Prepetition Second Lien Term Loan Agent, and the other parties thereto, as in effect immediately prior to the Effective Date.

***Prepetition Second Lien Term Loans*** means the Loans (under and as defined in the Prepetition Second Lien Term Loan Agreement) outstanding immediately prior to the Effective Date.

***Prepetition Sponsor Second Lien Term Lenders*** means the Lenders (as defined in the Prepetition Sponsor Second Lien Term Loan Agreement) holding Prepetition Sponsor Second Lien Term Loans immediately prior to the Effective Date.

***Prepetition Sponsor Second Lien Term Loan Agent*** means Cortland Capital Market Services LLC, solely in its capacity as administrative agent under the Prepetition Sponsor Second Lien Term Loan Agreement.

***Prepetition Sponsor Second Lien Term Loan Agreement*** means that certain Second Lien Term Loan Agreement, dated as of May 27, 2016 (as amended), by and among Fieldwood Energy LLC, as borrower, the Lenders thereunder and as defined therein, the Prepetition Sponsor Second Lien Term Loan Agent, and the other parties thereto, as in effect immediately prior to the Effective Date.

***Prepetition Sponsor Second Lien Term Loans*** means the Loans (under and as defined in the Prepetition Sponsor Second Lien Term Loan Agreement) outstanding immediately prior to the Effective Date.

***Priority Non-Tax Claim*** means any Claim (other than a DIP Facility Claim, an Administrative Expense Claim, or a Priority Tax Claim) that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

***Priority Tax Claim*** means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

***Professional Person*** means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

***Pro Rata*** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

***Purchase Agreement*** means that certain Purchase and Sale Agreement, dated as of February 14, 2018, by and among Fieldwood Energy LLC and Seller, attached to the Disclosure Statement as **Exhibit G**, which shall be reasonably acceptable to the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders, including all schedules, exhibits, instruments and other documents to be delivered pursuant thereto or in connection therewith.

***Purchased Assets*** means the "Assets" (as defined in the Purchase Agreement) acquired by Purchaser pursuant to the Purchase Agreement.

*Purchaser* means Fieldwood Energy LLC.

*RBL Claim* means any Claims arising under the Prepetition RBL Credit Agreement.

*Released Parties* means, collectively, and in each case in their capacities as such: (i) the Debtors; (ii) the Debtors' other non-Debtor affiliates; (iii) the Restructuring Support Parties; (iv) the Backstop Parties; (v) the Prepetition RBL Lenders; (vi) the Prepetition RBL Agent; (vii) the Prepetition First Lien Term Lenders; (viii) the Prepetition First Lien Term Loan Agent; (ix) the Prepetition FLLO Lenders; (x) the Prepetition FLLO Agent; (xi) the Prepetition Sponsor Second Lien Term Lenders; (xii) the Prepetition Sponsor Second Lien Term Loan Agent; (xiii) the Prepetition Second Lien Term Lenders; (xiv) the Prepetition Second Lien Term Loan Agent; (xv) the DIP Facility Lenders; (xvi) the DIP Facility Agent; (xvii) Riverstone V FW Holdings Sub, LLC; and (xviii) Fieldwood Management LLC; and with respect to each of the foregoing entities, such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, and all of their respective current and former officers and directors, principals, shareholders (regardless of whether such interests are held directly or indirectly), members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities; *provided*, that any holder of a Claim or Interest that opts out of granting the releases set forth in the Plan shall not be included in the definition of "Released Parties."

*Reorganized Debtors* means the Debtors, as reorganized as of the Effective Date in accordance with the Plan.

*Reorganized Energy Inc.* means Fieldwood Energy Inc., as reorganized on the Effective Date in accordance with the Plan.

*Reorganized Energy LLC* means Fieldwood Energy LLC, as reorganized on the Effective Date in accordance with the Plan.

*Requisite Creditors* has the meaning set forth in the Restructuring Support Agreement.

*Requisite First Lien Term Lenders* has the meaning set forth in the Restructuring Support Agreement.

*Requisite FLLO Term Lenders* has the meaning set forth in the Restructuring Support Agreement.

*Requisite Second Lien Term Lenders* has the meaning set forth in the Restructuring Support Agreement.

*Requisite Sponsor Second Lien Term Lenders* has the meaning set forth in the Restructuring Support Agreement.

*Restructuring* means the financial restructuring of the Debtors, the principal terms of which are set forth in the Plan and the Plan Supplement.

*Restructuring Expenses* means the reasonable and documented fees and expenses incurred by the Restructuring Support Parties in connection with the Restructuring, as provided in the Restructuring Support Agreement, the DIP Facility Order, and the Backstop Commitment Agreement, including, without limitation, the fees and expenses of O'Melveny & Myers LLP, Jackson Walker LLP, Houlihan Lokey Capital, Inc., Davis Polk & Wardwell LLP, Haynes & Boone LLP, PJT Partners LP, Vinson & Elkins LLP, and Perella Weinberg Partners LP (in each case, as counsel or financial advisor to certain of the Restructuring Support Parties), payable in accordance with the terms of the applicable engagement or fee letters executed with such parties and without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, which shall be Allowed as Administrative Expense Claims upon incurrence and shall not be subject to any offset, defense, counterclaim, reduction, or credit.

*Restructuring Support Agreement* means that certain Restructuring Support Agreement, dated as of February 14, 2018, by and among Fieldwood Holdings, certain other affiliates of Fieldwood Holdings specified therein, and the Restructuring Support Parties, attached hereto as **Exhibit A**, as the same may be amended, restated, or otherwise modified in accordance with its terms.

*Restructuring Support Parties* means, collectively, the Consenting Creditors and the Consenting Sponsor.

*Restructuring Transactions* means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (a) the Asset Purchase Transaction, (b) the Rights Offering, (c) the consummation of the transactions provided for under or contemplated by the Restructuring Support Agreement; (d) the execution and delivery of appropriate agreements or other documents (including the Plan Documents) containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and the Restructuring Support Agreement and that satisfy the requirements of applicable law; (e) the execution and delivery of appropriate instruments (including the Plan Documents) of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and the Restructuring Support Agreements; (f) enter into the Apache Decommissioning Agreement Amendment; and (g) all other actions that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate and consistent with the Restructuring Support Agreement.

*Rights Offering* means that certain rights offering pursuant to which each holder of Allowed SLTL Claims is entitled to receive Subscription Rights to acquire New Equity Interests in accordance with the Rights Offering Procedures.

**Rights Offering Procedures** means the procedures for the implementation of the Rights Offering approved by the Bankruptcy Court and substantially in the form attached to the Restructuring Support Agreement as **Exhibit I**.

**Schedule of Rejected Contracts** means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time and which shall otherwise be in form and substance reasonably acceptable to the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders.

**Schedules** means, the schedules of Assets and liabilities, statements of financial affairs, lists of holders of Claims and Interests and all amendments or supplements thereto filed by the Debtors with the Bankruptcy Court, if any.

**Secured Claim** means a Claim to the extent (a) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property (i) as set forth in the Plan, (ii) as agreed to by the holder of such Claim and the Debtors, or (iii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (b) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code.

**Securities Act** means the Securities Act of 1933, as amended.

**Security** means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

**Seller** means Noble Energy, Inc.

**SLTL Claim** means any Claim arising under the Prepetition Second Lien Term Loan Agreement or the Prepetition Sponsor Second Lien Term Loan Agreement.

**Subscription Rights** means the subscription rights to acquire New Equity Interests offered in accordance with the Rights Offering Procedures.

**Tax Code** means the Internal Revenue Code of 1986, as amended from time to time.

**Unimpaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

**U.S. Trustee** means the United States Trustee for Region 7.

**Voting Deadline** means March 14, 2018 at 5:00 p.m. Prevailing Central Time, or such date and time as may set by the Bankruptcy Court.

### 1.2 *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in or exhibit to the Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof and the Restructuring Support Agreement. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (d) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### 1.3 *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4 *Consent Rights of Restructuring Support Parties.*

Notwithstanding anything herein to the contrary, any and all consent rights of the Restructuring Support Parties set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, the Plan Supplement and any other Plan Documents, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.

### 1.5 *Controlling Document.*

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control. The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall

govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

## ARTICLE II.       ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS.

### 2.1      *Treatment of Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim other than a Fee Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable (but in no event later than 30 days after the Effective Date), the holder of such Allowed Administrative Expense Claim shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

### 2.2      *Treatment of Fee Claims.*

(a)      All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (a) file, on or before the date that is forty five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim.  On the Effective Date, the Debtors shall establish and fund the Fee Escrow Account.  The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims.  Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full.  The Fee Escrow Account shall be held in trust for Professional Persons retained by the Debtors and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full.  Fees owing to the applicable Professional Persons shall be paid in Cash to such Professional Persons from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals; provided, however, that the Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account.  To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be

satisfied in accordance with Section 2.1 of the Plan. No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way.

(b)     Any objections to Fee Claims shall be served and filed (a) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (b) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

### 2.3     *Treatment of DIP Facility Claims.*

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim (subject to the last sentence of this Section 2.3), each such Allowed DIP Facility Claim (a) shall be paid in full in Cash by the Debtors on the Effective Date equal to the Allowed amount of such DIP Facility Claim and all commitments under the DIP Facility Loan Agreement shall terminate, or (b) shall be otherwise satisfied by the Debtors in a manner acceptable to the DIP Facility Agent, any affected lender under the DIP Facility Loan Agreement, or any other holder of a DIP Facility Claim, as applicable, in accordance with the Restructuring Support Agreement. Upon the indefeasible payment or satisfaction in full in Cash, or other satisfactory treatment, of the DIP Facility Claims (other than any DIP Facility Claims based on the Debtors' contingent obligations under the DIP Facility Loan Agreement for which no claim has been made) in accordance with the terms of the Plan, on the Effective Date, all Liens granted to secure such obligations shall be terminated and of no further force and effect. The Debtors' contingent or unliquidated obligations under the DIP Facility Loan Agreement, to the extent not indefeasibly paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors in a manner reasonably acceptable to the DIP Facility Agent, any affected lender under the DIP Facility Loan Agreement, or any other holder of a DIP Facility Claim, as applicable, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or Confirmation Order, notwithstanding any provision hereof or thereof to the contrary.

At the direction and at the option of any DIP Facility Lender that is also a Backstop Party or a Related Fund (as defined in the Backstop Commitment Agreement) of any Backstop Party, and for administrative convenience, the cash to be received by such DIP Facility Lender on account of principal pursuant to Section 2.3 of the Plan shall be applied towards the obligations of such Backstop Party or Related Fund under the Backstop Commitment Agreement, and upon such application the principal amount of all loans of such DIP Facility Lender under the DIP Facility Loan Agreement shall be deemed paid and satisfied in full.

### 2.4     *Payment of Fees and Expenses under DIP Facility Order.*

On the later of (a) the Effective Date and (b) the date on which such fees, expenses or disbursements would be required to be paid under the terms of the DIP Facility Order, the Debtors or Reorganized Debtors (as applicable) shall pay all fees, expenses and disbursements of (w) the DIP Facility Agent, and (x) any accrued and unpaid fees and expenses as of the Effective Date required to be paid under or pursuant to the applicable DIP Facility Order. All payments of fees, expenses, or disbursements pursuant to this section shall be subject in all respects to the terms of the applicable DIP Facility Order.

**2.5** **_Treatment of Priority Tax Claims._**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable, the holder of such Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, Cash in an amount equal to the Allowed amount of such Claim or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; _provided_, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

# ARTICLE III.        CLASSIFICATION OF CLAIMS AND INTERESTS.

**3.1** **_Classification in General._**

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; _provided_, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

**3.2** **_Formation of Debtor Groups for Convenience Only._**

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

**3.3** **_Summary of Classification of Claims and Interests._**

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (a) Impaired and Unimpaired under the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to accept or reject the Plan:

| **Class** | **Type of Claim or Interest** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (Deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 3 | RBL Claims | Unimpaired | No (Deemed to accept) |
| Class 4 | FLTL Claims | Impaired | Yes |
| Class 5 | FLLO Claims | Impaired | Yes |
| Class 6 | SLTL Claims | Impaired | Yes |
| Class 7 | General Unsecured Claims | Unimpaired | No (Deemed to accept) |
| Class 8 | Intercompany Claims | Unimpaired | No (Deemed to accept) |
| Class 9 | Existing Holdings Interests | Unimpaired | No (Deemed to accept) |
| Class 10 | Existing Energy Inc. Interests | Impaired | No (Deemed to accept) |
| Class 11 | Intercompany Interests | Unimpaired | No (Deemed to accept) |

### 3.4 *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.5 *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

### 3.6 *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes who votes on the Plan shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.7 *Voting; Presumptions; Solicitation.*

(a) **Acceptance by Certain Classes**. Only holders of Allowed Claims or Interests in Classes 4, 5, and 6 are entitled to vote to accept or reject the Plan. An Impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. Holders of Claims or Interests in Classes 4, 5, and 6 shall receive ballots containing detailed voting instructions.

(b)     **Deemed Acceptance by Classes**.  Holders of Claims and Interests in Classes 1, 2, 3, 7, 8, 9, and 11 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  In addition, although holders of Interests in Class 10 are impaired under the Plan, such holders are presumed to be proponents of the Plan, and are deemed to accept.  Accordingly, all such holders are not entitled to vote to accept or reject the Plan.

### 3.8     *Cramdown.*

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (a) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.9     *No Waiver.*

Nothing contained in the Plan shall be construed to waive a Debtor's or other entity's right to object on any basis to any Claim.

## ARTICLE IV.        TREATMENT OF CLAIMS AND INTERESTS.

### 4.1     *Class 1:  Priority Non-Tax Claims.*

(a)     **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Priority Non-Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b)     **Impairment and Voting**:   Allowed Priority Non-Tax Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Priority Non-Tax Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Priority Non-Tax Claims.

### 4.2     *Class 2:  Other Secured Claims.*

(a)     **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and

the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors:  (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(b)     **Impairment and Voting**:   Allowed Other Secured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

### 4.3     *Class 3:  RBL Claims.*

(a)     **Treatment**: On the Effective Date, holders of Allowed RBL Claims shall receive payment in full, in Cash and the existing commitments shall be terminated.

(b)     **Impairment and Voting**:  RBL Claims are Unimpaired.  Holders of Allowed RBL Claims are not entitled to vote on the Plan.

(c)     **Allowance**: The RBL Claims shall be deemed Allowed on the Effective Date in the aggregate face amount of the then outstanding letters of credit issued under the RBL Credit Agreement, plus any unreimbursed amounts thereunder, and any accrued and unpaid interest payable on such unreimbursed amounts thereunder through the Effective Date, plus any fees, charges, including any and all reasonable and documented expenses and other amounts payable under the Prepetition RBL Credit Agreement.

### 4.4     *Class 4:  FLTL Claims.*

(a)     **Treatment**:  On the Effective Date, all of the FLTL Claims shall be cancelled and discharged.  On the Effective Date, each holder of an Allowed FLTL Claim shall receive (i) on account of the outstanding principal amount of such Claim, its Pro Rata share of the lending commitments arising under the Exit First Lien Term Loan Facility, secured by a first-priority lien on (x) substantially all of the property of the Reorganized Debtors that secured the FLTL Claims pursuant to the Prepetition First Lien Term Loan Agreement and the other applicable Loan Documents (as defined in the Prepetition First Lien Term Loan Agreement) and (y) substantially all of the Purchased Assets, in each case, on the terms and subject to the limitations set forth in the Exit First Lien Credit Agreement, on a "last-out" basis, and (ii) on account of all accrued and unpaid interest payable through the Effective Date and for all reasonable and documented expenses and other amounts payable under the Prepetition First Lien Term Loan Agreement, payment in Cash.

(b)     **Impairment and Voting**:  FLTL Claims are Impaired.  Holders of Allowed FLTL Claims are entitled to vote on the Plan.

(c)     **Allowance**:  The FLTL Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $1,142,688,815, plus (i) any accrued and unpaid interest thereon payable through the Effective Date, and (ii) any fees, charges, including any and all reasonable and documented expenses and other amounts payable under the Prepetition First Lien Term Loan Agreement.

### 4.5     *Class 5:  FLLO Claims.*

(a)     **Treatment**:  On the Effective Date, all of the FLLO Claims shall be cancelled and discharged.  On the Effective Date, each holder of an Allowed FLLO Claim shall receive (i) on account of the outstanding principal amount of such Claim, its Pro Rata share of the lending commitments arising under the Exit Second Lien Term Loan Facility, secured by a second-priority (in respect of the Exit LC Facility and the Exit First Lien Term Loan Facility) lien on (x) substantially all of the property of the Reorganized Debtors that secured the FLLO Claims pursuant to the Prepetition FLLO Term Loan Agreement and the other applicable Loan Documents (as defined in the Prepetition FLLO Term Loan Agreement) and (y) substantially all of the Purchased Assets, in each case, on the terms and subject to the limitations set forth in the Exit Second Lien Credit Agreement and (ii) on account of accrued and unpaid interest payable through the Effective Date and for all reasonable and documented expenses and other amounts payable under the Prepetition FLLO Credit Agreement, payment in Cash.

(b)     **Impairment and Voting**:  FLLO Claims are Impaired.  Holders of Allowed FLLO Claims are entitled to vote on the Plan.

(c)     **Allowance**:  The FLLO Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $517,500,000, plus (i) any accrued and unpaid interest thereon payable through the Effective Date, and (ii) any fees, charges, including any and all reasonable and documented expenses and other amounts payable under the Prepetition FLLO Credit Agreement.

### 4.6     *Class 6:  SLTL Claims.*

(a)     **Treatment**:  On the Effective Date, all of the SLTL Claims shall be cancelled and discharged.  On the Effective Date, each holder of an Allowed SLTL Claim shall receive, on account of its Allowed SLTL Claims, its Pro Rata share of (i) New Equity Interests representing, in the aggregate, 20.25% of the New Equity Interests issued on the Effective Date, and (ii) 100% of the Subscription Rights to acquire 75% of the New Equity Interests for $525 million in accordance with the Rights Offering Procedures, in each case the New Equity Interests subject to dilution by the Management Incentive Plan.

(b)     **Impairment and Voting**:  SLTL Claims are Impaired.  Holders of Allowed SLTL Claims are entitled to vote on the Plan.

(c)     **Allowance**:  The SLTL Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $1,626,219,212, plus (i) any accrued and unpaid interest thereon payable through the Petition Date, and (ii) any fees, charges, including any and all reasonable and documented expenses and other amounts payable under the Prepetition

Second Lien Term Loan Agreement or the Prepetition Sponsor Second Lien Term Loan Agreement.

### 4.7    *Class 7:  General Unsecured Claims.*

(a)    **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed General Unsecured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to different treatment, on and after the Effective Date, the Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

(b)    **Impairment and Voting**:  Allowed General Unsecured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed General Unsecured Claims.

### 4.8    *Class 8:  Intercompany Claims.*

(a)    **Treatment**:  On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors, as applicable, in their sole discretion.  All Intercompany Claims between any Debtor and a non-Debtor affiliate shall be Unimpaired under the Plan.

(b)    **Impairment and Voting**:  All Allowed Intercompany Claims are deemed Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

### 4.9    *Class 9:  Existing Holdings Interests.*

(a)    **Treatment**:  Existing Holdings Interests are Unimpaired.  As soon as practicable following the distributions of New Equity Interests on the Effective Date, Fieldwood Holdings shall liquidate and dissolve pursuant to applicable law, and the Reorganized Debtors shall provide for the distribution of Fieldwood Holdings' New Equity Interests (received pursuant to Section 4.10(a) of the Plan) to the holders of Existing Holdings Interests in the priorities set forth in Fieldwood Holdings' organizational documents and applicable law.  Any other assets of Fieldwood Holdings shall vest in Reorganized Energy Inc.

(b)    **Impairment and Voting**:  Existing Holdings Interests are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, holders of Existing Holdings Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Existing Holdings Interests.

### 4.10    *Class 10:  Existing Energy Inc. Interests.*

(a)    **Treatment**:  On the Effective Date, the Existing Energy Inc. Interests shall be cancelled without further action by or order of the Bankruptcy Court, and each holder of an Allowed Existing Energy Inc. Interest shall receive its Pro Rata share of New Equity Interests representing, in the aggregate, 0.25% of the New Equity Interests issued on the Effective Date (subject to dilution by the Management Incentive Plan).

(b)    **Impairment and Voting**:  The Existing Energy Inc. Interests are Impaired.  However, Fieldwood Holdings, as the sole holder of Existing Energy Inc. Interests, is a Debtor in these cases and a proponent of the Plan.  Accordingly, the Existing Energy Inc. Interests shall be conclusively deemed to accept the Plan, and the votes of such holder shall not be solicited with respect to such Allowed Existing Energy Inc. Interests.

### 4.11    *Class 11:  Intercompany Interests.*

(a)    **Treatment**:  Intercompany Interests are Unimpaired.  On the Effective Date, all Intercompany Interests shall be treated as set forth in section 5.15 of the Plan.

(b)    **Impairment and Voting**:  Intercompany Interests are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

### 4.12    *Treatment of Vacant Classes.*

Any Claim or Interest in a Class that is considered vacant under section 3.6 of the Plan shall receive no Plan Distribution.

## ARTICLE V.        MEANS FOR IMPLEMENTATION.

### 5.1    *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

## 5.2     *Continued Corporate Existence.*

(a)     Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Corporate Governance Documents.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and the New Corporate Governance Documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing:  (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under the applicable state, provincial and federal or foreign law).

(b)     On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, without limitation:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation or formation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law.

(c)     On the Effective Date or as soon thereafter as is reasonably practicable, Fieldwood Holdings shall file with the Office of the Secretary of State of Delaware a certificate of dissolution which may be executed by an officer of Fieldwood Holdings without the necessity of the approval of the board of directors of Fieldwood Holdings or the holders of Interests in Fieldwood Holdings, and upon such filing shall be deemed dissolved for all purposes and without the necessity of any other action by Fieldwood Holdings.  From and after the Effective Date, Fieldwood Holdings shall not be required to file any documents, or take any other action or receive any approval to withdraw business operations in any state where Fieldwood Holdings previously conducted its business operations.  If any of the foregoing is inconsistent or conflicts with any preexisting organizational or related documents of Fieldwood Holdings, such documents are deemed amended by the Plan to permit and authorize Fieldwood Holdings to take the actions contemplated herein.

**5.3**      ***Corporate Action.***

(a)      Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the assumption of executory contracts and unexpired leases as provided herein, (b) the selection of the managers, directors, or officers for the Reorganized Debtors, (c) the distribution of the New Equity Interests, (d) the entry into or execution of the Exit LC Documents, Exit First Lien Documents, and Exit Second Lien Documents, (e) the consummation of the Asset Purchase Transaction, and (g) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.

(b)      On or (as applicable) before the Effective Date, the appropriate directors, officers, and managers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan).  The authorizations and approvals contemplated by this Section 5.3 shall be effective notwithstanding any requirements under non-bankruptcy law.

**5.4**      ***Asset Purchase Transaction.***

(a)      The Plan and the Confirmation Order shall authorize the Asset Purchase Transaction pursuant to section 363 of the Bankruptcy Code under the terms and conditions of the Purchase Agreement.

(b)      Subject to and in connection with the occurrence of the Effective Date, the Debtors and Seller shall take all such actions as may be necessary or appropriate to effect the Asset Purchase Transaction on the terms and subject to the conditions set forth in the Purchase Agreement. Without limiting the generality of the immediately preceding sentence, upon the satisfaction or waiver of each of the conditions set forth in Section 9.1 of the Plan and the applicable conditions of the Purchase Agreement, on the Effective Date the Debtors and Seller shall take or cause to be taken all actions, including making appropriate filings or recordings, that may be required by applicable law in connection with the Asset Purchase Transaction.

(c)      In the event of any conflict whatsoever between the terms of the Plan and the Purchase Agreement with respect to the Asset Purchase Transaction, the terms of the Purchase Agreement shall control, and the Plan shall be deemed to incorporate in their entirety the terms, provisions, and conditions of the Purchase Agreement.

**5.5**      ***Plan Funding.***

Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from the proceeds of the Rights Offering.

### 5.6     *Cancellation of Existing Securities and Agreements.*

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, or in any Plan Document, on the Effective Date, all agreements, instruments, and other documents evidencing any prepetition Claim or Interest (other than certain Intercompany Interests that are not modified by the Plan) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation shall have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.

### 5.7     *Cancellation of Certain Existing Security Interests.*

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### 5.8     *Officers and Boards of Directors.*

(a)     On the Effective Date, the New Board shall consist of seven members. G.M. McCarroll shall serve as a member of the New Board.  The remaining members of the New Board shall be allocated in accordance with the Governance Term Sheet attached to the Restructuring Support Agreement as **Exhibit J**.  The composition of the boards of directors or managers, as applicable, of each Reorganized Debtor shall be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)     Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or managers, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors or managers, as applicable, of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### 5.9     *Management Incentive Plan.*

On the Effective Date, the New Board shall adopt the Management Incentive Plan.

### 5.10    *Authorization, Issuance, and Delivery of New Equity Interests.*

On the Effective Date, Reorganized Energy Inc. is authorized to issue or cause to be issued and shall issue the New Equity Interests for distribution in accordance with the terms of the Plan without the need for any further corporate or shareholder action.

### 5.11    *Exit LC Credit Agreement.*

On the Effective Date, the Reorganized Debtors shall enter into the Exit LC Credit Agreement.  The Exit LC Credit Agreement shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order.  On the Effective Date, all letters of credit issued under the Prepetition RBL Credit Agreement, to the extent Allowed, shall be deemed issued or reissued, as applicable, under the Exit LC Credit Agreement in accordance with the terms and conditions of the Exit LC Credit Agreement.  On the Effective Date, all Liens and security interests granted pursuant to, or in connection with, the Exit LC Credit Agreement:  shall (i) be reaffirmed and ratified by the applicable Reorganized Debtors and continue in full force and effect pursuant to the Exit LC Credit Agreement, and (ii) be deemed granted by the Reorganized Debtors pursuant to the Exit LC Credit Agreement.  On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the Exit LC Credit Agreement, as applicable, (including any Liens and security interests granted on the Purchased Assets) (x) shall be valid, binding, perfected, enforceable Liens and security interests in the property described in the Exit LC Credit Agreement and the other "Loan Documents" (as defined therein), with the priorities established in respect thereof under applicable non-bankruptcy law and the applicable New Intercreditor Agreements, and (y) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.  Pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors and the Reorganized Debtors have waived any discharge of the Claims and obligations arising under the Prepetition RBL Credit Agreement as modified by the Exit LC Credit Agreement.

### 5.12    *Exit First Lien Term Loan Facility and Exit Second Lien Term Loan Facility.*

On the Effective Date, the Exit First Lien Documents and Exit Second Lien Documents shall be executed and delivered by the Reorganized Debtors substantially in the form contained in the Plan Supplement, and the Reorganized Debtors shall be authorized to execute, deliver, and enter into such documents without the need for any further action.  The Exit First Lien Term Loan Facility and Exit Second Lien Term Loan Facility shall constitute legal, valid, binding and authorized joint and several obligations of the Reorganized Debtors, enforceable in accordance with their terms, and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order.  On the Effective Date, all Liens and security interests granted pursuant to, or in connection with, the Prepetition First Lien Credit Agreement and Prepetition FLLO Credit Agreement shall (i) be reaffirmed and ratified by the Reorganized Debtors and continue in full force and effect pursuant to the Exit First Lien Credit Agreement and Exit

Second Lien Credit Agreement, as applicable, and (ii) be deemed granted by the Reorganized Debtors pursuant to the Exit First Lien Credit Agreement and Exit Second Lien Credit Agreement, as applicable. On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the Exit First Lien Credit Agreement and Exit Second Lien Credit Agreement, as applicable, (including any Liens and security interests granted on the Purchased Assets) (x) shall be valid, binding, perfected, enforceable Liens and security interests in the property subject to a security interest granted by the applicable Reorganized Debtors pursuant to the Exit First Lien Credit Agreement and Exit Second Lien Credit Agreement and the "Loan Documents" (as defined in each of the Exit First Lien Credit Agreement and the Exit Second Lien Credit Agreement), as applicable, with the priorities established in respect thereof under applicable non-bankruptcy law and the applicable New Intercreditor Agreements, and (y) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

### 5.13    *New Intercreditor Agreements.*

On the Effective Date, the Reorganized Debtors, the Exit LC Facility Agent, the Exit First Lien Term Loan Agent, and the Exit Second Lien Term Loan Agent shall enter into the applicable New Intercreditor Agreement substantially in the forms contained in the Plan Supplement.

### 5.14    *Rights Offering.*

(a)    Terms. After the Petition Date, the Debtors will commence the Rights Offering in accordance with the Rights Offering Procedures. On the Effective Date, the Debtors shall consummate the Rights Offering. The Rights Offering shall be fully backstopped by the Backstop Parties in accordance with and subject to the terms and conditions of the Backstop Commitment Agreement. The right to participate in the Rights Offering may not be sold, transferred, or assigned, except in the circumstances described in the Backstop Commitment Agreement.

(b)    Purpose. On the Effective Date, the proceeds of the Rights Offering shall be used: (i) to fund the Asset Purchase Transaction, including the Purchaser's obligations under the Purchase Agreement; (ii) to provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes; (iii) to fund Allowed Administrative Expense Claims payable on or after the Effective Date; (iv) to pay in Cash in full the DIP Facility Claims; and (v) to fund Plan Distributions.

(c)    Backstop Commitment. In accordance with the Backstop Commitment Agreement and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to purchase, on or prior to the Effective Date, its respective Backstop Commitment Percentage (as defined in the Backstop Commitment Agreement) of the Unsubscribed Shares (as defined in the Backstop Commitment Agreement).

(d)    Backstop Commitment Premium. In exchange for providing the backstop commitment for the Rights Offering, the Backstop Parties shall receive the Backstop

Commitment Premium of 4.5% of the New Equity Interests (issued at the same price as the New Equity Interests offered in the Rights Offering).  The Backstop Commitment Premium shall be deemed fully earned upon the execution of the Backstop Commitment Agreement; *provided* that if the Effective Date does not occur, then the Backstop Commitment Premium shall be payable, in Cash, to the extent provided in Section 13 of the Backstop Commitment Agreement.

### 5.15   *Intercompany Interests; Corporate Reorganization.*

On the Effective Date and without the need for any further corporate action or approval of any board of directors, board of managers, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

### 5.16   *Restructuring Transactions.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with the Plan and the Restructuring Support Agreement as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

### 5.17   *Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date (or such shorter period as the Debtors may agree); *provided*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation and defense of the Plan whether incurred before, on, or after the Effective Date.

### 5.18   *Separability.*

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

## ARTICLE VI.        DISTRIBUTIONS.

### 6.1        *Distributions Generally.*

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan.

### 6.2        *Postpetition Interest on Claims.*

Except as otherwise set forth in the Plan, the Plan Documents, or the Confirmation Order, postpetition interest shall accrue, and shall be paid, on any Claims in the ordinary course of business in accordance with any applicable law, agreement, document, or Final Order, as the case may be, as if the Chapter 11 Cases had never been commenced.

### 6.3        *Date of Distributions.*

Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is practicable.

### 6.4        *Distribution Record Date.*

(a)        As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)        Notwithstanding anything in the Plan to the contrary, in connection with any distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under the Plan with holders of New Equity Interests to the extent consistent with the customary practices of DTC used in connection with such distributions.  All New Equity Interests to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent; *provided*, that such New Equity Interests will only be issued in accordance with DTC book-entry procedures if the same are permitted to be held through DTC's book-entry system and the Reorganized Debtors, in their sole discretion, deems such method of distribution advisable.

### 6.5        *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give

any bond or surety or other security for the performance of its duties.  The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records. The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in section 6.16 of the Plan.

### 6.6  *Delivery of Distributions.*

Subject to section 6.4(b) of the Plan, the Disbursing Agent shall issue or cause to be issued, the applicable consideration under the Plan and, subject to Bankruptcy Rule 9010, shall make all distributions to any holder of an Allowed Claim as and when required by the Plan at:  (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

### 6.7  *Unclaimed Property.*

One year from the later of:  (a) the Effective Date and (b) the date that is ten Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

### 6.8  *Satisfaction of Claims.*

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.9  *Manner of Payment under Plan.*

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 6.10   *Fractional Shares and De Minimis Cash Distributions.*

No fractional New Equity Interests shall be distributed.  When any distribution would otherwise result in the issuance of a number of New Equity Interests that is not a whole number, the New Equity Interests subject to such distribution shall be rounded to the next higher or lower whole number as follows:  (a) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (b) fractions less than 1/2 shall be rounded to the next lower whole number.  The total number of New Equity Interests to be distributed on account of Allowed SLTL Claims, and Existing Energy Inc. Interests, and pursuant to the Rights Offering, the Backstop Commitment Agreement, or the Backstop Commitment Premium shall be adjusted as necessary to account for the rounding provided for herein.  No consideration shall be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) New Equity Interests or $100.00 in Cash.  Fractional New Equity Interests that are not distributed in accordance with this section shall be returned to, and ownership thereof shall vest in, Reorganized Energy Inc.

### 6.11   *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by section 6.2 of the Plan).

### 6.12   *Allocation of Distributions between Principal and Interest.*

Except as otherwise provided in the Plan and subject to section 6.2 of the Plan, to the extent that any Allowed RBL Claim, Allowed FLTL Claim, Allowed FLLO Claim, or Allowed SLTL Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount (as determined for federal income tax purposes) of the Claim and then to accrued but unpaid interest.

### 6.13   *Exemption from Securities Laws.*

(a).   The issuance of and the distribution under this Plan of the New Equity Interests pursuant to Sections 4.6(a)(i) and 4.10(a) of this Plan shall be exempt from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.  These securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b).   The issuance and sale of the New Equity Interests pursuant to the Rights Offering, and to the Backstop Parties under the Backstop Commitment Agreement (including the New Equity Interests comprising the Backstop Commitment Premium), is being made in reliance

on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder. Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

### 6.14   *Setoffs and Recoupments.*

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s) and holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or its successor or assign may possess against such holder.

### 6.15   *Rights and Powers of Disbursing Agent.*

(a)     Powers of Disbursing Agent.  The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)     Expenses Incurred on or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement Claims (including, without limitation, for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

### 6.16   *Withholding and Reporting Requirements.*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors and any other distributing party shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Plan Distributions under the Plan shall be subject to any such withholding or reporting requirements. In the case of a non-Cash Plan Distribution that is

35

subject to withholding, the distributing party may request a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms.  If such form is requested and not submitted to the distributing party within 10 days of the request, the distributing party may, in its discretion, either (a) withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax, or (b) require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution.  If such form is requested and submitted to the distributing party within 10 days of the request, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax; provided that, the distributing party shall first notify the intended recipient of such contemplated sale and offer the intended recipient a reasonable opportunity to provide sufficient Cash to satisfy such withholding tax in lieu of such sale.  The distributing party shall have the right, but not the obligation, not to make a Plan Distribution until its withholding obligation is satisfied pursuant to the preceding sentences.  If an intended recipient of a non-Cash Plan Distribution has agreed to provide the withholding agent with the Cash necessary to satisfy the withholding tax pursuant to this section and such person fails to comply before the date that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.  Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  The distributing party may require a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms.

Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Plan Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

## ARTICLE VII.      PROCEDURES FOR RESOLVING CLAIMS.

### 7.1   *Disputed Claims Process.*

(a)      Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in the Plan, holders of Claims need not file proofs of Claim with the Bankruptcy Court, and the Reorganized Debtors and holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced.  The holders of Claims shall not be subject to any claims resolution process in the Bankruptcy Court in connection with their Claims and shall retain all their rights under applicable non-bankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors in any forum with jurisdiction over the parties.  Except for (a) proofs of Claim asserting damages arising out of the rejection of an

executory contract or unexpired lease by any of the Debtors pursuant to Section 8.3 of the Plan and (b) proofs of Claim that have been objected to by the Debtors before the Effective Date, upon the Effective Date, any filed Claim, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn.  To the extent not otherwise provided in the Plan, the deemed withdrawal of a proof of Claim is without prejudice to such claimant's rights under Section 7.1 of the Plan to assert its Claims in any forum as though the Debtors' Chapter 11 Cases had not been commenced.  From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

(b)     Except insofar as a Claim is Allowed under the Plan, only the Debtors or the Reorganized Debtors shall be entitled to object to Claims.  Any objections to Claims shall be served and filed (a) on or before the ninetieth (90th) day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Debtors or the Reorganized Debtors.

### 7.2     *Estimation of Claims.*

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.

### 7.3     *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan by any mechanism approved by the Bankruptcy Court.

### 7.4     *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.5    *Distributions after Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

## ARTICLE VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1    *General Treatment.*

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases shall be deemed assumed, unless such contract or lease (a) was previously assumed or rejected by the Debtors, pursuant to Final Order of the Bankruptcy Court, (b) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (c) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (d) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, *provided*, that the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders consent with respect to the Debtors' rejection of such contracts and leases.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

Subject to resolution of any dispute regarding any Cure Amount, all Cure Amounts shall be satisfied by the Debtors or Reorganized Debtors, as the case may be, upon assumption or assignment, as applicable, of the underlying contracts and unexpired leases. Assumption or assignment, as applicable, of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption or assumption and assignment, as applicable.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assigned shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Entity, upon the deemed assumption of such contract or unexpired lease.

### 8.2    *Determination of Cure Disputes and Deemed Consent.*

Any monetary amounts by which any executory contract or unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as applicable, upon assumption thereof. Following the Petition Date, the Debtors shall have served a notice on parties to executory contracts and unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with the Plan and setting forth the proposed Cure Amount (if any).  If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors, as applicable intend to assume does not receive such a notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

If there is a dispute regarding (a) any Cure Amount, (b) the ability of the Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective.  The Debtors reserve the right to reject any executory contract or unexpired lease not later than thirty (30) days after the entry of a Final Order resolving any such dispute.  Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption and assignment of such executory contract or unexpired lease or the relevant Cure Amount within fourteen (14) days of the filing thereof, shall be deemed to have assented to such assumption, assignment, and/or Cure Amount and shall be forever barred, estopped, and enjoined from challenging the validity of such assumption or the amount of such Cure Amount thereafter.

### 8.3    *Rejection Damages Claims.*

Any counterparty to a contract or lease that is identified on the Schedule of Rejected Contracts or is otherwise rejected by the Debtors must file and serve a proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (a) the Confirmation Date or (b) the effective date of rejection of such executory contract or unexpired lease.

### 8.4    *Survival of the Debtors' Indemnification Obligations.*

Any obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by the Plan; *provided*, that the Reorganized Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan

39

and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 8.5 *Compensation and Benefit Plans.*

All employment and severance agreements and policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code and, in the case of employment agreements, modified and assumed as agreed between the Debtors, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders.

### 8.6 *Insurance Policies.*

(a)     All insurance policies to which any Debtor is a party as of the Effective Date, including the D&O Policy, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies shall vest in the Reorganized Debtors. Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in the D&O Policy.

(b)     In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

### 8.7 *Reservation of Rights.*

(a)     Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)     Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)     Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE IX.    CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE DATE.

### 9.1    *Conditions Precedent to the Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)    the Plan Supplement, including the Plan Documents, has been filed;

(b)    the Bankruptcy Court has entered the Confirmation Order in form and substance reasonably acceptable to the Debtors, the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders and such Confirmation Order shall have become a Final Order;

(c)    the Restructuring Support Agreement shall not have been terminated by the Debtors or any of the Restructuring Support Parties and shall be in full force and effect;

(d)    the amendments to certain employment agreements to be assumed under Section 8.5 of the Plan shall have been executed and assumed;

(e)    the conditions to closing under the Purchase Agreement have been satisfied or waived in accordance with the terms thereof, and the Purchase Agreement is in full force and effect and binding on all parties thereto;

(f)    the conditions to effectiveness of the Backstop Commitment Agreement have been satisfied or waived in accordance with the terms thereof, and the Backstop Commitment Agreement is in full force and effect and binding on all parties thereto;

(g)    the conditions to effectiveness of the Exit LC Credit Agreement have been satisfied or waived in accordance with the terms thereof, and the Exit LC Credit Agreement is in full force and effect and binding on all parties thereto;

(h)    the conditions to effectiveness of the Exit First Lien Credit Agreement have been satisfied or waived in accordance with the terms thereof, and the Exit First Lien Credit Agreement is in full force and effect and binding on all parties thereto;

(i)    the conditions to effectiveness of the Exit Second Lien Credit Agreement have been satisfied or waived in accordance with the terms thereof, and the Exit Second Lien Credit Agreement is in full force and effect and binding on all parties thereto;

(j)        each of the New Intercreditor Agreements shall have been executed and delivered by each of the parties thereto;

(k)        the Debtors shall have implemented the Restructuring Transactions and all other transactions contemplated by the Plan and the Restructuring Support Agreement in a manner consistent in all respects with the Plan and Restructuring Support Agreement;

(l)        all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(m)        the Amended Certificate of Incorporation of Reorganized Energy Inc. has been filed with the appropriate governmental authority;

(n)        the Debtors shall have paid in full in Cash all Restructuring Expenses incurred, or estimated to be incurred, through the Effective Date; and

(o)        the Debtors, together with the Subscription Agent (as defined in the Rights Offering Procedures), shall have received proceeds of at least $525 million for the issuance of the New Equity Interests (including, for the avoidance of doubt, any DIP Facility Claims which are credited against any Backstop Party's funding amount).

### 9.2    *Waiver of Conditions Precedent.*

(a)        Each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by the Debtors, the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders.  If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court.  If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)        The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 9.3    *Effect of Failure of a Condition.*

If the conditions listed in Section 9.1 of the Plan are not satisfied or waived in accordance with Section 9.2 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date

reasonably acceptable to the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders, and the Requisite Sponsor Second Lien Term Lenders and as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the other Restructuring Support Parties, or any other Person.

## ARTICLE X.   EFFECT OF CONFIRMATION.

### 10.1   *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan.

### 10.2   *Vesting of Assets.*

Except as otherwise provided in the Plan, or any Plan Document, on and after the Effective Date, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with the Plan, the Rights Offering, and the Asset Purchase Transaction (including the Purchased Assets), shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and Interests.  Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 10.3   *Discharge of Claims against and Interests in the Debtors.*

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise provided in the Plan or in the Confirmation Order, each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest, where such Claim or Interest has been fully paid or otherwise satisfied in accordance with the Plan, and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.  Except as

otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor.

### 10.4    *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in the Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5    *Injunction against Interference with Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date, *provided,* that the foregoing shall not enjoin any Restructuring Support Party from exercising any of its rights or remedies under the Restructuring Support Agreement in accordance with the terms thereof.

### 10.6    *Plan Injunction.*

(a)    Except as otherwise provided in the Plan, in the Plan Documents, or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, and the Plan Documents, to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent

with the provisions of the Plan and the Plan Documents; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan and the Plan Documents; *provided, further*, that nothing contained in the Plan shall enjoin any Restructuring Support Party from exercising any of its rights or remedies under the Restructuring Support Agreement in accordance with the terms thereof.

(b)     By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in Section 10.6 of the Plan.

### 10.7    *Releases.*

(a)     ***RELEASES BY THE DEBTORS*. AS OF THE EFFECTIVE DATE AND TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE PLAN DOCUMENTS, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING, WITHOUT LIMITATION, THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, THE PLAN DOCUMENTS, OR IN THE CONFIRMATION ORDER, THE RELEASED PARTIES ARE DEEMED EXPRESSLY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED, ACQUITTED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, PREDECESSORS, ASSIGNS, SUBSIDIARIES, AFFILIATES AND REPRESENTATIVES AND ANY AND ALL OTHER PERSONS OR ENTITIES THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING ENTITIES, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS OR CAUSES OF ACTION, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE (COLLECTIVELY, THE "RELEASED CLAIMS") THAT THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON OR ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM OR IN

CONNECTION WITH, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE DEBTORS' RESTRUCTURING EFFORTS, THE NEGOTIATION, FORMULATION OR PREPARATION OF ANY TRANSACTIONS OR DOCUMENTS IN CONNECTION THEREWITH, THE DEBTORS' INTERCOMPANY TRANSACTIONS, ANY PREFERENCE, FRAUDULENT TRANSFER, OR OTHER AVOIDANCE CLAIM ARISING PURSUANT TO CHAPTER 5 OF THE BANKRUPTCY CODE OR APPLICABLE LAW, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AND ANY OTHER TRANSACTION OR ARRANGEMENT BETWEEN ANY DEBTOR, REORGANIZED DEBTOR, OR ESTATE AND ANY RELEASED PARTY (INCLUDING, WITHOUT LIMITATION, THE PREPETITION RBL CREDIT AGREEMENT, THE PREPETITION FIRST LIEN TERM LOAN AGREEMENT, THE PREPETITION FLLO CREDIT AGREEMENT, THE PREPETITION SECOND LIEN TERM LOAN AGREEMENT, AND THE PREPETITION SPONSOR SECOND LIEN TERM LOAN AGREEMENT), THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIM OR INTEREST BEFORE OR DURING THE CHAPTER 11 CASES, THE RESTRUCTURING TRANSACTIONS, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE DISCLOSURE STATEMENT, THE RESTRUCTURING SUPPORT AGREEMENT, THE ASSET PURCHASE TRANSACTION, THE PURCHASE AGREEMENT, AND THE PLAN AND RELATED AGREEMENTS, INSTRUMENTS, TERM SHEETS AND OTHER DOCUMENTS (INCLUDING THE PLAN DOCUMENTS), THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, THE BACKSTOP COMMITMENT AGREEMENT, OR THE RIGHTS OFFERING, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR ARISING ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING, IN EACH CASE OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT IS A CRIMINAL ACT OR CONSTITUTES INTENTIONAL FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT, AS DETERMINED BY A FINAL ORDER.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(a) OF THE PLAN (the "DEBTOR RELEASES"), WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (II) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE RELEASED CLAIMS RELEASED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THE ESTATES, (III) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS, (IV) FAIR, EQUITABLE AND REASONABLE, (V) GIVEN

AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VI) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

(b)     *RELEASES BY HOLDERS OF CLAIMS AND INTERESTS*. AS OF THE EFFECTIVE DATE AND TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE PLAN DOCUMENTS, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING, WITHOUT LIMITATION, THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, THE PLAN DOCUMENTS, OR IN THE CONFIRMATION ORDER, THE RELEASED PARTIES ARE DEEMED EXPRESSLY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED ACQUITTED AND DISCHARGED BY THE (I) THE HOLDERS OF ALL CLAIMS AND INTERESTS WHO VOTE TO ACCEPT THE PLAN, (II) HOLDERS OF CLAIMS OR INTERESTS THAT ARE UNIMPAIRED UNDER THE PLAN, WHERE THE APPLICABLE CLAIMS OR INTERESTS HAVE BEEN FULLY PAID OR OTHERWISE SATISFIED IN ACCORDANCE WITH THE PLAN, (III) HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN WAS SOLICITED BUT WHO DID NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN AND DID NOT OPT OUT OF GRANTING THE RELEASES SET FORTH IN THE PLAN, (IV) HOLDERS OF CLAIMS OR INTERESTS WHO VOTED TO REJECT THE PLAN BUT DID NOT OPT OUT OF GRANTING THE RELEASES SET FORTH IN THE PLAN, (V) THOSE HOLDERS OF CLAIMS OR INTERESTS WHO ARE UNIMPAIRED UNDER THE PLAN AND DO NOT TIMELY OBJECT TO THE RELEASES SET FORTH IN THE PLAN, (VI) THE PREPETITION RBL AGENT, (VII) THE PREPETITION FIRST LIEN TERM LOAN AGENT, (VIII) THE PREPETITION FLLO AGENT, (XI) THE PREPETITION SECOND LIEN TERM LOAN AGENT, (X) THE PREPETITION SPONSOR SECOND LIEN TERM LOAN AGENT, (XI) THE PREPETITION RBL LENDERS, (XII) THE PREPETITION FIRST LIEN TERM LENDERS, (XIII) THE PREPETITION FLLO LENDERS, (XIV) THE PREPETITION SECOND LIEN TERM LENDERS, (XV) THE PREPETITION SPONSOR SECOND LIEN TERM LENDERS, (XVI) THE DIP FACILITY AGENT, (XVII) THE DIP FACILITY LENDERS, (XVIII) THE CONSENTING SPONSOR, (XIX) RIVERSTONE V FW HOLDINGS SUB, LLC, AND (XX) FIELDWOOD MANAGEMENT LLC, AND WITH RESPECT TO EACH OF THE FOREGOING ENTITIES, SUCH ENTITIES' PREDECESSORS, SUCCESSORS, ASSIGNS, SUBSIDIARIES, AFFILIATES, MANAGED ACCOUNTS AND FUNDS, AND ALL OF THEIR RESPECTIVE CURRENT AND FORMER OFFICERS AND DIRECTORS, PRINCIPALS, SHAREHOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), MEMBERS, PARTNERS, MANAGERS, EMPLOYEES, SUBCONTRACTORS, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS,

CONSULTANTS, REPRESENTATIVES, INVESTMENT MANAGERS, INVESTMENT ADVISORS, MANAGEMENT COMPANIES, FUND ADVISORS, AND OTHER PROFESSIONALS, AND SUCH ENTITIES' RESPECTIVE HEIRS, EXECUTORS, ESTATES, SERVANTS, AND NOMINEES, IN EACH CASE IN THEIR CAPACITY AS SUCH, AND ANY AND ALL OTHER PERSONS OR ENTITIES THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING ENTITIES (COLLECTIVELY, THE "RELEASING PARTIES"), FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS OR CAUSES OF ACTION, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS OR THEIR ESTATES, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE THAT SUCH HOLDERS OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON OR ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM OR IN CONNECTION WITH, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE DEBTORS' RESTRUCTURING EFFORTS, THE NEGOTIATION, FORMULATION OR PREPARATION OF ANY TRANSACTIONS OR DOCUMENTS IN CONNECTION THEREWITH, THE DEBTORS' INTERCOMPANY TRANSACTIONS, ANY PREFERENCE, FRAUDULENT TRANSFER, OR OTHER AVOIDANCE CLAIM ARISING PURSUANT TO CHAPTER 5 OF THE BANKRUPTCY CODE OR APPLICABLE LAW, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AND ANY OTHER TRANSACTION OR ARRANGEMENT BETWEEN ANY DEBTOR, REORGANIZED DEBTOR, OR ESTATE AND ANY RELEASED PARTY (INCLUDING, WITHOUT LIMITATION, THE PREPETITION RBL CREDIT AGREEMENT, THE PREPETITION FIRST LIEN TERM LOAN AGREEMENT, THE PREPETITION FLLO CREDIT AGREEMENT, THE PREPETITION SECOND LIEN TERM LOAN AGREEMENT, AND THE PREPETITION SPONSOR SECOND LIEN TERM LOAN AGREEMENT), THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIM OR INTEREST BEFORE OR DURING THE CHAPTER 11 CASES, THE RESTRUCTURING TRANSACTIONS, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE DISCLOSURE STATEMENT, THE RESTRUCTURING SUPPORT AGREEMENT, THE ASSET PURCHASE TRANSACTION, THE PURCHASE AGREEMENT, THE PLAN AND RELATED AGREEMENTS, INSTRUMENTS, TERM SHEETS AND OTHER DOCUMENTS (INCLUDING THE PLAN DOCUMENTS), THE SOLICITATION OF VOTES WITH RESPECT TO THE

PLAN, THE BACKSTOP COMMITMENT AGREEMENT, OR THE RIGHTS OFFERING, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR ARISING ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING, IN EACH CASE OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT IS A CRIMINAL ACT OR CONSTITUTES INTENTIONAL FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT, AS DETERMINED BY A FINAL ORDER.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(b) OF THE PLAN (THE "THIRD-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

(c)    *Release of Liens*.  Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, including the Exit LC Facility Documents, the Exit First Lien Documents, the Exit Second Lien Documents, and the Apache Decommissioning Agreement Amendment, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.  In addition and for the avoidance of doubt, on the Effective Date, all of Apache's mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates of the Debtors or Reorganized Debtors shall be fully released and discharged, except for (i) any liens on property in The Fieldwood Decommissioning Trust A, a Delaware statutory trust, (ii) the "Recharacterization Mortgages" as defined in the Decommissioning Agreement dated September 30, 2013 between Apache, Fieldwood Energy LLC and GOM Shelf LLC, and (iii) any other mortgages, deeds of trust, Liens, pledges, or other security interests expressly preserved in the Apache Decommissioning Agreement Amendment.

### 10.8     *Exculpation.*

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM, ANY CLAIM, INTEREST, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, CAUSE OF ACTION, LOSS, REMEDY, OR LIABILITY FOR ANY CLAIM IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE NEGOTIATION AND PURSUIT OF THE EXIT LC CREDIT AGREEMENT, THE EXIT FIRST LIEN CREDIT AGREEMENT, THE EXIT SECOND LIEN CREDIT AGREEMENT, THE DIP FACILITY LOAN AGREEMENT, THE NEW BY-LAWS, THE MANAGEMENT INCENTIVE PLAN, THE BACKSTOP COMMITMENT AGREEMENT, THE DISCLOSURE STATEMENT, THE RESTRUCTURING SUPPORT AGREEMENT, THE RESTRUCTURING TRANSACTIONS, THE ASSET PURCHASE TRANSACTION, THE PURCHASE AGREEMENT, AND THE PLAN (INCLUDING THE PLAN DOCUMENTS), OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THE PLAN; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE CONDUCTING OF THE RIGHTS OFFERING; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF AN EXCULPATED PARTY THAT IS A CRIMINAL ACT OR CONSTITUTES INTENTIONAL FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.   THE EXCULPATED PARTIES AND EACH OF THEIR RESPECTIVE AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS, AND ATTORNEYS HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES THEREUNDER.   THIS EXCULPATION SHALL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.

### 10.9     *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims,

50

obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including, without limitation, the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan.

### 10.10   *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 10.11   *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in the Plan, including, without limitation, Sections 10.5, 10.6, 10.7, 10.8 and 10.9, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, but not limited to, rights, claims, Causes of Action, rights of setoff, offset, recoupment or other legal or equitable defenses against any holder of Existing Energy Inc. Interests or Existing Holdings Interests that arise on account of such holders' objection to, or support of, and objection to the Plan.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 10.12   *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring.

### 10.13   *Indemnification and Reimbursement Obligations.*

For purposes of the Plan, (a) the obligations of the Debtors to indemnify and reimburse their directors, members, managers, or officers that were directors, members, managers, or officers, respectively, on or subsequent to the Petition Date shall be assumed by the

Reorganized Debtors and (b) indemnification obligations of the Debtors arising from services as officers, members, managers, and directors during the period from and after the Petition Date shall be Administrative Expense Claims.  In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors', members', managers', and officers' insurance policies (including any "tail policy") in effect as of the Petition Date, and all members, managers, directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

# ARTICLE XI.      RETENTION OF JURISDICTION.

## 11.1   *Retention of Jurisdiction.*

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)      to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)      to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)      to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)      to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order;

(e)      to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)      to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)      to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person

or other entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     to hear and determine all Fee Claims;

(j)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation, or injunction provisions set forth in the Plan, or to maintain the integrity of the Plan following the occurrence of the Effective Date;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)     to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)     to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q)     to recover all Assets of the Debtors and property of the Estates, wherever located;

(r)     to resolve all disputes related to the Purchase Agreement to the fullest extent permitted by law; and

(s)     to enter a final decree closing each of the Chapter 11 Cases.

# ARTICLE XII.    MISCELLANEOUS PROVISIONS.

## 12.1    *Exemption from Certain Transfer Taxes.*

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan (including the Asset Purchase Transaction), (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Exit LC Credit Agreement, Exit First Lien Credit Agreement, or Exit Second Lien Credit Agreement and (f) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

## 12.2    *Request for Expedited Determination of Taxes.*

The Debtors will have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

## 12.3    *Dates of Actions to Implement Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

## 12.4    *Amendments.*

(a)    Plan Modifications.    The Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court, subject to the written consent of the Requisite Second Lien Term Lenders, Requisite Sponsor Second Lien Term Lenders and the other Requisite Creditors (in the case of the Requisite Creditors, solely to the extent such amendments, modifications and supplements materially and adversely affect in any respect any rights or treatment of such Requisite Creditors under the Plan) in accordance

with the Restructuring Support Agreement. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with the consent of the Requisite Second Lien Term Lenders and Requisite Sponsor Second Lien Term Lenders, may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

(b)    Certain Technical Amendments.    Consistent with the Restructuring Support Agreement, prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not materially and adversely affect in any respect the treatment of holders of Claims or Interests under the Plan.

### 12.5    *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors. If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

### 12.6    *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this section, is valid and enforceable pursuant to its terms.

### 12.7   *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise, the rights, duties, and obligations arising under the Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 12.8   *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

### 12.9   *Successors and Assigns.*

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such entity.

### 12.10   *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 12.11   *Computing Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.12   *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

### 12.13   *Notices.*

All notices, requests, and demands hereunder shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

if to the Debtors or Reorganized Debtors:

        FIELDWOOD ENERGY LLC
        2000 W. Sam Houston Parkway, S., Suite 1200,
        Houston, TX  77042
        Attn:  G.M. McCarroll, President, Chief Executive Officer and
        Mike Dane, Senior Vice President and Chief Financial Officer

        – and –

        WEIL, GOTSHAL & MANGES LLP
        700 Louisiana Street, Suite 1700
        Houston, Texas 77002
        Attn: Alfredo R. Pérez, Esq.
        Telephone: (713) 546-5000
        Facsimile:  (713) 224-9511

        – and –

        WEIL, GOTSHAL & MANGES LLP
        767 Fifth Avenue
        New York, New York 10153
        Attn:  Matthew S. Barr, Esq., Ray C. Schrock, P.C., and Jessica Liou, Esq.
        Telephone:  (212) 310-8000
        Facsimile:  (212) 310-8007

        *Attorneys for the Debtors*

if to the Consenting First Lien Term Lenders:

        O'MELVENY & MYERS LLP
        Times Square Tower, 7 Times Square
        New York, New York 10036
        Attn:  George A. Davis, Esq. and Daniel S. Shamah, Esq.
        Telephone:  (212) 326-2000
        Facsimile:  (212) 326-2061

        *Attorneys for the Consenting First Lien Term Lenders*

if to the Consenting Second Lien Term Lenders:

> DAVIS POLK & WARDWELL LLP
> 450 Lexington Avenue
> New York, New York 10017
> Attn:  Damian Schaible, Darren Klein and Natasha Tsiouris, Esq.
> Telephone:  (212) 450-4000
> Facsimile:  (212) 701-5361
>
> *Attorneys for the Consenting Second Lien Term Lenders*

if to the Consenting Sponsor Second Lien Term Lenders or the Consenting Sponsor:

> VINSON & ELKINS LLP
> 666 Fifth Avenue, 26th Floor
> New York, New York 10103
> Attn: David S. Meyer, Esq. and Jessica C. Peet, Esq.
> Telephone: (212) 237-0000
> Facsimile: (212) 237-0100
>
> *Attorneys for the Consenting Sponsor Second Lien Term Lenders and the
> Consenting Sponsor*

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those entities that have filed such renewed requests.

### 12.14   *Reservation of Rights.*

Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision of the Plan, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

Dated: February 14, 2018
Houston, Texas

Respectfully submitted,

FIELDWOOD ENERGY LLC, and its undersigned affiliates

Name: G.M. McCarroll
Title:   Authorized Officer

DYNAMIC OFFSHORE RESOURCES NS, LLC
FIELDWOOD HOLDINGS LLC
FIELDWOOD ENERGY INC.
FIELDWOOD ENERGY OFFSHORE LLC
FIELDWOOD ONSHORE LLC
FIELDWOOD SD OFFSHORE LLC
FW GOM PIPELINE, INC.
GOM SHELF LLC
BANDON OIL AND GAS GP, LLC
BANDON OIL AND GAS, LP
FIELDWOOD ENERGY SP LLC
GALVESTON BAY PIPELINE LLC
GALVESTON BAY PROCESSING LLC

Signature Page to Plan

## Exhibit A

**Restructuring Support Agreement**

**EXECUTION VERSION**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "*Agreement*"), dated as of February 14, 2018, is entered into by and among:

(i) Fieldwood Holdings LLC ("*Holdings*"), Fieldwood Energy LLC ("*FWE*"), Fieldwood Energy Inc. (f/k/a Fieldwood Managing Member LLC) ("*Energy Inc.*"), Fieldwood Onshore LLC, Galveston Bay Pipeline LLC, Galveston Bay Processing LLC, Fieldwood SD Offshore LLC, Fieldwood Energy Offshore LLC, Fieldwood Energy SP LLC, Dynamic Offshore Resources NS, LLC, Bandon Oil and Gas GP, LLC, Bandon Oil and Gas, LP, GOM Shelf LLC, and FW GOM Pipeline, Inc., each such entity a subsidiary of Holdings (collectively, the "*Company*");

(ii) Riverstone V FW Holdings Sub, LLC (the "*Consenting Sponsor*");

(iii) the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain First Lien Term Loan Credit Agreement, dated as of September 30, 2013, among FWE, Citibank, N.A. as administrative agent (the "*Prepetition First Lien Term Agent*"), the lenders holding Loans (as defined therein) that are not Reserve Based Term Loans (as defined therein; such Loans that are not Reserve Based Term Loans, the "*Prepetition FLTL Loans*") party thereto from time to time (the "*Prepetition First Lien Term Lenders*" and the undersigned Prepetition First Lien Term Lenders, together with their respective successors and permitted assigns and any subsequent Prepetition First Lien Term Lender that becomes party hereto in accordance with the terms hereof, the "*Consenting First Lien Term Lenders*") and the other agents party thereto from time to time (as amended from time to time including pursuant to (a) that certain Amendment No. 1 to First Lien Term Loan Agreement dated as of February 25, 2014 and (b) that certain Amendment No. 2 to First Lien Term Loan Agreement dated as of May 27, 2016, the "*Prepetition First Lien Term Loan Agreement*");

(iv) the undersigned lenders, or investment advisors or managers for the account of lenders, holding Loans that are Reserve Based Term Loans under the Prepetition First Lien Term Loan Agreement (the "*Prepetition RBTL Loans*" and together with the Prepetition FLTL Loans, the "*Prepetition First Lien Term Loans*", and the lenders Prepetition RBTL Loans party hereto, the "*Prepetition RBTL Lenders*" and together with the Prepetition First Lien Term Lenders, the "*Combined Prepetition FLTL Lenders*" and the undersigned Prepetition RBTL Lenders, together with their respective successors and permitted assigns and any subsequent Prepetition RBTL Lenders that becomes party hereto in accordance with the terms hereof, the "*Consenting RBTL Lenders*");

(v) the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain First Lien Last-Out Term Loan Agreement dated as of May 27, 2016 (as amended from time to time, the "*Prepetition FLLO Credit Agreement*" and the loans thereunder, the "*Prepetition FLLO Loans*"), among FWE, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder (the "*Prepetition FLLO Agent*"), the lenders from time to time party thereto (the "*Prepetition FLLO Lenders*" and the undersigned Prepetition FLLO Lenders, together with their respective successors and permitted

assigns and any subsequent Prepetition FLLO Term Lender that becomes party hereto in accordance with the terms hereof, the "***Consenting FLLO Term Lenders***");

(vi) the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain Second Lien Term Loan Agreement dated as of September 30, 2013 (as amended from time to time including pursuant to (a) that certain Amendment No. 1 to Second Lien Term Loan Agreement dated as of February 25, 2014, (b) that certain Amendment No. 2 and Limited Waiver to Second Lien Term Loan Agreement dated as of May 27, 2016 and (c) that certain Amendment No. 3 and Limited Waiver to Second Lien Term Loan Agreement dated as of May 27, 2016, the "***Prepetition Second Lien Credit Agreement***" and the loans outstanding thereunder the "***Prepetition Second Lien Term Loans***"), among FWE, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder (in such capacity, the "***Prepetition Second Lien Term Agent***"), and the lenders from time to time party thereto (the "***Prepetition Second Lien Term Lenders***" and the undersigned Prepetition Second Lien Term Lenders, together with their respective successors and permitted assigns and any subsequent Prepetition Second Lien Term Lender that becomes party hereto in accordance with the terms hereof, the "***Consenting Second Lien Term Lenders***"); and

(vii) the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain Sponsor Second Lien Term Loan Agreement, dated as of May 27, 2016 (the "***Prepetition Sponsor Second Lien Credit Agreement***" and the loans outstanding thereunder the "***Prepetition Sponsor Second Lien Term Loans***" and together with the Prepetition Second Lien Term Loans, the "***Prepetition SLT Loans***") by and among FWE, as borrower, Cortland Capital Markets Services LLC, as successor administrative agent and successor collateral agent, the other banks and financial institutions party thereto, and the lenders party thereto (in such capacity, the "***Prepetition Sponsor Second Lien Term Lenders***", and together with the Prepetition Second Lien Term Lenders, the "***Combined Prepetition SLTL Lenders***" and the undersigned Prepetition Sponsor Second Lien Term Lenders, together with their respective successors and permitted assigns and any subsequent Prepetition Sponsor Second Lien Term Lender that becomes party hereto in accordance with the terms hereof, the "***Consenting Sponsor Second Lien Term Lenders***", and together with the Consenting First Lien Term Lenders, the Consenting RBTL Lenders, the Consenting FLLO Term Lenders, and the Consenting Second Lien Term Lenders, the "***Consenting Creditors***").

The Company, each Consenting Creditor, the Consenting Sponsor, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the "***Parties***" and individually as a "***Party***."  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan (as defined below) attached hereto as **Exhibit A** (including any schedules and exhibits attached thereto).

When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section, Exhibit or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word

"or" shall not be exclusive and shall be read to mean "and/or." The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

## RECITALS

**WHEREAS,** the Parties have agreed to enter into certain transactions (the "***Restructuring Transactions***") in furtherance of a global restructuring of the Company's capital structure (the "***Restructuring***") which is anticipated to be effected through a prepackaged plan of reorganization (as may be amended or modified from time to time, the "***Plan***"), a solicitation of votes therefor (the "***Solicitation***") pursuant to the Bankruptcy Code (as defined below), and the commencement by the Company of voluntary cases (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Cod***e"), in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***");

**WHEREAS**, the Restructuring Transactions include: (i) entry into an Exit LC Facility (the "***Exit LC Facility***") in an aggregate amount of approximately $150 million, on the terms set forth in the LC Term Sheet attached hereto as **Exhibit B**, (ii) entry into an Exit First Lien Term Facility (the "***Exit First Lien Term Facility***") in an aggregate amount of approximately $1,143 million, on the terms set forth in the Exit First Lien Term Sheet attached hereto as **Exhibit C**; (iii) entry into an Exit Second Lien Term Facility (the "***Exit Second Lien Term Facility***" and together with the Exit LC Facility and the Exit First Lien Term Facility, the "***Exit Facilities***") in an aggregate amount of approximately $518 million, on the terms set forth in the Exit Second Lien Term Sheet attached hereto as **Exhibit D**; (iv) the conversion of the Prepetition Second Lien Term Loans and Prepetition Sponsor Second Lien Term Loans to new equity in the Company; (v) an offering of new equity to each eligible holder of the Company's Prepetition Second Lien Term Loans and Prepetition Sponsor Second Lien Term Loans to raise approximately $525 million (the "***Rights Offering***") backstopped by certain of the Consenting Creditors (collectively, the "***Backstop Parties***") on the terms described in the Backstop Commitment Agreement attached hereto as **Exhibit E** (the "***Backstop Agreement***"); (vi) the grant of a new Management Incentive Plan on the terms described in the MIP Term Sheet attached hereto as **Exhibit F** (the "***Management Incentive Plan***"), and (vii) the acquisition of certain offshore assets on the terms and conditions set forth in that certain Purchase and Sale Agreement (the "***Purchase Agreement***"), dated as of February 14, 2018, by and among FWE and the seller thereunder (the "***Sale Transaction***");

**WHEREAS**, as of the date hereof, the Consenting Sponsor, directly or indirectly, holds approximately 98% of the Capital Stock;

**WHEREAS,** as of the date hereof, the Consenting First Lien Term Lenders and Consenting RBTL Lenders hold, in the aggregate, approximately 74.9% of the aggregate outstanding principal amount of the Prepetition First Lien Term Loans;

**WHEREAS,** as of the date hereof, the Consenting FLLO Term Lenders hold, in the aggregate, approximately 71.6% of the aggregate outstanding principal amount of the Prepetition FLLO Term Loans;

**WHEREAS**, as of the date hereof, the Consenting Second Lien Term Lenders hold, in the aggregate, approximately 76.8% of the aggregate outstanding principal amount of the Prepetition Second Lien Term Loans;

**WHEREAS,** as of the date hereof, the Consenting Sponsor Second Lien Term Lenders hold 100% of the aggregate outstanding principal amount of the Prepetition Sponsor Second Lien Term Loans;

**WHEREAS,** as of the date hereof, the Consenting Sponsor Second Lien Term Lenders hold, in the aggregate, approximately 48.5% of the aggregate outstanding principal amount of the Prepetition SLT Loans, approximately 100% of which are held by the Consenting Sponsor Second Lien Term Lenders;

**WHEREAS**, certain of the Consenting Second Lien Term Lenders and certain of the Consenting Sponsor Second Lien Term Lenders (in such capacity, each Consenting Second Lien Term Lender and Consenting Sponsor Second Lien Term Lender which has indicated that it elects to provide a DIP Commitment (as defined below) below its name on the signature page hereto, a "***DIP Commitment Party***") have agreed to commit to provide the DIP Facility (as defined below) (such commitment, in each case, a "***DIP Commitment***"), and the Company and the Consenting Creditors have reached an agreement for the consensual use of Cash Collateral (as defined in the Bankruptcy Code), in each case on the terms set forth on the DIP Term Sheet (as defined below) attached hereto as **Exhibit G**;

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Plan and hereunder.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

(a)    "***Capital Stock***" means the issued and outstanding shares of capital stock of Holdings or any option thereon or any right or interest therein.

(b)    "***Claims***" means all claims arising under the Loans or any option thereon or any right or interest therein or any other claims against or interests in the Company.

(c)    "***Closing***" means the consummation of the Plan.

(d)   "***Confirmation Order***" means the order of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan in the Chapter 11 Cases.

(e)   "***Consenting Class***" means any of the following groups:  the Combined Prepetition FLTL Lenders, the Prepetition FLLO Term Lenders or the Combined Prepetition SLTL Lenders, as applicable.

(f)   "***Consenting Party Counsel***" means (i) O'Melveny & Myers LLP and Jackson Walker LLP, as counsel to certain of the Prepetition First Lien Term Lenders, (ii) Davis Polk & Wardwell LLP and Haynes & Boone LLP, as counsel to the Second Lien Term Agent and (iii) Vinson & Elkins LLP and Latham & Watkins LLP, as counsel to the Consenting Sponsor and the Prepetition Sponsor Second Lien Term Lenders.

(g)   "***Consenting Second Lien Creditor***" means any Consenting Second Lien Term Lender or any Consenting Sponsor Second Lien Term Lender.

(h)   "***Consenting Sponsor Consent Right***" means the Consenting Sponsor's right to consent to or approve Definitive Documents (as defined below), which right shall apply solely to the extent such Definitive Documents, (i) adversely, and with respect to the New Equity Interests, disproportionately (as compared to the Combined Prepetition SLTL Lenders receiving New Equity Interests) affect in any material respect any of the rights or benefits proposed to be granted to, or received by, the Consenting Sponsor pursuant to the Plan, or (ii) adversely affect in any material respect any obligation the Consenting Sponsor may have pursuant to the Plan, in each case, which consent shall not be unreasonably withheld, conditioned or delayed.

(i)   "***DIP Credit Agreement***" means the credit agreement evidencing the DIP Facility.

(j)   "***DIP Facility***" means the debtor-in-possession facility to be provided to the Company in accordance with the terms, and subject in all respects to the conditions, as set forth in the DIP Credit Agreement and pursuant to the terms and conditions of interim and final orders of the Bankruptcy Court.

(k)   "***DIP Term Sheet***" means the term sheet describing the terms of the DIP Facility attached hereto as **Exhibit G**.

(l)   "***Disclosure Statement***" means the disclosure statement in respect of the Plan attached hereto as **Exhibit H**, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

(m)   "***Effective Date***" means the date upon which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective.

(n)   "***Interest***" means any equity interest (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, including any option,

warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the Effective Date.

(o)      "*Loans*" means, as the context may require, the Prepetition First Lien Term Loans, the Prepetition RBTL Loans, the Prepetition FLLO Term Loans, the Prepetition Second Lien Term Loans and the Prepetition Sponsor Second Lien Term Loans.

(p)      "*Loan Documents*" means, as the context may require, the "Loan Documents" as defined in each of the Prepetition First Lien Term Loan Agreement, the Prepetition FLLO Credit Agreement, the Prepetition Second Lien Credit Agreement, and the Prepetition Sponsor Second Lien Credit Agreement.

(q)      "*Prepetition Credit Agreements*" means the Prepetition First Lien Term Loan Agreement, the Prepetition FLLO Credit Agreement, the Prepetition Second Lien Credit Agreement, and the Prepetition Sponsor Second Lien Credit Agreement.

(r)      "*Requisite Creditors*" means (i) the Requisite First Lien Term Lenders, (ii) the Requisite RBTL Lenders, (iii) the Requisite FLLO Term Lenders, (iv) the Requisite Second Lien Term Lenders and (v) the Requisite Sponsor Second Lien Term Lenders.

(s)      "*Requisite First Lien Term Lenders*" means, as of the date of determination, Consenting First Lien Term Lenders holding at least a majority of the outstanding Prepetition FLTL Loans held by the Consenting First Lien Term Lenders as of such date.

(t)       "*Requisite FLLO Term Lenders*" means, as of the date of determination, Consenting FLLO Term Lenders holding at least a majority of the outstanding Prepetition FLLO Term Loans held by the Consenting FLLO Lenders as of such date.

(u)      "*Requisite RBTL Lenders*" means, as of the date of determination, Consenting RBTL Lenders holding at least a majority of the outstanding Prepetition RBTL Loans held by the Consenting RBTL Lenders as of such date.

(v)      "*Requisite Second Lien Term Lenders*" means, as of the date of determination, Consenting Second Lien Term Lenders holding at least a majority of the outstanding Prepetition Second Lien Term Loans held by the Consenting Second Lien Term Lenders as of such date.

(w)     "*Requisite Sponsor Second Lien Term Lenders*" means, as of the date of determination, Consenting Sponsor Second Lien Term Lenders holding at least a majority of the outstanding Prepetition Sponsor Second Lien Term Loans as of such date.

(x)      "*Securities Act*" means the Securities Act of 1933, as amended.

(y)      "*Support Effective Date*" means the earliest date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company, (ii) Consenting First Lien Term Lenders holding at least 50%, in aggregate principal amount outstanding as of such date, of the Prepetition FLTL Loans, (iii) Consenting RBTL Lenders holding at least 50%, in aggregate principal amount outstanding as of such date, of the Prepetition RBTL Loans, (iv) Consenting FLLO Term Lenders holding at least 50%, in

aggregate principal amount outstanding as of such date, of the Prepetition FLLO Term Loans, (v) Consenting Second Lien Term Lenders holding at least 50%, in aggregate principal amount outstanding as of such date, of the Prepetition Second Lien Term Loans, (vi) Consenting Sponsor Second Lien Term Lenders holding at least 48.5%, in aggregate principal amount outstanding as of such date, of the Prepetition Second Lien Term Loans and (vii) the Consenting Sponsor.

(z)    "*Support Period*" means the period commencing on the Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in full with respect to all parties in accordance with Section 7 hereof and (ii) the Effective Date.

## 2. **Bankruptcy Process; Plan of Reorganization.**

(a)    The Plan.  The Plan is expressly incorporated herein and made a part of this Agreement.  The terms and conditions of the Restructuring are set forth in the Plan; provided that the Plan is supplemented by the terms and conditions of this Agreement.  In the event of any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan shall govern.

(b)    The definitive documents (the "*Definitive Documents*") with respect to the Restructuring shall include this Agreement, the Plan, the Disclosure Statement and any material documents (including any material related orders, agreements, instruments, schedules or exhibits) that are described in or contemplated by this Agreement and the Plan and necessary or desirable to implement the Restructuring, including, without limitation:

(i)    the motion seeking approval by the Bankruptcy Court of the Disclosure Statement, the Solicitation procedures and materials and the Confirmation Order;

(ii)    the Exit Facilities;

(iii)    the DIP Facility, including a motion seeking authority to enter into the DIP Facility, and an interim order (the "*Interim DIP Order*") and a final order (the "*Final DIP Order*" and together with the Interim DIP Order, the "*DIP Orders*") of the Bankruptcy Court approving the same;

(iv)    the first day motions, second day motions and orders of the Bankruptcy Court approving any first day motions or second day motions;

(v)    the Plan, Disclosure Statement, the Backstop Agreement and the Rights Offering Procedures attached hereto as **Exhibit I**;

(vi)    the supplement to the Plan (the "*Plan Supplement*"), including, without limitation (x) the amended organizational and governance documents governing the reorganized Company, (y) the shareholders agreement governing reorganized Energy Inc. (the "*Governance Documents*"), in each case consistent with the Governance Term Sheet attached hereto as **Exhibit J**; and

(vii)    any other documents, instruments, schedules or exhibits described in, related to, contemplated in, or necessary to implement, each of the foregoing.

Each of the Definitive Documents shall (1) contain terms and conditions consistent in all material respects with this Agreement and (2) otherwise be in form and substance reasonably acceptable in all respects to the Company, the Requisite Second Lien Term Lenders, the Requisite Sponsor Second Lien Term Lenders and, solely to the extent materially and adversely affecting the economic treatment under the Plan of the applicable Consenting Class of the Requisite First Lien Term Lenders, Requisite RBTL Lenders and Requisite FLLO Term Lenders, the Requisite First Lien Term Lenders, Requisite RBTL Lenders and Requisite FLLO Term Lenders.  Notwithstanding anything to the contrary in this Agreement, (A) any documentation relating to the DIP Facility, a motion seeking authority to enter into the DIP Facility, and the Interim DIP Order and the Final DIP Order of the Bankruptcy Court approving the same shall contain terms and conditions consistent in all respects with this Agreement and otherwise be in form and substance acceptable to the DIP Commitment Parties, (B) any amendments, modifications or otherwise to the Backstop Agreement and the Rights Offering Procedures shall be in form and substance acceptable to the Requisite Second Lien Term Lenders and the Requisite Sponsor Second Lien Term Lenders, (C) solely to the extent materially and adversely impacting the rights of the Requisite First Lien Term Lenders as an appointer of a Director of the Company, the Governance Documents shall be in form and substance reasonably acceptable to the Requisite First Lien Term Lenders, (D) any documentation relating to the Exit First Lien Facility shall be in form and substance reasonably acceptable to the Requisite First Lien Term Lenders and (E) the Plan, Disclosure Statement and the Confirmation Order shall be in form and substance reasonably acceptable to the Requisite First Lien Term Lenders.

(c)     <u>Commencement of the Chapter 11 Cases</u>.  The Company hereby agrees that, as soon as reasonably practicable, but in no event later than two (2) days after the Support Effective Date, the Company will commence Solicitation of votes on the Plan.  Provided that the Support Effective Date has occurred, the Company further agrees that, as soon as reasonably practicable, but in no event later than February 18, 2018 (the "*Outside Petition Date*") (the date on which such filing occurs, the "*Commencement Date*"), the Company shall file with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Cases of the Company.

(d)     <u>Filing of the Plan and Disclosure Statement</u>.  No later than the close of business on the next business day following the Commencement Date, the Company shall file the Plan along with the Disclosure Statement.

(e)     <u>Confirmation of the Plan</u>.  The Company shall use its commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable following the Commencement Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement, and each Consenting Creditor and the Consenting Sponsor shall use its commercially reasonable efforts to cooperate fully in connection therewith.

(f)     <u>DIP Financing and Cash Collateral</u>.  No later than the close of business on the next business day following the Commencement Date, the Parties shall file a motion with the Bankruptcy Court seeking entry of the DIP Orders.

3.    **Agreements of the Consenting Creditors.**

(a)    <u>Voting; Support</u>.   Each Consenting Creditor agrees that, for the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Consenting Creditor, such Consenting Creditor (acting severally and not jointly with the other Consenting Creditors) shall:

(i)    (A) timely vote or cause to be voted its Claims to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the Solicitation, (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); <u>provided</u>, <u>however</u>, that such vote may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Creditor at any time following the expiration of the Support Period or upon termination of this Agreement pursuant to the terms hereof with respect to such Consenting Creditor;

(ii)    timely vote (or cause to be voted) its Claims or Interests against any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company other than the Plan (each, an "***Alternative Restructuring***");

(iii)    not directly or indirectly, through any person or entity (including any administrative agent or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any Alternative Restructuring or take any other action that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring;

(iv)    not direct any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement, and, if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement, such Consenting Creditor shall use its commercially reasonable efforts to request that such administrative agent or collateral agent cease and refrain from taking any such action;

(v)    support and take all actions necessary or reasonably requested by the Company to facilitate the Solicitation of the Plan, obtain approval of the Disclosure Statement, and confirmation and consummation of the Plan and the Restructuring; and

(vi)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediments.

(b)     Rights of Consenting Creditors Unaffected.  Nothing contained herein shall limit:

(i)     the rights of a Consenting Creditor under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Bankruptcy Cases, in each case, so long as the exercise of any such right is consistent with this Agreement and such Consenting Creditor's obligations hereunder;

(ii)    the ability of a Consenting Creditor to purchase, sell, or enter into any transactions in connection with its Claims or Interests, in compliance with the terms hereof and applicable law;

(iii)   subject to the terms and obligations hereof and applicable law, any right of a Consenting Creditor under the Prepetition Credit Agreements, any other applicable agreement, instrument or document that gives rise to a Consenting Creditor's Claims or Interests, as applicable, or constitute a waiver or amendment of any provision of any such agreement, instrument or document;

(iv)    subject to any confidentiality provisions in this Agreement and the Prepetition Credit Agreements, the ability of a Consenting Creditor to consult with any other Parties or entities; or

(v)     the ability of a Consenting Creditor to enforce any right, remedy, condition, consent or approval requirement under this Agreement or under any of the Definitive Documents.

(c)     Transfers.  Each Consenting Creditor agrees that, for the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Consenting Creditor, such Consenting Creditor shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (each, a "*Transfer*"), directly or indirectly, in whole or in part, any of its Claims or any option thereon or any right or interest therein or any other Claims against or Interests in the Company (including grant any proxy or deposit any Claims against or Interests in the Company into a voting trust or entry into a voting agreement with respect thereto), unless the transferee thereof either (A) is a Consenting Creditor or (B) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all claims or interests it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit K** (a "*Joinder Agreement*"), and delivering an executed copy thereof within two (2) business days of such execution, to (i) Weil, Gotshal & Manges LLP ("*Weil*"), as counsel to the Company, and (ii) Consenting Party Counsel, in which event (x) the transferee (including the Consenting Creditor transferee, if applicable) shall be deemed to be a Consenting Creditor hereunder to the extent of such transferred rights and obligations and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations.  Each Consenting Creditor agrees that any Transfer of any Claim or interest that does not comply with the terms and

procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer.

(d)       Additional Claims or Interests.   Nothing in this Agreement shall be construed to preclude a Consenting Creditor from (i) acquiring additional Claims, (ii) holding or acquiring any other claims against the Company entitled to vote on the Plan, (iii) holding or acquiring any Interests in the Company entitled to vote on the Plan or (iv) Transferring any Claims; provided, that, in each case, each such Consenting Creditor shall promptly notify Weil and each such Consenting Creditor agrees that such additional Claims or other claims or Interests shall be subject to this Agreement, and that, for so long as this Agreement has not been terminated pursuant to the terms hereof with respect to such Consenting Party, it shall vote (or cause to be voted) any such additional Claims or other claims or Interests entitled to vote on the Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with Section 3(a) hereof.

(e)       Additional Lenders.   Any Prepetition Second Lien Term Lender may, at any time after the Support Effective Date, become a party to this Agreement as a Consenting Second Lien Term Loan Lender (an "*Additional Consenting Second Lien Term Loan Lender*") by executing a joinder agreement substantially in the form attached hereto as **Exhibit K**, pursuant to which such Additional Consenting Second Lien Term Loan Lender shall be bound by the terms of this Agreement as a Consenting Second Lien Term Loan Lender hereunder.

(f)       Forbearance.   For the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Consenting Party, each Consenting Creditor and the Consenting Sponsor agree, to forbear from the exercise of its rights (including any right of set-off) or remedies it may have under the Loan Documents, as applicable, and under applicable U.S. or foreign law or otherwise, in each case, with respect to any breaches, defaults, events of defaults or potential defaults by the Company; provided that, in accordance with the applicable Prepetition Credit Agreements, the accrual of interest (including default interest, if any) shall be unaffected by the terms hereof and continue during the Support Period with respect to the Prepetition FLLO Loans, the Prepetition Second Lien Term Loans and the Prepetition Sponsor Second Lien Term Loans.   Each Consenting Creditor and the Consenting Sponsor further agree that if any applicable administrative agent or collateral agent takes any action inconsistent with any such Consenting Creditor's or the Consenting Sponsor's (as applicable) obligations under this Agreement, such Consenting Creditor or the Consenting Sponsor (as applicable) shall use commercially reasonable efforts to cause such administrative agent or collateral agent to cease and refrain from taking such actions.

(g)       Treatment Under the Plan.   Each Consenting Creditor agrees, during the Support Period (and including the Effective Date), that to the extent it is a DIP Commitment Party, without the consent of the Requisite Second Lien Term Lenders and the Requisite Sponsor Second Lien Term Lenders, it will not accept treatment under the Plan in respect of its DIP Facility claims other than (A) payment in full in cash on the Effective Date or (B) the application of any cash to be received on account of such Consenting Creditor's DIP Facility claims towards such Consenting Creditor's obligations in respect of the Rights Offering in accordance with the Backstop Agreement or the Rights Offering subscription agreement.

(h)     DIP Commitments.  Subject to the termination rights set forth in Section 7 and subject to the conditions set forth in the DIP Term Sheet, each of the DIP Commitment Parties, severally and not jointly, agrees to provide (or cause any of its designees to provide) its allocable share of the DIP Commitment as set forth in **Exhibit L** attached hereto on the Closing Date on the terms and conditions substantially as set forth in the DIP Term Sheet.  For the avoidance of doubt, upon termination or expiration of this Agreement in accordance with its terms, the commitment of the DIP Commitment Parties made pursuant to this Section 3(h) to enter into the DIP Credit Agreement and provide its allocable share of the DIP Commitment as set forth in **Exhibit L** shall terminate; provided, however, that upon the closing of the DIP Credit Agreement, the DIP Credit Agreement shall govern the DIP Commitments and any termination thereof.

**4.       Agreements of the Consenting Sponsor.**

(a)     Voting; Support.  The Consenting Sponsor agrees that, for the duration of the Support Period, it shall:

(i)     (A) timely vote or cause to be voted its Claims and Interests to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the Solicitation, (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided, however, that such vote may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by the Consenting Sponsor at any time following the expiration of the Support Period or upon termination of this Agreement pursuant to the terms hereof;

(ii)     timely vote (or cause to be voted) its Claims or Interests against any Alternative Restructuring;

(iii)     not directly or indirectly, through any person or entity (including any administrative agent or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any Alternative Restructuring or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring;

(iv)     not request or be entitled to (A) any management or similar fees payable by the Company and hereby waives the right to receive payment on account of any such fees except as otherwise provided in this Agreement or any Definitive Document or (B) any dividends, distributions, or other payments in respect of its Claims and Interests, except as otherwise provided in this Agreement or any Definitive Document;

(v)     support and take all actions necessary or reasonably requested by the Company to facilitate the Solicitation of the Plan, obtain approval of the Disclosure Statement, and confirmation and consummation of the Plan and the Restructuring; and

(vi)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment.

(b)     <u>Transfers</u>.  The Consenting Sponsor agrees that, for the duration of the Support Period, it shall not, directly or indirectly, sell, transfer, assign or otherwise dispose of any of its Claims against, or Interests in, the Company (including grant any proxy or deposit any Claims against or Interests in the Company into a voting trust or entry into a voting agreement with respect thereto).

5.     **Agreements of the Parties.**

(a)     <u>Covenants</u>.  Each Party agrees that, for the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Party, such Party shall use its commercially reasonable efforts to:

(i)     support and take all commercially reasonable actions necessary to facilitate the approval of the Disclosure Statement, the Solicitation and confirmation and consummation of the Plan (it being understood that the Parties shall not be required to incur any out of pocket cost or expense, or any liability in connection therewith); and

(ii)     provide reasonably prompt written notice (in accordance with <u>Section 21</u> hereof) to the Company between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which any person in a managing capacity of such Party has actual knowledge, and which occurrence or failure would be likely to cause any covenant of such Party contained in this Agreement not to be satisfied in any material respect or (B) any failure of such Party to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement or the Backstop Agreement.

(b)     <u>Hedging</u>.  Notwithstanding anything to the contrary in this Agreement, each Party agrees that the Company may enter into new commodity price hedging arrangements in the ordinary course of business consistent with the Company's past practices and interest rate hedging arrangements consistent with industry practices and, in each case, not for speculative purposes.

6.     **Agreements of the Company**.

(a)     <u>Covenants</u>.  The Company agrees that, for the duration of the Support Period, the Company shall, and shall cause each of its subsidiaries included in the definition of Company, to:

(i)     use commercially reasonable efforts to (A) obtain approval of the Plan and consummate the Restructuring, including timely filing any objection or opposition to any motion filed with the Bankruptcy Court seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, directing the appointment of an examiner with expanded powers or a

trustee, converting the Chapter 11 Cases or for relief that (1) is inconsistent with this Agreement in any respect or (2) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, (B) obtain orders of the Bankruptcy Court in respect of the Restructuring and (C) support the release and exculpation provisions contained in the Plan;

(ii)     (A) seek entry of the DIP Orders and, if necessary, timely file a formal written response in opposition to any objection filed with the Bankruptcy Court by any person or entity with respect to entry of the DIP Orders or with respect to any adequate protection proposed to be granted or granted to the Requisite Creditors pursuant to the DIP Orders, (B) subject to professional responsibilities, prosecute and defend any appeals related to the Restructuring, (C) execute and deliver any other required agreements to effectuate and consummate the Restructuring and (D) operate its business in the ordinary course, taking into account the Restructuring;

(iii)     provide reasonably prompt written notice (in accordance with Section 21 hereof) to the Consenting Creditors between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which the Company has actual knowledge which occurrence or failure would be likely to cause (1) any covenant of the Company contained in this Agreement not to be satisfied in any material respect or (2) any condition precedent contained in the Plan not to timely occur or become impossible to satisfy, (B) receipt of any notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, (C) receipt of any material notice, including from any governmental unit with jurisdiction, of any proceeding commenced, or, to the actual knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any respect the transactions contemplated by the Restructuring, (D) any failure of the Company to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder and (E) receipt of any notice from the seller under the Purchase Agreement alleging a default or event of default thereunder;

(iv)     subject to compliance with all applicable confidentiality agreements or obligations, provide to the Consenting Creditors and/or their respective professionals, upon reasonable advance notice to the Company, (A) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's finances and operations and participating in the planning process with respect to the Restructuring, (B) prompt access to any information provided to any existing or prospective financing sources (including lenders under any exit financing) and (C) timely and reasonable responses to all diligence requests;

(v)     not amend or modify, or file a pleading seeking authority to amend or modify, the Definitive Documents or any other document related to the DIP Facility or the Restructuring in a manner that is inconsistent with this Agreement;

(vi)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring embodied in the Plan, if any;

14

(vii)    not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with, consummation of the Restructuring, in each case, to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors, managers, members or partners, as applicable, of each Company; provided that the Company shall not be obligated to agree to any modification of any document that is inconsistent with the Plan;

(viii)    provide draft copies of all material motions or applications and other documents (including all first day and second day motions and orders of the Bankruptcy Court approving any first day motions or second day motions, the Plan, the Disclosure Statement, ballots and other Solicitation materials in respect of the Plan and any proposed amended version of the Plan or the Disclosure Statement, and a proposed confirmation order) the Company intends to file with the Bankruptcy Court to the Consenting Party Counsel at least two (2) business days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders or materials (other than the Plan, the Disclosure Statement, a confirmation order or adequate protection order) at least two (2) business days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing), and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(ix)    pay all the reasonable and documented fees and expenses, subject to the terms of any applicable engagement letter or reimbursement letter, as the case may be, of (a) Consenting Party Counsel, (b) Houlihan Lokey Capital, Inc., as financial advisor to the Consenting First Lien Term Lenders, (c) PJT Partners, LP, as financial advisor to the Second Lien Agent on behalf of the Consenting Second Lien Term Lenders and (d) Perella Weinberg Partners LP, as financial advisor to the Consenting Sponsor Second Lien Term Lenders; provided that the Company shall pay any accrued but unpaid amounts owing under such engagement and/or fee letters to the extent required under the terms thereof upon the termination of this Agreement, but shall not be responsible for any fees and expenses incurred after termination; provided further that any invoices shall not be required to contain individual time detail; and

(x)    not amend, alter, supplement, restate or otherwise modify the Purchase Agreement without the prior written consent of the Requisite Second Lien Term Lenders and the Requisite Sponsor Second Lien Term Lenders.

(b)    Automatic Stay.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination of this Agreement by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice); provided that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

7.     **Termination of Agreement**.

(a)     This Agreement shall terminate two (2) business days following the delivery of notice, delivered in accordance with Section 21 hereof: (i) from the Requisite Second Lien Term Lenders or the Requisite Sponsor Second Lien Term Lenders to the other Parties at any time after and during the continuance of any Consenting Second Lien Creditor Termination Event (as defined below), (ii) from the Company to the other Parties at any time after and during the continuance of a Company Termination Event (as defined below), (iii) from the Requisite FLLO Term Lenders or the Requisite RBTL Term Lenders to the other Parties at any time after and during the continuance of any Consenting Creditor Termination Event (as defined below), (iv) from the Requisite First Lien Term Lenders to the other Parties at any time after and during the continuance of any Consenting First Lien Term Lender Termination Event or (v) from the Consenting Sponsor to the other Parties at any time after and during the continuance of any Consenting Sponsor Termination Event (as defined below); provided, that termination by any of the Requisite FLLO Term Lenders, the Requisite RBTL Term Lenders or the Requisite First Lien Term Lenders, as applicable, shall only be effective as to such applicable Consenting Class. Notwithstanding any provision to the contrary in this Section 7, no Party may exercise any of its respective termination rights as set forth herein if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of the Consenting Creditor Termination Event, Consenting Second Lien Creditor Termination Event, Company Termination Event or Consenting Sponsor Termination Event.  In addition, this Agreement shall terminate automatically on the Effective Date of the Plan.

(b)     A "Consenting Second Lien Creditor Termination Event" shall mean any of the following:

(i)     the breach by the Company, the Consenting Sponsor, the Requisite First Lien Term Lenders, the Requisite Second Lien Term Lenders or the Requisite Sponsor Second Lien Term Lenders of any of the undertakings, representations, warranties or covenants of such Party set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Section 7(a) and 21 hereof (as applicable);

(ii)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

(iii)     if the Company shall not have complied with each of the following milestones (the "*Milestones*"):

(1)     if the Company shall not have commenced the Solicitation in accordance with section 1126(b) of the Bankruptcy Code on or before February 15, 2018;

16

(2)     if, as of 11:59 p.m. prevailing Eastern Time on the Outside Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Chapter 11 Cases shall not have been filed;

(3)     if, as of 11:59 p.m. prevailing Eastern Time on the date that is five (5) days after the commencement date, the Interim DIP Order has not been entered by the Bankruptcy Court;

(4)     if, as of 11:59 p.m. prevailing Eastern Time on the date that is thirty (30) days after the commencement date, the Final DIP Order has not been entered by the Bankruptcy Court;

(5)     if, as of 11:59 p.m. prevailing Eastern Time on the date that is seventy-five (75) days after the commencement date, the Confirmation Order has not been entered by the Bankruptcy Court;

(6)     if, as of 11:59 p.m. prevailing Eastern Time on the date that is twenty (20) days after the entry by the Bankruptcy Court of the Confirmation Order, the Effective Date shall not have occurred;

(iv)     as of 11:59 p.m. prevailing Eastern Time on June 30, 2018, the Effective Date shall not have occurred;

(v)     the termination of the Backstop Agreement in accordance with its terms;

(vi)     the Company withdraws the Plan or Disclosure Statement, or the Company files any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement or the Plan and such motion or pleading has not been withdrawn prior to the earlier of (A) two (2) business days after the Company receives written notice from the Requisite Creditors (in accordance with Section 21 hereof) that such motion or pleading is inconsistent with this Agreement or the Plan and (B) entry of an order of the Bankruptcy Court approving such motion or pleading;

(vii)     the Company files any motion for the (A) conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (B) appointment of an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee or receiver in one or more of the Chapter 11 Cases or (C) dismissal of one or more of the Chapter 11 Cases;

(viii)     the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(ix)     the Company (A) files any motion seeking to avoid, disallow, subordinate or recharacterize any claim, lien, or interest held by any Consenting Creditor arising under or relating to the Prepetition First Lien Term Loan Agreement, the Prepetition FLLO Credit Agreement, the Prepetition Second Lien Credit Agreement or the

Prepetition Sponsor Second Lien Credit Agreement or (B) shall have supported any application, adversary proceeding or cause of action referred to in the immediately preceding clause (A) filed by a third party, or consents (without the consent of the Requisite Second Lien Term Lenders and the Requisite Sponsor Second Lien Term Lenders) to the standing of any such third party to bring such application, adversary proceeding or cause of action;

(x)     on or after the date hereof, the Company engages in any merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than (A) the commencement of the Chapter 11 Cases, (B) as permitted under the DIP Facility, (C) with the consent of the Requisite Second Lien Term Lenders and the Requisite Sponsor Second Lien Term Lenders or (D) pursuant to the Sale Transaction;

(xi)     the Bankruptcy Court grants relief that (A) is inconsistent with this Agreement in any material respect or (B) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, unless the Company has sought a stay of such relief within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance;

(xii)     the Company files, propounds or otherwise supports any plan of reorganization other than the Plan;

(xiii)     on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement;

(xiv)     the failure of the Company to comply with the DIP Order, including failure to make adequate protection payments when due, which remains uncured for a period of five (5) business days after the receipt of written notice of such event, or is not otherwise waived in accordance with the terms thereof;

(xv)     the occurrence of an "Event of Default" (as defined in the DIP Credit Agreement) under the DIP Facility that has not been waived or timely cured in accordance therewith and the resulting acceleration of the obligations or termination of lending commitments under the DIP Facility;

(xvi)     the termination of this Agreement as to the Consenting Sponsor, the Consenting Sponsor Second Lien Term Lenders or the Consenting Second Lien Term Lenders;

(xvii)     the termination of the Purchase Agreement by any party thereto;

(xviii)  the Company makes any payment to the Consenting Sponsor, other than as provided in this Agreement or any agreements relating to the Restructuring; or

(xix)    the entry by the Company into any material non-ordinary course transaction or payment by the Company of any material non-ordinary course payment inconsistent with this Agreement or the Plan, including entry into any new key employee incentive plan or key employee retention plan or similar arrangement, or any new or amended agreement regarding executive compensation.

(c)    A "Company Termination Event" shall mean any of the following:

(i)    the breach by one or more of the Consenting Creditors, of any of the undertakings, representations, warranties or covenants of the Consenting Creditors set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof (as applicable), but only if the non-breaching Consenting Creditors in the applicable class hold less than 66⅔% the aggregate principal amount of Claims in such Class; provided that a breach by the Consenting Sponsor shall not give rise to a Company Termination Event;

(ii)    the board of directors, managers, members or partners, as applicable, of the Company reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; provided, that the Company provides notice of such determination to the Consenting Creditors within five (5) business days after the date thereof;

(iii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

(iv)    as of 11:59 p.m. prevailing Eastern Time on February 15, 2018, the Support Effective Date shall not have occurred;

(v)    as of 11:59 p.m. prevailing Eastern Time on the date that is twenty (20) days after the entry of the Confirmation Order by the Bankruptcy Court, the Effective Date shall not have occurred;

(vi)    as of 11:59 p.m. prevailing Eastern Time on June 30, 2018, the Effective Date shall not have occurred;

(vii)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases; or

(viii)    the termination of the Backstop Agreement in accordance with its terms.

19

(d)　　A "Consenting Creditor Termination Event" shall mean any of the following:

(i)　　the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance; or

(ii)　　the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases.

(e)　　A "Consenting First Lien Term Lender Termination Event" shall mean any of the following:

(i)　　the breach by the Company, the Consenting Sponsor, the Requisite Second Lien Term Lenders or the Requisite Sponsor Second Lien Term Lenders of any of the undertakings, representations, warranties or covenants of such Party set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof (as applicable);

(ii)　　the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

(iii)　　the Company withdraws the Plan or Disclosure Statement, or the Company files any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement or the Plan and such motion or pleading (A) materially and adversely impacts or would reasonably be expected to materially and adversely impact the economic treatment under the Plan of the Consenting First Lien Term Lenders and (B) has not been withdrawn prior to the earlier of (x) two (2) business days after the Company receives written notice from the Requisite Creditors (in accordance with Section 21 hereof) that such motion or pleading is inconsistent with this Agreement or the Plan and (y) entry of an order of the Bankruptcy Court approving such motion or pleading;

(iv)　　as of 11:59 p.m. prevailing Eastern Time on the Outside Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Chapter 11 Cases shall not have been filed;

(v)     as of 11:59 p.m. prevailing Eastern Time on the date that is seventy-five (75) days after the commencement date, the Confirmation Order has not been entered by the Bankruptcy Court;

(vi)     as of 11:59 p.m. prevailing Eastern Time on the date that is twenty (20) days after the entry by the Bankruptcy Court of the Confirmation Order, the Effective Date shall not have occurred;

(vii)     as of 11:59 p.m. prevailing Eastern Time on June 30, 2018, the Effective Date shall not have occurred;

(viii)     the Company files any motion for the (A) conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (B) appointment of an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee or receiver in one or more of the Chapter 11 Cases or (C) dismissal of one or more of the Chapter 11 Cases;

(ix)     the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(x)     the Company (A) files any motion seeking to avoid, disallow, subordinate or recharacterize any claim, lien, or interest held by any Consenting First Lien Term Lender arising under or relating to the Prepetition First Lien Term Loan Agreement or (B) shall have supported any application, adversary proceeding or cause of action referred to in the immediately preceding clause (A) filed by a third party, or consents (without the consent of any affected Consenting First Lien Term Lender) to the standing of any such third party to bring such application, adversary proceeding or cause of action;

(xi)     on or after the date hereof, the Company engages in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than (A) the commencement of the Chapter 11 Cases, (B) as permitted under the DIP Facility, (C) with the consent of the Requisite First Lien Term Lenders, such consent not to be unreasonably withheld or (D) pursuant to the Sale Transaction;

(xii)     the Company files, propounds or otherwise supports any plan of reorganization other than the Plan and such plan of reorganization materially and adversely impacts or would reasonably be expected to materially and adversely impact the economic treatment under the Plan of the Consenting First Lien Term Lenders;

(xiii)     the Bankruptcy Court grants relief that (A) is inconsistent with this Agreement in any material respect or (B) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, unless the Company has sought a stay of such relief within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance, and any

21

such relief described in clause (A) or (B) materially and adversely impacts or would reasonably be expected to materially and adversely impact the economic treatment under the Plan of the Consenting First Lien Term Lenders;

(xiv)   on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement;

(xv)   the termination of this Agreement as to the Consenting FLLO Term Lenders, Consenting RBTL Lenders, Consenting Second Lien Term Lenders and Consenting Sponsor Second Lien Term Lenders;

(xvi)   the valid termination by the seller under the Purchase Agreement in accordance with the terms thereof;

(xvii)  the Company makes any payment to the Consenting Sponsor other than as provided in this Agreement or any agreements relating to the Restructuring; or

(xviii) the entry by the Company into any material non-ordinary course transaction or payment by the Company of any material non-ordinary course payment inconsistent with this Agreement or the Plan, including entry into any new key employee incentive plan or key employee retention plan or similar arrangement, or any new or amended agreement regarding executive compensation.

(f)      A "Consenting Sponsor Termination Event" shall mean any of the following:

(i)      the breach by any of the other Parties hereto, of any of the undertakings, representations, warranties or covenants of such Party set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice which breach adversely affects the treatment of the Consenting Sponsor under the Plan and remains uncured for a period of five (5) days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof;

(ii)     the Company files any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement or the Plan, in each case, that materially adversely impacts or would reasonably be expected to materially adversely impact the Consenting Sponsor;

(iii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance; or

(iv)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing

any of the Chapter 11 Cases, or (D) that has a material and adverse impact on the rights or treatment of the Consenting Sponsor in this Agreement.

(g)      Mutual Termination.  This Agreement may be terminated by mutual agreement of the Company, the Consenting Sponsor and the Requisite Creditors upon the receipt of written notice delivered in accordance with Section 21 hereof.

(h)      Effect of Termination.  Subject to the proviso contained in Section 7(a) hereof, upon the termination of this Agreement in accordance with this Section 7, and except as provided in Section 15 hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law; provided, however, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon a termination of this Agreement, each Consenting Creditor and the Consenting Sponsor may, upon written notice to the Company and the other Parties, revoke its vote or any consents given prior to such termination, whereupon any such vote or consent shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement.  If this Agreement has been terminated as to any Consenting Creditor or the Consenting Sponsor in accordance with Section 7 hereof at a time when permission of the Bankruptcy Court shall be required for a change or withdrawal (or cause to change or withdraw) of its vote to accept the Plan, the Company shall not oppose any attempt by such Consenting Creditor or the Consenting Sponsor to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Company at law, equity, or otherwise, including those remedies set forth in Section 14 hereof.

(i)      If the Restructuring Transactions are not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

## 8.      **Definitive Documents; Good Faith Cooperation; Further Assurances**.

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

9. **Representations and Warranties**.

(a)    Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Creditor becomes a party hereto):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party except, in the case of the Company, for the filing of the Chapter 11 Cases;

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the SEC or other securities regulatory authorities under applicable securities laws; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Creditor and the Consenting Sponsor severally (and not jointly) represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) is the beneficial owner of the principal amount of each Loan or number and class of Capital Stock set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof) and does not beneficially own any other loans or Capital Stock, and/or (ii) has, with respect to the beneficial owners of such Loans or Capital Stock, (A) sole investment or voting discretion with respect thereto, (B) full power and authority to vote on and consent to matters concerning such Loans or Capital Stock or to exchange, assign and transfer such Loans or Capital Stock, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)     Each Consenting Creditor and the Consenting Sponsor severally (and not jointly) makes the representations and warranties set forth in Section 22(c) hereof, in each case, to the other Parties.

(d)     The Consenting Sponsor represents and warrants to the Company that it holds of record and owns beneficially the number of shares and class of Capital Stock set forth below its name on its signature page to this Agreement, free and clear of any restrictions on transfer, liens or options, warrants, purchase rights, contracts, commitments, claims and demands (other than restrictions on transfer set forth in the organizational documents of Holdings arising under applicable securities laws) and that such equity interests constitute approximately 98% of the Capital Stock.

(e)     The Company represents and warrants that, as of the date hereof, Holdings has no assets, other than its ownership of 100% of the Capital Stock of Energy Inc. or as set forth in its governing documents, and no material liabilities, other than its obligations as a guarantor under the Company's current letters of credit facility, and is not a party to, or beneficiary under, any agreements, contracts, licenses, franchises, permits, certificates, approvals or other similar authorizations other than as required by applicable law, rule, or regulation, or which have been entered into with its members or Energy Inc.

10.     **Disclosure; Publicity**.

The Company shall submit drafts to Consenting Party Counsel of any press releases that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least one (1) business day prior to making any such disclosure.  Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Creditor, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Party), other than advisors to the Company, the principal amount or percentage of any Loans or any other Claims against, or Interests in, the Company held by any Consenting Creditor, in each case, without such Consenting Creditor's consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Creditor) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Loans held by all the Consenting Creditors, collectively, on a facility by facility basis.  Notwithstanding the provisions in this Section 10, any Party may disclose, to the extent consented to in writing by a Consenting Creditor, such Consenting Creditor's individual holdings.

11.     **Amendments and Waivers**.

(a)     Other than as set forth in Section 11(b), this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented except with the written consent of the Company, the Requisite Second Lien Term Lenders, the Requisite Sponsor Second Lien Term Lenders and the other Requisite Creditors (in the case of the other Requisite Creditors, (i) solely to the extent such amendments, modifications and supplements

materially and adversely affect in any respect any rights under the Plan or this Agreement of such other Requisite Creditors and (ii) such consent not to be unreasonably withheld, conditioned or delayed) and the Consenting Sponsor (in the case of the Consenting Sponsor, such consent shall be limited solely to the Consenting Sponsor Consent Right);

(b)      Notwithstanding Section 11(a):

(i)      any waiver, modification, amendment or supplement to this Section 11 shall require the written consent of all of the Parties;

(ii)      any modification, amendment or change to the definition of "Requisite First Lien Term Lenders", "Requisite FLLO Term Lenders", "Requisite Second Lien Term Lenders" and "Requisite Sponsor Second Lien Term Lenders" shall require the written consent of each individual Consenting Creditor included in such definition;

(iii)      any change, modification or amendment to this Agreement or the Plan that treats or affects any Consenting Creditor in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which any of the other Consenting Creditors are treated (after taking into account each of the Consenting Creditors' respective holdings and interests in the Company and the recoveries contemplated by the Plan (as in effect on the date hereof)) shall require the written consent of such Consenting Creditor; and

(iv)      any change, modification or amendment to this Agreement or the Plan that does not materially and adversely affect in any respect any rights of a Consenting Creditor, shall not require the consent of such Consenting Creditor but, for the avoidance of doubt, shall require the consent of the Requisite Second Lien Term Lenders and the Requisite Sponsor Second Lien Term Lenders.

(c)      In the event that an adversely affected Consenting Creditor ("**Non-Consenting Creditor**") does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of each Consenting Creditor, but such waiver, change, modification or amendment receives the consent of Consenting Creditors (i) owning at least 66⅔% of the outstanding relevant Claims or Capital Stock of the applicable Class of which such Non-Consenting Creditor is a member, and (ii) representing at least a majority in number of claimants in such Class, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditors, but this Agreement shall continue in full force and effect in respect to all other members of the Consenting Class who have so consented.

## 12.   **Effectiveness**.

This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto and shall become effective and binding on all Parties on the Support Effective Date; provided, however, that signature pages executed by Consenting Creditors shall be delivered to (a) other Consenting Creditors and the Consenting Sponsor in a redacted form that removes the details of such Consenting Creditors' holdings and (b) the Company, Weil, Consenting Party Counsel in an unredacted form (to be held by Weil and Consenting Party Counsel on a professionals' eyes only-basis).

13.   **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL**.

(a)   This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)   Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan in the City of New York ("***NY Courts***") and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring Transactions.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the NY Courts other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any NY Courts. Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring Transactions, (i) any claim that it is not personally subject to the jurisdiction of the NY Courts for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 13(b) shall be brought in the Bankruptcy Court.

(c)   EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

14.   **Specific Performance/Remedies**.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of

money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.  Each Party also agrees that it will not seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief.

15.     <u>**Survival**</u>.

Notwithstanding the termination of this Agreement pursuant to <u>Section 7</u> hereof, the agreements and obligations of the Parties in this <u>Section 15</u>, and <u>Sections 7(i)</u>, <u>10</u>, <u>12</u>, <u>13</u>, <u>14</u>, <u>16</u>, <u>17</u>, <u>18</u>, <u>19</u>, <u>20</u>, <u>21</u> and <u>22</u> hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; <u>provided</u>, <u>however</u>, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

16.     <u>**Headings**</u>.

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.     <u>**Successors and Assigns; Severability; Several Obligations**</u>.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; <u>provided</u>, <u>however</u>, that nothing contained in this <u>Section 17</u> shall be deemed to permit Transfers of the Loans or claims arising under the Loans other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.  The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

18.     <u>***No Third-Party Beneficiaries***</u>.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

19.     <u>**Prior Negotiations; Entire Agreement**</u>.

This Agreement, including the exhibits and schedules hereto (including the Plan) constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any

confidentiality agreements (if any) heretofore executed between the Company and each Consenting Creditor shall continue in full force and effect.

**20.    Counterparts**.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

**21.    Notices**.

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses:

(1)    If to the Company, to:

Fieldwood Energy LLC
2000 W. Sam Houston Parkway, S. Suite 1200
Houston, Texas 77042
Attention:  G. M. McCarroll and Michael Dane

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:   Matt Barr, Esq.
                    (matt.barr@weil.com)
                    Jessica Liou, Esq.
                    (jessica.liou@weil.com)
                    - and -
                    Gavin Westerman, Esq.
                    (gavin.westerman@weil.com)

(2)    If to a Consenting RBTL Lender, Consenting FLLO Term Lender, Consenting Second Lien Term Lender, or a transferee thereof, to the addresses set forth below following the Consenting Creditor's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:  Damian Schaible, Esq.
                    (damian.schaible@davispolk.com)
                    Darren Klein, Esq.

(darren.klein@davispolk.com)
-and-
Natasha Tsiouris, Esq.
(natasha.tsiouris@davispolk.com)

(3)　　If to the Consenting First Lien Term Lenders, or a transferee thereof, to the addresses set forth below such Consenting First Lien Term Lender's signature (or as directed by any transferee thereof), as the case may be, with copies to:

O'Melveny & Myers LLP
Times Square Tower, 7 Times Square
New York, NY 10036
Attention:　George A. Davis, Esq.
　　　　　　(gdavis@omm.com)
　　　　　　-and-
　　　　　　Daniel S. Shamah, Esq.
　　　　　　(dshamah@omm.com)

(4)　　If to the Consenting Sponsor Second Lien Term Lenders or the Consenting Sponsor, to:

Vinson & Elkins LLP
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Tel: (212) 237-0000
Fax: (212) 237-0100
Attention:　David S. Meyer, Esq.
　　　　　　(dmeyer@velaw.com)
　　　　　　-and-
　　　　　　Jessica C. Peet, Esq.
　　　　　　(jpeet@velaw.com)

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

**22.**　　**No Solicitation; Representation by Counsel; Adequate Information**.

(a)　　This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases from the Creditors.  The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditor has received the Disclosure Statement and related ballots and solicitation materials.

(b)　　Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal

decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)     Each Consenting Creditor and the Consenting Sponsor acknowledges, agrees and represents to the other Parties that it (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act or a non-US person participating in the offering outside the United States in reliance on Regulation S under the Securities Act, (ii) is an "accredited investor" as such term is defined in Rule 501 of Regulation D of the Securities Act, (iii) understands that if it is to acquire any securities, as defined in the Securities Act, pursuant to the Restructuring Transactions, such securities have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's or Consenting Sponsor's, as applicable, representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available and (iv) has such knowledge and experience in financial and business matters that such Consenting Creditor or the Consenting Sponsor, as applicable, is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to the Restructuring Transactions and understands and is able to bear any economic risks with such investment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

FIELDWOOD HOLDINGS LLC
FIELDWOOD ENERGY LLC
FIELDWOOD ENERGY INC.

By: _____
    Name:  G. M. McCarroll
    Title:    President and Chief Executive Officer

**FIELDWOOD ENERGY OFFSHORE LLC**
**FIELDWOOD ENERGY SP LLC**
**BANDON OIL AND GAS, LP**
**BANDON OIL AND GAS GP, LLC**
**FIELDWOOD SD OFFSHORE LLC**
**FIELDWOOD ONSHORE LLC**
**GALVESTON BAY PROCESSING LLC**
**GALVESTON BAY PIPELINE LLC**
**DYNAMIC OFFSHORE RESOURCES NS, LLC**
**GOM SHELF LLC**
**FW GOM PIPELINE, INC.**

By: _____
    Name:  G. M. McCarroll
    Title:    President

Consenting Lenders' Signature Pages Intentionally Omitted

**<u>EXHIBIT A</u>**
**CHAPTER 11 PLAN**

Intentionally Omitted

**<u>EXHIBIT B</u>**
**LC TERM SHEET**

Attached.

**Exhibit B**

**PROJECT PELICAN**
**$147.8 MILLION SENIOR SECURED REVOLVING CREDIT FACILITY**
**"EXIT LC FACILITY TERM SHEET"**

**SUMMARY OF PRINCIPAL TERMS AND CONDITIONS[1]**

| | |
|---|---|
| **EXISTING CREDIT FACILITY:** | The Borrower's (as defined below) senior secured revolving credit facility (the "***Prepetition RBL Facility***") provided by Citibank, N.A., as administrative agent, certain lenders party thereto from time to time and the other agents party thereto from time to time pursuant to that certain Credit Agreement dated as of September 30, 2013 (as amended, supplemented or otherwise modified from time to time, the "***Prepetition RBL Credit Agreement***"). |
| **BORROWER/HOLDINGS:** | Fieldwood Energy LLC, a Delaware limited liability company (the "***Borrower***"), all of the outstanding equity interests of which will, as of the Closing Date, be owned directly by Fieldwood Energy Inc., a Delaware corporation ("***Holdings***"). |
| **AGENT:** | An administrative agent reasonably acceptable to the LC Facility Lenders and the Borrower (the "***Administrative Agent***"). |
| **LENDERS:** | Riverstone Global Energy and Power Fund V (FT), L.P., together with any assignees thereof (collectively, the "***LC Facility Lenders***"). |
| **ISSUING BANKS** | Financial institutions meeting the definition of "Issuing Bank" as defined in the Decommissioning Agreement and reasonably acceptable to the LC Facility Lenders and the Borrower. |
| **FACILITY:** | A senior secured first lien "first-out" letter of credit facility (the "***LC Facility***", the funding commitments thereunder the "***LC Funding Commitments***" and the letter of credit issuance commitments thereunder, the "***LC Issuance Commitments***"), that shall become effective on the effective date of the Plan (the "***Closing Date***"). The LC Issuance Commitments shall be in an initial aggregate amount of $147.8 million and the LC Funding Commitments shall be in an initial aggregate principal amount equal to the product of (i) the face amount of the Closing Date Secured LCs (as defined below) outstanding on the Closing Date and (ii) the cash collateralization percentage required by the Issuing Banks with respect to the Secured LCs (the "***Required Cash Collateral Percentage***"). The LC Facility shall be secured (i) on a pari passu basis with the First Lien Term Facility and the Permitted Hedge Obligations, but will (together with the Permitted Hedge Obligations) rank ahead of the First Lien Term Facility, on |

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Restructuring Support Agreement (the "***Restructuring Support Agreement***") to which this Term Sheet is attached, including the term sheet for the $1.143 billion senior secured term loan facility attached to the Restructuring Support Agreement as Exhibit C (the "***Exit FLTL Term Sheet***"). In the event any such capitalized term is subject to multiple and differing definitions, the appropriate meaning thereof for purposes of this Term Sheet shall be determined by reference to the context in which it is used.

a "first-out" basis, in the payment waterfall in the applicable Intercreditor Agreement (as defined below) and (ii) on a senior basis to the Exit SLTL Facility.

**FIRST LIEN TERM FACILITY:** A senior secured amended and restated first lien "last-out" term loan facility (the "*First Lien Term Facility*" and the commitments thereunder, the "*First Lien Term Commitments*") that shall become effective on the Closing Date. The First Lien Term Commitments shall be in an aggregate principal amount of $1.143 billion which shall be secured (i) on a *pari passu* basis with the LC Facility and the Permitted Hedge Obligations, but will rank behind the LC Facility and the Permitted Hedge Obligations, on a "last-out" basis, in the payment waterfall in the applicable Intercreditor Agreement and (ii) on a senior basis to the Exit SLTL Facility.

**PURPOSE:** The proceeds of any loans borrowed under the LC Facility ("*LC Facility Loans*") will be used solely to reimburse draws under and/or cash collateralize letters of credit secured, backstopped or otherwise supported by the LC Facility (such letters of credit, "*Secured LCs*" and the issuer of any Secured LC, an "*Issuing Bank*").

**AVAILABILITY:** Letters of Credit: The LC Issuance Commitments shall be fully available on the Closing Date and until the Maturity Date for the issuance by the Issuing Banks of replacement letters of credit in respect of the existing letters of credit identified on *Annex I* hereto (such existing letters of credit, the "*Specified Letters of Credit*" and such replacement letters of credit, the "*Closing Date Secured LCs*").

LC Facility Loans: The LC Funding Commitments shall be fully available on the Closing Date until the Maturity Date. Upon the drawing of any Secured LC by the beneficiary thereof, unless such draw is immediately reimbursed by the Borrower, the LC Facility Lenders will, subject to the conditions of the LC Facility Documentation, make LC Facility Loans on the Borrower's account in the amount of the applicable letter of credit draw, the proceeds of which shall be funded directly to the applicable Issuing Bank. In addition, the LC Facility Lenders may, in their discretion, at any time following the eighteen month anniversary of the Closing Date and in minimum amounts to be agreed, make LC Facility Loans for the Borrower's account to cash collateralize Secured LCs; provided that the aggregate amount of outstanding LC Facility Loans shall not at any time exceed the LC Funding Commitments.

**CASH COLLATERAL** Any cash collateral for the Secured LCs shall be maintained in a blocked, interest bearing deposit account established by and in the name of the Borrower, but under the "control" of the Administrative Agent (the "*Cash Collateral Account*") pursuant

to a control agreement in form and substance reasonably acceptable to the Administrative Agent. The cash or deposit account balances may, at the discretion of the Borrower, be invested in Permitted Investments (to be defined in a manner agreed by the Borrower and the LC Facility Lenders). Any interest or other amounts earned on such cash collateral shall be applied to offset amounts due in respect of interest on the LC Facility Loans and the Letter of Credit Fees.

**INTEREST RATES AND FEES:**   LC Facility Loans: Adjusted LIBOR plus 4.50% per annum, payable quarterly to the Administrative Agent for the account of each LC Facility Lender with respect to any outstanding LC Facility Loans.

Letter of Credit Fee: 4.50% per annum, payable quarterly to the Administrative Agent for the account of each LC Facility Lender with respect to any outstanding Secured LCs to the extent undrawn (or, if drawn, to the extent unreimbursed) and not cash collateralized.

Fronting Fee: In an amount required by the applicable Issuing Banks, payable quarterly to the Administrative Agent for the account of each Issuing Bank.

Upfront Fee: Payable on the Closing Date in an amount equal to 2.0% of the LC Funding Commitments on the Closing Date less the amount of the Commitment Fee set forth below paid by the Borrower.

Commitment Fee: $500,000 payable upon execution of the Restructuring Support Agreement.

Alternative Transaction Fee: $1,000,000 payable upon the closing of an alternative refinancing of the Specified Letters of Credit.

Default Rate: 2% per annum on any overdue amounts during the existence of a payment default.

The interest rate applicable to LC Facility Loans and the Letter of Credit Fee may be increased by up to 1.00% after the eighteen month anniversary of the Closing Date to the extent necessary to achieve successful syndication of the LC Facility.

**FINAL MATURITY:**   The LC Facility will mature three years after the Closing Date (the "*Maturity Date*"). Unless alternative arrangements satisfactory to the Issuing Banks have been made, the Borrower shall cash collateralize all Secured LCs outstanding on the Maturity Date at the Required Cash Collateral Percentage.

**GUARANTEES:**          All obligations of the Borrower under the LC Facility will be jointly and severally unconditionally guaranteed on a first lien secured basis (the "***Guarantees***") by the same Guarantors (as defined in the Exit FLTL Term Sheet) that guarantee the First Lien Term Facility.

**SECURITY:**            The obligations of the Borrower under the LC Facility and the Guarantees will be secured by liens on the same Collateral (as defined in the Exit FLTL Term Sheet) securing the First Lien Term Facility.

**INTERCREDITOR AGREEMENTS**   The lien priority, relative rights and other creditors' rights issues between and among the holders of the LC Facility, the holders of the loans under the Exit FLTL Facility and the holders of the loans under the Exit SLTL Facility will be set forth in one or more intercreditor agreements (the "***Intercreditor Agreements***") reasonably satisfactory to the Borrower and the Administrative Agent.

**MANDATORY PREPAYMENTS:**   None.

**VOLUNTARY PREPAYMENTS:**   Prepayments of borrowings under the LC Facility will be permitted at any time without premium or penalty, subject to customary notice requirements; provided that the LC Issuance Commitments and the LC Funding Commitments may not be terminated or reduced by the Borrower prior to the Maturity Date without the consent of the LC Facility Lenders and the Issuing Banks, so long as, after giving effect to such termination or reduction, the aggregate face amount of Secured LCs outstanding shall not exceed the remaining LC Issuance Commitments and the aggregate amount of LC Facility Loans shall not exceed the remaining LC Funding Commitments, respectively, and in either case, the LC Funding Commitments shall not at any time be less than an amount equal to the product of (a) the face amount of all Secured LCs outstanding at such time and (b) the Required Cash Collateral Percentage with respect to such Secured LCs.

**DOCUMENTATION:**       The definitive documentation for the LC Facility (the "***LC Facility Documentation***") will be documented under a single credit agreement, will be consistent with the terms set forth in this Exit LC Facility Term Sheet, with respect to operative letter of credit provisions will be substantially identical to the Prepetition RBL Credit Agreement (provided that the LC Facility Lenders shall be required to acquire a 100% participation in each Secured LC from the applicable Issuing Bank), with respect to representations, covenants and events of default, will be substantially consistent with those contained in the First Lien Term Facility, and will reflect the post-bankruptcy status of Borrower and the Guarantors, taking into account the nature of the assets, operations and condition of the Borrower post-emergence, and will not include

any terms and provisions related to a borrowing base, delivery of reserve reports, reserve-based loan reporting requirements and, in each case, requirements associated therewith.

**ASSIGNMENTS/PARTICIPATIONS:** Lenders will be permitted to make assignment and sell participation in respect of the LC Funding Commitments and the LC Facility Loans in minimum amounts and integral multiples to be agreed.

**CONDITIONS TO CLOSING:**

The closing of the LC Facility and the making of the initial extensions of credit thereunder, will be subject to satisfaction of conditions precedent substantially identical to the conditions precedent to the effectiveness of the First Lien Term Facility as set forth on Annex II to the Exit FLTL Term Sheet as well as the following conditions:

(a) the making of satisfactory arrangements with the issuers of the Specified Letters of Credit; and

(b) the execution and delivery by each Issuing Bank of all LC Facility Documentation to which it is a party.

**GOVERNING LAW AND FORUM:** New York

**COUNSEL TO ADMINISTRATIVE AGENT:** Vinson & Elkins LLP

*ANNEX I*

## SPECIFIED LETTERS OF CREDIT

| Issuer | Letter of Credit No. | Face Amount | Expiration Date |
|---|---|---|---|
| Bank of America, N.A. | 3129195 | $72,995,948 | 9/30/18 |
| JPMorgan Chase Bank, N.A. | CTCS-764290 | $74,605,349 | 9/30/18 |
| Citibank, N.A. | 69601415 | $200,000 | 7/1/18 |

**<u>EXHIBIT C</u>**
**EXIT FIRST LIEN TERM SHEET**

Attached.

**EXHIBIT C**

**PROJECT PELICAN**
**$1.143 BILLION SENIOR SECURED TERM LOAN FACILITY**
**"EXIT FLTL TERM SHEET"**

**SUMMARY OF PRINCIPAL TERMS AND CONDITIONS[1]**

**CERTAIN PREPETITION DEBT FACILITIES AND INSTRUMENTS:**

The Borrower's (as defined below) senior secured first lien revolving credit facility (the "***Prepetition RBL Facility***") provided by Citibank, N.A., as administrative agent (the "***Prepetition RBL Agent***"), certain lenders party thereto from time to time (the "***Prepetition RBL Lenders***") and the other agents party thereto from time to time pursuant to that certain Credit Agreement dated as of September 30, 2013 (as amended, supplemented or otherwise modified from time to time, including pursuant to (i) that certain Amendment No. 1 to Credit Agreement dated as of February 25, 2014, (ii) that certain Amendment No. 2 to Credit Agreement dated as of April 8, 2015, and (iii) that certain Amendment No. 3 to Credit Agreement dated as of May 27, 2016, the "***Prepetition RBL Credit Agreement***").

The Borrower's senior secured first lien term loan facility (the "***Prepetition First Lien Term Loan Facility***") pursuant to that certain First Lien Term Loan Credit Agreement, dated as of September 30, 2013, among the Borrower, Citibank, N.A. as administrative agent (the "***Prepetition First Lien Term Agent***"), the lenders party thereto from time to time (the "***Prepetition First Lien Term Lenders***") and the other agents party thereto from time to time (as amended from time to time including pursuant to (i) that certain Amendment No. 1 to First Lien Term Loan Agreement dated as of February 25, 2014 and (ii) that certain Amendment No. 2 to First Lien Term Loan Agreement dated as of May 27, 2016, the "***Prepetition First Lien Term Loan Agreement***") consisting of reserve-based term loans due 2020 (the "***Prepetition RBTL Loans***") and first lien term loans due 2018 (the "***Prepetition FLTL Loans***" and together with the Prepetition RBTL Loans, the "***Prepetition First Lien Term Loans***").

The Borrower's senior secured first lien "last out" term loan facility (the "***Prepetition FLLO Facility***") pursuant to that certain First Lien Last-Out Term Loan Agreement dated as of May 27, 2016, among the Borrower, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder (the "***Prepetition FLLO Agent***"), and the lenders from time to time party thereto (the "***Prepetition FLLO Lenders***") (as amended from time to time, the "***Prepetition FLLO Credit Agreement***") (and the loans thereunder, the "***Prepetition FLLO Loans***").

The Borrower's senior secured second lien term loan facility (the "***Prepetition Second Lien Facility***") pursuant to that certain Second Lien

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Restructuring Support Agreement to which this Term Sheet is attached, including the other exhibits attached to such Restructuring Support Agreement. In the event any such capitalized term is subject to multiple and differing definitions, the appropriate meaning thereof for purposes of this ***Exhibit C*** shall be determined by reference to the context in which it is used.

Term Loan Agreement dated as of September 30, 2013, among the Borrower, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder (the "***Prepetition Second Lien Term Agent***"), and the lenders from time to time party thereto (as amended from time to time including pursuant to (i) that certain Amendment No. 1 to Second Lien Term Loan Agreement dated as of February 25, 2014, (ii) that certain Amendment No. 2 and Limited Waiver to Second Lien Term Loan Agreement dated as of May 27, 2016 and (iii) that certain Amendment No. 3 and Limited Waiver to Second Lien Term Loan Agreement dated as of May 27, 2016, the "***Prepetition Second Lien Credit Agreement***") (the loans outstanding under the Prepetition Second Lien Credit Agreement, "***Prepetition Second Lien Term Loans***").

The Borrower's senior secured second lien term loan facility (the "***Prepetition Sponsor Second Lien Facility***") pursuant to that certain Credit Agreement dated as of May 27, 2016 among the Borrower, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder (the "***Prepetition Sponsor Second Lien Term Agent***") and the lenders from time to time party thereto (as amended from time to time, including pursuant to that certain Amendment No 1 to the Sponsor Second Lien Credit Agreement dated as of September 29, 2017, the "***Prepetition Sponsor Second Lien Credit Agreement***") (the loans outstanding under the Prepetition Sponsor Second Lien Credit Agreement, the "***Prepetition Sponsor Second Lien Term Loans***").

| | |
|---|---|
| **BORROWER/HOLDINGS:** | Fieldwood Energy LLC, a Delaware limited liability company (the "***Borrower***"), all of the outstanding equity interests of which will, as of the Closing Date (as defined below), be owned directly by Fieldwood Energy Inc., a Delaware corporation ("***Holdings***"). |
| **AGENT:** | Wells Fargo Bank, National Association, will act as sole administrative agent and collateral agent (collectively, in such capacities, the "***First Lien Term Loan Agent***", and as used in this ***Exhibit C***, the "***Administrative Agent***"). |
| **LENDERS:** | The Prepetition First Lien Term Lenders that elect to provide a commitment in respect of the First Lien Term Facility (defined below) (collectively, the "***First Lien Term Lenders***"). |
| **EXIT FIRST LIEN TERM FACILITY:** | A senior secured amended and restated first lien "last-out" term loan facility (the "***First Lien Term Facility***" and the loans under such First Lien Term Facility, the "***First Lien Term Loans***") that shall become effective on the effective date of the Plan (the "***Plan Effective Date***") provided by each First Lien Term Lender based on pro rata allocation of term loan commitments under the Prepetition First Lien Term Facility (collectively, the "***First Lien Term Commitments***") such that the aggregate amount of the First Lien Term Commitments shall be in an amount equal to an aggregate principal amount of $1.143 billion, which First Lien Term Facility shall be secured (i) on a *pari passu* basis with |

the Exit LC Facility (as defined below) and the Permitted Hedge Obligations (as defined below), but will rank behind the Exit LC Facility and the Permitted Hedge Obligations, on a "last-out" basis, in the payment waterfall in the applicable Intercreditor Agreement (as defined below) and (ii) on a senior basis to the Exit SLTL Facility (as defined below).

|  |  |
|---|---|
| **INCREMENTAL TERM FACILITIES:** | The Borrower shall be entitled, on one or more occasions, to incur separate classes of additional term loans or increases in existing term loans (the "***Incremental Term Loans***") under the First Lien Term Facility or incur additional *pari passu* secured, junior secured or unsecured term loans under a new term loan facility (each, an "***Incremental Term Facility***") (or any secured or unsecured notes or loans issued in lieu of (and subject to the conditions set forth in this paragraph and in the next succeeding paragraph; provided that in no event shall such notes or loans be guaranteed by entities that are not guarantors under the First Lien Term Facility and in no event shall such secured notes or loans be secured by assets other than the Collateral) any Incremental Term Loans ("***Incremental Equivalent Debt***")), so long as, (a) if such Incremental Term Facility (or Incremental Equivalent Debt) is secured by a lien on the Collateral that is *pari passu* with the lien securing the First Lien Term Facility, (i) the Total Net Leverage Ratio (to be defined in a manner consistent with the First Lien Term Facility Documentation Principles (as defined below)), calculated on a *pro forma* basis after giving effect to such Incremental Term Loans (or Incremental Equivalent Debt) and the use of the proceeds therefrom (it being understood that the proceeds from such Incremental Term Facility (or any Incremental Equivalent Debt) shall not be used for netting indebtedness for purposes of calculating the Total Net Leverage Ratio pursuant to this paragraph), does not exceed 2.00:1.00 and (ii) the proceeds of such Incremental Term Facility (or Incremental Equivalent Debt) are used solely to finance acquisitions or similar investments; provided that the Borrower may not incur any such *pari passu* Incremental Term Loans (or Incremental Equivalent Debt) prior to the six month anniversary of the Closing Date, (b) if such Incremental Term Facility (or Incremental Equivalent Debt) is secured by a lien on the Collateral that is junior to the lien securing the First Lien Term Facility, the Total Net Leverage Ratio, calculated on a *pro forma* basis after giving effect to such Incremental Term Loans (or Incremental Equivalent Debt) and the use of the proceeds therefrom (it being understood that the proceeds from such Incremental Term Facility (or any Incremental Equivalent Debt) shall not be used for netting indebtedness for purposes of calculating the Total Net Leverage Ratio pursuant to this paragraph), does not exceed 2.50:1.00 or (c) if such Incremental Term Facility (or Incremental Equivalent Debt) is unsecured, the Total Net Leverage Ratio, calculated on a *pro forma* basis after giving effect to such Incremental Term Loans (or Incremental Equivalent Debt) and the use of the proceeds therefrom (it being understood that the proceeds from such Incremental Term Facility (or |

any Incremental Equivalent Debt) shall not be used for netting indebtedness for purposes of calculating the Total Net Leverage Ratio pursuant to this paragraph), does not exceed 3.00:1.00.

At the time of the incurrence of any Incremental Term Facility (or, in the case of clauses (ii) and (iii) below, Incremental Equivalent Debt): (i)(A) no event of default exists or would exist after giving effect thereto and (B) the representations and warranties contained in the First Lien Term Facility Documentation shall be true and correct in all material respects (or, in the case of any such representation that is qualified by materiality, in all respects) immediately prior to, and after giving effect to, the incurrence of such Incremental Term Loans, (ii) the maturity date of the Incremental Term Loans (or Incremental Equivalent Debt) shall be no earlier than the maturity date of the First Lien Term Facility, (iii) the weighted average life to maturity of the Incremental Term Loans (or Incremental Equivalent Debt) shall be no shorter than the remaining weighted average life to maturity of the First Lien Term Facility, (iv) all fees and expenses owing in respect of such increase to the Administrative Agent and the First Lien Term Lenders providing such Incremental Term Loans shall have been paid, (v) the Incremental Term Loans shall have the same guarantors as, and if secured, shall be secured on a *pari passu* or more junior basis by the same collateral securing, the First Lien Term Facility, (vi) any Incremental Term Loans shall be on the terms and pursuant to documentation to be determined and to the extent not consistent with the First Lien Term Facility (except to the extent permitted by clauses (ii) through (v) above) such terms and documentation shall be reasonably satisfactory to the Administrative Agent (it being understood that no consent of the Administrative Agent shall be required for terms and conditions that are more restrictive than those set forth in the existing First Lien Term Facility Documentation to the extent the existing First Lien Term Facility receives the benefit of such provisions or to the extent such provisions are only applicable after the latest maturity of any then-existing First Lien Term Loans) (the requirements described in clauses (ii) and (iii) above, the "***Required Debt Terms***"), and (vii) with respect to Incremental Term Loans the all-in-yield (but excluding any amendment fees, arrangement fees or similar fees payable to any lead arranger (or its affiliates) in connection with the commitment or syndication of any such indebtedness and any other fees not paid or payable generally to all lenders in the primary syndication) (whether in the form of interest rate margins, original issue discount, upfront fees (with original issue discount and upfront fees being equated to an interest rate assuming a 4-year life to maturity (or, if shorter, the remaining life) on a straight line basis) or a "floor", with such increased amount being equated to interest margin for purposes of determining any increase to the applicable interest margin (*provided* that such differential between interest rate floors shall be equated to the applicable all-in-yield only to the extent an increase in the interest rate floor under the existing First Lien Term Facility would cause an increase in the interest rate then in effect thereunder) (the "***Effective Yield***") under the First Lien Term Facility and including any amendment to the applicable margin on the

First Lien Term Loans that became effective subsequent to the Closing Date but prior to the time of the addition of such Incremental Term Facility) applicable to any Incremental Term Facility will be determined by the Borrower and the lenders providing such Incremental Term Facility, but will not be more than 0.50% higher than the corresponding all-in-yield (after giving effect to interest rate margins (including any "floors"), original issue discount and upfront fees) for the existing First Lien Term Facility, unless the interest rate margins with respect to the existing First Lien Term Facility are increased by an amount equal to the difference between the Effective Yield with respect to such Incremental Term Facility and the corresponding Effective Yield on the existing First Lien Term Facility minus 0.50% (the "***MFN Protection***"); *provided* that the MFN Protection shall only apply to any Incremental Term Facility, Incremental Equivalent Debt, or Permitted Ratio Debt (as defined below) in the form of term loans that ranks *pari passu* with the First Lien Term Facility; *provided, further,* that Incremental Term Loans may provide for mandatory prepayments of the Incremental Term Loans on a *pro rata* basis or less than *pro rata* basis, and the Borrower shall be permitted to voluntarily prepay any class of term loans on a better than *pro rata* basis as compared to any other class of term loans.  The Borrower may seek commitments in respect of Incremental Term Loans from existing First Lien Term Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) and additional banks, financial institutions and other institutional lenders who will become First Lien Term Lenders in connection therewith, subject to the Administrative Agent's consent to the extent such consent would be required in connection with an assignment thereto under the heading "*Assignments and Participations*" below.

**EXIT LC FACILITY:**    A senior secured first lien "first-out" letter of credit facility (the "***Exit LC Facility***", the funding commitments thereunder, the "***LC Funding Commitments***" and the letter of credit issuance commitments thereunder the "***LC Issuance Commitments***") that shall become effective on the Plan Effective Date.  The LC Issuance Commitments shall be in an aggregate principal amount of $147.8 million and the LC Funding Commitments shall be in an aggregate amount equal to the product of (a) the face amount of the letters of credit issued under the Exit LC Facility on the Plan Effective Date and (b) the cash collateralization percentage required by the issuing banks with respect to such letters of credit, which Exit LC Facility shall be secured (i) on a *pari passu* basis with the First Lien Term Facility and the Permitted Hedge Obligations, but will (together with the Permitted Hedge Obligations) rank ahead of the First Lien Term Facility, on a "first-out" basis, in the payment waterfall in the applicable Intercreditor Agreement and (ii) on a senior basis to the Exit SLTL Facility.

**REFINANCING FACILITY:**    The First Lien Term Facility Documentation will permit the Borrower to refinance First Lien Term Loans from time to time, in whole, with one or more new term loan facilities (each, a "***Refinancing Term Facility***") under the First Lien Term Facility Documentation with the consent of

the Borrower and the institutions providing such Refinancing Term Facility or with (x) one or more series of senior unsecured notes and (y) one or more series of senior secured notes that will be secured by the Collateral on a *pari passu* or junior basis with the First Lien Term Facility, which will be subject to customary intercreditor arrangements in a form to be agreed (any such notes under clause (x) or (y), "***Refinancing Notes***"); *provided* that (i) any Refinancing Term Facility or Refinancing Notes shall not mature prior to the maturity date of, or have a shorter weighted average life to maturity than, the loans under the First Lien Term Facility being refinanced, (ii) any Refinancing Notes are not subject to any amortization prior to final maturity or are subject to the same amortization schedule as the loans under the First Lien Term Facility being refinanced and are not subject to mandatory redemption or prepayment (except customary asset sales or change of control provisions), (iii) the other terms and conditions of such Refinancing Term Facility or Refinancing Notes (excluding pricing and optional prepayment or redemption terms) are, when taken as a whole, not materially more favorable to the investors or lenders providing such Refinancing Term Facility or Refinancing Notes, as applicable, than those applicable to the First Lien Term Facility being refinanced (except for covenants or other provisions applicable only to periods after the latest final maturity date of the First Lien Term Facility existing at the time of such refinancing or to the extent such terms and conditions are added for the benefit of the existing First Lien Term Facility), (iv) except to the extent otherwise permitted under the First Lien Term Facility Documentation, the aggregate principal amount of any Refinancing Term Facility or Refinancing Notes shall not exceed the aggregate principal amount of the indebtedness and commitments being refinanced or replaced therewith, plus accrued and unpaid interest, penalties, premiums, fees, commissions, underwriting discounts and expenses related thereto, (v) the proceeds of such Refinancing Term Facility or Refinancing Notes shall be applied, substantially concurrently with the incurrence thereof, to the *pro rata* prepayment of outstanding loans under the applicable First Lien Term Facility being so refinanced, (vi) any Refinancing Term Facility or Refinancing Notes that is *pari passu* with the First Lien Term Facility being refinanced in right of payment and security shall share ratably in any mandatory prepayment of the First Lien Term Loans unless the Borrower and the lenders or holders in respect of such Refinancing Term Facility or Refinancing Notes elect lesser payments, and (vii) any Refinancing Term Facility and Refinancing Notes will (A) have the same guarantors and rank on the same or more junior basis in right of payment as the tranche being refinanced or replaced and (B) be secured by the Collateral with the same or more junior priority as the tranche being refinanced or replaced, or be unsecured (and to the extent subordinated in right of payment or security, subject to a customary subordination and intercreditor agreement, as applicable).

**PURPOSE:**   The proceeds of any First Lien Term Loans will be deemed used by the Borrower, on the Plan Effective Date (the "***Closing Date***") to refinance

C-7

certain prepetition indebtedness of the Borrower and its subsidiaries, including without limitation the entirety of the Prepetition First Lien Term Loans, pay fees and expenses in connection therewith and to finance other general corporate purposes of the Borrower and its subsidiaries and, after the Closing Date, to finance the working capital needs and other general corporate purposes of the Borrower and its subsidiaries.

**AVAILABILITY:**   The full amount of the First Lien Term Facility (or such lesser amount as the Borrower shall request) must be drawn in a single drawing on the Closing Date; amounts borrowed thereunder that are repaid or prepaid may not be reborrowed.

**INTEREST RATES AND FEES:**   As set forth on ***Annex I*** hereto.

**DEFAULT RATE:**   At any time when a payment event of default under the First Lien Term Facility exists, any overdue principal or interest (after giving effect to any grace periods) payable under or in respect of the First Lien Term Facility not paid when due shall, upon the election of the Required Lenders, bear interest at the applicable interest rate plus 2% per annum. Other overdue amounts (after giving effect to any grace periods) shall, upon the election of the Required Lenders, bear interest at the interest rate applicable to ABR loans plus 2% per annum.

**FINAL MATURITY:**   The First Lien Term Facility will mature on the date that is four years after the Closing Date (the "***First Lien Term Loan Maturity Date***"); provided that the First Lien Term Facility Documentation shall provide the right for individual First Lien Term Lenders to agree to extend the maturity date of all or a portion of the outstanding loans under the First Lien Term Facility upon the request of the Borrower and without the consent of any other First Lien Term Lender; it being understood that each First lien Term Lender under the applicable tranche or tranches of the First Lien Term Facility that are being extended shall have the opportunity to participate in such extension on the same terms and conditions as each other First Lien Term Lender in such tranche or tranches (it further being understood that no existing First Lien Term Lender will have any obligation to commit to any such extension).

**GUARANTEES:**   All obligations of the Borrower under the First Lien Term Facility will be jointly and severally unconditionally guaranteed (the "***Guarantees***") by Holdings and by each existing and subsequently acquired or organized direct or indirect wholly-owned domestic restricted subsidiary of the Borrower (the "***Subsidiary Guarantors***" and, together with Holdings, the "***Guarantors***"; the Guarantors and the Borrower collectively, the "***Loan Parties***"); provided that Guarantors shall not include (unless at the option of the Borrower (and, in the case of a non-domestic subsidiary, with the consent of the Administrative Agent), such subsidiary is designated as a Guarantor by the Borrower) (a) unrestricted subsidiaries, (b) immaterial subsidiaries (to be defined in a manner to be

C-8

agreed upon based on assets or revenue and consistent with the First Lien Term Facility Documentation Principles), (c) any subsidiary that is prohibited by applicable law, rule or regulation (in each case, for so long as such prohibition or restriction remains in effect) or by any contractual obligation existing on the Closing Date (or, if later, the date it becomes a restricted subsidiary so long as any such restriction in any contract is not entered into in contemplation of such subsidiary becoming a subsidiary) from guaranteeing the First Lien Term Facility or which would require governmental (including regulatory) consent, approval, license or authorization to provide such Guarantee unless such consent, approval, license or authorization has been received, (d) any direct or indirect domestic subsidiary (i) substantially all the assets of which consist of the equity or debt of one or more direct or indirect subsidiary of the Borrower organized under the laws of any jurisdiction other than the United States, any state thereof or the District of Columbia (a "*Foreign Subsidiary*"), (ii) that is treated as a disregarded entity or partnership for U.S. federal income tax purposes and that holds equity of one or more Foreign Subsidiaries (an entity described in either (i) or (ii) a "*FSHCO*") or (iii) of a Foreign Subsidiary or a FSHCO, (e) any subsidiaries where the provision of a guaranty would result in material adverse tax consequences as reasonably determined by the Borrower, (f) any acquired restricted subsidiary to the extent that any Assumed Acquisition Debt (as defined below) incurred in connection therewith prohibits such subsidiary (or any restricted subsidiary thereof that guarantees such indebtedness) from becoming a Guarantor for so long as such prohibition exists or (g) any other domestic subsidiary with respect to which, in the reasonable judgment of the Administrative Agent and the Borrower, the cost or other consequences of providing the guarantee of, or granting liens to secure, the obligations under the First Lien Term Facility are excessive in view of the benefits to be obtained by the First Lien Term Lenders from such Guarantee (each of the subsidiaries set forth in the foregoing clause (a) through clause (g) being "*Excluded Subsidiaries*"); provided, that any subsidiary of the Borrower that is a borrower or guarantor in respect of the Exit LC Facility or the Exit SLTL Facility shall be a borrower or guarantor under the First Lien Term Facility.

**SECURITY:**     The obligations of the Borrower under the First Lien Term Facility and the Guarantees will be secured by (x) perfected first-priority security interests in substantially all of the assets of the Loan Parties (subject to certain exceptions set forth below and in the First Lien Term Facility Documentation), whether owned on the Closing Date or thereafter acquired (collectively, the "*Collateral*") including, but not limited to: (i) a perfected first-priority pledge of all the equity interests of the Borrower, (ii) oil and gas properties subject to a lien securing the Prepetition First Lien Term Loan Facility, (iii) substantially all of the property of the Loan Parties acquired in connection with 'Project Jazz' and (iv) a perfected first-priority pledge of all the equity interests held by the Borrower or any Subsidiary Guarantor in any restricted subsidiary (limited to no more than 65% of the outstanding voting interests and 100% of the outstanding non-voting equity interests of any Foreign

Subsidiary or FSHCO).

Notwithstanding anything to the contrary, the Collateral shall exclude certain property of the Loan Parties to be mutually agreed including, without limitation, the following: (i) motor vehicles and other assets subject to certificates of title) and commercial tort claims below a threshold to be agreed, (ii) "margin stock" (within the meaning of Regulation U) and pledges and security interests prohibited by applicable law, rule or regulation or agreements with any governmental authority or which would require governmental (including regulatory) consent, approval, license or authorization to provide such security interest unless such consent, approval, license or authorization has been received, in each case, after giving effect to the applicable anti-assignment provisions of the UCC, (iii) equity interests in any entities other than wholly-owned domestic restricted subsidiaries to the extent not permitted by the terms of such entities' organizational or joint venture documents, (iv) assets to the extent a security interest in such assets could result in an investment in "United States property" by a controlled foreign corporation within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended (or any similar law or regulation in any applicable jurisdiction) or otherwise result in a material adverse tax consequence, as reasonably determined by the Borrower, it being understood that no more than 65% of the outstanding voting equity interests and 100% of the outstanding non-voting equity interests of any Foreign Subsidiaries or FSHCO shall be included in the Collateral, (v) any lease, license or other agreement or any property subject to a purchase money security interest or similar arrangement to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement, purchase money or similar arrangement or create a right of termination in favor of any other party thereto (other than the Borrower or a Guarantor) after giving effect to the applicable anti-assignment provisions of the UCC, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition, (vi) any letter of credit rights (other than to the extent a lien thereon can be perfected by filing a UCC-1 financing statement), (vii) any assets over which the granting of security interests in such assets would be prohibited by an enforceable contractual obligation binding on the assets that existed at the time of the acquisition thereof and was not created or made binding on the assets in contemplation or in connection with the acquisition of such assets, applicable law or regulation (in each case, except to the extent such prohibition is unenforceable after giving effect to applicable provisions of the UCC, other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibitions) or to the extent that such security interests would require obtaining the consent of any Governmental Authority and such consent has not been obtained or would result in materially adverse tax consequences as reasonably determined by the Borrower in writing delivered to the Administrative Agent, (viii) any right, title or interest in any license, contract or agreement or any right, title or interest

thereunder to the extent, but only to the extent, that such a grant would violate the terms of applicable law or of such license, contract or agreement, or result in a breach of the terms of, or constitute a default under, any such license, contract or agreement or if the contract or agreement in which such lien is granted prohibits or requires the consent of any person (other than the Loan Parties) as a condition to the creation of any other security interest on such equipment or asset (other than to the extent that any such term would be rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 UCC or any other applicable law or regulation (including Title 11 of the United States Code) or principles of equity); provided that, immediately upon the ineffectiveness, lapse or termination of any such provision, the Collateral shall include all such rights and interests as if such provision had never been in effect, (ix) those assets as to which the Administrative Agent and the Borrower reasonably agree that the cost of obtaining such a security interest or perfection thereof are excessive in relation to the benefit to the First Lien Term Lenders of the security to be afforded thereby, (x) equity interests in (A) immaterial subsidiaries (other than a guarantor) (or any person that is not a subsidiary which, if a subsidiary would constitute an immaterial subsidiary) and (B) any acquired subsidiary that is subject to the limitations of an Assumed Acquisition Debt incurred in connection therewith, (xi) other equity interests to be agreed giving due consideration to the First Lien Term Facility Documentation Principles, (xii) intellectual property requiring filing in a jurisdiction outside of the United States and any "intent-to-use" trademark applications prior to the filing of a "Statement of Use", "Amendment to Allege Use" or similar notice with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law, (xiii) except with respect to Guarantors that are non-U.S. entities, if any, actions outside of the United States in order to create or perfect any security interest in any asset located outside of the United States, and foreign law security or pledge agreements or foreign intellectual property filings, searches or schedules, (xiv) the Trust A NPI, the Trust A Account and any amount held therein, any interest in Trust A or the Letters of Credit (each as defined in the Apache Decommissioning Agreement) (or any personal property re-characterization thereof), (xv) oil and gas properties that in the aggregate represent less than 5% of the PV-9 of the Loan Parties' total proved reserves and (xvi) other exceptions to be mutually agreed upon (the foregoing described in clauses (i) through (xvi) are, collectively, the "***Excluded Assets***").

Notwithstanding anything to the contrary, no Loan Party shall be required, nor shall the Administrative Agent be authorized, (i) to perfect the above-described pledges, security interests and mortgages by any means other than by (A)(1) filings pursuant to the UCC in the office of the secretary of state (or similar central filing office) of the relevant States and (2) filings in the applicable real estate records with respect to real properties included in the Collateral or fixtures relating to such real

properties, (B) filings in the USPTO and/or USCO, as applicable, with respect to intellectual property as expressly required in the First Lien Term Facility Documentation, (C) mortgages in respect of oil and gas properties and fee-owned real property included in the Collateral and (D) subject to the Intercreditor Agreements referred to below, delivery to the Administrative Agent of all stock certificates, intercompany notes and other instruments (to the extent such intercompany note or other instrument is in an amount in excess of an amount to be agreed) to be held in its possession, in each case as expressly required in the First Lien Term Facility Documentation, (ii) to enter into any control agreement with respect to any deposit account, securities account or commodities account, (iii) to take any action (other than the actions listed in clause (D) above) with respect to any assets located outside of the United States, or (iv) to take any actions in any jurisdiction other than the United States (or any political subdivision thereof) or enter into any collateral documents governed by the laws of any country other than the United States.

**INTERCREDITOR AGREEMENTS:**   Subject to the First Lien Term Facility Documentation Principles, the lien priority, relative rights and other creditors' rights issues between and among the holders of the Exit LC Facility, the holders of the First Lien Term Loans and the holders of the loans under the Exit SLTL Facility will be set forth in one or more intercreditor agreements (the "***Intercreditor Agreements***") reasonably satisfactory to the Borrower and the Administrative Agent.

**MANDATORY PREPAYMENTS:**   (a)       100% of the net cash proceeds of Asset Sales (to be defined consistent with the First Lien Term Facility Documentation Principles) of the type described in clause (f)(iii) of  the section titled "*Negative Covenants*" below; *provided*, that the Borrower shall have the right to reinvest 100% of such net cash proceeds if such proceeds are reinvested within 12 months; *provided*, *however*, that, in the event the aggregate amount of such net cash proceeds shall exceed $100 million during the term of the First Lien Term Facility, the Borrower agrees to prepay an aggregate principal amount of First Lien Term Loans equal to 50% of such excess net cash proceeds and shall have the right to reinvest the remaining 50% of such excess net cash proceeds in accordance with the terms of this clause (a); and

(b)       100% of the net cash proceeds of issuances, offerings or placements of debt obligations of Holdings and its restricted subsidiaries (except the net cash proceeds of any permitted debt (other than the proceeds of any Refinancing Term Facility or Refinancing Notes)).

The above-described mandatory prepayments will be without premium or penalty (but subject to reimbursement of applicable lenders' redeployment costs in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period).

Any First Lien Term Lender may elect not to accept its pro rata portion

of any mandatory prepayment (each, a "***Declining Lender***"), but, in the case of <u>clause (b)</u> above, solely to the extent the relevant prepayment does not represent a refinancing of the First Lien Term Facility. Any prepayment amount declined by a Declining Lender may be retained by the Borrower (such retained amounts, the "***Declined Proceeds***").

Mandatory prepayments required under the First Lien Term Facility Documentation may, if required pursuant to the terms of any other indebtedness secured *pari passu* with the First Lien Term Facility, be applied to the First Lien Term Loans and such other *pari passu* indebtedness, in each case on a ratable basis based on the outstanding principal amounts thereof.

|  |  |
|---|---|
| **VOLUNTARY PREPAYMENTS:** | Prepayments of borrowings under the First Lien Term Facility (other than, for the avoidance of doubt, any reduction of First Lien Term Loans in connection with a permitted assignment thereof to an Affiliated Lender (to be defined in a manner consistent with the First Lien Term Facility Documentation Principles) will be permitted at any time, in minimum principal amounts to be agreed upon, subject to customary notice requirements (subject to reimbursement of the First Lien Term Lenders' redeployment costs (other than lost profits) in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period) and subject to a prepayment premium in the amount of (i) if on or prior to the six month anniversary of the Closing Date, 1.00% of the total amount of the First Lien Term Loans so prepaid and (ii) if after the six month anniversary of the Closing Date, 0.00% of the total amount of the First Lien Term Loans so prepaid. |
| **UNRESTRICTED SUBSIDIARIES:** | The First Lien Term Facility Documentation will contain provisions pursuant to which, subject to certain limitations consistent with the First Lien Term Facility Documentation Principles, the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary of the Borrower as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a restricted subsidiary. |
| **DOCUMENTATION:** | The definitive documentation for the First Lien Term Facility (the "***First Lien Term Facility Documentation***") will be documented under a single credit agreement, will contain the terms set forth in this ***Exhibit C*** and, to the extent not covered by this ***Exhibit C***, will be substantially consistent with the Prepetition First Lien Term Loan Agreement, with changes and modifications in a manner appropriate to reflect post-bankruptcy status of Borrower and the Guarantors, taking into account the nature of the assets, operations and condition of the Borrower post-emergence, including changes and modifications to remove any terms and provisions related to a borrowing base, delivery of reserve reports, reserve-based loan reporting requirements and, in each case, requirements associated therewith (collectively, for purposes of this ***Exhibit C***, the "***First Lien Term Facility Documentation Principles***"). The First Lien Term Facility Documentation will be negotiated in good faith within a reasonable time period to be determined based on the |

expected Closing Date.

For purposes of calculating Consolidated EBITDA, Consolidated Total Assets and financial ratios, *pro forma* effect will be given to acquisitions and other investments (other than in the ordinary course of business), material dispositions and certain other specified transactions on a basis consistent with the First Lien Term Facility Documentation Principles.

**REPRESENTATIONS AND WARRANTIES:**

The First Lien Term Facility Documentation shall contain usual and customary representations and warranties for financings of this type and consistent with the First Lien Term Facility Documentation Principles.

**CONDITIONS PRECEDENT:**

The closing of the First Lien Term Facility will be subject to satisfaction of the following: (a) all of the representations and warranties in the First Lien Term Facility Documentation shall be true and correct in all material respects (or if qualified by materiality or material adverse effect, in all respects) as of the date of such extension of credit, or if such representation speaks as of an earlier date, as of such earlier date; (b) no default or event of default under the First Lien Term Facility shall have occurred and be continuing or would result from such extension of credit; (c) delivery of a customary borrowing notice and (d) the occurrence of those conditions listed on Annex II hereto.

**AFFIRMATIVE COVENANTS:**

The First Lien Term Facility Documentation shall contain usual and customary affirmative covenants for financings of this type and consistent with the First Lien Term Facility Documentation Principles.

The Borrower agrees to establish a segregated account (the "*Jazz Account*") to be funded on a monthly basis with 75% of operating cash flow from a specified Jazz field (which has been identified to certain of the Prepetition First Lien Term Lenders' advisors as "Swordfish") which amounts shall be used to pay for any P&A liabilities for such field. Borrower shall provide quarterly reporting with respect to the Jazz Account in form reasonably acceptable to the Administrative Agent, commencing with the fiscal quarter ending in the second fiscal quarter after the Closing Date.

The Borrower agrees that, so long as Franklin Resources, Inc. shall hold at least 25% of the aggregate amount of the loans and commitments under the First Lien Term Facility, it shall be entitled to appoint one member to the board of directors of Holdings.

**NEGATIVE COVENANTS:**

The First Lien Term Facility Documentation shall contain negative covenants (to be applicable to the Borrower and its restricted subsidiaries and, with respect to the passive holding company covenant only, Holdings) consistent with the First Lien Term Facility Documentation Principles, subject to the following and other exceptions including (x) a Cumulative Credit Basket (to be defined in a manner consistent with the First Lien Term Facility Documentation Principles) that may be used for dividends and other restricted payments (including, without limitation,

restricted debt payments) and (y) other exceptions consistent with the First Lien Term Facility Documentation Principles to be mutually agreed (including certain dollar baskets growing based off of a percentage of Consolidated EBITDA) (a "***Builder Component***"):

(a)      limitations on dividends on, and redemptions and repurchases of, equity interests and other restricted payments ("***Restricted Payments***") (which shall permit, among other exceptions, (i) Restricted Payments in an amount not to exceed the Cumulative Credit Basket so long as (x) no event of default exists at the time of the declaration thereof or would result therefrom and (y) after giving effect to such Restricted Payment the *pro forma* Total Net Leverage Ratio would not exceed 2.00:1.00, (ii) a general Restricted Payments basket in an amount not to exceed the greater of an amount to be agreed and a Builder Component (the "***Restricted Payment General Basket***"), so long as no event of default has occurred and is continuing or would result therefrom, a general basket and (iii) Restricted Payments, made as tax distributions to Holdings (or a direct or indirect parent) in an amount equal to Holdings' (or such parent's) tax obligations paid on the income of Borrower and its subsidiaries);

(b)      limitations on cash prepayments, redemptions, and repurchases ("***Specified Prepayments***") of Subordinated Indebtedness (to be defined in a manner consistent with the First Lien Term Facility Documentation Principles) (which shall permit, among other exceptions, (i) regularly scheduled cash interest payments and payments of fees, expenses and indemnification obligations, (ii) Specified Prepayments of Subordinated Indebtedness; *provided* that (x) no payment or bankruptcy event of default has occurred and is then continuing or would result therefrom and (y) the First Lien Net Leverage Ratio (as defined below) on a pro forma basis after such prepayment, redemption or repurchase does not exceed 2.00:1.00, and (iii) a general Specified Prepayments basket in an amount not to exceed the greater of an amount to be agreed and a Builder Component, so long as no event of default has occurred and is continuing or would result therefrom);

(c)      limitations on liens (which shall permit, among other exceptions, (i) liens securing Permitted Ratio Debt (as defined below), Incremental Term Loans and/or Incremental Equivalent Debt, in each case, other than to the extent incurred under the unsecured indebtedness component of the definition thereof, (ii) liens securing the Exit LC Facility and any Permitted Hedge Obligations on a *pari passu* "first-out" basis, (iii) liens securing the Exit SLTL Facility on a junior basis, (iv) liens on assets owned by, and on the equity of non-Loan Parties securing permitted debt of, non-Loan Parties, (v) liens securing Assumed Acquisition Debt (secured only by acquired assets and not incurred in anticipation thereof), (vi) liens securing debt permitted under clause (e) (iv) below, (vii) a general lien basket securing debt in an amount not to exceed an amount to equal the general debt basket in clause (e)(v) below (including a Builder Component), (viii) liens arising under the Apache

Decommissioning Agreement and in connection with any Letter of Credit (as defined in the Apache Decommissioning Agreement) required to be delivered pursuant to the Apache Decommissioning Agreement and (ix) other liens so long as (x) in the case of any *pari passu* liens, the Borrower is in pro forma compliance with a Total Net Leverage Ratio of 2.00:1.00 and (y) in the case of any junior liens, the Borrower is in pro forma compliance with a Total Net Leverage Ratio of 2.50:1.00;

(d)      limitations on Investments (to be defined in a manner consistent with the First Lien Term Facility Documentation Principles) (which shall permit, among other exceptions, (i) investments in any Subsidiary Guarantors, (ii) intercompany investments in connection with cash management in the ordinary course of business, (iii) investments in any Similar Business (to be defined as mutually agreed) in an aggregate amount not to exceed $300 million and 5% of total assets, (iv) a general basket for investments not to exceed $300 million and 5% of total assets, (v) additional investments in joint ventures not to exceed $100 million, (vi) re-organizations and other activities related to tax planning and reorganization so long as, after giving effect thereto, the security interest of the First Lien Term Lenders in the Collateral, taken as a whole, is not materially impaired and (vii) other investments so long as no event of default then exists or would result therefrom and the Borrower is in pro forma compliance with a Total Net Leverage Ratio of 2.00:1.00; *provided*, if any investment is made in any person pursuant to clause (iii), (iv) or (v) that becomes the Borrower or a Subsidiary Guarantor after the date of such investment, such investment shall thereafter be deemed to have been made pursuant to clause (i) and not clause (iii), (iv) or (v), as applicable; *provided*, *further*, that investments in unrestricted subsidiaries shall not exceed $100 million in the aggregate at any time outstanding and shall be limited to investments made of the nature that are customary in the oil and gas business;

(e)      limitations on debt, guarantees and hedging arrangements (which shall permit, among other exceptions, (i) debt (x) assumed in connection with any acquisition or similar investment (and not incurred in contemplation thereof) so long as the Total Net Leverage Ratio does not exceed 2.00:1.00 (debt incurred under this clause (i) being, "***Assumed Acquisition Debt***"), or (y) constituting adjustments of purchase price or "earn outs" entered into in connection with acquisitions, (ii) purchase money indebtedness and capital leases (including any indebtedness incurred in connection with sale-leaseback transactions) outstanding on the Closing Date and additional purchase money indebtedness and capital leases (including any indebtedness incurred in connection with sale-leaseback transactions) not to exceed the greater of (x) $150 million and (y) 2.5% of consolidated total assets of the Borrower, (iii) other indebtedness so long as (x) in the case of indebtedness that is secured by a lien on the Collateral ranking *pari passu* with the liens securing the First Lien Term Facility, the *pro forma* Total Net Leverage Ratio does not exceed 2.00:1.00, (y) in the case of indebtedness that is secured by a lien on the Collateral ranking junior to

the liens securing the First Lien Term Facility, the *pro forma* Total Net Leverage Ratio does not exceed 2.50:1.00, and (z) in the case of unsecured debt, the *pro forma* Total Net Leverage Ratio does not exceed 3.00:1.00 (debt incurred under this clause (iii) being, "***Permitted Ratio Debt***"); *provided* that (1) if such Permitted Ratio Debt is secured by a lien on the Collateral that is *pari passu* with the liens securing the First Lien Term Facility, then the proceeds of the Permitted Ratio Debt shall be used solely to finance acquisitions or similar investments and shall not be incurred prior to the six month anniversary of the Closing Date, (2) any Permitted Ratio Debt consisting of term loans secured by a lien on the Collateral ranking *pari passu* with the liens securing the First Lien Term Facility shall be subject to the MFN Protection and (3) any Permitted Ratio Debt shall be subject to the Required Debt Terms, (iv) debt in respect of hedge agreements entered into in the ordinary course of business and not for speculative purposes, (v) a general debt basket not to exceed the greater of an amount to be agreed and a Builder Component (the "***General Debt Basket***"), (vi) debt in respect of the Exit LC Facility, (vii) debt in respect of an exit second lien term facility in an aggregate principal amount not to exceed $518 million (the "***Exit SLTL Facility***"), (viii) debt incurred in respect of any Letters of Credit (as defined in the Apache Decommissioning Agreement) required to be issued pursuant to the Apache Decommissioning Agreement, (ix) in the case of the foregoing clauses (i) through (iii) and (v) through (viii) Permitted Refinancing Debt in respect thereof and (x) debt arising under the Apache Decommissioning Agreement;

(f)      limitations on Asset Sales (including sale leasebacks and sales of equity of subsidiaries) (which Asset Sales shall permit, among other exceptions, any conveyance, sale, lease, sale and leaseback, assignment transfer or other disposition so long as (i) such disposition is made fair market value, (ii) not less than 75% of such the consideration for such disposition shall be in the form of cash (subject to customary qualifications for non-cash consideration, including that any liabilities assumed by the transferee or that are otherwise cancelled or terminated in connection with such disposition shall be deemed to be cash) and (iii) the Borrower shall make a mandatory prepayment of any net cash proceeds received by it as and to extent required pursuant to the section titled "*Mandatory Prepayments*" above);

(g)      limitations on transactions with affiliates;

(h)      limitations on restrictions on ability of restricted subsidiaries to pay dividends or make distributions and limitations on negative pledge agreements (subject to customary exceptions for debt permitted to be incurred by the covenant described under clause (e) above);

(i)      passive nature of Holdings' business (or the business of any subsidiary of Holdings that owns, directly or indirectly, equity interests of the Borrower) and inability of Holdings' to incur indebtedness;

(j)      restrictions on amendments to the documentation governing the Exit Second Lien Term Facility, any other permitted junior debt, the Apache Decommissioning Agreement and any similar documentation entered into in connection with the Jazz acquisition; and

(k)      restrictions on hedging and swap agreements (other than agreements with counterparties having a rating of BBB- or Baa3 or better or an investment grade-rated participant ("*Eligible Counterparties*") the net notional volumes for which do not exceed in the aggregate, as of the date of the latest hedging transaction, 75% of the reasonably anticipated oil and natural gas production from PDP reserves as forecast based upon the Company's most recent reserve report and/or business plan, as applicable (and including PDP with respect to oil and gas properties to be acquired pursuant to a permitted transaction)) (the obligations under such agreements, the "*Permitted Hedge Obligations*"); *provided*, the Company shall enter into within 90 days of the Closing Date and, thereafter, maintain hedging and swap agreements with Eligible Counterparties with respect to at least 25% of the rolling 12 month oil and natural PDP (i) initially, as set forth in the Company's most recent reserve report as of the Closing Date and (ii) thereafter, tested semi-annually, based off the Company's most recent reserve report as of such date.

| | |
|---|---|
| **FINANCIAL COVENANT:** | Maximum total net leverage coverage ratio (the "*Total Net Leverage Ratio*") of no greater than 4.00:1.00. The Total Net Leverage Ratio shall be tested as of the last day of each fiscal quarter of the Borrower, commencing with the first full fiscal quarter ending after the Closing Date. |

Maximum first lien senior secured net leverage coverage ratio (the "*First Lien Net Leverage Ratio*") of no greater than: (i) 2.50:1.00 for the first two fiscal quarters ending after the Closing Date and (ii) 2.25:1.00 for each fiscal quarter ending thereafter. The First Lien Net Leverage Ratio shall be tested as of the last day of each fiscal quarter of the Borrower, commencing with the first full fiscal quarter ending after the Closing Date.

Asset coverage ratio to be calculated as follows: (i) numerator based on the proved PV-10 value (which for the avoidance of doubt shall be burdened by all P&A obligations) calculated using strip prices (with the final year of the forward curves held constant and adjusted for basis differentials) plus the present value of hedges, plus any outstanding letters of credit securing P&A obligations where such letters of credit are junior to the first lien senior secured indebtedness (ii) denominator based on total first lien senior secured indebtedness as of the immediately preceding Test Date less unrestricted and restricted cash (the "*Asset Coverage Ratio*"), with the Asset Coverage Ratio required to be no less than 1.75:1.00. The Asset Coverage Ratio shall be tested, and each component of such calculation shall be measured as of the last day of the second and fourth fiscal quarter of the Borrower, commencing with the

fiscal quarter ending in the second fiscal quarter after the Closing Date (each a "***Test Date***"). The proved PV-10 value shall be based on an audited reserve report for one of the two annual tests and based on internal company analysis for the other test, in each case in form and substance reasonably satisfactory to the Administrative Agent.

The First Lien Term Facility Documentation will include customary equity cure provisions consistent with the First Lien Term Facility Documentation Principles.

**EVENTS OF DEFAULT:**                The First Lien Term Facility Documentation shall contain usual and customary events of default (with customary materiality thresholds and grace periods) for financings of this type and consistent with the First Lien Term Facility Documentation Principles.

**VOTING:**                Amendments and waivers of the First Lien Term Facility Documentation will require the approval of First Lien Term Lenders (other than Defaulting Lenders (as defined below)) holding more than 50% of the aggregate amount of the loans and commitments under the First Lien Term Facility (the "***Required Lenders***") (with amendments and waivers also requiring customary class votes), except that (a) the consent of each First Lien Term Lender directly affected thereby (but not the Required Lenders, other than in the case of clause (a)(ii), which shall require the consent of each First Lien Term Lenders increasing its commitments as well as the consent of the Required Lenders) shall be required with respect to: (i) modifications to *pro rata* payment, pro rata sharing or payment waterfall provisions (other than for purposes of any amendment that would extend the final maturity date of any First Lien Term Loans and certain other exceptions, in each case, on terms to be agreed upon), (ii) increases in the commitment of such First Lien Term Lenders, (iii) reductions or forgiveness of principal, interest, premiums, fees, or reimbursement obligations payable to such First Lien Term Lenders (it being understood that any change in any definition applicable to any ratio used in the calculation of such rate of interest or fees) (or any component definition thereof) shall not constitute a reduction in any rate of interest or any fee) and (iv) extensions of final maturity or scheduled amortization of the loans or commitments of such First Lien Term Lenders or of the date for payment to such First Lien Term Lenders of any interest, premiums, fees or any reimbursement obligation and (b) the consent of each First Lien Term Lenders shall be required with respect to (i) modifications to voting requirements or percentages and (ii) releases of all or substantially all of the value of the Guarantees, or all or substantially all of the Collateral.

The Borrower or the Administrative Agent shall, subject to usual and customary conditions (including, in the case of clauses (a) and (d) below, any applicable prepayment premium), have the right to replace a First Lien Term Lenders or terminate the commitment of a First Lien Term Lenders on a non-*pro rata* basis (a) in connection with amendments and waivers requiring the consent of all First Lien Term Lenders or of all

First Lien Term Lenders directly affected thereby so long as the consent of the Required Lenders has been obtained, (b) if such First Lien Term Lenders asserts a claim for any funding protection, whether for increased costs, taxes, required indemnity payments or otherwise, (c) if such First Lien Term Lenders is a Defaulting Lender, or (d) if such First Lien Term Lenders elects not to participate in any "amend and extend" transaction.

**DEFAULTING LENDERS:**   The First Lien Term Facility Documentation shall contain customary provisions relating to "defaulting" First Lien Term Lenders ("***Defaulting Lenders***") consistent with the First Lien Term Facility Documentation Principles.

**COST AND YIELD PROTECTION:**   The First Lien Term Facility Documentation shall contain customary provisions relating to cost and yield protection consistent with the First Lien Term Facility Documentation Principles.

**ASSIGNMENTS AND PARTICIPATIONS:**   The First Lien Term Lenders will be permitted to assign (other than to Disqualified Lenders (as such term shall be defined as mutually agreed)) First Lien Term Loans under the First Lien Term Facility with the consent of the Borrower and the Administrative Agent, in each case, not to be unreasonably withheld or delayed (it being understood that (i) the withholding of consent by the Borrower to any assignment to a Disqualified Lender shall be deemed reasonable and (ii) the Borrower will be deemed to have consented to an assignment of First Lien Term Loans if it has not responded a request for consent to such assignment within 10 business days after receipt of written request therefor); *provided* that such consent shall not be required, (i) if such assignment of any loan or commitment under the First Lien Term Facility is made to another First Lien Term Lender or an affiliate or approved fund of any First Lien Term Lenders or (ii) in the case of the Borrower, if a payment or bankruptcy event of default has occurred and is continuing.  Each assignment will be in the minimum amount of and in integral multiples of $1,000,000 or, if less, all of such First Lien Term Lender's remaining loans and commitments of the applicable class.

The First Lien Term Lenders will have the right to participate their commitments and loans to other persons (other than any natural persons, Specified Equity Holders (to be defined in a manner consistent with the First Lien Term Facility Documentation Principles), Holdings, the Borrower, or any of their respective subsidiaries, any Affiliated Lender and any Disqualified Lenders (to the extent that a list (together with any supplements thereto) of Disqualified Lenders has been made available to the First Lien Term Lenders)). Participants shall have the same benefits as the First Lien Term Lenders with respect to yield protection and increased cost provisions, subject to customary limitations and restrictions. Voting rights of participants shall be limited solely to those matters set forth in clauses (i) and (ii) under the first paragraph under the heading "Voting" with respect to which the affirmative vote of the First

Lien Term Lenders from which it purchased its participation would be required. Pledges of loans in accordance with applicable law shall be permitted without restriction. The Administrative Agent shall have no responsibility to ensure that the foregoing limitations as to participations are observed by the First Lien Term Lenders.

Assignments of First Lien Term Loans to Specified Equity Holders and their respective affiliates or Holdings, the Borrower or any of their respective subsidiaries shall be permitted on terms and subject to limitations consistent with the First Lien Term Facility Documentation Principles (except that such assignments shall be permitted so long as no payment or bankruptcy event of default shall exist); *provided*, that (i) for any Required Lender vote, Debt Fund Affiliates (to be defined as mutually agreed) may not, in the aggregate, account for more than 49.9% of the amounts included in determining whether the Required Lenders have consented to the relevant amendment, waiver or other action and (ii) for any Required Lender vote, non-Debt Fund Affiliates may not, in the aggregate, account for more than 30% of the amounts included in determining whether the Required Lenders have consented to the relevant amendment, waiver or other action.

**REPLACEMENT OF ADMINISTRATIVE AGENT:**

The Administrative Agent may resign or, if it or a controlling affiliate thereof becomes subject to a bankruptcy or insolvency event, be removed by the Borrower or the Required Lenders, in each case upon 10 days' notice by the applicable parties and, in each case, subject to the appointment of a successor administrative agent. Such successor shall be appointed by the Required Lenders and approved by the Borrower, which approval shall not be unreasonably withheld; *provided* that such approval shall not be required during the continuance of a payment or bankruptcy event of default. The Borrower shall have no obligation to pay any fee to any successor that is greater than or in addition to the fees payable to the Administrative Agent on the Closing Date.

**EXPENSES AND INDEMNIFICATION:**

The Borrower will indemnify the Administrative Agent, the First Lien Term Lenders, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, and representatives of each of the foregoing (each, an "***Indemnified Person***"), within 30 days after receipt of a written request together with customary backup documentation in reasonable detail, from and against any and all reasonable and documented (in reasonable detail) out-of-pocket costs, expenses (including reasonable fees, disbursements and other charges of counsel (limited to one counsel for all Indemnified Persons, taken as a whole and, if reasonably necessary a single local counsel for all Indemnified Persons taken as a whole in each relevant material jurisdiction (which may be a single local counsel acting in multiple material jurisdictions) (unless there is an actual or perceived conflict of interest in which case each such Indemnified Person may, with the consent of the Borrower (not to be unreasonably withheld or delayed), retain its own counsel))), damages, losses and liabilities of such Indemnified Person arising out of or relating to any claim or any

litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by Holdings, the Borrower or any of their respective affiliates or equity holders) that relates to the Transactions, including the financing contemplated hereby; *provided* that no Indemnified Person will be indemnified for any cost, expense or liability from (i) its willful misconduct, bad faith or gross negligence (as determined by a court of competent jurisdiction in a final and non-appealable decision), (ii) a material breach of the obligations of an Indemnified Person or any Indemnified Person's controlled affiliates under the First Lien Term Facility Documentation (as determined by a court of competent jurisdiction in a final and non-appealable decision) or (iii) any proceeding that is brought by an Indemnified Person against any other Indemnified Person (other than an agent under the definitive documentation acting in its capacity as such or any claims arising out of an act or omission on the part of the Borrower or any of its affiliates, to all of which this indemnity shall be applicable). In addition, if the Closing Date occurs, the Borrower shall pay (a) all reasonable and documented out-of-pocket expenses (including, without limitation, reasonable fees, disbursements and other charges of one primary counsel and, if reasonably necessary, a single local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions)) of the Administrative Agent in connection with the preparation and administration of the definitive documentation, and amendments, modifications and waivers thereto, and (b) all reasonable and documented out-of-pocket expenses (including, without limitation, if reasonably necessary, fees, disbursements and other charges of one primary counsel and, if reasonably necessary, a single local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions)) of the Administrative Agent and the First Lien Term Lenders for enforcement costs and documentary taxes associated with the First Lien Term Facility.

**CONFIDENTIALITY:**    The First Lien Term Facility Documentation will contain customary confidentiality provisions with respect to information regarding Holdings, the Borrower, their respective subsidiaries, their business, operations, assets and related matters, which shall in any event prohibit disclosure of any confidential information to competitors.

**GOVERNING LAW AND FORUM:**    New York.

**COUNSEL TO ADMINISTRATIVE AGENT:**    [_____].

**ANNEX I**
**To Exhibit A**

**INTEREST RATES:**     The interest rates under the First Lien Term Facility will be as follows:

At the option of the Borrower, Adjusted LIBOR plus 5.25% or ABR plus 4.25% (the "***Initial Rate***"), with such rate to automatically increase 300 basis points in the event that the Debt Rating (as defined below) falls below B3 or B- for at least one full fiscal quarter and so long as it remains below such rating.

"***Debt Rating***"   means, as of any date of determination, the rating as determined by either S&P or Moody's (collectively, the "***Debt Ratings***"), as applicable, of the Borrower's first lien senior secured long-term debt; *provided* that (i) until the date that an initial Debt Rating shall be determined, the Initial Rate shall apply, (ii) if the respective Debt Ratings issued differ then the rate applicable to the lower of such Debt Ratings shall apply and (iii) if the Borrower has only one Debt Rating, the rate for such Debt Rating shall apply.  If either the rating system of S&P or Moody's shall change in a manner that directly and materially impacts the pricing or if both S&P and Moody's shall cease to be engaged in the business of rating debt, then in either case, the Borrower and the Required Lenders shall negotiate in good faith to amend the references to the Debt Rating(s) to reflect such changed rating system or to replace such rating system with an alternative measurement scheme, as applicable, and pending the effectiveness of any such amendment, the ratings of such rating agency most recently in effect prior to such change or cessation shall be employed in determining the pricing.

The Borrower may elect interest periods of one, two, three or six months (or 12 months or a shorter period if available to all First Lien Term Lenders) (each, an "***Interest Period***") for Adjusted LIBOR borrowings.

Calculation of interest shall be on the basis of the actual number of days elapsed over a 360-day year (or 365- or 366-day year, as the case may be, in the case of ABR loans based on the Prime Rate) and interest shall be payable (i) in the case of ABR loans, quarterly in arrears and (ii) in the case of Adjusted LIBOR loans at the end of each interest period and, in any event, at least every three months.

"***ABR***" is the Alternate Base Rate, which is the highest of (i) the Administrative Agent's Prime Rate, (ii) the Federal Funds Effective Rate plus 1/2 of 1.0% and (iii) one-month Adjusted LIBOR plus 1.0%.

"***Adjusted LIBOR***" is the London interbank offered rate (or a comparable successor rate which rate is reasonably approved by the Administrative Agent and the Borrower and applied in a manner consistent with market practice) for eurodollar deposits for a period equal to the applicable Interest Period appearing on the LIBOR01 Page that displays the Intercontinental Exchange Benchmark Administration Interest Settlement Rate for deposits in Dollars with a term equivalent to such Interest Period,; *provided* that Adjusted LIBOR will at all times be adjusted for statutory reserves and shall be deemed to be not less than 1.00%.

*Annex II*

**PROJECT PELICAN**

**SUMMARY OF CONDITIONS PRECEDENT**

The borrowing under the First Lien Term Facility shall be subject only to the following conditions precedent:

1.   A final non-appealable order of the Bankruptcy Court confirming the Plan in form and substance reasonably satisfactory to the Administrative Agent, which shall not have been reversed, vacated, amended, supplemented or otherwise modified in any manner that could reasonably be expected to adversely affect the interest of the First Lien Term Lenders (the "*Confirmation Order*") and authorizing the Borrower to execute, deliver and perform under all documents contemplated under the First Lien Term Facility Documentation shall have been entered and shall have become a final order of the Bankruptcy Court.

2.   The execution and delivery by each of the Loan Parties of (i) the First Lien Term Facility Documentation (including the Intercreditor Agreements (which may be limited to an acknowledgement by the Loan Parties)), (ii) customary legal opinions, customary evidence of authorization, customary officer's certificates, good standing certificates (to the extent applicable) in the jurisdiction of organization of each Loan Party, (iii) a solvency certificate substantially in the form of ***Annex III*** hereto executed by the chief financial officer or other officer of equivalent duties and (iv) all documents and instruments required to create and perfect the Administrative Agent's security interests in the Collateral under the First Lien Term Facility, which shall be, if applicable, in proper form for filing.

3.   The Administrative Agent shall have received (a) audited consolidated balance sheets and related statements of income and cash flows of the Borrower and its subsidiaries for the three most recently completed fiscal years ended at least 105 days before the Closing Date (the receipt of such financial statements for 2015 and 2016 being acknowledged by the First Lien Term Lenders) and (b) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its subsidiaries for each subsequent fiscal quarter (other than fiscal year end) ended at least 60 days before the Closing Date.

4.   The Administrative Agent shall have received *pro forma* financial statements consisting of a *pro forma* consolidated balance sheet and *pro forma* consolidated statements of income as of and for the twelve month period ending on the last day of the recently completed four fiscal quarter period ended at least 60 days before the Closing Date.

5.   The Administrative Agent shall have received, at least 3 business days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, that has been requested in writing by the First Lien Term Lenders at least 10 business days prior to the Closing Date.

6.   All fees required to be paid on the Closing Date pursuant to the Fee Letter and this Term Sheet and reasonable and documented out-of-pocket expenses (including legal expenses) required to be paid on the Closing Date pursuant to this Term Sheet, to the extent invoiced at least 3 business days prior to the Closing Date, shall, upon the initial borrowing of the First Lien Term Facility, have been paid.

7.   The representations and warranties of the Loan Parties set forth in the First Lien Term Facility Documentation shall be true and correct in all material respects (or, in the case of any such representation that is qualified by materiality, in all respects).

8.   No default or event of default shall exist or would result from the consummation of the Transactions.

*Annex III*

## FORM OF SOLVENCY CERTIFICATE

[_____][__], 20[__]

This Solvency Certificate is being executed and delivered pursuant to Section [__] of that certain [●] (the "***Credit Agreement***"; the terms defined therein being used herein as therein defined).

I, [_____], a Financial Officer (or other officer of equivalent duties) of the Borrower (after giving effect to the Transactions), in such capacity and not in an individual capacity, hereby certify on behalf of the Borrower as follows:

        1.      The sum of the debt and liabilities (subordinated, contingent or otherwise) of the Borrower and its subsidiaries, on a consolidated basis, does not exceed the fair value of the present assets of the Borrower and its subsidiaries, on a consolidated basis.

        2.      The capital of the Borrower and its subsidiaries, on a consolidated basis, is not unreasonably small in relation to their business as conducted or contemplated to be conducted on the date hereof.

        3.      The Borrower and its subsidiaries, on a consolidated basis, have not incurred and do not intend to incur, or believe that they will incur, debts or other liabilities, including current obligations, beyond their ability to pay such debts or other liabilities as they become due (whether at maturity or otherwise).

        4.      In reaching the conclusions set forth in this Solvency Certificate, the undersigned has (i) reviewed the Credit Agreement and other Loan Documents referred to therein and such other documents deemed relevant and (ii) made such other investigations and inquiries as the undersigned has deemed appropriate.  The undersigned is familiar with the financial performance and prospects of the Borrower and its subsidiaries.

IN WITNESS WHEREOF, I have executed this Solvency Certificate on the date first written above.

[FIELDWOOD ENERGY LLC]

By: _____
Name:
Title:

## **EXHIBIT D**
## **EXIT SECOND LIEN TERM SHEET**

Attached.

**EXHIBIT D**

**PROJECT PELICAN**
**$518.0 MILLION SENIOR SECURED SECOND LIEN TERM LOAN FACILITY**
**"EXIT SLTL TERM SHEET"**

**SUMMARY OF PRINCIPAL TERMS AND CONDITIONS[1]**

| | |
|---|---|
| **CERTAIN PREPETITION DEBT FACILITIES AND INSTRUMENTS:** | The Borrower's (as defined below) senior secured first lien revolving credit facility provided by Citibank, N.A., as administrative agent, certain lenders party thereto from time to time and the other agents party thereto from time to time pursuant to that certain Credit Agreement dated as of September 30, 2013 (as amended, supplemented or otherwise modified from time to time, including pursuant to (i) that certain Amendment No. 1 to Credit Agreement dated as of February 25, 2014, (ii) that certain Amendment No. 2 to Credit Agreement dated as of April 8, 2015, and (iii) that certain Amendment No. 3 to Credit Agreement dated as of May 27, 2016). |

The Borrower's senior secured first lien term loan facility (the "*Prepetition First Lien Term Loan Facility*") pursuant to that certain First Lien Term Loan Credit Agreement, dated as of September 30, 2013, among the Borrower, Citibank, N.A. as administrative agent, the lenders party thereto from time to time and the other agents party thereto from time to time (as amended from time to time including pursuant to (i) that certain Amendment No. 1 to First Lien Term Loan Agreement dated as of February 25, 2014 and (ii) that certain Amendment No. 2 to First Lien Term Loan Agreement dated as of May 27, 2016) consisting of reserve-based term loans due 2020 and first lien term loans due 2018.

The Borrower's senior secured first lien "last out" term loan facility (the "*Prepetition FLLO Facility*") pursuant to that certain First Lien Last-Out Term Loan Agreement dated as of May 27, 2016, among the Borrower, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder, and the lenders from time to time party thereto (the "*Prepetition FLLO Lenders*").

The Borrower's senior secured second lien term loan facility pursuant to that certain Second Lien Term Loan Agreement dated as of September 30, 2013, among the Borrower, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder, and the lenders from time to time party thereto (as amended from time to time including pursuant to (i) that certain Amendment No. 1 to Second Lien Term Loan Agreement dated as of February 25, 2014, (ii) that certain Amendment No. 2 and Limited Waiver to Second Lien Term Loan Agreement dated as of May 27, 2016 and (iii) that certain Amendment No. 3 and Limited

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Restructuring Support Agreement (the "*Restructuring Support Agreement*") to which this Term Sheet is attached, including the term sheet for the $1.143 billion senior secured term loan facility attached to the Restructuring Support Agreement as *Exhibit C* (the "*Exit FLTL Term Sheet*") and the other exhibits attached to such Restructuring Support Agreement. In the event any such capitalized term is subject to multiple and differing definitions, the appropriate meaning thereof for purposes of this *Exhibit D* shall be determined by reference to the context in which it is used.

Waiver to Second Lien Term Loan Agreement dated as of May 27, 2016, the "***Prepetition Second Lien Credit Agreement***") (the loans outstanding under the Prepetition Second Lien Credit Agreement, "***Prepetition Second Lien Term Loans***").

The Borrower's senior secured second lien term loan facility pursuant to that certain Credit Agreement dated as of May 27, 2016 among the Borrower, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder and the lenders from time to time party thereto (as amended from time to time, including pursuant to that certain Amendment No 1 to the Sponsor Second Lien Credit Agreement dated as of September 29, 2017).

**BORROWER/HOLDINGS:**  Fieldwood Energy LLC, a Delaware limited liability company (the "***Borrower***"), all of the outstanding equity interests of which will, as of the Closing Date (as defined below), be owned directly by Fieldwood Energy Inc., a Delaware corporation ("***Holdings***").

**AGENT:**  [●], will act as sole administrative agent and collateral agent (collectively, in such capacities, the "***Second Lien Term Loan Agent***", and as used in this ***Exhibit D***, the "***Administrative Agent***").

**LENDERS:**  The Prepetition FLLO Lenders that elect to provide a commitment in respect of the Second Lien Term Facility (defined below) (collectively, the "***Second Lien Term Lenders***").

**EXIT SECOND LIEN TERM FACILITY:**  A senior secured amended and restated second lien term loan facility (the "***Second Lien Term Facility***" and the loans under such Second Lien Term Facility, the "***Second Lien Term Loans***") that shall become effective on the effective date of the Plan (the "***Plan Effective Date***") provided by each Second Lien Term Lender based on pro rata allocation of term loan commitments under the Prepetition FLLO Facility (collectively, the "***Second Lien Term Commitments***") such that the aggregate amount of the Second Lien Term Commitments shall be in an amount equal to an aggregate principal amount of $518.0 million, which Second Lien Term Facility shall be secured on a junior basis to the Exit LC Facility (as defined below), the Permitted Hedge Obligations (as defined in the Exit FLTL Term Sheet) and the First Lien Term Facility (as defined below).

**INCREMENTAL SECOND LIEN TERM FACILITIES:**  The Borrower shall be entitled, on one or more occasions, to incur separate classes of additional term loans or increases in existing term loans (the "***Incremental Second Lien Term Loans***") under the Second Lien Term Facility or incur additional *pari passu* secured, junior secured or unsecured term loans under a new term loan facility (each, an "***Incremental Second Lien Term Facility***") (or any secured or unsecured notes or loans issued in lieu of (and subject to the conditions set forth in this paragraph and in the next succeeding paragraph; provided that in no event shall such notes or loans be guaranteed by entities that are not guarantors under the Second Lien Term

Facility and in no event shall such secured notes or loans be secured by assets other than the Collateral) any Incremental Second Lien Term Loans ("***Incremental Equivalent Debt***")), so long as, (a) if such Incremental Second Lien Term Facility (or Incremental Equivalent Debt) is secured by a lien on the Collateral that is *pari passu* with the lien securing the Second Lien Term Facility, the Total Net Leverage Ratio (to be defined in a manner consistent with the Second Lien Term Facility Documentation Principles (as defined below)), calculated on a *pro forma* basis after giving effect to such Incremental Second Lien Term Loans (or Incremental Equivalent Debt) and the use of the proceeds therefrom (it being understood that the proceeds from such Incremental Second Lien Term Facility (or any Incremental Equivalent Debt) shall not be used for netting indebtedness for purposes of calculating the Total Net Leverage Ratio pursuant to this paragraph), does not exceed 2.50:1.00, (b) if such Incremental Second Lien Term Facility (or Incremental Equivalent Debt) is secured by a lien on the Collateral that is junior to the lien securing the Second Lien Term Facility, the Total Net Leverage Ratio, calculated on a pro forma basis after giving effect to such Incremental Second Lien Term Loans (or Incremental Equivalent Debt) and the use of the proceeds therefrom (it being understood that the proceeds from such Incremental Second Lien Term Facility (or any Incremental Equivalent Debt) shall not be used for netting indebtedness for purposes of calculating the Total Net Leverage Ratio pursuant to this paragraph), does not exceed 2.50:1.00 or (c) if such Incremental Second Lien Term Facility (or Incremental Equivalent Debt) is unsecured, the Total Net Leverage Ratio, calculated on a pro forma basis after giving effect to such Incremental Second Lien Term Loans (or Incremental Equivalent Debt) and the use of the proceeds therefrom (it being understood that the proceeds from such Incremental Term Facility (or any Incremental Equivalent Debt) shall not be used for netting indebtedness for purposes of calculating the Total Net Leverage Ratio pursuant to this paragraph), does not exceed 3.00:1.00.

At the time of the incurrence of any Incremental Second Lien Term Facility (or, in the case of clauses (ii) and (iii) below, Incremental Equivalent Debt): (i)(A)  no event of default exists or would exist after giving effect thereto and (B) the representations and warranties contained in the Second Lien Term Facility Documentation shall be true and correct in all material respects (or, in the case of any such representation that is qualified by materiality, in all respects) immediately prior to, and after giving effect to, the incurrence of such Incremental Second Lien Term Loans, (ii) the maturity date of the Incremental Second Lien Term Loans (or Incremental Equivalent Debt) shall be no earlier than the maturity date of the Second Lien Term Facility, (iii) the weighted average life to maturity of the Incremental Second Lien Term Loans (or Incremental Equivalent Debt) shall be no shorter than the remaining weighted average life to maturity of the Second Lien Term Facility, (iv) all fees and expenses owing in respect of such increase to the Administrative Agent and the Second Lien Term Lenders providing such Incremental Second Lien Term Loans shall have

been paid, (v) the Incremental Second Lien Term Loans shall have the same guarantors as, and if secured, shall be secured on a *pari passu* or more junior basis by the same collateral securing, the Second Lien Term Facility, (vi) any Incremental Second Lien Term Loans shall be on the terms and pursuant to documentation to be determined and to the extent not consistent with the Second Lien Term Facility (except to the extent permitted by clauses (ii) through (v) above) such terms and documentation shall be reasonably satisfactory to the Administrative Agent (it being understood that no consent of the Administrative Agent shall be required for terms and conditions that are more restrictive than those set forth in the existing Second Lien Term Facility Documentation to the extent the existing Second Lien Term Facility receives the benefit of such provisions or to the extent such provisions are only applicable after the latest maturity of any then-existing Second Lien Term Loans) (the requirements described in clauses (ii) and (iii) above, the "***Required Debt Terms***"), and (vii) with respect to Incremental Term Loans the all-in-yield (but excluding any amendment fees, arrangement fees or similar fees payable to any lead arranger (or its affiliates) in connection with the commitment or syndication of any such indebtedness and any other fees not paid or payable generally to all lenders in the primary syndication) (whether in the form of interest rate margins, original issue discount, upfront fees (with original issue discount and upfront fees being equated to an interest rate assuming a 4-year life to maturity (or, if shorter, the remaining life) on a straight line basis) or a "floor", with such increased amount being equated to interest margin for purposes of determining any increase to the applicable interest margin (*provided* that such differential between interest rate floors shall be equated to the applicable all-in-yield only to the extent an increase in the interest rate floor under the existing Second Lien Term Facility would cause an increase in the interest rate then in effect thereunder) (the "***Effective Yield***") under the Second Lien Term Facility and including any amendment to the applicable margin on the Second Lien Term Loans that became effective subsequent to the Closing Date but prior to the time of the addition of such Incremental Second Lien Term Facility) applicable to any Incremental Second Lien Term Facility will be determined by the Borrower and the lenders providing such Incremental Second Lien Term Facility, but will not be more than 0.50% higher than the corresponding all-in-yield (after giving effect to interest rate margins (including any "floors"), original issue discount and upfront fees) for the existing Second Lien Term Facility, unless the interest rate margins with respect to the existing Second Lien Term Facility are increased by an amount equal to the difference between the Effective Yield with respect to such Incremental Second Lien Term Facility and the corresponding Effective Yield on the existing Second Lien Term Facility minus 0.50% (the "***Second Lien MFN Protection***"); *provided* that the Second Lien MFN Protection shall only apply to any Incremental Second Lien Term Facility, Incremental Equivalent Debt or Permitted Ratio Debt (to be defined in the Second Lien Term Facility Documentation in a manner consistent with the Exit FLTL Term Sheet) in the form of term loans that ranks *pari passu* with the Second Lien Term Facility; *provided, further,* that Incremental

Second Lien Term Loans may provide for mandatory prepayments of the Incremental Second Lien Term Loans on a *pro rata* basis or less than *pro rata* basis, and the Borrower shall be permitted to voluntarily prepay any class of term loans on a better than *pro rata* basis as compared to any other class of term loans.  The Borrower may seek commitments in respect of Incremental Second Lien Term Loans from existing Second Lien Term Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) and additional banks, financial institutions and other institutional lenders who will become Second Lien Term Lenders in connection therewith, subject to the Administrative Agent's consent to the extent such consent would be required in connection with an assignment thereto under the heading "*Assignments and Participations*" below.

The Borrower may seek commitments in respect of Incremental Second Lien Term Loans from existing Second Lien Term Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) and additional banks, financial institutions and other institutional lenders who will become Second Lien Term Lenders in connection therewith, subject to the Administrative Agent's consent to the extent such consent would be required in connection with an assignment thereto under the heading "Assignments and Participations" below.

**EXIT LC FACILITY:**    A senior secured first lien "first-out" letter of credit facility (the "***Exit LC Facility***", the funding commitments thereunder, the "***LC Funding Commitments***" and the letter of credit issuance commitments thereunder the "***LC Issuance Commitments***") that shall become effective on the Plan Effective Date.  The LC Issuance Commitments shall be in an aggregate principal amount of $147.8 million and the LC Funding Commitments shall be in an aggregate amount equal to the product of (a) the face amount of the letters of credit issued under the Exit LC Facility on the Plan Effective Date and (b) the cash collateralization percentage required by the issuing banks with respect to such letters of credit, which Exit LC Facility shall be secured (i) on a *pari passu* basis with the First Lien Term Facility and the Permitted Hedge Obligations, but will (together with the Permitted Hedge Obligations) rank ahead of the First Lien Term Facility, on a "first-out" basis, in the payment waterfall in the applicable Intercreditor Agreement and (ii) on a senior basis to the Second Lien Term Facility.

**EXIT FIRST LIEN TERM FACILITY:**    A senior secured amended and restated first lien "last-out" term loan facility (the "***First Lien Term Facility***" and the lenders thereunder, the "***First Lien Term Lenders***") that shall become effective on the Plan Effective Date provided by each First Lien Term Lender based on pro rata allocation of term loan commitments under the Prepetition First Lien Term Facility (collectively, the "***First Lien Term Commitments***" and the loans in respect thereof, the "***First Lien Term Loans***").  The First Lien Term Commitments shall be in an aggregate principal amount of $1.143 billion, which First Lien Term Facility shall be secured (i) on a

*pari passu* basis with the Exit LC Facility and the Permitted Hedge Obligations, but will rank behind the Exit LC Facility and Permitted Hedge Obligations, on a "last-out" basis, in the payment waterfall, in the applicable Intercreditor Agreements (as defined below) and (ii) on a senior basis to the Second Lien Term Facility.

**REFINANCING SECOND LIEN FACILITY:**

The Second Lien Term Facility Documentation will permit the Borrower to refinance Second Lien Term Loans from time to time, in whole or part, with one or more new term loan facilities (each, a "***Second Lien Refinancing Term Facility***") under the Second Lien Term Facility Documentation with the consent of the Borrower and the institutions providing such Second Lien Refinancing Term Facility or with (x) one or more series of senior unsecured notes and (y) one or more series of senior secured notes that will be secured by the Collateral on a *pari passu* or junior basis with the Second Lien Term Facility, which will be subject to customary intercreditor arrangements in a form to be agreed (any such notes under clause (x) or (y), "***Second Lien Refinancing Notes***"); *provided* that (i) any Second Lien Refinancing Term Facility or Second Lien Refinancing Notes shall not mature prior to the maturity date of, or have a shorter weighted average life to maturity than, the loans under the Second Lien Term Facility being refinanced, (ii) any Second Lien Refinancing Notes are not subject to any amortization prior to final maturity or are subject to the same amortization schedule as the loans under the Second Lien Term Facility being refinanced and are not subject to mandatory redemption or prepayment (except customary asset sales or change of control provisions), (iii) the other terms and conditions of such Second Lien Refinancing Term Facility or Second Lien Refinancing Notes (excluding pricing and optional prepayment or redemption terms) are, when taken as a whole, not materially more favorable to the investors or lenders providing such Second Lien Refinancing Term Facility or Second Lien Refinancing Notes, as applicable, than those applicable to the Second Lien Term Facility being refinanced (except for covenants or other provisions applicable only to periods after the latest Second final maturity date of the Second Lien Term Facility existing at the time of such refinancing or to the extent such terms and conditions are added for the benefit of the existing Second Lien Term Facility), (iv) except to the extent otherwise permitted under the Second Lien Term Facility Documentation, the aggregate principal amount of any Second Lien Refinancing Term Facility or Second Lien Refinancing Notes shall not exceed the aggregate principal amount of the indebtedness and commitments being refinanced or replaced therewith, plus accrued and unpaid interest, penalties, premiums, fees, commissions, underwriting discounts and expenses related thereto, (v) the proceeds of such Second Lien Refinancing Term Facility or Second Lien Refinancing Notes shall be applied, substantially concurrently with the incurrence thereof, to the *pro rata* prepayment of outstanding loans under the applicable Second Lien Term Facility being so refinanced, (vi) any Second Lien Refinancing Term Facility or Second Lien Refinancing Notes that is *pari passu* with the Second Lien Term Facility being refinanced in right of payment and security shall

share ratably in any mandatory prepayment of the Second Lien Term Loans unless the Borrower and the lenders or holders in respect of such Second Lien Refinancing Term Facility or Second Lien Refinancing Notes elect lesser payments, and (vii) any Second Lien Refinancing Term Facility and Second Lien Refinancing Notes will (A) have the same guarantors and rank on the same or more junior basis in right of payment as the tranche being refinanced or replaced and (B) be secured by the Collateral with the same or more junior priority as the tranche being refinanced or replaced, or be unsecured (and to the extent subordinated in right of payment or security, subject to a customary subordination and intercreditor agreement, as applicable).

**PURPOSE:**          The proceeds of any Second Lien Term Loans will be deemed used by the Borrower, on the Plan Effective Date (the "***Closing Date***") to refinance certain prepetition indebtedness of the Borrower and its subsidiaries, including without limitation the entirety of the Prepetition Second Lien Term Loans, pay fees and expenses in connection therewith and to finance other general corporate purposes of the Borrower and its subsidiaries and, after the Closing Date, to finance the working capital needs and other general corporate purposes of the Borrower and its subsidiaries.

**AVAILABILITY:**          The full amount of the Second Lien Term Facility (or such lesser amount as the Borrower shall request) must be drawn in a single drawing on the Closing Date; amounts borrowed thereunder that are repaid or prepaid may not be reborrowed.

**INTEREST RATES AND FEES:**          As set forth on ***Annex I*** hereto.

**DEFAULT RATE:**          At any time when a payment event of default under the Second Lien Term Facility exists, any overdue principal or interest (after giving effect to any grace periods) payable under or in respect of the Second Lien Term Facility not paid when due shall, upon the election of the Required Lenders, bear interest at the applicable interest rate <u>plus</u> 2% per annum. Other overdue amounts (after giving effect to any grace periods) shall, upon the election of the Required Lenders, bear interest at the interest rate applicable to ABR loans <u>plus</u> 2% per annum.

**FINAL MATURITY:**          The Second Lien Term Facility will mature on the date that is five years after the Closing Date (the "***Second Lien Term Loan Maturity Date***"); *provided* that the Second Lien Term Facility Documentation shall provide the right for individual Second Lien Term Lenders to agree to extend the maturity date of all or a portion of the outstanding loans under the Second Lien Term Facility upon the request of the Borrower and without the consent of any other Second Lien Term Lender; it being understood that each Second lien Term Lender under the applicable tranche or tranches of the Second Lien Term Facility that are being extended shall have the opportunity to participate in such extension on the same terms and conditions as each other Second Lien Term Lender

D-8

in such tranche or tranches (it further being understood that no existing Second Lien Term Lender will have any obligation to commit to any such extension).

**GUARANTEES:**

All obligations of the Borrower under the Second Lien Term Facility will be jointly and severally unconditionally guaranteed on a second lien secured basis (the "***Second Lien Guarantees***") by the same Guarantors (as defined in the Exit FLTL Term Sheet) that guarantee the First Lien Term Facility.

**SECURITY:**

The obligations of the Borrower under the Second Lien Term Facility and the Second Lien Guarantees will be secured by a perfected second lien security interest in the same Collateral (as defined in the Exit FLTL Term Sheet) that secures the First Lien Term Facility, excluding for the avoidance of doubt, Excluded Assets (as defined in the Exit FLTL Term Sheet).

The second lien pledges, security interests and mortgages on the Collateral shall be created and perfected on terms, and pursuant to documentation that will be separate from but substantially similar to the First Lien Term Facility Documentation, with appropriate modifications to reflect the second lien status of the Second Lien Term Facility.

**INTERCREDITOR AGREEMENTS:**

Subject to the Second Lien Term Facility Documentation Principles, the lien priority, relative rights and other creditors' rights issues between and among the holders of the Exit LC Facility and the holders of the First Lien Term Loans the holders of the Second  Lien Term Loans and will be set forth in one or more intercreditor agreements (the "***Intercreditor Agreements***") reasonably satisfactory to the Borrower and the Administrative Agent.

**MANDATORY PREPAYMENTS:**

(a)      100% of the net cash proceeds of Asset Sales (to be defined consistent with the Second Lien Term Facility Documentation Principles) of the type described in clause (f)(iii) of  the section titled "*Negative Covenants*" in the Exit FLTL Term Sheet (subject to the right of the Borrower to reinvest 100% of such net cash proceeds if such proceeds are reinvested within 12 months; and

(b)      100% of the net cash proceeds of issuances, offerings or placements of debt obligations of Holdings and its restricted subsidiaries (except the net cash proceeds of any permitted debt (other than the proceeds of any Second Lien Refinancing Term Facility or Second Lien Refinancing Notes)).

The above-described mandatory prepayments will be without premium or penalty (but subject to reimbursement of applicable lenders' redeployment costs in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period).

Notwithstanding anything to the contrary set forth above, no mandatory prepayment of the Second Lien Term Loans shall be required until

amounts outstanding under the First Lien Term Facility and any other debt secured on a *pari passu* basis with the First Lien Term Facility requiring such mandatory prepayments have been paid in full, other than with (x) Declined Proceeds (as defined in the Exit FLTL Term Sheet) and (y) proceeds of permitted refinancing debt in respect of the Second Lien Term Facility.

Any Second Lien Term Lender may elect not to accept its pro rata portion of any mandatory prepayment (each, a "***Declining Second Lien Lender***"), but, in the case of *clause (b)* above, solely to the extent the relevant prepayment does not represent a refinancing of the Second Lien Term Facility. Any prepayment amount declined by a Declining Second Lien Lender may be retained by the Borrower.

Mandatory prepayments required under the Second Lien Term Facility Documentation may, if required pursuant to the terms of any other indebtedness secured *pari passu* with the Second Lien Term Facility, be applied to the Second Lien Term Loans and such other *pari passu* indebtedness, in each case on a ratable basis based on the outstanding principal amounts thereof.

**VOLUNTARY PREPAYMENTS:**

Prepayments of borrowings under the Second Lien Term Facility (other than, for the avoidance of doubt, any reduction of Second Lien Term Loans in connection with a permitted assignment thereof to an Affiliated Lender (to be defined in a manner consistent with the Second Lien Term Facility Documentation Principles) will be permitted at any time, in minimum principal amounts to be agreed upon, subject to customary notice requirements (subject to reimbursement of the Second Lien Term Lenders' redeployment costs (other than lost profits) in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period) and, subject to a prepayment premium in the amount of (i) if on or prior to the six month anniversary of the Closing Date, 1.00% of the total amount of the Second Lien Term Loans so prepaid and (ii) if after the six month anniversary of the Closing Date, 0.00% of the total amount of the Second Lien Term Loans so prepaid.

**UNRESTRICTED SUBSIDIARIES:**

The Second Lien Term Facility Documentation will contain unrestricted subsidiary provisions substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation.

**DOCUMENTATION:**

The definitive documentation for the Second Lien Term Facility (the "***Second Lien Term Facility Documentation***") will be documented under a single credit agreement, will contain the terms set forth in this ***Exhibit D*** and, to the extent not covered by this ***Exhibit D***, will be substantially consistent with the First Lien Term Facility Documentation (as defined in the Exit FLTL Term Sheet) (the "***Second Lien Term Facility Documentation Principles***"). The Second Lien Term Facility Documentation will be negotiated in good faith within a reasonable time period to be determined based on the expected Closing Date.

For purposes of calculating Consolidated EBITDA, Consolidated Total

Assets and financial ratios, *pro forma* effect will be given to acquisitions and other investments (other than in the ordinary course of business), material dispositions and certain other specified transactions on a basis consistent with the Second Lien Term Facility Documentation Principles.

**REPRESENTATIONS AND WARRANTIES:** The Second Lien Term Facility Documentation will contain representations and warranties substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation.

**CONDITIONS PRECEDENT:** The closing of the Second Lien Term Facility will be subject to satisfaction of the following: (a) all of the representations and warranties in the Second Lien Term Facility Documentation shall be true and correct in all material respects (or if qualified by materiality or material adverse effect, in all respects) as of the date of such extension of credit, or if such representation speaks as of an earlier date, as of such earlier date; (b) no default or event of default under the Second Lien Term Facility shall have occurred and be continuing or would result from such extension of credit; (c) delivery of a customary borrowing notice; and (d) the occurrence of those conditions listed on Annex II hereto.

**AFFIRMATIVE COVENANTS:** The Second Lien Term Facility Documentation will contain affirmative covenants substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation, with appropriate modifications to reflect the second lien status of the Second Lien Term Facility.

**NEGATIVE COVENANTS:** The negative covenants shall be substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation, with (i) appropriate modifications to reflect the second lien status of the Second Lien Term Facility, (ii) monetary baskets and thresholds set at an additional cushion of 15% against the applicable basket or threshold in the First Lien Term Loan Documentation and (iii) any debt that is incurred as Permitted Ratio Debt (as defined in the Exit FLTL Term Sheet) that is permitted to be secured by a lien on the Collateral that is senior to the lien securing the Second Lien Term Facility shall be required to be secured on a *pari passu* basis with the First Lien Term Facility.

**FINANCIAL COVENANT:** None.

**EVENTS OF DEFAULT:** The Second Lien Term Facility Documentation will contain events of default substantially consistent with the corresponding provisions set forth in the Exit FLTL Term Sheet, with (i) appropriate modifications to reflect the second lien status of the Second Lien Term Facility and (ii) cross-acceleration (instead of cross-default) and cross-payment event of default at maturity to the LC Facility and the First Lien Term Facility.

D-11

| | |
|---|---|
| **VOTING:** | The Second Lien Term Facility Documentation will contain voting provisions substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation. |
| **COST AND YIELD PROTECTION:** | The Second Lien Term Facility Documentation will contain provisions for increased costs and loss of yield substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation. |
| **ASSIGNMENTS AND PARTICIPATIONS:** | The Second Lien Term Facility Documentation will contain provisions for assignments of and participations in the Second Lien Term Loans substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation. |
| **REPLACEMENT OF ADMINISTRATIVE AGENT:** | The Second Lien Term Facility Documentation will contain provisions for replacement of the Administrative Agent substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation. |
| **EXPENSES AND INDEMNIFICATION:** | The Second Lien Term Facility Documentation will contain provisions for expenses and indemnification substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation. |
| **CONFIDENTIALITY:** | The Second Lien Term Facility Documentation will contain confidentially provisions substantially consistent with the corresponding provisions set forth in the First Lien Term Facility Documentation. |
| **GOVERNING LAW AND FORUM:** | New York. |
| **COUNSEL TO ADMINISTRATIVE AGENT:** | Davis Polk & Wardwell LLP. |

**ANNEX I**
**To Exhibit A**

**INTEREST RATES:**      The interest rates under the Second Lien Term Facility will be as follows:

At the option of the Borrower, Adjusted LIBOR <u>plus</u> 7.25% or ABR <u>plus</u> 6.25%, with such rate to automatically increase 300 basis points in the event that the Debt Rating (as defined in the Exit FLTL Term Sheet) falls below B3 or B- for at least one full fiscal quarter and so long as it remains below such rating.

The Borrower may elect interest periods of one, two, three or six months (or 12 months or a shorter period if available to all Second Lien Term Lenders) (each, an "***Interest Period***") for Adjusted LIBOR borrowings.

Calculation of interest shall be on the basis of the actual number of days elapsed over a 360-day year (or 365- or 366-day year, as the case may be, in the case of ABR loans based on the Prime Rate) and interest shall be payable (i) in the case of ABR loans, quarterly in arrears and (ii) in the case of Adjusted LIBOR loans at the end of each interest period and, in any event, at least every three months.

"***ABR***" is the Alternate Base Rate, which is the highest of (i) the per annum rate publicly quoted from time to time by The Wall Street Journal as the "Prime Rate" in the United States, (ii) the Federal Funds Effective Rate <u>plus</u> 1/2 of 1.0% and (iii) one-month Adjusted LIBOR <u>plus</u> 1.0%.

"***Adjusted LIBOR***" is the London interbank offered rate (or a comparable successor rate to be determined in the Second Lien Term Facility Documentation) for eurodollar deposits for a period equal to the applicable Interest Period appearing on the LIBOR01 Page that displays the Intercontinental Exchange Benchmark Administration Interest Settlement Rate for deposits in Dollars with a term equivalent to such Interest Period,; *provided* that Adjusted LIBOR will at all times be adjusted for statutory reserves and shall be deemed to be not less than 1.00%.

*Annex II*

PROJECT PELICAN

SUMMARY OF CONDITIONS PRECEDENT

The borrowing under the Second Lien Term Facility shall be subject only to the following conditions precedent:

1.   A final non-appealable order of the Bankruptcy Court confirming the Plan in form and substance reasonably satisfactory to the Administrative Agent, which shall not have been reversed, vacated, amended, supplemented or otherwise modified in any manner that could reasonably be expected to adversely affect the interest of the Second Lien Term Lenders (the "***Confirmation Order***") and authorizing the Borrower to execute, deliver and perform under all documents contemplated under the Second Lien Term Facility Documentation shall have been entered and shall have become a final order of the Bankruptcy Court.

2.   The execution and delivery by each of the Loan Parties of (i) the Second Lien Term Facility Documentation (including the Intercreditor Agreements (which may be limited to an acknowledgement by the Loan Parties)), (ii) customary legal opinions, customary evidence of authorization, customary officer's certificates, good standing certificates (to the extent applicable) in the jurisdiction of organization of each Loan Party, (iii) a solvency certificate substantially in the form of ***Annex III*** hereto executed by the chief financial officer or other officer of equivalent duties and (iv) all documents and instruments required to create and perfect the Administrative Agent's security interests in the Collateral under the Second Lien Term Facility, which shall be, if applicable, in proper form for filing.

3.   The Administrative Agent shall have received (a) audited consolidated balance sheets and related statements of income and cash flows of the Borrower and its subsidiaries for the three most recently completed fiscal years ended at least 105 days before the Closing Date (the receipt of such financial statements for 2015 and 2016 being acknowledged by the Second Lien Term Lenders) and (b) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its subsidiaries for each subsequent fiscal quarter (other than fiscal year end) ended at least 60 days before the Closing Date.

4.   The Administrative Agent shall have received *pro forma* financial statements consisting of a *pro forma* consolidated balance sheet and *pro forma* consolidated statements of income as of and for the twelve month period ending on the last day of the recently completed four fiscal quarter period ended at least 60 days before the Closing Date.

5.   The Administrative Agent shall have received, at least 3 business days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, that has been requested in writing by the Second Lien Term Lenders at least 10 business days prior to the Closing Date.

6.   All fees required to be paid on the Closing Date pursuant to the Fee Letter and this Term Sheet and reasonable and documented out-of-pocket expenses (including legal expenses) required to be paid on the Closing Date pursuant to this Term Sheet, to the extent invoiced at least 3 business days prior to the Closing Date, shall, upon the initial borrowing of the Second Lien Term Facility, have been paid.

7.   The representations and warranties of the Loan Parties set forth in the Second Lien Term Facility Documentation shall be true and correct in all material respects (or, in the case of any such representation that is qualified by materiality, in all respects).

8.   No default or event of default shall exist or would result from the consummation of the Transactions.

*Annex III*

## FORM OF SOLVENCY CERTIFICATE

[____][__], 20[__]

This Solvency Certificate is being executed and delivered pursuant to Section [__] of that certain [●] (the "***Credit Agreement***"; the terms defined therein being used herein as therein defined).

I, [_____], a Financial Officer (or other officer of equivalent duties) of the Borrower (after giving effect to the Transactions), in such capacity and not in an individual capacity, hereby certify on behalf of the Borrower as follows:

      1.     The sum of the debt and liabilities (subordinated, contingent or otherwise) of the Borrower and its subsidiaries, on a consolidated basis, does not exceed the fair value of the present assets of the Borrower and its subsidiaries, on a consolidated basis.

      2.     The capital of the Borrower and its subsidiaries, on a consolidated basis, is not unreasonably small in relation to their business as conducted or contemplated to be conducted on the date hereof.

      3.     The Borrower and its subsidiaries, on a consolidated basis, have not incurred and do not intend to incur, or believe that they will incur, debts or other liabilities, including current obligations, beyond their ability to pay such debts or other liabilities as they become due (whether at maturity or otherwise).

      4.     In reaching the conclusions set forth in this Solvency Certificate, the undersigned has (i) reviewed the Credit Agreement and other Loan Documents referred to therein and such other documents deemed relevant and (ii) made such other investigations and inquiries as the undersigned has deemed appropriate.  The undersigned is familiar with the financial performance and prospects of the Borrower and its subsidiaries.

IN WITNESS WHEREOF, I have executed this Solvency Certificate on the date first written above.

[FIELDWOOD ENERGY LLC]

By: _____
Name:
Title:

**<u>EXHIBIT E</u>**
**BACKSTOP COMMITMENT AGREEMENT**

Attached.

BACKSTOP COMMITMENT AGREEMENT

AMONG

FIELDWOOD HOLDINGS LLC,

FIELDWOOD ENERGY INC.

AND

THE BACKSTOP PARTIES PARTY HERETO

Dated as of February 14, 2018

# TABLE OF CONTENTS

PAGE

| | | |
|---|---|---|
| Section 1. | THE RIGHTS OFFERING. | 2 |
| Section 2. | THE BACKSTOP COMMITMENTS. | 4 |
| Section 3. | TRANSFER OF BACKSTOP COMMITMENT. | 6 |
| Section 4. | BACKSTOP PARTY DEFAULT. | 7 |
| Section 5. | REPRESENTATIONS AND WARRANTIES OF THE ISSUER AND THE COMPANY. | 7 |
| Section 6. | REPRESENTATIONS AND WARRANTIES OF THE BACKSTOP PARTIES. | 16 |
| Section 7. | ADDITIONAL COVENANTS OF THE COMPANY. | 18 |
| Section 8. | ADDITIONAL COVENANTS OF THE BACKSTOP PARTIES. | 26 |
| Section 9. | SUPPORT OF PLAN. | 26 |
| Section 10. | CONDITIONS TO THE OBLIGATIONS OF THE BACKSTOP PARTIES. | 27 |
| Section 11. | CONDITIONS TO THE OBLIGATIONS OF THE COMPANY. | 29 |
| Section 12. | SURVIVAL OF REPRESENTATIONS AND WARRANTIES. | 30 |
| Section 13. | TERMINATION. | 30 |
| Section 14. | INDEMNIFICATION OBLIGATIONS. | 33 |
| Section 15. | NOTICES. | 35 |
| Section 16. | SURVIVAL. | 37 |
| Section 17. | ASSIGNMENT; THIRD PARTY BENEFICIARIES. | 37 |
| Section 18. | COMPLETE AGREEMENT. | 37 |
| Section 19. | GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY. | 37 |
| Section 20. | COUNTERPARTS. | 37 |
| Section 21. | ACTION BY, OR CONSENT OR APPROVAL OF, THE BACKSTOP PARTIES. | 38 |
| Section 22. | AMENDMENTS AND WAIVERS. | 38 |
| Section 23. | SPECIFIC PERFORMANCE. | 38 |
| Section 24. | OTHER INTERPRETIVE MATTERS. | 38 |

#90500902v12

## INDEX OF DEFINED TERMS

| Term | Section |
|------|---------|
| Accredited Investor | Section 1(a) |
| Affiliate | 3(b) |
| Affiliate Agreement | 5(q) |
| Agreement | Preamble |
| Alternative Restructuring | Section 9(b) |
| Alternate Transaction | Section 7(k)(1) |
| Alternate Transaction Proposal | Section 7(k)(2) |
| Antitrust Laws | Section 7(g) |
| Backstop Commitment Percentage | Recitals |
| Backstop Commitments | Section 2(a)(ii) |
| Backstop Commitment Premium | 2(c) |
| Backstop Funding Deadline | 1(g)(v) |
| Backstop Funding Notice | 1(g) |
| Backstop Parties | Preamble |
| Backstop Party | Preamble |
| Backstop Party Shares | 6(d) |
| Backstop Transfer Notice | 3(a) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business Day | 1(d)(3) |
| Business Plan | Section 7(h)(iii) |
| Chapter 11 Cases | Recitals |
| Chosen Courts | 19 |
| Company | Preamble |
| Company Board | Section 7(k)(1) |
| Company Disclosure Letter | Section 5 |
| Confirmation Order | Recitals |
| Control | 3(b) |
| Debtors | Recitals |
| Defaulting Backstop Party | Section 4 |
| Disclosure Statement | 7(a) |
| Eligible Claims | 1(a) |
| Eligible Holder | 1(a) |
| Environmental Law | 5(n) |
| Funding Account | Section 1(g)(iv) |
| Financial Statements | Section 5(i) |
| Funding Amount | Section 1(g)(iii) |
| Hazardous Materials | 5(n) |
| HSR Act | Section 7(g) |
| Indemnified Claim | 14(b) |
| Indemnified Person | 14(a) |
| Intellectual Property Rights | 5(p) |
| Issuer | Recitals |

ii

| Term | Section |
|------|---------|
| Knowledge of the Company | Section 5(k) |
| Legend | Section 7(e) |
| Lien | Section 5(v)(i) |
| Losses | 14(a) |
| Material Adverse Effect | 5(f) |
| Material Contract | Section 5(y) |
| Net Funding Amount | Section 1(g)(iv) |
| Outside Date | 13(a) |
| Parties | Preamble |
| Party | Preamble |
| Per Share Price | Recitals |
| Permitted Lien | Section 5(v)(i) |
| Permitted Transferee | 3(a) |
| Person | Section 5(l) |
| Petition Date | Recitals |
| Plan | Recitals |
| Plan Effective Date | Recitals |
| Reference Date | Section 5(h) |
| Related Fund | 3(b) |
| Required Backstop Parties | Recitals |
| Rights Offering Amount | Recitals |
| Rights Offering Procedures | Section 1 |
| Rights Offering Shares | Recitals |
| Rights Offering Subscription Form | 1(d)(1) |
| Riverstone | Recitals |
| RSA | Recitals |
| Securities Act | 6(d) |
| Second Lien Credit Agreements | Recitals |
| SLTL Claim | Recitals |
| Subscription Agent | Section 1(d)(1) |
| Subscription Expiration Deadline | 1(d)(3) |
| Subscription Record Date | Recitals |
| Superior Transaction | Section 7(k)(1) |
| Superior Proposal | Section 7(k)(2) |
| Taxes | 5(u)(i) |
| Transaction Expenses | Section 2(d) |
| Unsubscribed Shares | Recitals |

#90500902v12

# BACKSTOP COMMITMENT AGREEMENT

This BACKSTOP COMMITMENT AGREEMENT (including exhibits and schedules attached hereto and incorporated herein, this "**Agreement**"), dated as of February 14, 2018 is made by and among Fieldwood Energy Inc., a Delaware corporation (the "**Issuer**"), Fieldwood Holdings LLC, a Delaware limited liability company (the "**Company**"), and the ultimate parent of the Issuer and each of the other Debtors (as defined below), on behalf of itself and the other Debtors, on the one hand, and the Backstop Parties set forth on **Schedule 1** hereto (each referred to herein, individually, as a "**Backstop Party**" and, collectively, as the "**Backstop Parties**"), on the other hand. The Company and each Backstop Party is referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**". Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan (as defined below).

WHEREAS, the Debtors, certain of the Backstop Parties and certain of the Debtors' other creditors and interest holders have entered into a Restructuring Support Agreement, dated as of February 14, 2018 (such agreement, as may be amended, restated, supplemented or otherwise modified from time to time, including all the exhibits thereto, the "**RSA**"), which provides for the restructuring of the Company's capital structure and financial obligations pursuant to a "prepackaged" plan of reorganization (as it may be amended, modified or supplemented from time to time as provided in the RSA, the "**Plan**"). The Company and certain of its subsidiaries as set forth on **Schedule 2** (collectively, the "**Debtors**") will file voluntary petitions for relief (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") (the date of such filings being referred to herein as the "**Petition Date**") and will seek confirmation of the Plan;

WHEREAS, subject to the Bankruptcy Court's entry of an order confirming the Plan (the "**Confirmation Order**"), consummation of the Plan, and the other conditions specified in Section 10 and Section 11 hereof, prior to or on the effective date of the Plan (the "**Plan Effective Date**") the Issuer will offer and sell the New Equity Interests issued pursuant to the Rights Offering and this Agreement (excluding New Equity Interests issued as the Backstop Commitment Premium (as defined below)) representing approximately 75% of the New Equity Interests issued by the Issuer on the Plan Effective Date (prior to taking into account the Management Incentive Plan) (the "**Rights Offering Shares**") *pro rata* to all Eligible Holders (as defined below) of claims under the Prepetition Second Lien Credit Agreement and the Prepetition Sponsor Second Lien Credit Agreement (the "**Second Lien Credit Agreements**", and each claim under such agreements, an "**SLTL Claim**") at an aggregate purchase price of $525 million (the "**Rights Offering Amount**") at $23.33 per share (the "**Per Share Price**") (subject to adjustment pursuant hereto) which may be subscribed for by all Eligible Holders (as defined below) of Eligible Claims (as defined below) on or before February 9, 2018 (the "**Subscription Record Date**");

WHEREAS, in order to facilitate the Plan and the Rights Offering, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein, (A)

the Company has agreed to consummate the Plan and (B) each Backstop Party, severally and not jointly, has agreed to purchase from the Issuer, on the Plan Effective Date, (i) all Rights Offering Shares allocated to such Backstop Party based on its ownership of Eligible Claims (and on the ownership of Eligible Claims owned by certain of its Related Funds as provided on **Schedule 1**), and (ii) such Backstop Party's percentage (its "**Backstop Commitment Percentage**"), as set forth on **Schedule 1** opposite such Backstop Party's name, of all Rights Offering Shares that are not purchased by other Eligible Holders (as defined below) of Eligible Claims pursuant to the Rights Offering (the "**Unsubscribed Shares**");

WHEREAS, as consideration for their respective Backstop Commitments, the Backstop Parties will receive, on the Plan Effective Date, the Backstop Commitment Premium (as defined below);

WHEREAS, for purposes of this Agreement, "**Required Backstop Parties**" shall mean (i) Backstop Parties holding at least 50% in aggregate amount of the Backstop Commitments of all Backstop Parties (excluding the "Riverstone Entities" as set forth on **Schedule 1** and their Permitted Transferees that are Related Funds (collectively, "**Riverstone**") and any Defaulting Backstop Parties (as defined below) and, in each case, their corresponding Backstop Commitments), (ii) Backstop Parties holding at least 50% in aggregate amount of the Backstop Commitments of all Backstop Parties (excluding any Defaulting Backstop Parties and their corresponding Backstop Commitments) and (iii) Riverstone, so long as Riverstone continues to hold at least 45% of the aggregate amount of the Backstop Commitments of all Backstop Parties.

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties and covenants set forth herein, and other good and valuable consideration, the Company and the Backstop Parties agree as follows:

Section 1.    THE RIGHTS OFFERING.  The Rights Offering will be conducted in accordance with the Rights Offering Procedures attached as Exhibit I to the RSA (the "**Rights Offering Procedures**") and as follows:

(a)    Pursuant to the RSA and the Plan, each holder of an SLTL Claim that is an "accredited investor" as defined in Rule 501(a) under the Securities Act  (an "**Accredited Investor**") (each such holder, an "**Eligible Holder**") before the Subscription Record Date will receive Subscription Rights with respect to their claims under the Second Lien Credit Agreements held or beneficially held by such Eligible Holder as of the Subscription Record Date (such claims being, "**Eligible Claims**") to subscribe for its *pro rata* share (measured as the principal and accrued and unpaid interest amount of Eligible Claims held by such Eligible Holder as compared to the aggregate principal and accrued and unpaid interest amount relating to such Eligible Claims held by all Eligible Holders) of the Rights Offering Shares, subject to certain other customary representations and warranties.

(b)       Subject to the terms and conditions of this Agreement, the Issuer hereby undertakes to offer Rights Offering Shares for subscription by Eligible Holders of Eligible Claims pursuant to the RSA and the Plan as set forth in this Agreement.

(c)       The Issuer will issue Subscription Rights to purchase the Rights Offering Shares at the Per Share Price.  Each Eligible Holder of Eligible Claims as of the Subscription Record Date will receive a Subscription Right to subscribe for its *pro rata* share of the Rights Offering Shares at the Per Share Price.

(d)       (1) The Issuer will provide, or cause to be provided, to each Eligible Holder of Eligible Claims a subscription form (the "**Rights Offering Subscription Form**"), whereby each Eligible Holder of Eligible Claims may exercise its Subscription Rights in whole or in part, *provided* that such Eligible Holder of Eligible Claims (i) timely and properly executes and delivers its Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to the subscription agent for the Rights Offering selected by the Company (the "**Subscription Agent**") in advance of the Subscription Expiration Deadline (as defined below) and (ii) (A) if such Eligible Holder is not a Backstop Party, such Eligible Holder pays the aggregate purchase price of the Rights Offering Shares elected to be purchased by the Eligible Holder of Eligible Claims by wire transfer of immediately available funds prior to the Subscription Expiration Deadline to an account established by the Subscription Agent for the Rights Offering or (B) if such Eligible Holder is a Backstop Party, such Backstop Party pays the aggregate purchase price of its Rights Offering Shares and those Rights Offering Shares to be purchased by such Backstop Party, as provided on **Schedule 1,** pursuant to certain Subscription Rights allocated to certain of its Related Parties in accordance with Section 1(g).

(2) In advance of the Subscription Expiration Deadline, (A) the Issuer shall deliver to each Backstop Party a notice setting forth such Backstop Party's allocation of Rights Offering Shares for which it may exercise its Subscription Rights and (B) each Backstop Party shall timely and properly exercise its rights to purchase its allocated portion of the Rights Offering Shares, pursuant to the procedures set forth in the preceding clause (1) and the Rights Offering Procedures, subject to payment in accordance with Section 1(g).  For the avoidance of doubt, each Backstop Party shall fully exercise all Subscription Rights allotted to it for the purchase of the Rights Offering Shares (including, for the avoidance of doubt, those Rights Offering Shares to be purchased by such Backstop Party, as provided on **Schedule 1,** pursuant to certain Subscription Rights allocated to certain of its Related Parties).

(3) For purposes of this Agreement, the "**Subscription Expiration Deadline**" means 5:00 p.m. New York City time on such date that is specified in the Rights Offering Procedures or such other date as the Company or the Issuer, subject to the approval of the Required Backstop Parties, may specify in a notice provided to the Eligible Holders of Eligible Claims before 9:00 a.m. New York City time on the Business Day before the then-effective Subscription Expiration Deadline. For purposes of this Agreement, "**Business Day**" means any day of the year on which national banking

3

institutions in New York City are open to the public for conducting business and are not required or authorized to close.

(e)     The Issuer will issue the Rights Offering Shares to the Eligible Holders of Eligible Claims with respect to which Subscription Rights were validly exercised by such Eligible Holders of Eligible Claims upon the Plan Effective Date.  The portion of Rights Offering Shares issued to an Eligible Holder who elects to acquire such Rights Offering Shares shall be rounded down to the nearest whole share.

(f)     If the Subscription Agent for any reason does not receive from an Eligible Holder of Eligible Claims both a timely and duly completed Rights Offering Subscription Form and timely payment for the Rights Offering Shares being purchased by such Eligible Holder of Eligible Claims, the Rights Offering Procedures shall provide that, unless otherwise approved by the Issuer and the Required Backstop Parties, such Eligible Holder of Eligible Claims shall be deemed to have relinquished and waived its right to participate in the Rights Offering.

(g)     As soon as reasonably practicable following the Subscription Expiration Deadline, but, in any event, no later than eight (8) Business Days prior to the Plan Effective Date, the Issuer will deliver to each Backstop Party by email delivery a written notice (the "**Backstop Funding Notice**") of: (i) the number of Rights Offering Shares that such Backstop Party has subscribed to purchase pursuant to such Backstop Party's Rights Offering Subscription Form (including, for the avoidance of doubt, those Rights Offering Shares to be purchased by such Backstop Party, as provided on **Schedule 1,** pursuant to certain Subscription Rights allocated to certain of its Related Parties) and the aggregate purchase price therefor; (ii) the aggregate number of Unsubscribed Shares, if any, and the aggregate purchase price therefor; (iii) the aggregate number of Unsubscribed Shares to be issued and sold by the Issuer to such Backstop Party based upon each Backstop Party's Backstop Commitment Percentage and the aggregate purchase price therefor (together with the amounts referenced in (i), such Backstop Party's "**Funding Amount**"); (iv) wire instructions for a segregated account  (the "**Funding Account**"), which will be an escrow account held in an agreed upon, nationally recognized financial institution if the Required Backstop Parties so request, to which such Backstop Party shall deliver an amount equal to its Funding Amount, less the amount of any cash to which such Backstop Party or a Related Fund of such Backstop Party is entitled to receive under the Plan with respect to the Loans (as defined in the DIP Credit Agreement) if, in accordance with the Plan, such Backstop Party or a Related Fund of such Backstop Party directed that such amount be credited against the Funding Amount of such Backstop Party (such amount, the "**Net Funding Amount**"); and (v) the estimated deadline for delivery of the Funding Amount which shall be three (3) Business Days before the expected Plan Effective Date (the "**Backstop Funding Deadline**").  Each Backstop Party shall deliver and pay its applicable Funding Amount by wire transfer in immediately available funds in U.S. dollars into the Funding Account.  If this Agreement is terminated pursuant to Section 13 after such delivery, such funds shall be released, without any interest accrued thereon, promptly following such termination.

Section 2.    THE BACKSTOP COMMITMENTS.

4

(a)     On the basis of the representations and warranties contained herein, but subject to the conditions set forth in Section 10, each of the Backstop Parties, severally and not jointly, agrees to:

(i)     subscribe for, in accordance with Section 1(d)(2), and purchase, in accordance with Section 1(g), the Rights Offering Shares allocated to such Backstop Party at the aggregate purchase price therefor based upon the Per Share Price; and

(ii)     purchase, in accordance with Section 1(g), its Backstop Commitment Percentage of the Unsubscribed Shares at the aggregate purchase price therefor based upon the Per Share Price (together with its commitment pursuant to Section 2(a)(i), the "**Backstop Commitments**").

(b)     Each Backstop Party's Backstop Commitment Percentage shall be allocated *pro rata* based on (a) each Backstop Party's (together with those of certain of its Related Parties as provided on **Schedule 1**)  aggregate amount of claims for principal and accrued and unpaid interest under the Second Lien Credit Agreements *divided by* (b) the aggregate amount of such claims under the Second Lien Credit Agreements owned by all Backstop Parties  (together with those of certain of their respective Related Parties as provided on **Schedule 1**), in each case on the date the RSA is executed.

(c)     On the basis of the representations and warranties herein contained, as consideration for the Backstop Commitments and the other undertakings of the Backstop Parties herein, the Issuer will pay to the Backstop Parties, in the aggregate, on the Plan Effective Date, a nonrefundable aggregate premium in an amount equal to 6% of the Rights Offering Amount (the "**Backstop Commitment Premium**"), which Backstop Commitment Premium shall be deemed fully earned by the Backstop Parties upon the execution of this Agreement, in the form of shares of New Equity Interests (issued at the Per Share Price), which shall be allocated among the Backstop Parties *pro rata* based on each Backstop Party's Backstop Commitment Percentage; *provided* that, if the Plan Effective Date does not occur, then, the Backstop Commitment Premium shall be payable, in cash, to the extent provided in Section 13..

(d)     Subject to the entry of the Confirmation Order, which order shall approve this Section 2(d), on the Plan Effective Date, the Company or the Issuer, as applicable, will reimburse or pay, as the case may be, all of the reasonable and documented fees and expenses (collectively, "**Transaction Expenses**"), subject to the terms of any applicable engagement letter or reimbursement letter, as the case may be, of Davis Polk & Wardwell LLP as counsel to the applicable Backstop Parties, Vinson & Elkins LLP and Latham & Watkins LLP as counsel to Riverstone, PJT Partners, LP as financial advisor to the applicable Backstop Parties, Perella Weinberg Partners LP as financial advisor to Riverstone; *provided* that the Company shall pay any accrued but unpaid amounts owing under such engagement and/or fee letters to the extent required under the terms thereof upon the termination of this Agreement, but shall not be responsible for any fees and expenses incurred after termination; *provided further* that any invoices shall not be required to contain individual time detail.

(e)      On the Plan Effective Date, the Backstop Parties will purchase, and the Issuer will sell to the Backstop Parties, only such amount of Rights Offering Shares and Unsubscribed Shares as is listed in the Backstop Funding Notice, without prejudice to the rights of the Issuer or the Backstop Parties to seek later an upward or downward adjustment if the amount of Rights Offering Shares or Unsubscribed Shares in such Backstop Funding Notice is inaccurate and in such event, the respective obligations to fund additional purchase price or issue additional Rights Offering Shares or Unsubscribed Shares shall survive notwithstanding such Backstop Funding Notice.

(f)      Delivery of the Unsubscribed Shares and Rights Offering Shares will be made by the Issuer to the respective Backstop Parties on the Plan Effective Date upon the release of the Net Funding Amount of each Backstop Party from the Funding Account, upon which time such funds shall be delivered to the Issuer by wire transfer of immediately available funds to the account specified by the Issuer to the Backstop Parties at least twenty four (24) hours in advance.

(g)      Delivery of the shares in connection with the Backstop Commitment Premium will be made by the Issuer to the respective Backstop Parties on the Plan Effective Date.

Section 3.    TRANSFER OF BACKSTOP COMMITMENT.

(a)      Each Backstop Party's Backstop Commitment shall only be transferable, in whole or in part, to a Permitted Transferee (as defined below); *provided* that the transferring Backstop Party shall give notice of its intent to transfer its Backstop Commitment (other than to a Related Fund (as defined below)), whether in whole or in part, ("**Backstop Transfer Notice**") to the non-transferring Backstop Parties and such non-transferring Backstop Parties shall have a right, but not an obligation, for a period of ten (10) days following receipt of the Backstop Transfer Notice to purchase its *pro rata* share thereof based on the proportion of its Backstop Commitment to the aggregate amount of Backstop Commitments of all non-transferring Backstop Parties purchasing such transferring Backstop Party's Backstop Commitment, on the terms described in the Backstop Transfer Notice.  If such non-transferring Backstop Parties do not elect to purchase all of the Backstop Commitment offered in the Backstop Transfer Notice, then the transferring Backstop Party shall have the right to complete such transfer to any third party who is a Permitted Transferee on terms and conditions that are at least as favorable in the aggregate to such transferring Backstop Party as the terms and conditions set forth in the Backstop Transfer Notice. Any Permitted Transferee of the Backstop Commitment shall agree in writing to be bound by the representations, warranties, covenants and obligations of such transferring Backstop Party under this Agreement and the RSA and shall, as a condition of such transfer, provide the Company and the non-transferring Backstop Parties with evidence reasonably satisfactory to them that such transferee is reasonably capable of fulfilling such obligations, including such financial information as may reasonably be requested by the Company or its representatives demonstrating the ability of the Permitted Transferee to fund the entire amount of its existing Backstop Commitment plus the amount of the Backstop Commitment transferred to such Permitted

6

Transferee. "**Permitted Transferee**" means (i) a Related Fund or (ii) any other Backstop Party.

(b)     Notwithstanding the foregoing, a Backstop Party may assign its Backstop Commitment (including its Subscription Rights), to any fund, account or investment vehicle that is controlled, managed, advised or sub-advised by such Backstop Party, an Affiliate thereof or the same investment manager, advisor or subadvisor as the Backstop Party or an Affiliate of such investment manager, advisor or subadvisor (each, a "**Related Fund**") without submitting a Backstop Transfer Notice, in which case such Related Fund transferee shall agree in writing to be bound by the representations, warranties, covenants and obligations of such transferring Backstop Party under this Agreement and the RSA, shall make the representations set forth in Section 6 hereof as of the date of such transfer as if it was a Backstop Party, and shall, as a condition of such transfer, provide the Company and the non-transferring Backstop Parties with evidence reasonably satisfactory to them that such transferee is reasonably capable of fulfilling such obligations. In such event, the assigning Backstop Party shall remain fully obligated for its Backstop Commitment. For purposes of this Agreement, (i) "**Affiliate**" shall mean with respect to any specified Person (as defined below), any other Person that, at the time of determination, directly or indirectly through one or more intermediaries, Controls (as defined below), is Controlled by or is under common Control with such specified Person and (ii) "**Control**" shall mean, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. The terms "Controlled by," "Controlled" and "under common Control with" shall have correlative meanings.

Section 4.     BACKSTOP PARTY DEFAULT.  Any Backstop Party that fails to timely fund its Backstop Commitment or fully exercise all Subscription Rights held by it in the Rights Offering (a "**Defaulting Backstop Party**") will be liable for the consequences of its breach and the parties hereto can enforce rights of money damages and/or specific performance upon the failure to timely fund by the Defaulting Backstop Party.  Each of the non-defaulting Backstop Parties shall have the right, but not the obligation, to assume its *pro rata* share of such Defaulting Backstop Party's Backstop Commitment, based on the proportion of its Backstop Commitment to the aggregate amount of Backstop Commitments of all non-defaulting Backstop Parties assuming such Defaulting Backstop Party's Backstop Commitment.  No Defaulting Backstop Party shall be entitled to any portion of the Backstop Commitment Premium.

Section 5.     REPRESENTATIONS AND WARRANTIES OF THE ISSUER AND THE COMPANY.  Except as set forth in the Disclosure Letter delivered to the Backstop Parties on the date hereof (the "**Company Disclosure Letter**"), each of the Issuer and the Company represents and warrants to, and agrees with, the Backstop Parties as set forth below. Except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement is made as of the date hereof.

(a)     *Organization and Qualification*.  Each of the Company and its subsidiaries is duly organized, validly existing and in good standing under the laws of its respective

jurisdiction of incorporation or organization and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Each of the Company and its subsidiaries is duly qualified or authorized to do business and is in good standing under the laws of each jurisdiction in which it owns or leases real property or in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not be reasonably likely to result in a Material Adverse Effect.

(b)     *Power and Authority*.

(i)     Each of the Company and the Issuer has the requisite corporate power and authority to enter into, execute and deliver this Agreement and, subject to entry of the Confirmation Order and consummation of the Plan, to perform its obligations hereunder, including, with respect to the Issuer, to issue the Subscription Rights and the Rights Offering Shares.  Each of the Company and the Issuer has taken all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement, including, with respect to the Issuer, the issuance of the Subscription Rights and the Rights Offering Shares.

(ii)     The Company has the requisite corporate power and authority to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and consummation of the Plan, to perform its obligations thereunder, and will have taken all necessary corporate action required for the due authorization, execution, delivery and performance by it of the Plan.

(c)     *Execution and Delivery; Enforceability*.

(i)     This Agreement has been duly and validly executed and delivered by each of the Company and the Issuer, and, subject to entry of the Confirmation Order and consummation of the Plan, constitutes or will constitute the valid and binding obligations of the Company and the Issuer, enforceable against the Company and the Issuer in accordance with its terms.

(ii)     Upon the entry of the Confirmation Order and consummation of the Plan, the Plan will constitute the valid and binding obligation of the Company, enforceable against it in accordance with its terms.

(d)     *Authorized Capital*.  Upon the Plan Effective Date, the authorized capital of the Issuer shall be consistent with the terms of the Plan and Disclosure Statement (as defined below) and the issued and outstanding Rights Offering Shares of the Issuer shall be consistent with the terms of the Plan and Disclosure Statement.

(e)     *Issuance*.  The distribution of the Subscription Rights and, subject to entry of the Confirmation Order and consummation of the Plan, the issuance of the Rights Offering Shares, including the New Equity Interests subscribed for by the Backstop Parties in the Rights Offering, the Unsubscribed Shares and the shares issued pursuant to

8

the Backstop Commitment Premium, will have been duly and validly authorized and, when the Rights Offering Shares are issued and delivered against payment therefor in the Rights Offering or to the Backstop Parties hereunder, will be duly and validly issued and outstanding, fully paid, non-assessable and free and clear of all Taxes, liens, pre-emptive rights, rights of first refusal, subscription and similar rights, except as set forth herein, and other than liens pursuant to applicable securities laws.

(f)     *No Conflict*.  The distribution of the Subscription Rights, and, subject to entry of the Confirmation Order and consummation of the Plan, the sale, issuance and delivery of the Rights Offering Shares upon exercise of the Subscription Rights, the consummation of the Rights Offering by the Issuer, the sale, issuance and delivery of the Unsubscribed Shares pursuant to the terms hereof, and the execution and delivery (or, with respect to the Plan, the filing with the Bankruptcy Court) by the Company of this Agreement and the Plan and compliance by it with all of the provisions hereof and thereof and the consummation of the transactions contemplated hereby and thereby: (i) will not conflict with or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent expressly provided in or contemplated by the Plan, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries is bound or to which any of their properties or assets is subject; (ii) will not result in any violation of the provisions of the organizational documents of the Company or any of its subsidiaries; and (iii) assuming the accuracy of the Backstop Parties' representations and warranties in Section 6, will not result in any violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of its subsidiaries or any of their respective properties, except in any such case described in clause (i) or clause (iii), as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  "**Material Adverse Effect**" means any fact, event, change, effect, development, circumstance, or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on: (a) the business, operations, properties, assets or financial condition of the Company and its subsidiaries, in each case, taken as a whole; or (b) the ability of the Company or any of its subsidiaries, in each case taken as a whole, to perform their obligations under this Agreement, the Plan or the RSA; *provided*, that, for the purposes of clause (a), none of the following, either alone or in combination, will constitute a Material Adverse Effect: (A) any change in the United States or foreign economies or securities or financial markets in general (including any decline in the price of securities generally or any market or index); (B) any change that generally affects any industry in which the Company or its subsidiaries operate; (C) general business or economic conditions in any of the geographical areas in which the Company or its subsidiaries operate; (D) national or international political or social conditions, including any change arising in connection with, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions, whether

commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war; (E) the occurrence of any act of God or other calamity or force majeure event (whether or not declared as such), including any civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (F) any changes in applicable Laws or U.S. GAAP (or other relevant accounting rules); (G) any change resulting from the filing or pendency of or emergence from the Chapter 11 Cases, actions taken in connection with the Chapter 11 Cases, or any reasonably anticipated effects of such filing, pendency, emergence or actions, or from any action approved by the Bankruptcy Court; (H) any change resulting from the public announcement of the Chapter 11 Cases or the entry into this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated hereby; (I) any change resulting from the taking of any action taken by the Company and its subsidiaries after the date hereof with the prior consent of the Required Backstop Parties; or (J) any effects or changes arising from or related to the breach of this Agreement by Backstop Parties; *provided further,* that the exceptions set forth in clauses (A) through (E) of this definition shall not be regarded as exceptions to clause (a) of this definition solely to the extent that any such described event has a disproportionately adverse impact on the Company and its subsidiaries, taken as a whole, as compared to other companies in the industries in which the Company and its subsidiaries operate.

(g)     *Consents and Approvals.*  Assuming the accuracy of the Backstop Parties' representations and warranties in Section 6, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of its subsidiaries is required for the distribution of the Subscription Rights, the sale, issuance and delivery of the Rights Offering Shares upon exercise of the Subscription Rights, the issuance, sale and delivery of Unsubscribed Shares to the Backstop Parties hereunder, the consummation of the Rights Offering by the Issuer and the execution and delivery by the Company of this Agreement or the Plan and compliance by them with all of the provisions hereof and thereof (including payment of the Backstop Commitment Premium and Transaction Expenses of the Backstop Parties as required in Section 2(d) herein) and the consummation of the transactions contemplated hereby and thereby, except (i) the entry of the Confirmation Order, (ii) filings, if any, pursuant to the HSR Act and the expiration or termination of all applicable waiting periods thereunder or any applicable notification, authorization, approval or consent under any other Antitrust Laws in connection with the transactions contemplated by this Agreement, (iii) the filing of any other corporate documents in connection with the transactions contemplated by this Agreement with applicable state filing agencies, (iv) such consents, approvals, authorizations, registrations or qualifications as may be required under foreign securities laws, federal securities laws or state securities or Blue Sky laws in connection with the offer and sale of the Rights Offering Shares, Unsubscribed Shares and the Backstop Commitment Premium and (v) such consents, approvals, authorizations, registrations or qualifications the absence of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(h)     *No Undisclosed Material Liabilities*. There are no liabilities or obligations of the Company or any of its subsidiaries of any kind whatsoever, whether accrued,

10

contingent, absolute, determined or determinable, other than: (i) liabilities or obligations disclosed and provided for in the Financial Statements (as defined below), (ii) liabilities or obligations incurred in the ordinary course of business since the date of the most recent balance sheet presented in the Financial Statements (as defined below) (the "**Reference Date**") or (iii) liabilities or obligations which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(i)     *Financial Statements*.  The financial statements and the related notes thereto of the Company and its consolidated subsidiaries for the period ended September 30, 2017 (the "**Financial Statements**") present fairly in all material respects the consolidated financial position of the Company and its subsidiaries as of the dates indicated and the results of their operations and their cash flows for the periods specified. The Financial Statements have been prepared in conformity with U.S. GAAP as applied to a non-reporting issuer throughout the periods covered thereby.

(j)     *No Violation*.  The Company and its subsidiaries are not, except as a result of the Chapter 11 Cases, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such default or violation that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect; *provided* that this Section 5(j) shall not constitute a representation or warranty as to any violation of or liability under, or compliance with, any Environmental Law, which matters are exclusively covered under Section 5(n).

(k)     *Legal Proceedings*.  Other than the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith, and other than as set forth in the Company Disclosure Letter, there are no legal, governmental or regulatory investigations, actions, suits or proceedings pending or, to the Knowledge of the Company, threatened, in each case, to which the Company and its subsidiaries is or may be a party or to which any property of the Company and its subsidiaries is or may be the subject that, individually or in the aggregate would reasonably be expected to result in a Material Adverse Effect. For the purposes of this Agreement "**Knowledge of the Company**" shall mean the actual knowledge of G. M. McCarroll and Michael T. Dane.

(l)     *No Broker's Fees*. Other than this Agreement, neither the Company nor any of its subsidiaries is a party to any contract, agreement or understanding with any other individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, associate, trust, Governmental Entity or other entity or organization (each a "**Person**"), other than Evercore Group L.L.C., that would give rise to a valid claim against it or the Backstop Parties for a brokerage commission, finder's fee or like payment in connection with the offering and sale of the Subscription Rights, the Rights Offering Shares or the Backstop Party Shares.

(m)     *Absence of Certain Changes*.  Since the Reference Date, no change, event, circumstance effect, development, occurrence or state of facts has occurred or exists that has had or is reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

11

(n)     *Environmental*.  Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) no written notice, claim, demand, request for information, order, complaint or penalty has been received by the Company or any of its subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the Knowledge of the Company, threatened which allege a violation of or liability under any Environmental Laws, in each case relating to the Company or any of its subsidiaries, (ii) the Company and each of its subsidiaries is in compliance with Environmental Law and has obtained, maintains in full force and effect, and is in compliance with all material permits, licenses and other approvals currently required under any Environmental Law for conduct of its business as presently conducted by the Company and each of its subsidiaries, and (iii) to the Knowledge of the Company, no Hazardous Materials have been released by the Company or any of its subsidiaries at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of the Company or any of its subsidiaries under any Environmental Laws. For purposes of this Agreement, "**Environmental Law**" means all applicable foreign, federal, state and local conventions, treaties, protocols, laws, statutes, rules, regulations, ordinances, orders and decrees in effect on the date hereof relating in any manner to contamination, pollution or protection of the environment or exposure to hazardous or toxic substances, materials or wastes, and "**Hazardous Materials**" means all materials, substances, chemicals, or wastes (or combination thereof) that is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum, oil ,or words of similar meaning or effect under any Environmental Law.

(o)     *Insurance*. The Company and each of its subsidiaries, as applicable, has insured its respective properties and assets against such risks and in such amounts as are consistent with past practice or are customary for similarly situated companies engaged in similar businesses. All premiums due and payable in respect of material insurance policies maintained by the Company and its subsidiaries have been paid. As of the date hereof, to the Knowledge of the Company, neither the Company nor any of its subsidiaries has received written notice from any insurer or agent of such insurer with respect to any material insurance policies of the Company or any of its subsidiaries of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

(p)     *Intellectual Property*. Except, in each case, where the failure of such statement to be correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) the Company and its subsidiaries own, or possess the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights, licenses, domain names, and any and all applications or registrations for any of the foregoing (collectively, "**Intellectual Property Rights**") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other person, (ii) to the Knowledge of the Company, neither the Company and its subsidiaries nor any Intellectual Property Right, proprietary right, product, process, method, substance, part, or other material now employed, sold or

offered by the Company and its subsidiaries, is infringing upon, misappropriating or otherwise violating any valid Intellectual Property Rights of any person, and (iii) no claim or litigation regarding any of the foregoing is pending or, to the Knowledge of the Company, threatened.

(q)     *No Undisclosed Relationship*.  Except for employment relationships and compensation, benefits and travel advances in the ordinary course of business or as disclosed in Section 5(q) of the Company Disclosure Letter, neither the Company nor any of its subsidiaries is a party to any agreement with, or involving the making of any payment or transfer of assets to, Riverstone V FW Holdings Sub, LLC or any of its Affiliates, any other stockholder beneficially owning greater than 5% of the Company or any officer or director of the Company or any of its subsidiaries (each, an "**Affiliate Agreement**").

(r)     *Money Laundering Laws*.  The operations of the Company and its subsidiaries are, and have been at all times since January 1, 2014, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the money laundering statutes of all jurisdictions in which the Company and its subsidiaries operate (and the rules and regulations promulgated thereunder) and any related or similar laws and there has been no material legal proceeding by or before any governmental entity or any arbitrator involving the Company or any of its subsidiaries with respect to such laws is pending or, to the Knowledge of the Company, threatened.

(s)     *Sanctions Laws*.  Neither the Company and its subsidiaries nor, to the Knowledge of the Company, any of their respective directors, officers, employees or other Persons acting on their behalf with express authority to so act are currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department. The Company and its subsidiaries will not directly or indirectly use the proceeds of the Rights Offering, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, for the purpose of financing the activities of any Person that, to the Knowledge of the Company and its subsidiaries, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

(t)     *Foreign Corrupt Practices Act*. To the Knowledge of the Company, there have been no actual or alleged material violations of the Foreign Corrupt Practices Act of 1977, as amended, nor any applicable anti-corruption or anti-bribery laws in any jurisdiction other than the United States, in each case, since January 1, 2014, by the Company and its subsidiaries or any of their respective officers, directors, agents, distributors, employees or any other Person acting on behalf of the Company or any of its subsidiaries.

(u)     *Taxes*.

(i)     The Company and each of its subsidiaries have paid all material amounts of income, gross receipts, license, payroll, employment, excise,

13

severance, occupation, premium, windfalls profits, customs duties, capital stock, franchise, profits, withholding, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other taxes levied by a governmental authority, including interest and penalties thereon ("**Taxes**") imposed on it or its assets, business or properties, or, to the extent not yet due, such Taxes have been accrued and fully provided for in accordance with generally accepted accounting principles. The Company and each of its subsidiaries has timely filed all income and other material returns, information statements or reports required to be filed with any governmental authority with respect to Taxes.

(ii)     There are no material Liens for Taxes on any asset of the Company or its subsidiaries other than liens for Taxes not yet delinquent or for Taxes contested in good faith by appropriate proceedings.

(iii)     The Company and its subsidiaries have no liability for any material amount of Taxes of any other Person or entity, either by operation of law, by contract or as a transferee or successor. The Company and its subsidiaries are not a party to any material Tax allocation or Tax sharing agreement with any third party (other than an agreement entered into in the ordinary course of business consistent with past practice (such as a lease or a license) or the principal purpose of which is not the sharing, assumption or indemnification of Tax).

(iv)     As of the date hereof, there is no outstanding audit, assessment, dispute or claim concerning any material Tax liability of the Company and its subsidiaries (taken as a whole), and the Company and its subsidiaries have not received from any governmental authority any written notice regarding any contemplated or pending audit, examination or other administrative proceeding or court proceeding concerning any material amount of Taxes imposed thereon.

(v)     All material Taxes that the Company and its subsidiaries (taken as a whole) were (or was) required by law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid to the proper authorities to the extent due and payable.

(vi)     None of the Company and any of its subsidiaries has been included in any "consolidated," "unitary" or "combined" Tax Return provided for under any law with respect to Taxes for any taxable period for which the statute of limitations has not expired (other than a group of which the Company and/or its current or past subsidiaries are or were the only members).

(vii)     None of the Company and any of its subsidiaries has been either a "distributing corporation" or a "controlled corporation" in a distribution occurring during the last five years in which the parties to such distribution treated the distribution as one to which Section 355 of the Internal Revenue Code of 1986, as amended (the "**Code**"), is applicable.

14

(viii)    None of the Company and any of its subsidiaries has been requested in writing, and, to the Knowledge of the Company, there are no claims against the Company or any of its subsidiaries, to pay any liability for Taxes of any Person (other than the Company or its subsidiaries) that are material to the Company and its subsidiaries taken as a whole, arising from the application of Treasury Regulation Section 1.1502-6 or any analogous provision of state, local or foreign law, or as a transferee or successor.

(ix)    Neither the consummation of the Plan nor the issuance of Rights Offering Shares will result in any material degrouping charges for Tax purposes with respect to the Company or its subsidiaries.

(v)    *Title to Property*.

(i)    *Personal Property*.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (A) the Company and its subsidiaries have good title to, free and clear of any and all Liens (other than Permitted Liens), or a valid leasehold interest in, all personal properties, machinery, equipment and other tangible assets of the business necessary for the conduct of the business as presently conducted by the Company and its subsidiaries and (B) such properties, (x) are in the possession or control of the Company or its subsidiaries; and (y) are in good and operable condition and repair, reasonable wear and tear excepted. For purposes of this Agreement, "**Lien**" and "**Permitted Liens**" shall have the respective meanings given to those terms in the DIP Credit Agreement.

(ii)    *Leased Real Property*.  The Company and its subsidiaries have complied with all obligations under all leases to which it is a party that have not been rejected in the Chapter 11 Cases, except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and all such leases are in full force and effect (except to the extent subject to applicable to bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights generally and to general principles of equity), except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Company and its subsidiaries enjoy peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(w)    *Labor Relations*. There is no labor or employment-related legal proceeding pending or, to the Knowledge of the Company, threatened against the Company or any of its subsidiaries, by or on behalf of any of their respective employees or such employees' labor organization, works council, workers' committee, union representatives or any other type of employees' representatives appointed for collective bargaining purposes, or by

any Governmental Entity, that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(x)     *Licenses and Permits*. The Company and its subsidiaries possess all licenses, certificates, permits and other authorizations issued by, and have made all declarations and filings with, the appropriate Governmental Entities that are necessary for the ownership or lease of their respective properties and the conduct of their business as presently conducted by the Company and its subsidiaries, in each case, except as would not have and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Except as would not have and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company and its subsidiaries (i) have not received written notice of any revocation or modification of any such license, certificate, permit or authorization or (ii) have no reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course.

(y)     *Material Contracts*.

(i)     All Material Contracts are valid, binding and enforceable by and against the Company and its subsidiaries, as applicable (except to the extent enforceability may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights generally and to general principles of equity), except where the failure to be valid, binding or enforceable would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and no written notice to terminate, in whole or part, any Material Contract has been delivered to the Company and its subsidiaries except where such termination would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Other than as a result of the filing of the Chapter 11 Proceedings, neither the Company and its subsidiaries nor, to the Knowledge of the Company and its subsidiaries, any other party to any Material Contract, is in default or breach under the terms thereof except, in each case, for such instances of default or breach that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  For purposes of this Agreement, "**Material Contract**" means any contract necessary for the operation of the business of the Company and its subsidiaries as presently conducted by the Company and its subsidiaries that is a "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K or required to be disclosed on a current report on Form 8-K).

Section 6.     REPRESENTATIONS AND WARRANTIES OF THE BACKSTOP PARTIES. Each of the Backstop Parties severally represents and warrants to, and agrees with, the Company and the Issuer as set forth below. Each representation, warranty and agreement is made as of the date hereof.

(a)     *Formation*.  Such Backstop Party has been duly organized or formed, as applicable, and is validly existing as a corporation or other entity in good standing under the applicable laws of its jurisdiction of organization or formation.

16

(b)     *Power and Authority*.  Such Backstop Party has the requisite power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement.

(c)     *Execution and Delivery*.  This Agreement has been duly and validly executed and delivered by such Backstop Party and constitutes its valid and binding obligation, enforceable against such Backstop Party in accordance with its terms.

(d)     *Securities Laws Compliance*.  The New Equity Interests subscribed for by the Backstop Parties in the Rights Offering, the Unsubscribed Shares and the shares issued pursuant to the Backstop Commitment Premium (collectively, the "**Backstop Party Shares**") will not be offered for sale, sold or otherwise transferred by such Backstop Party except pursuant to an effective registration statement under the Securities Act of 1933 and the rules and regulations of the SEC thereunder (the "**Securities Act**") or in a transaction exempt from or not subject to registration under the Securities Act and any applicable state securities laws.

(e)     *Purchase Intent*.  Such Backstop Party is acquiring the Backstop Party Shares for its own account or for the accounts for which it is acting as investment advisors or manager, and not with a view to distributing or reselling such Backstop Party Shares or any part thereof.  Such Backstop Party understands that such Backstop Party must bear the economic risk of this investment indefinitely, unless the Backstop Party Shares are registered pursuant to the Securities Act and any applicable state securities or Blue Sky laws or an exemption from such registration is available, and further understands that it is not currently contemplated that any Backstop Party Shares will be registered at the time of issuance.

(f)     *Investor Status*.  Such Backstop Party is an Accredited Investor.  Such Backstop Party understands that the Backstop Party Shares are being offered and sold to such Backstop Party in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that each of the Company and the Issuer is relying upon the truth and accuracy of, and such Backstop Party's compliance with, the representations, warranties, agreements, acknowledgments and understandings of such Backstop Party set forth herein in order to determine the availability of such exemptions and the eligibility of such Backstop Party to acquire Backstop Party Shares. Such Backstop Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the Rights Offering Shares and the Unsubscribed Shares. Such Backstop Party understands and is able to bear any economic risks associated with such investment (including the necessity of holding such shares for an indefinite period of time). Except for the representations and warranties expressly set forth in this Agreement, such Backstop Party has independently evaluated the merits and risks of its decision to enter into this Agreement and disclaims reliance on any representations or warranties, either express or implied, by or on behalf of the Company or the Issuer. Such Backstop Party acknowledges that it has been afforded the opportunity to ask questions and receive

17

answers concerning the Company and its subsidiaries and to obtain additional information that it has requested to verify the accuracy of the information contained herein.

(g)     *Consents and Approvals*.  Assuming the accuracy of the Company's representations and warranties in Section 5, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over such Backstop Party or any of its properties is required for the purchase of the Backstop Party Shares by the Backstop Parties hereunder and the execution and delivery by such Backstop Party of this Agreement and performance of and compliance by it with all of the provisions hereof and thereof (and the consummation of the transactions contemplated hereby and thereby), except (i) the entry of the Confirmation Order, (ii) filings, if any, pursuant to the HSR Act and the expiration or termination of all applicable waiting periods thereunder or any applicable notification, authorization, approval or consent under any other Antitrust Laws in connection with the transactions contemplated by this Agreement, (iii) the filing of any other corporate documents in connection with the transactions contemplated by this Agreement with applicable state filing agencies, (iv) such consents, approvals, authorizations, registrations or qualifications as may be required under foreign securities laws, federal securities laws or state securities or Blue Sky laws in connection with the offer and sale of the Rights Offering Shares, Unsubscribed Shares and the Backstop Commitment Premium and (v) such consents, approvals, authorizations, registrations or qualifications the absence of which would not, individually or in the aggregate, reasonably be expected to result in a material adverse effect on the ability of such Backstop Party to perform its obligations under this Agreement.

(h)     *Sufficiency of Funds*.  Such Backstop Party will have sufficient immediately available funds to make and complete the payment of the aggregate purchase price for its New Equity Interests subscribed for in the Rights Offering and its Backstop Commitment Percentage of the Unsubscribed Shares on the Backstop Funding Deadline.

(i)     *No Brokers Fee*.  Such Backstop Party is not a party to any contract with any Person that would give rise to a valid claim against any of the Debtors for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Rights Offering Shares or the Unsubscribed Shares.

Section 7.     ADDITIONAL COVENANTS OF THE COMPANY.  The Company agrees with the Backstop Parties as follows:

(a)     *Plan and Disclosure Statement*. The Company shall: (i) file as soon as practicable after the Petition Date, the Plan and a related disclosure statement (the "**Disclosure Statement**") with the Bankruptcy Court, each in form and substance reasonably acceptable to the Required Backstop Parties or as otherwise approved pursuant to the terms of the RSA, it being understood that the Plan and Disclosure Statement distributed to creditors on February 14, 2018 are reasonably acceptable to the Required Backstop Parties and consistent in all material respects with the RSA; and (ii) seek the entry of a Confirmation Order by the Bankruptcy Court, in form and substance reasonably acceptable to the Required Backstop Parties and the Company, pursuant to the terms set

18

forth in the RSA. The Company will, not later than two (2) Business Days prior to the filing thereof, provide draft copies of all Restructuring Documents (as defined in the RSA) to counsel to the Backstop Parties; *provided*, that if two (2) Business Days in advance is not reasonably practicable, such Restructuring Document shall be delivered as soon as reasonably practicable prior to filing.

(b)    *Support of the Plan*. The Company agrees that, for the duration of the Support Period (as defined in the RSA), the Company shall, and shall cause each of its subsidiaries included in the definition of "Company" in the RSA to use commercially reasonable efforts to (i) obtain approval of the Plan and consummate the Restructuring (as defined in the RSA), including timely filing any objection or opposition to any motion filed with the Bankruptcy Court seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, directing the appointment of an examiner with expanded powers or a trustee, converting the Chapter 11 Cases or for relief that (A) is inconsistent with the RSA in any respect or (B) would, or would reasonably be expected to, frustrate the purposes of the RSA, including by preventing the consummation of the Restructuring and (ii) obtain orders of the Bankruptcy Court in respect of the Restructuring.

(c)    *Rights Offering*.  The Issuer shall effectuate the Rights Offering in accordance with the Plan and the Rights Offering Procedures.

(d)    *Form D and Blue Sky*. The Issuer shall timely file a Form D with the SEC with respect to the Backstop Party Shares, to the extent required under Regulation D of the Securities Act.  The Company or the Issuer shall, on or before the Plan Effective Date, take such action as the Company or the Issuer shall reasonably determine is necessary in order to obtain an exemption for, or to qualify for sale or issuance to the Backstop Parties the Backstop Party Shares under applicable securities and "blue sky" Laws of the states of the United States (or to obtain an exemption from such qualification) and any applicable foreign jurisdictions. The Company or the Issuer, as applicable, shall timely make all filings and reports relating to the offer and sale of the Backstop Party Shares required under applicable securities and "blue sky" Laws of the states of the United States following the Plan Effective Date. The Company or the Issuer, as applicable, shall pay all fees and expenses in connection with satisfying its obligations under this Section 7(d).

(e)    *Share Legend*. Each certificate evidencing New Equity Interests issued hereunder, including any New Equity Interests that may be issued in satisfaction of the Backstop Commitment Premium, and each certificate issued in exchange for or upon the transfer of any such shares, shall be stamped or otherwise imprinted with a legend (the "**Legend**") in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE

REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE
EXEMPTION FROM REGISTRATION THEREUNDER."

In the event that any such shares are uncertificated, such shares shall be subject
to a restrictive notation substantially similar to the Legend in the stock ledger or other
appropriate records maintained by the Issuer or agent and the term "Legend" shall
include such restrictive notation.

(f)     *Unsubscribed Shares*.  The Company, in consultation with counsel for the
Backstop Parties, shall determine the amount of Unsubscribed Shares, if any, and, in good
faith, provide a Backstop Funding Notice that accurately reflects the amount of
Unsubscribed Shares as so determined and to provide to the Backstop Parties a
certification by the Subscription Agent of the Unsubscribed Shares or, if such certification
is not available, such written backup to the determination of the Unsubscribed Shares as
the Backstop Parties may reasonably request.

(g)     *Approvals*.  Except as set forth in this Agreement or with the prior written
consent of the Required Backstop Parties, during the period from the date of this
Agreement to the earlier of the Plan Effective Date and the date on which this Agreement
is terminated in accordance with its terms, the Company and each of its subsidiaries shall
use reasonable efforts to reasonably promptly take all actions and prepare and file all
necessary documentation (including by reasonably cooperating with the Backstop Parties
as to the appropriate time of filing such documentation and its content) and to effect all
applications that are necessary in connection with seeking any governmental approval,
exemption or authorization from any governmental authority under any Antitrust Laws
that are necessary to consummate and make effective the transactions contemplated by
this Agreement. The Company shall reasonably promptly notify the Backstop Parties (and
furnish to them copies of, if requested) of any communications from governmental
authorities and shall not participate in any meeting with any such authority unless it
consults with the Backstop Parties in advance to the extent permitted by applicable law
and gives the Backstop Parties a reasonable opportunity to attend and participate thereat.
The Company and each of its subsidiaries shall not take any action that is intended or
reasonably likely to materially impede or delay the ability of the parties hereto to obtain
any necessary approvals required for the transactions contemplated by this Agreement.

For purposes of this Agreement, "**Antitrust Laws**" means the Hart Scott
Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations
promulgated thereunder (the "**HSR Act**") and any similar law enforced by any
governmental antitrust entity of any jurisdiction regarding pre-acquisition notifications
for the purpose of competition reviews of mergers and acquisitions, the Sherman Act, as
amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended,
and all other applicable laws that are designed or intended to prohibit, restrict or regulate
actions or transactions having the purpose or effect of monopolization or restraint of trade
or lessening of competition through merger or acquisition or effectuating foreign
investment.

(h)     *Conduct of Business*.  Except as set forth in the Plan, the RSA, herein or with the prior consent of the Required Backstop Parties, the Company shall, and shall cause its subsidiaries to, (i) except to the extent inconsistent with the Bankruptcy Code or the DIP Credit Agreement (as defined in the RSA), carry on its business in the ordinary course, (ii) use commercially reasonable efforts to preserve intact their material business organization, (iii) use commercially reasonable efforts to keep available the services of their current senior executive officers and key employees, and (iv) use commercially reasonable efforts to preserve their material relationships with customers, suppliers, licensors, licensees, distributors and others having material business dealings with the Company or its subsidiaries in connection with its business. Except (i) as set forth in Section 7(h) of the Company Disclosure Letter, (ii) with the prior consent of the Required Backstop Parties or (iii) as expressly provided in the Plan, the RSA or herein from and after the date hereof until the Plan Effective Date, the Company shall not, and shall cause its subsidiaries not to, other than in the ordinary course of business:

(i)     enter into any acquisition, merger with or other change of control of another business to the extent prohibited under the DIP Credit Agreement as in effect on the date hereof, in each case without giving effect to any amendments or waivers thereto and regardless of whether or not such DIP Credit Agreement remains in effect;

(ii)     dispose of any material asset to the extent prohibited under the DIP Credit Agreement as in effect on the date hereof, in each case without giving effect to any amendments or waivers thereto and regardless of whether or not such DIP Credit Agreement remains in effect;

(iii)     give effect to any material changes to the Company's business plan underlying the Financial Projections attached as Exhibit E to the Disclosure Statement (the "**Business Plan**");

(iv)     give effect to the termination of one or more related contracts that, in the aggregate, results in a reduction of $30 million or more of the Company's revenue on an annualized basis, other than as described in the Business Plan, unless such contract is replaced with a similar contract which provides a substantially similar amount of revenue;

(v)     enter into one or more related contracts that, in the aggregate, would result in $30 million or more of the Company's revenue on an annualized basis, other than as described in the Business Plan, unless such contracts replace existing, similar contracts which provide a substantially similar amount of revenue;

(vi)     enter into any material amendment of or waiver of any material right of the Company by the Company under the Purchase Agreement; *provided* that if the Required Backstop Parties have not provided a response within two (2) Business Days following a request by the Company for consent pursuant to this Section 7(h)(vi), consent will be deemed given;

(vii)     enter into any new key employee incentive plan or key employee retention plan or similar arrangement, or any new or amended agreement regarding executive compensation;

(viii)     give effect to a material capital expenditure contracted for following the date hereof in an amount greater than $10 million that is not expressly contemplated in the Business Plan or if such capital expenditure is expressly prohibited under the DIP Credit Agreement as in effect on the date hereof, without giving effect to any amendments or waivers thereto and whether or not the DIP Credit Agreement remains in effect;

(ix)     enter into any Affiliate Agreements, except to the extent not prohibited by the DIP Credit Agreement as in effect on the date hereof, without giving effect to any amendments or waivers thereto and whether or not such DIP Credit Agreement remains in effect;

(x)     declare, set aside or pay any dividends or purchase, redeem, or otherwise acquire, except in connection with the Plan, any shares of its capital stock, except to the extent not prohibited by the DIP Credit Agreement as in effect on the date hereof, without giving effect to any amendments or waivers thereto and whether or not such DIP Credit Agreement remains in effect;

(xi)     issue, deliver, grant, sell, pledge or otherwise encumber any of its capital stock or any convertible securities into its capital stock or any of its assets, except to the extent required by the DIP Credit Agreement, to the extent required by the Bankruptcy Court or to the extent not prohibited by the DIP Credit Agreement as in effect on the date hereof, without giving effect to any amendments or waivers thereto and whether or not such DIP Credit Agreement remains in effect;

(xii)     make, change or rescind any material election relating to Taxes, except elections consistent with past practice, except to the extent not prohibited by the DIP Credit Agreement as in effect on the date hereof, without giving effect to any amendments or waivers thereto and whether or not such DIP Credit Agreement remains in effect;

(xiii)     become a party to, establish, adopt, amend or terminate any collective bargaining agreement or other agreement with a labor union, works council or similar organization;

(xiv)     amend its articles of incorporation, bylaws or other similar organizational documents (whether by merger, consolidation or otherwise), other than as contemplated by this Agreement, the Plan, the RSA or the other transactions contemplated thereby or as approved by the Bankruptcy Court;

(xv)     make any loans, advances or capital contributions to, or investments in, any other Person, other than in the ordinary course of business,

except to the extent not prohibited by the DIP Credit Agreement as in effect on the date hereof, without giving effect to any amendments or waivers thereto and whether or not such DIP Credit Agreement remains in effect;

(xvi)    settle, or offer or propose to settle, any material litigation, investigation, arbitration, proceeding or other claim involving or against the Company or any of its subsidiaries, except to the extent not prohibited by the DIP Credit Agreement as in effect on the date hereof, without giving effect to any amendments or waivers thereto and whether or not such DIP Credit Agreement remains in effect (it being understood and acknowledged that any litigation pending as of the date hereof which is not listed on Section 5(k) of the Company Disclosure Letter shall be deemed to be not material)[1], or

(xvii)   except as permitted above, agree, resolve or commit to do any of the foregoing.

(i)     *Access to Information*.  The Company and each of its subsidiaries shall (i) afford the Backstop Parties and their respective representatives, upon the reasonable request and notice of at least three (3) Business Days and no more than once every two (2) week period from the date hereof until the Plan Effective Date, a status call with senior management of the Company and its subsidiaries and (ii) during such period, furnish promptly to such parties all reasonable information concerning the Company and its subsidiaries' business and properties as may reasonably be requested by any such party, such information to be consistent with the information required to be provided pursuant to the DIP Credit Agreement, and directly related to a stated purpose for such request, *provided* that the foregoing shall not require the Company (x) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company to violate any of its obligations with respect to confidentiality to a third party, (y) to disclose any legally privileged information of the Company, or (z) to violate any applicable laws or orders.

(j)     *Further Assurances*.  Without in any way limiting any other obligation of the Company and its subsidiaries in this Agreement, the Company and its subsidiaries shall use commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, and as any Backstop Party may reasonably request, in order to consummate and make effective the transactions contemplated by this Agreement. The Company furthermore agrees that it shall perform, and cause its subsidiaries to perform, any and all of its covenants, agreements and obligations under this Agreement and not take any actions that would be inconsistent with such obligations.

(k)     *Alternate Transactions*.

---

[1] Schedule to list "None."

(1) From the date of this Agreement until the earlier of the termination of this Agreement in accordance with its terms and the Plan Effective Date, (A) the Company and its subsidiaries shall, and shall instruct and direct their respective representatives to, immediately cease and terminate any ongoing solicitation, discussions and negotiations with respect to any Alternate Transaction (as defined below), and (B) the Company and its subsidiaries shall not, and the Company and its subsidiaries shall instruct and direct their respective representatives not to, directly or indirectly, initiate, solicit, engage in or participate in any discussions, inquiries or negotiations in connection with any proposal or offer relating to an Alternate Transaction, afford access to the business, properties, assets, books or records of or provide any non-public information relating to the Company or any of its subsidiaries to, otherwise cooperate in any way with, or knowingly assist, participate in, facilitate or encourage any effort by any Person that is seeking to make, or has made, an Alternate Transaction proposal. It is agreed that any violation of the restrictions on the Company set forth in this Section 7(k) by any subsidiary of the Company or any representative of the Company or any of its subsidiaries shall be deemed a breach of this Section 7(k) by the Company. "**Alternate Transaction**" means any transaction with respect to a reorganization, restructuring, merger, consolidation, share exchange, rights offering, equity investment, business combination, recapitalization or similar transaction (including the sale of all or substantially all of the assets of the Company and its subsidiaries) involving the Company or any other Debtors that is inconsistent with the Rights Offering, the Backstop Commitment, the RSA, this Agreement or the Plan.  "**Superior Transaction**" means a transaction that the board of directors of the Company (the "**Company Board**") determines in good faith, based on the advice of its financial and legal advisors: (x) would be in the best interests of the Company, its creditors and equity holders as a whole, including, but not limited to the Backstop Parties, and (y) would reasonably be expected to provide a recovery (but, with respect to any creditor constituent, not in excess of its claim) to holders of SLTL Claims at least as favorable as the recovery set forth in the Plan.

(2) Notwithstanding the foregoing clause (a)(1), if following the date of this Agreement (i) the Company or any of its subsidiaries receives a bona fide unsolicited proposal or offer (whether written or unwritten) for an Alternate Transaction (an "**Alternate Transaction Proposal**") from any Person not solicited by the Company or its subsidiaries in violation of this Section 7(k) in any material respect that the Company Board has determined in good faith, after consultation with its outside counsel and independent financial advisor, that such Alternate Transaction Proposal constitutes, or could reasonably be expected to result in, a Superior Transaction and that failure of the Company Board to pursue such Alternate Transaction Proposal would reasonably be expected to be inconsistent with the Company Board's fiduciary duties under applicable Laws (a "**Superior Proposal**"), the Company may, in response to such Superior Proposal: (x) furnish non-public information in response to a request therefor by such Person if such Person has executed and delivered to the Company a confidentiality agreement on terms no less favorable than any Backstop Party confidentiality agreement and if the Company also promptly (and in any event within 24 hours after the time such information is provided to such Person) makes such information available to the Backstop Parties; and (y) engage or participate in discussions and negotiations with such

24

Person regarding such Superior Proposal. The Company shall also notify the Backstop Parties promptly if the Company Board determines that an Alternate Transaction Proposal is a Superior Proposal no later than 24 hours following such determination.

(3) The Company shall notify the Backstop Parties promptly (and, in any event, within 24 hours) if any Alternate Transaction Proposals are received by, any non-public information is requested from, or any discussions or negotiations are sought to be initiated or continued with, it or its subsidiaries or its or its subsidiaries' representatives with respect to any Alternate Transaction Proposal, indicating, in connection with such notice, the identity of the parties and the material terms and conditions of any Alternate Transaction Proposal (including, if applicable, copies of any and all written inquiries, requests, proposals or offers, including any draft of proposed agreements received or sent by the Company, also within 24 hours) and, thereafter, the Company shall keep the Backstop Parties reasonably informed of the status and terms of any such Alternate Transaction Proposals (including any amendments thereto) and the status of any such discussions or negotiations, including any change in the Company's intentions as previously notified. None of the Company or any of its subsidiaries shall, after the date of this Agreement, enter into any confidentiality or similar agreement that would prohibit it from providing such information to the Backstop Parties.

(4) Prior to the earlier of the occurrence of the Plan Effective Date and the termination of this Agreement in accordance with its terms, the Company Board may approve a Superior Proposal not solicited in violation of this Section 7(k) that the Company Board has determined in good faith, after consultation with its outside legal counsel and its independent financial advisor, constitutes a Superior Transaction, if and only if, (i) prior to taking such action the Company Board determines in good faith, after consultation with its outside legal counsel, that failure to take such action would reasonably be expected to be inconsistent with the Company Board's fiduciary duties under applicable Laws; (ii) the Company Board notifies the Backstop Parties in writing at least four (4) Business Days in advance that it intends to take such action or that the Company intends to terminate this Agreement pursuant to Section 13(c) which notice shall specify the identity of the Person making such Superior Proposal and all of the material terms and conditions of such Superior Proposal and attach the most current version of any proposed transaction agreement (and any related agreements) providing for such Superior Proposal; (iii) after providing such notice and prior to taking any such action or terminating this Agreement pursuant to Section 13(b), the Company shall, and shall cause its representatives to, negotiate in good faith with the Backstop Parties during the four (4) Business Day period to make such adjustments to the terms and conditions of this Agreement and the other transaction agreements as would permit the Company Board not to take such action or terminate this Agreement; and (iv) following the end of such four (4) Business Day period, the Company Board shall have determined in good faith, after consultation with its outside legal counsel and independent financial advisor, and after taking into account any changes to this Agreement and the other transaction agreements proposed by the Backstop Parties, that the Superior Proposal continues to constitute a Superior Transaction assuming such changes agreed to by the Backstop Parties were to be given effect.

(5) With respect to any Alternate Transaction that is premised, whether directly or indirectly, on one or more asset sales under Section 363 of the Bankruptcy Code or pursuant to a chapter 11 plan, each Backstop Party and/or the respective agents under the Second Lien Credit Agreements (including the collateral agent under and as defined in the Second Lien Credit Agreements) shall (in the manner provided for in the Second Lien Credit Agreement Documents) have the right to "credit bid" (whether pursuant to Section 363(k) of the Bankruptcy Code or otherwise) all (or such lesser portion as they may determine under the Second Lien Credit Agreements) of the maximum amount of Eligible Claims (including all principal, premium, interest (at the default rate to the extent applicable under the Second Lien Credit Agreements and irrespective of whether permissible under the Bankruptcy Code), penalties, fees, charges, expenses, indemnifications, reimbursements, damages, and all other amounts and liabilities payable under the Second Lien Credit Agreements) notwithstanding any provision of the Bankruptcy Code or any applicable Law (including Section 363(k) of the Bankruptcy Code) to the contrary, subject only to any applicable term or condition of the Second Lien Credit Agreements, to the extent that such term or condition is found to be enforceable.

Section 8.    ADDITIONAL COVENANTS OF THE BACKSTOP PARTIES.  Each of the Backstop Parties agrees with the Company, severally and not jointly, as follows:

(a)    *Approvals*.  Except as set forth in this Agreement or with the prior written consent of the Company, during the period from the date of this Agreement to the earlier of the Plan Effective Date and the date on which this Agreement is terminated in accordance with its terms, the Backstop Parties shall use reasonable efforts to reasonably promptly take all actions and prepare and file all necessary documentation (including by reasonably cooperating with the Company as to the appropriate time of filing such documentation and its content) and to effect all applications that are necessary in connection with seeking any governmental approval, exemption or authorization from any governmental authority under any Antitrust Laws, that are necessary to consummate and make effective the transactions contemplated by this Agreement. Each Backstop Party shall reasonably promptly notify the Company (and furnish to it copies of, if requested) of any communications from governmental authorities and shall not participate in any meeting with any such authority unless it consults with the Company in advance to the extent permitted by applicable law and gives the Company a reasonable opportunity to attend and participate thereat.  The Backstop Parties shall not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties hereto to obtain any necessary approvals required for the transactions contemplated by this Agreement.

Section 9.    SUPPORT OF PLAN.  Each Backstop Party agrees that, for the duration of the Support Period, such Backstop Party shall:

(a)    (i) timely vote or cause to be voted its SLTL Claims to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the Solicitation (as defined in the RSA), (ii) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); *provided*, however, that such vote may, upon written notice to the

Company and the other parties, be revoked (and, upon such revocation, deemed void ab initio) by any Backstop Party at any time following the expiration of the Support Period or upon termination of the RSA pursuant to the terms hereof with respect to such Backstop Party;

(b)     timely vote (or cause to be voted) its SLTL Claims against any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company other than the Plan (each, a "**Alternative Restructuring**");

(c)     not directly or indirectly, through any person or entity (including any administrative agent or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any Alternative Restructuring or take any other action that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring;

(d)     support and take all actions necessary or reasonably requested by the Company to facilitate the Solicitation of the Plan, obtain approval of the Disclosure Statement, and confirmation and consummation of the Plan and the Restructuring; and

(e)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediments.

Section 10.   CONDITIONS TO THE OBLIGATIONS OF THE BACKSTOP PARTIES.  The obligations of the Backstop Parties to purchase Rights Offering Shares and Unsubscribed Shares pursuant to their respective Backstop Commitments on the Plan Effective Date are subject to the satisfaction of the following conditions (unless waived by the Required Backstop Parties), except where the failure to satisfy any such condition results solely from the failure by any Backstop Party to comply with this Agreement:

(a)     *Plan and Confirmation Order*.  The Plan, as approved, and the Confirmation Order, as entered by the Bankruptcy Court and which shall have become a Final Order, shall each be consistent in all material respects with the RSA or otherwise with such amendments, modifications or changes that are reasonably acceptable to the Required Backstop Parties.

(b)     *Conditions to the Plan*.  The conditions to the occurrence of the Plan Effective Date set forth in the Plan and the Confirmation Order shall have been satisfied or waived by the Company in accordance with the terms of the Plan, and the Plan Effective Date shall have occurred or be deemed to have occurred.

(c)     *Asset Purchase Transaction*. Substantially contemporaneous with the transactions contemplated hereunder, the Company shall have consummated the Asset Purchase Transaction pursuant to the Purchase Agreement, in the form attached as Exhibit

G to the Disclosure Statement with only such material amendments and waivers of material rights of the Company that been reasonably approved (or deemed to be approved) by the Required Backstop Parties in accordance with this Agreement.

(d)    *Rights Offering*. The Issuer shall have commenced the Rights Offering, the Rights Offering shall have been conducted in all material respects in accordance with this Agreement and the Rights Offering Procedures, and the Subscription Expiration Deadline shall have occurred.

(e)    *Approvals*. All terminations or expirations of waiting periods imposed by any Governmental Entity required under the HSR Act or any other Antitrust Laws, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained from any Governmental Entity under any Antitrust Law shall have been made or obtained for the transactions contemplated by this Agreement.

(f)    *Backstop Funding Notice*. The Backstop Parties shall have received a Backstop Funding Notice in accordance with Section 1(g).

(g)    *Valid Issuance*. The Rights Offering Shares shall be, upon (i) payment of the aggregate purchase price as provided herein and (ii) the Plan Effective Date, validly issued and outstanding, and free and clear of all Taxes, liens, pre-emptive rights, rights of first refusal, subscription and similar rights, except as set forth herein, and other than liens pursuant to applicable securities laws.

(h)    *No Restraint*. No judgment, injunction, decree or other legal restraint shall be in effect that prohibits the consummation of the Restructuring.

(i)    *Representations and Warranties*.

(i)    The representations and warranties of the Company contained in Sections 5(a), (b), (c),(d), (e) and (f)(ii) qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects on and as of the Plan Effective Date as if made on and as of the Plan Effective Date (or, to the extent made as of a specific date, as of such date); and

(ii)    all other representations and warranties of the Company contained in Section 5 shall be true and correct (without giving effect to any qualification set forth therein as to "materiality", "Material Adverse Effect" or other qualifications based on the word "material" or similar phrases) on and as of the Plan Effective Date as if made on and as of the Plan Effective Date (or, to the extent made as of a specific date, as of such date), except, where the failure of such representations and warranties to be so true and correct does not have, and would not reasonably be expected to have, a Material Adverse Effect.

(j)    *Covenants*. The Company and the Issuer shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Plan Effective Date.

28

(k)     *Backstop Commitment Premium.*  All premiums and other amounts, including the Backstop Commitment Premium, required to be paid or reimbursed by the Company or the Issuer, as applicable, to the Backstop Parties as of the Plan Effective Date shall have been so paid or reimbursed.

(l)     *Material Adverse Effect*.  Since the Reference Date, there shall not have occurred, and there shall not exist, any change, event, circumstance, effect, development, occurrence or state of facts that constitutes, individually or in the aggregate, a Material Adverse Effect.

(m)     *Officer's Certificate*.  The Backstop Parties shall have received on and as of the Plan Effective Date a certificate of the chief executive officer or chief financial officer of the Company, in his or her capacity as such and not in his or her individual capacity, confirming that the conditions set forth in Section 10(i), Section 10(j) and Section 10(l) have been satisfied.

Section 11.   CONDITIONS TO THE OBLIGATIONS OF THE COMPANY.  The obligations of the Company pursuant to this Agreement are subject to satisfaction of the following conditions (unless waived by the Company), except where the failure to satisfy any such condition is the result of a failure by the Company to comply with this Agreement:

(a)     *Plan and Confirmation Order*.  The Plan, as approved, and the Confirmation Order, as entered by the Bankruptcy Court, and which shall have become a Final Order, shall each be consistent in all material respects with the RSA or otherwise with such amendments, modifications or changes that are reasonably acceptable to the Required Backstop Parties and the Company.

(b)     *Conditions to the Plan*. The conditions to the occurrence of the Plan Effective Date set forth in the Plan and the Confirmation Order shall have been satisfied or waived by the Company in accordance with the terms of the Plan, and the Plan Effective Date shall have occurred or be deemed to have occurred.

(c)     *Rights Offering*. The Rights Offering shall have been conducted and the Subscription Expiration Deadline shall have occurred.

(d)     *Net Funding Amount.*  Each Backstop Party shall have wired its Net Funding Amount into the bank account so designated by the Company.

(e)     *Approvals*. All terminations or expirations of waiting periods imposed by any Governmental Entity required under the HSR Act or any other Antitrust Laws, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained from any Governmental Entity under any Antitrust Law shall have been made or obtained for the transactions contemplated by this Agreement.

(f)     *Representations and Warranties.* The representations and warranties of the Backstop Parties set forth in this Agreement qualified as to materiality shall be true and

29

correct, and those not so qualified shall be true and correct in all material respects, in each case, on and as of the Plan Effective Date as if made on and as of the Plan Effective Date (or, to the extent given as of a specific date, as of such date).

(g)     *Covenants*.  The Backstop Parties shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Backstop Parties on or prior to the Plan Effective Date.

(h)     *No Restraint*.  No judgment, injunction, decree or other legal restraint shall be in effect that prohibits the consummation of the Restructuring.

Section 12.   SURVIVAL OF REPRESENTATIONS AND WARRANTIES.  The representations and warranties made in this Agreement will not survive the Plan Effective Date. Covenants and agreements that by their terms are to be satisfied after the Plan Effective Date shall survive until satisfied in accordance with their terms, subject to termination pursuant to Section 13.

Section 13.   TERMINATION.

(a)     *Termination*.  This Agreement may be terminated by (i) by the mutual written consent of the Company and the Required Backstop Parties or (ii) either the Company or any Backstop Party if the Plan Effective Date has not occurred on or prior to June 30, 2018 (the "**Outside Date**"), subject to the extension of such Outside Date by mutual agreement of the Required Backstop Parties and the Company.

(b)     *Termination by the Company*.  The Company may terminate this Agreement by written notice to each Backstop Party upon the occurrence and during the continuance of any of the following:

(i)     any Backstop Party shall have breached any representation, warranty, covenant or other agreement made by such Backstop Party in this Agreement, and such breach or inaccuracy would, individually or in the aggregate, result in a failure of a condition set forth in Section 11(d), Section 11(f) or Section 11(g), if continuing on the Plan Effective Date, being satisfied and such breach or inaccuracy is not cured by such Backstop Party by the earlier of (1) the tenth (10th) Business Day after the giving of notice thereof to such Backstop Party by the Company and (2) the Outside Date; *provided* that the Company shall not have the right to terminate this Agreement pursuant to this Section if it is then in breach of any representation, warranty, covenant or other agreement hereunder that would result in the failure of any condition set forth in Section 10 being satisfied; and *provided, further*, that prior to the Company being permitted to terminate the Agreement under this Section each of the other non-breaching Backstop Parties shall have the right, but not the obligation, to assume its *pro rata* share of such breaching Backstop Party's Backstop Commitment, based on the proportion of its Backstop Commitment to the aggregate amount of Backstop Commitments of all non-breaching Backstop

30

Parties assuming such breaching Backstop Party's Backstop Commitment, in which case the Company shall not have the right to terminate this Agreement pursuant to this Section;

(ii)     the Company Board reasonably determining in good faith based upon the advice of outside counsel that failing to enter into a Superior Transaction would be inconsistent with the exercise of its fiduciary duties under applicable law;

(iii)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring; or

(iv)     the RSA has been terminated in accordance with its terms, except under Section 7(b)(i) thereunder as a result of a breach of the RSA by the Company or the other Debtors.

(c)     *Termination by the Required Backstop Parties*.  The Required Backstop Parties may terminate this Agreement by written notice to the Company upon the occurrence and during the continuance of any of the following:

(i)     the Company or the Issuer shall have breached any representation, warranty, covenant or other agreement made thereby in this Agreement, and such breach or inaccuracy would, individually or in the aggregate, result in a failure of a condition set forth in Section 10(g), Section 10(i) or Section 10(j), if continuing on the Plan Effective Date, being satisfied and such breach or inaccuracy is not cured by such Debtor by the earlier of (1) the tenth (10th) Business Day after the giving of notice thereof to the Company by the Backstop Parties and (2) the Outside Date; *provided* that the Backstop Parties shall not have the right to terminate this Agreement pursuant to this Section if any Backstop Party is then in breach of any representation, warranty, covenant or other agreement hereunder that would result in the failure of any condition set forth in Section 11 being satisfied;

(ii)     (A) the Debtors file any pleading, motion or document with the Bankruptcy Court seeking approval of an Alternate Transaction, (B) the Bankruptcy Court approves or authorizes an Alternate Transaction request at the request of any party in interest, or (C) the Company, its subsidiaries or any of its Affiliates enters into any Contract or written agreement in principle providing for the consummation of any Alternate Transaction;

(iii)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring;

(iv)     the valid termination of the Purchase Agreement in accordance with the terms thereof;

31

(v)     the RSA has been terminated in accordance with its terms or through a willful or material breach by the Company or the other Debtors of their obligations under the RSA;

(vi)     the occurrence of an "Event of Default" (as defined under the DIP Credit Agreement) that has not been waived or timely cured in accordance therewith and the resulting acceleration of the obligations or termination of lending commitments under the DIP Facility; or

(vii)     any of the Chapter 11 Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or the Bankruptcy Court has entered an order in any of the Chapter 11 Cases appointing an examiner or trustee with expanded powers to oversee or operate the Debtors in the Chapter 11 Cases.

(d)     *Effect of Termination*.  Subject to Section 16, upon termination of this Agreement, each party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the transactions contemplated hereby or otherwise, that it would have been entitled to take had it not entered into this Agreement. Notwithstanding anything contained herein, if this Agreement is terminated as a result of a breach of this Agreement by a party hereto, such party shall not be released and shall remain liable for any damages resulting from such termination.

(e)     *Termination Payment*.  If (x) this Agreement is terminated in accordance with  **Section13)b)(ii (or Section 13(c)(ii) ,or )y (the Company** enters into a definitive agreement to consummate or consummates an Alternate Transaction within six months of a termination of this Agreement (A) by the Company pursuant to Section 13(b)(iv) (but only in connection with a termination of the RSA by the Company (other than a termination of the RSA by the Company in connection with a Company Termination Event (as defined in the RSA) under clauses (i), (iii), (vi), (vii) or (viii) of the definition thereof) without the prior written consent of the Required Backstop Parties); or (B) by the Required Backstop Parties pursuant to (1) Section 13(c)(i), (2) Section 13(c)(iv) (but only in connection with a termination of the Purchase Agreement by, or with the mutual agreement of, the Company without the prior written consent of the Required Backstop Parties) or (3) Section 13(c)(v) (but only in connection with a termination of the RSA by the Company (other than a termination of the RSA by the Company in connection with a Company Termination Event (as defined in the RSA) under clauses (i), (iii), (vi), (vii) or (viii) of the definition thereof) without the prior written consent of the Required Backstop Parties),  then, no later than 2 Business Days following the consummation of the applicable Alternative Transaction, the Company shall pay or cause to be paid to the Backstop Parties that are not Defaulting Backstop Parties (pro rata in accordance with their Backstop Commitment Percentages, excluding the Backstop Commitment Percentage of any Defaulting Backstop Party) a non-refundable cash payment in an aggregate amount equal to the cash equivalent of the Backstop Commitment Premium (plus any Transaction Expenses).

32

Section 14.   INDEMNIFICATION OBLIGATIONS.

(a)      *Company Indemnity*. The Company and the Issuer shall indemnify and hold harmless each Backstop Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective representatives and controlling persons (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Backstop Parties except to the extent otherwise provided for in this Agreement) (collectively, "**Losses**") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with this Agreement, the Plan and the transactions contemplated hereby and thereby, including the Backstop Commitments, the Rights Offering, the payment of the Backstop Commitment Premium or the use of the proceeds of the Rights Offering, the Transaction Expenses or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, the Issuer or their equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal or other third party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; *provided*, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (i) as to any Defaulting Backstop Party or any Indemnified Person related thereto, caused by such default by such Backstop Party, or (ii) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

(b)      *Indemnification Procedure*.  Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnified Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; *provided*, that (A) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (B) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this Section 14. In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; *provided*, that if the parties (including

33

any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims. Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination, and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person. Notwithstanding anything herein to the contrary, the Company shall have sole control over any Tax controversy or Tax audit and shall be permitted to settle any liability for Taxes of the Company.

(c)    *Settlement of Indemnified Claims*.  The Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party. If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this Section 14. The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii)

34

such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)    *Contribution*.  If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to Section 14(a), then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations. It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Company pursuant to the issuance and sale of the New Equity Interests in the Rights Offering contemplated by this Agreement and the Plan, bears to (ii) the Backstop Commitment Premium paid or proposed to be paid to the Backstop Parties. The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.

(e)    *Treatment of Indemnification Payments*. All amounts paid by an Indemnifying Party to an Indemnified Person under this Section 14 shall, to the extent permitted by applicable law, be treated for all Tax purposes as adjustments to the purchase price for the New Equity Interests subscribed for by the Backstop Parties in the Rights Offering and the Unsubscribed Shares purchased by such Indemnified Person. The provisions of this Section 14 are an integral part of the transactions contemplated by this Agreement and without these provisions the Backstop Parties would not have entered into this Agreement, and the obligations of the Company under this Section 14 shall constitute allowed administrative expenses of the Debtors' estate under Sections 503(b) and 507 of the Bankruptcy Code and are payable without further order of the Bankruptcy Court, and the Company may comply with the requirements of this Section 14 without further order of the Bankruptcy Court.

Section 15.   NOTICES.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) when sent by facsimile (with written confirmation of transmission), (c) five (5) days after being deposited with the United States Post Office, by registered or certified mail, postage prepaid, (d) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), or (e) when sent by electronic mail (with acknowledgment received), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party hereto may have specified by like notice):

If to Backstop Parties, to each of the undersigned Backstop Parties at the addresses listed on the signatures pages hereto,

with a copy to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY  10017
Attention:     Damian S. Schaible
                    Stephen Salmon
Email:          damian.schaible@davispolk.com
                    stephen.salmon@davispolk.com

and

Vinson & Elkins LLP
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Tel: (212) 237-0000
Fax: (212) 237-0100
Attention:     David S. Meyer
                    Jessica C. Peet
Email:          dmeyer@velaw.com
                    jpeet@velaw.com

and

If to the Company, to:

Fieldwood Energy Inc.
c/o Fieldwood Energy LLC
2000 W. Sam Houston Parkway, S. Suite 1200
Houston, Texas 77042
Attention:  G. M. McCarroll and Michael Dane

with a copy to (which shall not constitute notice):

 Weil, Gotshal & Manges LLP
 767 Fifth Avenue
 New York, NY 10153
 Attention:  Matt Barr, Esq.
                  (matt.barr@weil.com)
                  Gavin Westerman, Esq.
                  (gavin.westerman@weil.com)
                  - and -
                  Mariel Cruz, Esq.
                  (mariel.cruz@weil.com)

Section 16.   SURVIVAL.  Notwithstanding the termination of this Agreement, the agreements and obligations of the parties hereto in Section 13(d) and Sections 14 through Section 22 shall survive such termination and shall continue in full force and effect for the benefit of the parties hereto in accordance with the terms hereof.

Section 17.   ASSIGNMENT; THIRD PARTY BENEFICIARIES.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned by any of the parties hereto without the prior written consent of the other parties hereto. Notwithstanding the previous sentence, the Backstop Parties' obligations hereunder may be assigned, delegated or transferred, in whole or in part, by any Backstop Party to any Permitted Transferee (in accordance with Section 3).

Section 18.   COMPLETE AGREEMENT.  This Agreement (including the Exhibits, the Schedules, and the other documents and instruments referred to herein) constitutes the entire agreement of the parties hereto and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the parties hereto with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties hereto will continue in full force and effect.

Section 19.   GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY.  This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement (including the exhibits and schedules hereto), or the negotiation, execution, termination, performance or nonperformance of this Agreement (including the exhibits and schedules hereto), shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State, without regard to any conflict of laws principles thereof. Each party hereto agrees that it shall bring any action or proceeding in respect of any claim based upon, arising out of, or related to this agreement, any provision hereof or any of the transactions contemplated hereby, in the United States District Court for the Southern District of New York or any New York State court sitting in the Borough of Manhattan of New York City (the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement or the transactions that are the subject of this Agreement (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto; *provided* that upon the commencement of the Chapter 11 Cases, the Bankruptcy Court shall be the sole Chosen Court. Each party hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. EACH PARTY HERETO WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING BASED UPON, ARISING OUT OF, OR RELATED TO THIS AGREEMENT, ANY PROVISION HEREOF OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 20.   COUNTERPARTS.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will

#90500902v12

become effective when counterparts have been signed by each of the parties hereto and delivered to the other parties hereto (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

Section 21.   ACTION BY, OR CONSENT OR APPROVAL OF, THE BACKSTOP PARTIES. Whenever this Agreement refers to any action to be taken by, or any consent or approval to be given by, the Backstop Parties, unless otherwise expressly provided in any particular instance, such reference shall be deemed to require the action, consent or approval of the Required Backstop Parties.

Section 22.   AMENDMENTS AND WAIVERS.

(a)      This Agreement may be amended, modified or supplemented and the terms and conditions of this Agreement may be waived, only by a written instrument signed by the Company and the Required Backstop Parties and subject, to the extent required after the Petition Date, to the approval of the Bankruptcy Court; *provided* that any modification of, or amendment or supplement to, this Agreement that would have the effect of (i) materially and adversely affecting any Backstop Party in a manner that is disproportionate to any other Backstop Party, (ii) increasing the aggregate purchase price to be paid by all of the Backstop Parties in respect of the Backstop Party Shares, (iii) increasing or decreasing any Backstop Party's Commitment Percentage (as set forth on **Schedule 1**) (other than as a result of a permitted transfer to which such Backstop Party is a party), or (iv) modifying this Section 22, shall require the prior written consent of each Backstop Party.

(b)      No delay on the part of any party hereto in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party hereto of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party hereto otherwise may have at law or in equity.

Section 23.   SPECIFIC PERFORMANCE.  The parties hereto acknowledge and agree that any breach of the terms of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and, accordingly, the parties hereto agree that in addition to any other remedies, each party hereto will be entitled to enforce the terms of this Agreement by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond.

Section 24.   OTHER INTERPRETIVE MATTERS.

(a)      Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply: (i) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to

38

this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) any reference in this Agreement to $ shall mean U.S. dollars; (iii) all exhibits and schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein and any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement; (iv) words imparting the singular number only shall include the plural and vice versa; (v) the words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (vi) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (vii) the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement; and (viii) all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(b)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

FIELDWOOD HOLDINGS LLC
FIELDWOOD ENERGY INC.

By: _____
    Name:  G. M. McCarroll
    Title:    President and Chief Executive Officer

Backstop Parties' Signature Pages Intentionally Omitted

**Schedule 1**

**Backstop Commitment Percentages**

Intentionally Omitted

Schedule 2

**Debtor Entities**

| Name of Entity | Jurisdiction |
| --- | --- |
| Dynamic Offshore Resources NS, LLC | Texas |
| Fieldwood Energy LLC | Delaware |
| Fieldwood Holdings LLC | Delaware |
| Fieldwood Energy Inc. | Delaware |
| Fieldwood Energy Offshore LLC | Delaware |
| Fieldwood Onshore LLC | Delaware |
| Fieldwood SD Offshore LLC | Delaware |
| FW GOM Pipeline, Inc. | Delaware |
| GOM Shelf LLC | Delaware |
| Bandon Oil and Gas GP, LLC | Delaware |
| Bandon Oil and Gas, LP | Delaware |
| Fieldwood Energy SP LLC | Louisiana |
| Galveston Bay Pipeline LLC | Delaware |
| Galveston Bay Processing LLC | Delaware |

**<u>EXHIBIT F</u>**
**MANAGEMENT INCENTIVE PLAN TERM SHEET**

Attached.

EXHIBIT F

**Fieldwood Energy LLC**
**Post-Emergence Management Incentive Plan Term Sheet**

The following describes the principal terms of the management incentive plan (the "<u>Plan</u>") to be adopted by Fieldwood Energy LLC (the "<u>Company</u>"), in connection with its chapter 11 plan of reorganization (the "<u>Plan of Reorganization</u>"), and the initial grant of awards on or promptly following the Company's emergence from the Plan of Reorganization (the "<u>Emergence Awards</u>").  This term sheet does not contain all of the terms and conditions of the Plan.

**TERMS OF THE PLAN**

| Category | Terms |
|---|---|
| **Effective Date** | The Plan will be effective on, and the Emergence Awards under the Plan will be granted on or promptly following[1], the effective date of the Plan of Reorganization (the "<u>Effective Date</u>"). |
| **Administration** | The Compensation Committee of the Board of Directors of the reorganized Company (the "<u>Compensation Committee</u>"), if one is formed, or the Board of Directors of the reorganized Company (the "<u>Board</u>"), as applicable, shall administer the Plan and make all determinations with respect to any awards granted under the Plan (the "<u>Awards</u>"), other than as specified in this Plan term sheet.  Other than the Emergence Awards, the Compensation Committee or the Board, as applicable, shall have the right to make all determinations with respect to Awards, in consultation with the Chief Executive Officer of the Company (the "<u>CEO</u>"). |
| **Participants** | Officers and employees of the reorganized Company. |
| **Award Pool** | • 10% of the outstanding equity securities of the reorganized Company, on a fully diluted basis (including shares issuable under the Plan) as of the Effective Date will be available for grant under the Plan (the "<u>Award Pool</u>"). <br><br> • If any outstanding Award expires or is forfeited, cancelled or otherwise terminated, the equity underlying such Award will again become available for grant under the Plan. <br><br> • Equity capitalization of the Company to be established with a number of shares large enough to provide flexibility for granting multiple Awards under the Plan. |
| **Plan Awards** | The Plan will be an "omnibus" incentive plan which will permit the Compensation Committee or Board, as applicable, to grant various types of equity awards, including: stock options (ISOs and NQSOs), stock appreciation rights, restricted stock, restricted stock units and other stock-based awards.  Emergence Awards shall be granted in accordance with the terms set forth herein. |
| **Anti-dilution / Adjustment** | Awards will be subject to customary adjustment provisions for changes in capitalization or other corporate events, including, for example, a debt recapitalization (but not including equity infusions into the Company based on fair market value). |

---

[1] Emergence Awards should be granted as close to the Effective Date as possible to properly reflect fair market market of the equity securities for purposes of the option strike price.

| Category | Terms |
|---|---|
| **Restrictive Covenants** | • As a condition to receiving Emergence Awards, Emergence Award recipients will be required to enter into customary restrictive covenants, including (i) a non-compete as described below, (ii) a non-solicit as described below, (iii) perpetual non-disparagement and (iv) perpetual confidentiality.<br><br>• Notwithstanding the foregoing:<br><br>    o The CEO shall be subject to the same restrictive covenants as set forth in his employment agreement currently in place, provided that (i) the geographic scope of the non-compete shall be the Gulf of Mexico region, including those portions of such region in the United States and/or Mexico, (ii) the "Restriction Period" as defined in his employment agreement shall be two years and (iii) the restrictive covenants shall also include a perpetual mutual non-disparagement covenant.<br><br>    o Three other senior managers (each of whom is currently party to an employment agreement with the Company) shall be subject to the same restrictive covenants as set forth in their employment agreement currently in place, provided that (i) the geographic scope of the non-compete shall be the Gulf of Mexico region, including those portions of such region in the United States and/or Mexico, (ii) the "Restriction Period" as defined in their employment agreements shall be one year and (iii) the restrictive covenants shall also include a perpetual mutual non-disparagement covenant.<br><br>    o Other Emergence Award receipents, as determined by the CEO to pose a competitive risk, shall be subject to a non-compete and non-solicit during their term of employment and for six months thereafter. |
| **Call Rights** | Awards and the shares of Company common stock underlying all Awards will be subject to a call right in the event of a termination of employment for any reason or a material restrictive covenant breach, with a call price of fair market value; *provided* that in the event of a termination for cause or a restrictive covenant breach, the call price will be the lower of cost and fair market value. |

<u>**TERMS OF EMERGENCE AWARDS**</u>

| Category | Terms |
|---|---|
| **Emergence Award Pool** | The Award Pool will be 10% on a fully-diluted basis, of which 9% shall be granted as Emergence Awards (the "<u>Emergence Award Pool</u>") upon the Effective Date as the types of awards set forth below (and in such proportions). Of the Emergence Awards, 3.5% shall be granted to the CEO and the remaining 5.5% shall be granted to other recipients as determined by the CEO.<br><br>In the event the entire Award Pool (including forfeitures) is not fully allocated to participants at the time of a Liquidity Event (as defined below), the remainder of the Award Pool will be allocated to participants in a manner determined by the Compensation Committee or the Board, as applicable, in consultation with the CEO. |
| **Form of** | • The Emergence Award Pool will be 9% on a fully-diluted basis. |

| Category | Terms |
|----------|-------|
| **Emergence Awards** | • Of the 9%, 2.7% will be granted in the form of restricted stock units ("RSUs") with service-based vesting (as described below) as Emergence Awards. RSUs are based on the value of the Company's common stock, and will include dividend equivalent rights.<br><br>• Of the 9%, 6.3% will be granted in the form of non-qualified stock options ("Options") with service-based vesting (as described below) as Emergence Awards. The exercise price will be equal to the fair market value of the common stock of the Company at the time of grant (the value of the Company shall be $2,250,000,000). Each Option will have a term of exercise of 10 years. |
| **Vesting of Emergence Awards** | Subject to the continued employment of the participant on the vesting date (and certain exceptions as provided below), the Emergence Awards will become vested as follows:<br><br>• 25% will vest on the Effective Date<br><br>• 25% will vest on the first anniversary of the Effective Date<br><br>• 25% will vest on the second anniversary of the Effective Date<br><br>• 25% will vest on the third anniversary of the Effective Date<br><br>Emergence Awards will also become fully vested upon (i) a Liquidity Event, (ii) a termination of employment by the Company without "cause" (this clause (ii) is only applies to the four senior managers with employment agreements) and (iii) a termination of employment due to the participant's death or permanent disability.  In addition, if there is an initial public offering of the reorganized Company's equity securities, 50% of the then unvested Emergence Awards shall become vested.<br><br>Upon a termination for any reason other than as set forth herein, all unvested Emergence Awards at such termination date will be cancelled, forfeited and terminated, and the equity underlying such Emergence Award will again become available for grant under the Plan. |
| **Payment of Emergence Awards Upon a Liquidity Event** | Emergence Awards are payable upon the occurrence of a Liquidity Event, based on the value of the consideration attributable to the Company's common stock in the Liquidity Event, subject to any contingencies, holdbacks, escrows, and deferred payments as applicable to other shareholders of the Company. All payments will be made in cash or marketable securities received in the Liquidity Event transaction.<br><br>"Liquidity Event" definition to be based on final equity structure, but shall generally be defined to include a sale of stock, sale of assets, corporate merger or reorganization, in which one or more of the principal stockholders of the Company has liquidated at least a majority of their interest in the Company, but will not include an initial public offering of the Company.<br><br>The grant, vesting and payment of the Emergence Awards will be designed to comply with the requirements of IRC Section 409A. |

**<u>EXHIBIT G</u>**
**DIP TERM SHEET**

Attached.

**EXHIBIT G**

## FIELDWOOD ENERGY LLC
## DIP FACILITY TERM SHEET

This term sheet (the "**DIP Facility Term Sheet**") sets forth the principal terms of a secured debtor-in-possession credit facility (the "**DIP Facility**"; the credit agreement evidencing the DIP Facility, the "**DIP Credit Agreement**" and, together with the other definitive documents governing the DIP Facility, the "**DIP Documents**," each of which shall be in form and substance acceptable to the DIP Facility Borrower (as defined below), the DIP Facility Agent and the DIP Lenders (each as defined herein)). The DIP Credit Agreement otherwise shall be in form and substance substantially consistent with this DIP Facility Term Sheet and shall be entered into with the DIP Facility Borrower (as defined below), certain of its subsidiaries, Fieldwood Holdings LLC and Fieldwood Energy Inc. in connection with their respective cases under chapter 11 (the "**Chapter 11 Cases**"; the debtors and debtors-in-possession thereunder, the "**Debtors**" and each a "**Debtor**") of title 11 of the United States Code (the "**Bankruptcy Code**"). The DIP Facility will be subject to the approval of the Bankruptcy Court (as defined herein) and consummated in the Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), in accordance with (i) the DIP Orders (as defined herein) of the Bankruptcy Court authorizing the Debtors to enter into the DIP Facility and (ii) the DIP Documents to be executed by the Debtors.

| SUMMARY OF PRINCIPAL TERMS | |
|---|---|
| **DIP Facility Borrower** | Fieldwood Energy LLC, as a debtor and debtor-in-possession (the "**DIP Facility Borrower**"). |
| **Guarantors** | Fieldwood Holdings LLC, Fieldwood Energy Inc. (formerly known as Fieldwood Managing Member LLC) and all domestic subsidiaries of the DIP Facility Borrower, subject to certain exceptions to be agreed (including with respect to GOM P&A Services LLC and Fieldwood Offshore LLC), each as a debtor and debtor-in-possession (the "**Guarantors**" and, together with the DIP Facility Borrower, the "**Loan Parties**"), it being understood and agreed that each subsidiary of the DIP Facility Borrower that is an obligor under any of the Prepetition Facilities described below shall be a Guarantor. |
| **DIP Facility Agent** | Cortland Capital Markets Services LLC, as administrative agent and collateral agent (in such capacities, the "**DIP Facility Agent**") |
| **DIP Lenders** | Funds managed or advised by the entities specified on Schedule L to the Restructuring Support Agreement to which this DIP Facility Term Sheet is attached (the "**Restructuring Support Agreement**"), including Riverstone Investment Group (together with its affiliates, the "**Sponsor**"), each of which is a lender under the Prepetition Second Lien Term Loan Agreement (as defined below) or the Prepetition Sponsor Second Lien Term Loan Agreement (as defined below) on the Petition Date (as defined below), or an affiliate or designee of any of the foregoing (collectively, the "**Specified Lenders**"), as lenders under the DIP Facility (in such capacities, collectively, the "**DIP Lenders**"). <br><br> The Specified Lenders are allocated DIP Commitments as set forth in Schedule L to the Restructuring Support Agreement. |
| **Amount & Type** | A multiple-draw senior secured debtor-in-possession US dollar term loan credit facility in an aggregate principal amount not to exceed $60 million (the commitments under the DIP Facility, the "**DIP Commitments**"; the loans under |

|  | the DIP Facility, the "**DIP Loans**"), subject to the terms and conditions of this DIP Facility Term Sheet and the DIP Documents.  The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and any DIP Loans repaid may not be reborrowed.<br><br>From and after the Bankruptcy Court's entry of the Interim DIP Order (as defined below) and upon satisfaction of all other applicable conditions precedent described below, the DIP Facility Borrower may make up to two draws of DIP Loans in an aggregate amount up to $30 million, with any such draw to be made available in increments of $15 million.<br><br>From and after the Bankruptcy Court's entry of the Final DIP Order (as defined below) and upon satisfaction of all other applicable conditions precedent, up to the full remaining amount of the DIP Facility shall be made available in incremental draws of $15 million on any date prior to the Confirmation Date (as defined below). The DIP Commitments will automatically terminate on the earlier of the DIP Termination Date and the date on which any Chapter 11 plan for the reorganization of the DIP Facility Borrower or any other Debtor is confirmed. |
|---|---|
| **Use of Proceeds** | For general corporate and working capital purposes, including to (i) pay required debt service on the DIP Loans, (ii) pay the fees, costs and expenses of the DIP Agent and the DIP Lenders, (iii) pay fees and expenses of professionals associated with the Chapter 11 Cases and (iv) provide Adequate Protection (as defined below). |
| **DIP Termination Date** | The earliest of (i) the date falling six months after the commencement of the Chapter 11 Cases (such commencement date, the "**Petition Date**"), (ii) the effective date of any Chapter 11 plan for the reorganization of the DIP Facility Borrower or any other Debtor, (iii) the consummation of a sale or other disposition of all or substantially all assets of the Debtors under Bankruptcy Code section 363, (iv) the date of acceleration of the DIP Loans and termination of the DIP Commitments upon and during the continuance of an event of default under the DIP Facility and (v) 30 days after the date of entry of the Interim DIP Order (or such later date as agreed to by the Required DIP Lenders (as defined below)), unless the Final DIP Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**"). |
| **Interest Rate** | 10.0% per annum.<br><br>During the continuance of an event of default, all overdue amounts under the DIP Facility will bear interest at a rate equal to 2% per annum, <u>plus</u> the otherwise applicable rate. |
| **Amortization** | None. |
| **Mandatory Prepayments** | Subject to the terms of the DIP Orders and the prior payment (or cash collateralization) in full of the loans (or letters of credit, as applicable) outstanding under the Prepetition RBL Credit Agreement (as defined below) and the Prepetition First Lien Term Loan Agreement (as defined below), mandatory prepayments under the DIP Facility shall be required with 100% of the net cash proceeds from (a) issuance of any indebtedness (with exceptions for permitted |

WEIL:\96421014\11\45327.0003
#90481485v27

|  | indebtedness) and (b) sales or other dispositions (including casualty events) of any assets (excluding sales of inventory in the ordinary course of business and other customary exceptions to be mutually agreed). |
|---|---|
| **Voluntary Prepayments** | Amounts outstanding under the DIP Facility may be voluntarily repaid at any time without premium or penalty. |
| **Interim DIP Order** | The interim order approving the DIP Facility, which shall be in form and substance acceptable to the Required DIP Lenders and the Debtors (the "**Interim DIP Order**"), shall, among other things, authorize and approve (i) the borrowing and making of the DIP Loans in an amount up to $30 million, (ii) the granting of the super-priority claims and liens against the Debtors and their assets in accordance with this DIP Facility Term Sheet and the DIP Documents, (iii) the payment of all reasonable and documented fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Facility Agent and the DIP Lenders as described in "Fees and Expenses Indemnification" by the Debtors, to the extent invoiced at least two business days prior to the Closing Date (or any later date reasonably acceptable to the DIP Facility Borrower), (iv) the use of cash collateral, *provided* that the Adequate Protection (as defined below) shall be granted in accordance with the terms set forth in this DIP Facility Term Sheet and (v) the payment of the Upfront Fees (as defined below), which payment shall not be subject to reduction, setoff or recoupment. |
| **Final DIP Order** | The final order approving the DIP Facility, which shall be substantially in the same form as the Interim DIP Order (with such modifications as are necessary to convert the Interim DIP Order into a final order) and in form and substance acceptable to the Required DIP Lenders and the Debtors (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"), shall, among other things, authorize and approve the DIP Facility Borrower to draw the full amount of the DIP Commitments. |
| **Prepetition Facilities**[1] | "**Prepetition RBL Credit Agreement**" – that certain Credit Agreement, dated as of September 30, 2013, and the "Secured Parties" thereunder the "**Prepetition RBL Secured Parties**."<br><br>"**Prepetition First Lien Term Loan Agreement**" – that certain First Lien Term Loan Agreement, dated as of September 30, 2013, the "Secured Parties" thereunder the "**Prepetition FLTL Secured Parties**" (the Prepetition FLTL Secured Parties together with the Prepetition RBL Secured Parties, the "**Unprimed Prepetition Secured Parties**").<br><br>"**Prepetition FLLO Credit Agreement**" – that certain First Lien Last-Out Term Loan Agreement, dated as of May 27, 2016 and the "Secured Parties" thereunder the "**Prepetition FLLO Secured Parties**."<br><br>"**Prepetition Second Lien Term Loan Agreement**" – that certain Second Lien Term Loan Agreement, dated as of September 30, 2013, the "Secured Parties" thereunder the "**Prepetition Second Lien Secured Parties**" and the administrative agent thereunder, the "**Prepetition Second Lien Agent**"). |

---

[1] In each case, as amended, supplemented or otherwise modified prior to the date hereof.

3

| | |
|---|---|
| | "**Prepetition Sponsor Second Lien Term Loan Agreement**" – that certain Sponsor Second Lien Term Loan Agreement, dated as of May 27, 2016, and the "Secured Parties" thereunder the "**Prepetition Sponsor Second Lien Secured Parties**" and, together with the Prepetition FLLO Secured Parties and the Prepetition Second Lien Secured Parties, the "**Primed Prepetition Secured Parties**" (together with the Unprimed Prepetition Secured Parties, the "**Prepetition Secured Parties**").<br><br>Collectively, the agreements described above are referred to herein as the "**Prepetition Credit Agreements**," and the secured obligations thereunder, collectively, the "**Prepetition Secured Obligations**" and all "Collateral" securing such Prepetition Secured Obligations, the "**Prepetition Collateral**". |
| **Apache Decommissioning Agreement**[2] | "**Apache Decommissioning Agreement**" – that certain Decommissioning Agreement, dated as of September 30, 2013, by and among Apache Corporation, a Delaware corporation ("**APA**"), Apache Shelf, Inc., a Delaware corporation ("**APSH**"), Apache Deepwater LLC, a Delaware limited liability company ("**APDW**"), Apache Shelf Exploration LLC, a Delaware limited liability company (together with APA, APSH and APDW, the "**Sellers**" or the "**Apache Secured Parties**"), the DIP Facility Borrower and GOM Shelf LLC. |
| **DIP Collateral** | All present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Loan Parties, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of the Loan Parties, including, for the avoidance of doubt, any equity or other interests in the Loan Parties' non-Debtor and/or jointly-owned subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding (i) any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law but, subject to entry of the Final DIP Order, including the proceeds thereof, and (ii) the Trust A NPI, the Trust A Account, any interest in Trust A or the Letters of Credit (each as defined in the Decommissioning Agreement) (the collateral described in clause (ii), the "**Apache Collateral**") (collectively, the "**DIP Collateral**" and the liens on the DIP Collateral securing the DIP Facility, the "**DIP Liens**"). |
| **Priority Under the DIP Facility** | All obligations of the DIP Facility Borrower and the Guarantors to the DIP Lenders and to the DIP Facility Agent (collectively, the "**DIP Obligations**") shall, subject to the Carve-Out (as defined below), at all times:<br><br>    a.    be entitled to superpriority administrative expense claim status in the Chapter 11 Case of such Loan Party;<br><br>    b.    be secured by a perfected first priority security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral |

---

[2] As amended, supplemented or otherwise modified prior to the date hereof.

WEIL:\96421014\11\45327.0003
#90481485v27

is not subject to valid, perfected and unavoidable liens as of the Petition Date (subject to customary exclusions); and

c.    except as otherwise provided below with respect to the existing liens of the Primed Prepetition Secured Parties and Apache Secured Parties, be secured by a junior perfected security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral is subject to (i) valid, perfected and unavoidable liens in favor of third parties (including the Unprimed Prepetition Secured Parties) that were in existence immediately prior to the Petition Date and permitted under the Prepetition Credit Agreements, (ii) valid and unavoidable permitted liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code ((i) and (ii) together, the "**Other Senior Liens**") and (iii) valid and perfected liens in favor of hedge counterparties in connection with hedging transactions entered into by the Debtors on a post-petition basis in accordance with an acceptable hedge motion (the "**Hedging Liens**"; the Hedging Liens together with the Other Senior Liens, the "**Permitted Prior Liens**"), subject as to priority to such liens in favor of such third parties; and

d.    pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected priming security interest and lien on the DIP Collateral (which DIP Collateral, for the avoidance of doubt, excludes the Apache Collateral) of each Loan Party to the extent such DIP Collateral is subject to existing liens that secure the Prepetition Secured Obligations of the Primed Prepetition Secured Parties and the obligations of the Apache Secured Parties.

The "**Carve-Out**" shall be usual and customary for similar debtor-in-possession financings and shall be in an amount equal to: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee, (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $100,000, and (iii) to the extent allowed by the Bankruptcy Court at any time, and whether allowed before or after delivery of a Trigger Notice, (A) all allowed and unpaid claims for fees, costs, disbursements and expenses of professionals whose retention by the Debtors is approved by the Bankruptcy Court pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Professional Fees**") incurred at any time on or prior to the delivery of a Trigger Notice, plus (B) Professional Fees incurred after the delivery of a Trigger Notice in an amount not to exceed $5,000,000, of professionals retained by the Debtors (the "**Carve-Out Cap**"), in each case subject to the limits imposed by the DIP Orders or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigation of the claims, liens and defenses against any Prepetition Secured Party.

"**Trigger Notice**" shall mean a written notice delivered by the DIP Facility Agent describing the event of default that is alleged to continue under the DIP Documents (or, after the payment in full of the DIP Obligations, delivered by the administrative agents under the Prepetition Credit Agreements (the "**Prepetition Agents**") describing the reason for termination of the use of cash collateral);

| | |
|---|---|
| | *provided* that under no circumstances shall any success, completion or similar fee be payable from the Carve-Out following delivery of a Trigger Notice.<br><br>For the avoidance of doubt, (x) the DIP Liens shall not be secured by the Apache Collateral nor prime any unavoidable, valid and properly perfected lien existing as of the Petition Date in respect of the Apache Collateral and (y) the DIP Liens shall prime the liens of the Apache Secured Parties on the shared Prepetition Collateral. |
| **Adequate Protection** | Pursuant to Sections 361, 363(c), 363(e) and 364(d)(1) of the Bankruptcy Code, as protection in respect of (x) the incurrence of the DIP Facility, (y) the imposition of the automatic stay, and (z) the Debtors' use of the Prepetition Collateral including cash collateral, the Debtors and the DIP Lenders agree, subject to Bankruptcy Court approval, to the following forms of adequate protection (the "**Adequate Protection**"):<br><br>Unprimed Prepetition Secured Parties:<br><br>(a) accrued and unpaid reasonable and documented fees and expenses incurred prior to the Petition Date owed to:  (i) Willkie Farr & Gallagher as sole counsel and RPA Advisors as sole financial advisor for the Prepetition RBL Secured Parties and (ii) O'Melveny & Myers and, if reasonably necessary, one local counsel as counsel to the Prepetition FLTL Secured Parties and Houlihan Lokey as sole financial advisor for the Prepetition FLTL Secured Parties and, if requested, one counsel for the administrative agent under the Prepetition First Lien Term Loan Agreement;<br><br>(b) when due, current payment of all reasonable and documented fees and out-of-pocket expenses payable to:  (i) Willkie Farr & Gallagher as sole counsel and RPA Advisors as sole financial advisor for the Prepetition RBL Secured Parties and (ii) O'Melveny & Myers and, if reasonably necessary, one local counsel as counsel to the Prepetition FLTL Secured Parties and Houlihan Lokey as sole financial advisor for the Prepetition FLTL Secured Parties and, if requested, one counsel for the administrative agent under the Prepetition First Lien Term Loan Agreement;<br><br>(c) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, (i) replacement liens on the DIP Collateral to secure the Unprimed Prepetition Secured Party Adequate Protection Claims, senior to all other liens on the DIP Collateral except the Carve-Out and Permitted Prior Liens (the "**Unprimed Prepetition Secured Party Adequate Protection Liens**"), (ii) allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**Unprimed Prepetition Secured Party Adequate Protection Claims**") and (iii) current payment in cash of post-petition interest (or letter of credit fees, as applicable) to the Unprimed Petition Secured Parties at the non-default rates provided therein, *provided*, that if the letters of credit are drawn during the pendency of the Chapter 11 Cases, then amounts funded by the Prepetition RBL Secured Parties shall bear interest at the default rate.<br><br>Prepetition FLLO Secured Parties:<br><br>(a) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, (i) replacement liens on the DIP Collateral to secure the FLLO Secured Party Adequate Protection Claims (the "**FLLO Secured Party** |

**Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (w) the Carve-Out, (x) the Permitted Prior Liens, (y) the liens of the Unprimed Prepetition Secured Parties (including the adequate protection liens granted in accordance with this DIP Facility Term Sheet) and (z) the DIP Liens, (ii) current payment in cash of post-petition interest to the FLLO Secured Parties at the non-default rates provided therein and (iii) payment at emergence of accrued and unpaid prepetition interest to the FLLO Secured Parties at the default rate provide therein;

(b) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**FLLO Secured Party Adequate Protection Claims**");

(c) financial reporting and other reports and notices delivered by the DIP Facility Borrower under the DIP Facility; and

(d) the Milestones (as defined below) may be amended, modified or extended, in each case, as to the Prepetition FLLO Secured Parties only by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required FLLO Secured Parties (which shall mean Prepetition FLLO Secured Parties holding greater than 50% of the outstanding principal amount of loans under the Prepetition FLLO Term Loan Agreement).

Prepetition Second Lien Secured Parties:

(a) all accrued and unpaid fees and disbursements owed to the Prepetition Second Lien Agent, including all fees and expenses of counsel and other professionals of the Prepetition Second Lien Agent (including Davis Polk & Wardwell LLP, PJT Partners LP and any local counsel or other advisor retained by the Prepetition Second Lien Agent) incurred prior to the Petition Date;

(b) when due, current payment of all fees and expenses payable to the Prepetition Second Lien Agent, including all fees and expenses of counsel and other professionals of the Prepetition Second Lien Agent (including Davis Polk & Wardwell LLP, PJT Partners LP and any local counsel or other advisor retained by the Prepetition Second Lien Agent);

(c) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral to secure the Second Lien Credit Agreement Secured Party Adequate Protection Claims (the "**Second Lien Secured Party Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (i) the Carve-Out, (ii) the Permitted Prior Liens, (iii) the liens of the Unprimed Prepetition Secured Parties (including the adequate protection liens granted thereto in accordance with this DIP Facility Term Sheet), (iv) the DIP Liens and (v) the liens of the FLLO Secured Parties (including the FLLO Secured Party Adequate Protection Liens), and ranking *pari passu* with the Sponsor Second Lien Secured Party Adequate Protection Liens;

(d) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections

WEIL:\96421014\11\45327.0003
#90481485v27

503(b) and 507(b) of the Bankruptcy Code (the "**Second Lien Secured Party Adequate Protection Claims**");

(e) financial reporting and other reports and notices delivered by the DIP Facility Borrower under the DIP Facility; and

(f) the Milestones (as defined below) may be amended, modified or extended, in each case, as to the Prepetition Second Lien Secured Parties only by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required Second Lien Secured Parties (which shall mean Prepetition Second Lien Secured Parties holding greater than 50% of the outstanding principal amount of loans under the Prepetition Second Lien Term Loan Agreement).

Prepetition Sponsor Second Lien Secured Parties:

(a) accrued and unpaid reasonable and documented fees and expenses incurred prior to the Petition Date owed to the Prepetition Sponsor Second Lien Secured Parties, including the fees and disbursements of Vinson & Elkins LLP as sole counsel to the Prepetition Sponsor Second Lien Secured Parties and Perella Weinberg L.P. as sole financial advisor to the Prepetition Sponsor Second Lien Secured Parties;

(b) when due, current payment of all reasonable and documented fees and out-of-pocket expenses payable to the Prepetition Sponsor Second Lien Secured Parties, including the fees and disbursements of Vinson & Elkins LLP as sole counsel to the Prepetition Sponsor Second Lien Secured Parties and Perella Weinberg L.P. as sole financial advisor to the Prepetition Sponsor Second Lien Secured Parties;

(c) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral to secure the Sponsor Second Lien Secured Party Adequate Protection Claims (the "**Sponsor Second Lien Secured Party Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (i) the Carve-Out, (ii) the Permitted Prior Liens, (iii) the liens of the Unprimed Prepetition Secured Parties (including the adequate protection liens granted thereto in accordance with this DIP Facility Term Sheet), (iv) the DIP Liens and (v) the liens of the FLLO Secured Parties (including the FLLO Secured Party Adequate Protection Liens), and ranking *pari passu* with the Second Lien Secured Party Adequate Protection Liens; and

(d) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**Sponsor Second Lien Secured Party Adequate Protection Claims**").

(e) the Milestones (as defined below) may be amended, modified or extended, in each case, as to the Prepetition Sponsor Second Lien Secured Parties only by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required Sponsor Second Lien Secured Parties (which shall mean Prepetition Sponsor Second Lien Secured Parties holding greater than 50% of the outstanding principal amount of loans under the Prepetition Sponsor Second Lien Term Loan Agreement).

WEIL:\96421014\11\45327.0003
#90481485v27

| | In addition, the DIP Orders shall provide for customary prepetition secured lender protections, including, but not limited to, waivers regarding Sections 506(c) and 552(b) of the Bankruptcy Code, the equitable doctrine of marshaling, limitations on the use of collateral and stipulations in respect of the validity of prepetition liens and obligations, in each case, as such may pertain to the claims and liens of the Prepetition Secured Parties.<br><br>For the avoidance of doubt, the Unprimed Prepetition Secured Party Adequate Protection Claims, the FLLO Secured Party Adequate Protection Claims, the Second Lien Secured Party Adequate Protection Claims, and the Sponsor Second Lien Secured Party Adequate Protection Claims shall in all cases have the same relative priority as the Unprimed Prepetition Secured Party Adequate Protection Liens, the FLLO Secured Party Adequate Protection Liens, the Second Lien Secured Party Adequate Protection Liens, and the Sponsor Second Lien Secured Party Adequate Protection Liens, respectively. |
|---|---|
| **Milestones** | The DIP Documents shall require compliance with the following milestones (the "**Milestones**"):<br><br>• No later than 1 day after the Petition Date, filing of a motion, in form and substance satisfactory to the DIP Lenders, seeking approval of the DIP Facility.<br><br>• No later than 5 days after the Petition Date, entry of the Interim DIP Order.<br><br>• No later than 30 days after the Petition Date, entry of the Final DIP Order.<br><br>• No later than 90 days after the Petition Date, approval of an Acceptable Disclosure Statement and approval of the Acceptable Plan (the "**Confirmation Date**").<br><br>• No later than 20 days after the Confirmation Date, effectiveness of the Acceptable Plan. |
| **Events of Default** | Usual and customary for financings of this type. |
| **Conditions Precedent to Closing** | Usual and customary for financings of this type, including, without limitation: (i) execution and delivery of the DIP Credit Agreement and the other DIP Documents evidencing the DIP Facility; (ii) the Petition Date shall have occurred, and the DIP Facility Borrower and each Guarantor shall be a debtor and a debtor-in-possession; (iii) the Debtors shall have filed a prepackaged plan of reorganization in the form attached to the Restructuring Support Agreement as Exhibit A with such changes as are acceptable to the Required DIP Lenders (an "**Acceptable Plan**") and a disclosure statement relating thereto in the form attached to the Restructuring Support Agreement as Exhibit H with such changes as are acceptable to the Required DIP Lenders (an "**Acceptable Disclosure Statement**"); (iv) entry of the Interim DIP Order; and (v) delivery of a Budget (as defined below) reasonably acceptable to the Required DIP Lenders. The date on which the closing conditions are satisfied is referred to herein as the "**Closing Date**". |
| **Conditions Precedent to the Extension of each DIP Loan** | Conditions precedent customarily found in loan documents for similar debtor-in-possession financings and including, without limitation: (i) no default or event of default; (ii) accuracy of representations and warranties in all material respects; (iii) the Interim DIP Order or the Final DIP Order, as applicable, shall |

WEIL:\96421014\11\45327.0003
#90481485v27

| | |
|---|---|
| | be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the consent of the Required DIP Lenders and (iv) delivery of a customary notice of borrowing. |
| **Covenants** | Affirmative and negative covenants usual and customary for financings of this type. |
| **Financial Covenants** | Budget variance covenant, tested bi-weekly requiring, in each case for the prior four-week period (a "**Test Period**") (i) the negative variance (as compared to the approved Budget) of the aggregate receipts of the Debtors not to exceed 15% and (ii) the positive variance (as compared to the approved Budget) of the aggregate operating disbursements (excluding professional fees and expenses and adequate protection payments) made by the Debtors not to exceed 15%.<br><br>For purposes of testing the budget variance covenant, any positive variance (in the case of receipts) or negative variance (in the case of disbursements) against the applicable approved Budget during any two-week period prior to a Test Period may be carried forward into such Test Period.<br><br>The first Test Period for which the budget variance covenant will be tested shall be the four-week period ending two weeks after the Closing Date, it being understood that the budgeted amounts for the two-week period prior to Closing Date shall be deemed to be the actual reported amounts for such period.<br><br>"**Budget**" means, a rolling 13-week cash flow forecast delivered on or prior to the Closing Date and every four weeks thereafter, setting forth the Debtors' projected cash receipts and cash disbursements during such 13-week period (i) initially, covering the period commencing on or about the Closing Date and (ii) thereafter, commencing on the first day of each four-week period thereafter. Any updates to the Budget delivered after the Closing Date shall be reasonably acceptable to the Required DIP Lenders (it being understood that if the Required DIP Lenders have not objected to an updated Budget within five Business Days after delivery thereof, the Required DIP Lenders shall be deemed to have approved such updated Budget). |
| **Representations and Warranties** | Representations and warranties usual and customary for financings of this type. |
| **Voting** | Amendments and waivers of the DIP Facility will require the approval of DIP Lenders holding more than 50% of the outstanding DIP Commitment and DIP Loans (the "**Required DIP Lenders**"), subject to customary exceptions for certain provisions which shall require the consent of each affected DIP Lender or all DIP Lenders and customary protections for the DIP Facility Agent. |
| **Fees and Expenses Indemnification** | Loan Parties obligated under the DIP Facility shall pay all reasonable, documented out-of-pocket fees, costs and expenses incurred or accrued by the DIP Facility Agent and the DIP Lenders, including, without limitation, the reasonable and documented fees and expenses of Davis Polk & Wardwell LLP as primary counsel to the DIP Facility Agent and a single local counsel in the State of Texas and PJT Partners as financial advisor to the DIP Facility Agent, in each case, associated with the syndication of the DIP Facility and the preparation, |

WEIL:\96421014\11\45327.0003
#90481485v27

| | negotiation, execution, delivery and administration of the DIP Loan Documents and any amendment or waiver with respect thereto.<br><br>The Loan Parties will indemnify the DIP Facility Agent and DIP Lenders, and hold them harmless from and against all reasonable, documented out-of-pocket costs, expenses and liabilities arising out of or relating to the transactions contemplated hereby, except solely for gross negligence, willful misconduct of such indemnified party or willful and material breach by such indemnified party of the DIP Documents to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment. |
|---|---|
| **Upfront Fees** | An upfront fee in an amount equal to 3.00% of the DIP Commitments shall be due and payable to the DIP Lenders in cash  on the Closing Date ratably based on their respective DIP Commitments on the Closing Date (the "**Upfront Fee**"). |
| **Unused Commitment Fees** | An unused commitment fee equal to 1.00% per annum on the actual daily amount of the unused DIP Commitments shall be paid on a monthly basis to the DIP Lenders in cash ratably based on their respective DIP Commitments. |
| **Assignments and Participations** | Usual and customary for financings of this type. |
| **Governing Law** | The laws of the State of New York (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code. |
| **Miscellaneous** | The DIP Documents will include yield protection provisions usual and customary for financings of this type. |
| **Counsel to DIP Facility Agent** | Davis Polk & Wardwell LLP. |

WEIL:\96421014\11\45327.0003
#90481485v27

## <u>EXHIBIT H</u>
## DISCLOSURE STATEMENT

Filed Separately

**<u>EXHIBIT I</u>**
**RIGHTS OFFERING PROCEDURES**

Attached.

## FIELDWOOD ENERGY INC.

### RIGHTS OFFERING PROCEDURES

The Subscription Rights and shares of common stock, par value $0.01 per share ("New Equity Interests" or "New Common Stock"), of Fieldwood Energy Inc., a Delaware company (the "Issuer") are being distributed and issued without registration under the Securities Act of 1933, as amended (the "Securities Act"), in reliance upon the exemption provided by Section 4(a)(2) thereof and/or Regulation D promulgated thereunder.

None of the Subscription Rights or New Equity Interests issuable upon exercise of such rights distributed pursuant to these Rights Offering Procedures have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer and sale of a security. The Subscription Rights are not detachable from the Allowed Claims (as defined below) and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the New Equity Interests, the SLTL Claims and any related claims), except as set forth in Section 6 herein.

None of the New Equity Interests have been registered under the Securities Act, nor any State or local law requiring registration for offer or sale of a security, and no New Equity Interests may be sold or transferred except pursuant to an effective registration statement or exemption from registration under the Securities Act.

The Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.

Each of the New Equity Interests issued upon exercise of a Subscription Right, and each book-entry position or certificate issued in exchange for or upon the transfer, sale or assignment of any such New Equity Interest, shall be deemed to contain or be stamped or otherwise imprinted with, as applicable, a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD

1

**OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."**

February 23, 2018

2

Eligible Claimants (as defined below) should note the following times relating to the Rights Offering:

| Date | Calendar Date | Event |
|---|---|---|
| Subscription Record Date……………………….. | February 22, 2018 | The date and time mutually agreed between the Company and the Required Backstop Parties (as defined in the Backstop Commitment Agreement (as defined below)) for the determination of the holders entitled to participate in the Rights Offering. |
| Subscription Commencement Date.. | February 23, 2018 | Commencement of the Rights Offering. |
| Subscription Expiration Deadline … | 5:00 p.m. New York City Time on March 14, 2018 | The deadline for Eligible Claimants to subscribe for New Equity Interests. Eligible Claimant's rights offering subscription exercise form (the "**Rights Offering Subscription Form**") (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and executed subscription agreement (the "**Subscription Agreement**") must be received by Prime Clerk LLC (the "**Subscription Agent**") by the Subscription Expiration Deadline. Eligible Claimants who are not Backstop Parties must deliver the Aggregate Purchase Price (as defined below) by the Subscription Expiration Deadline. Eligible Claimants who are Backstop Parties must deliver |

3



|  | the Aggregate Purchase Price (as defined below) by the deadline specified, and in the form and manner set forth, in the Backstop Commitment Agreement. |

**Terms used and not defined herein shall have the meaning assigned to them in the Plan (as defined below).**

4

To Eligible Claimants:

Fieldwood Holdings LLC (the "**Company**") and certain of its directly- and indirectly-owned subsidiaries, as chapter 11 debtors and debtors in possession (such subsidiaries, together with the Company, the "**Debtors**"),[1] are seeking to implement a proposed financial restructuring of their existing funded debt and certain other obligations pursuant to the Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors, filed with the Court on February [•], 2018 [BCR No. [•]] (as it may be amended, modified or supplemented from time to time, the "**Plan**").

The New Equity Interests, with an aggregate purchase price of $525 million, may be subscribed for by Eligible Claimants. Each holder of SLTL Claims (as defined in the Plan) on the Subscription Record Date (as defined below) that is an Accredited Investor (each such holder, an "**Eligible Holder**") will receive Subscription Rights with respect to the SLTL Claims held or beneficially held[2] by such Eligible Holder as of the Subscription Record Date (such SLTL Claims, "**Allowed Claims**" and an Eligible Holder of Allowed Claims, an "**Eligible Claimant**") to subscribe for its pro rata share (measured as the principal and accrued and unpaid interest amount of all Allowed Claims held by such Eligible Claimant as compared to the aggregate principal and accrued and unpaid interest amount of Allowed Claims held by all Eligible Holders) of the New Equity Interests, provided that it (i) timely and properly executes and delivers its Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement, and makes certain customary representations and warranties set forth therein, to the Subscription Agent in advance of the Subscription Expiration Deadline and (ii) timely pays the applicable Aggregate Purchase Price.

No Eligible Claimant shall be entitled to participate in the Rights Offering unless the Aggregate Purchase Price for the New Equity Interests it subscribes for is received by the Subscription Agent (i) in the case of an Eligible Claimant that is not a Backstop Party, by the Subscription Expiration Deadline, and (ii) in the case of an Eligible Claimant that is a Backstop Party, by the deadline and in the form and manner specified in the Backstop Commitment Agreement (the "**Backstop Funding Deadline**"). No interest is payable on any advanced funding of the Aggregate Purchase Price. If the Rights Offering is terminated for any reason, your Aggregate Purchase Price will be returned to you promptly. No interest will be paid on any returned Aggregate Purchase Price.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Holdings LLC (9264); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042. The location of the Debtors' headquarters is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

[2] For these purposes, SLTL Claims held or beneficially owned, shall include only those Allowed Claims that are properly reflected in Item 4 of Exhibit C to the Rights Offering Subscription Procedures.

WEIL:\96428839\8\45327.0003

**In order to participate in the Rights Offering, you must complete all the steps outlined below. If all of the steps outlined below are not completed by the Subscription Expiration Deadline or the Backstop Funding Deadline, as applicable, you shall be deemed to have forever and irrevocably relinquished and waived your right to participate in the Rights Offering.**

1.      **Rights Offering**

Eligible Claimants have the right, but not the obligation, to participate in the Rights Offering.  Only Eligible Claimants as of the Subscription Record Date may participate in the Rights Offering.

Subject to the terms and conditions set forth in the Plan, these Rights Offering Procedures and the Subscription Agreement, each Eligible Claimant is entitled to subscribe for up to one New Equity Interest per $75.41 of Allowed Claims, at a purchase price of $23.33 per share (the "***Per Share Purchase Price***").  For each Eligible Claimant, the total amount of New Equity Interests to be purchased *multiplied by* the Per Share Purchase Price, is referred to herein as the "***Aggregate Purchase Price.***"[3]

Eligible Claimants will be subject to restrictions under the Securities Act on their ability to resell the New Equity Interests, as discussed in more detail in Article VIII of the Disclosure Statement, entitled "Transfer Restrictions and Consequences Under Federal Securities Laws."

**SUBJECT TO THE TERMS AND CONDITIONS OF THE SUBSCRIPTION AGREEMENT, AND THE BACKSTOP COMMITMENT AGREEMENT IN THE CASE OF ANY BACKSTOP PARTY, ALL SUBSCRIPTIONS SET FORTH IN THE SUBSCRIPTION AGREEMENT ARE IRREVOCABLE.**

2.      **The Backstop**

The Rights Offering will be backstopped by the Backstop Parties.  Each of the Backstop Parties, severally and not jointly, has agreed, pursuant to the Backstop Commitment Agreement by and among the Company, certain of the Company's subsidiaries, and the Backstop Parties party thereto, dated as of February 14, 2018 (as amended and supplemented from time to time) (the "***Backstop Commitment Agreement***"), to purchase all New Equity Interests that are not purchased by other Eligible Claimants pursuant to the Rights Offering, in accordance with the percentages set forth in <u>Schedule 1</u> to the Backstop Commitment Agreement.  As consideration for their undertakings in the Backstop Commitment Agreement, the Backstop Parties will receive the Backstop Commitment Premium (as defined in the Backstop Commitment Agreement) set

---

[3] The Per Share Purchase Price has been determined on the assumption that 30,000,000 shares of New Common Stock will be issued and outstanding on the Effective Date of the Plan. The Issuer may, in its sole discretion in accordance with the Plan, determine to issue a greater or lesser number of shares of New Common Stock on the Effective Date of the Plan, in which case (i) the number of shares of New Common Stock subject to this rights offering (the "***Rights Offering Shares***") shall be proportionately adjusted and (ii) the Per Share Purchase Price will be adjusted to be equal to the quotient obtained by dividing $525,000,000 by the number of Rights Offering Shares, as so adjusted.

6

forth in the Backstop Commitment Agreement.  Pursuant to the Backstop Commitment Agreement, each Backstop Party has agreed to fully exercise all Subscription Rights allotted to it for the purchase of the New Equity Interests. Furthermore, and notwithstanding anything else to the contrary herein, pursuant to the Backstop Commitment Agreement, certain of the Backstop Parties shall have the right, and have agreed with the Company, to exercise Subscription Rights that will be allotted to certain of its related funds and assigned by such related funds to such Backstop Party, in accordance with Schedule 1 to the Backstop Commitment Agreement.

### 3.      Subscription Period

The Rights Offering will commence on the Subscription Commencement Date and will expire at the Subscription Expiration Deadline.  Each Eligible Claimant intending to purchase New Equity Interests in the Rights Offering must affirmatively elect to exercise its Subscription Rights in the manner set forth in the Rights Offering Subscription Form by the Subscription Expiration Deadline.

Any exercise of Subscription Rights after the Subscription Expiration Deadline will not be allowed and any purported exercise received by the Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored, except that the Company shall have the discretion, with the consent of the Required Backstop Parties, to allow any exercise of Subscription Rights after the Subscription Expiration Deadline.

The Subscription Expiration Deadline may be extended with the consent of the Required Backstop Parties or as required by law.

### 4.      Delivery of Subscription Agreement

Each Eligible Claimant may exercise all or any portion of such Eligible Claimant's Subscription Rights, subject to the terms and conditions of the Subscription Agreement. In order to facilitate the exercise of the Subscription Rights, beginning on the Subscription Commencement Date, the Subscription Agent will send a Subscription Agreement to each Eligible Claimant together with appropriate instructions for the proper completion, due execution, and timely delivery of the executed Subscription Agreement and the payment of the applicable Aggregate Purchase Price for its New Equity Interests.

### 5.      Exercise of Subscription Rights

(a)      In order to validly exercise its Subscription Rights, each Eligible Claimant that is not a Backstop Party must:

i.      return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

7

ii.　　　promptly upon returning its Subscription Agreement and Rights Offering Subscription Form to the Subscription Agent, but in no event later than the Subscription Expiration Deadline, pay the applicable Aggregate Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in Item 5 of the Rights Offering Subscription Form.

(b)　　In order to validly exercise its Subscription Rights, each Eligible Claimant that is a Backstop Party must:

i.　　　return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

ii.　　　no later than the Backstop Funding Deadline, pay the applicable Aggregate Purchase Price (in accordance with the terms and conditions and in the form and manner set forth in the Backstop Commitment Agreement), to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in Item 5 of the Rights Offering Subscription Form.

All Eligible Claimants must deliver their completed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), completed Subscription Agreement, and (with respect to the Eligible Claimants that are not Backstop Parties) payment of the applicable Aggregate Purchase Price payable for the New Equity Interests elected to be purchased by such Eligible Claimant directly to the Subscription Agent on or before the Subscription Expiration Deadline. In all cases, Eligible Claimants that are Backstop Parties must deliver their payment of the applicable Aggregate Purchase Price payable for the New Equity Interests elected to be purchased by such Eligible Claimant directly to the Subscription Agent no later than the Backstop Funding Deadline.

In the event that the funds received by the Subscription Agent from any Eligible Claimants do not correspond to the Aggregate Purchase Price payable for the New Equity Interests elected to be purchased by such Eligible Claimant, the number of the New Equity Interests deemed to be purchased by such Eligible Claimant will be the lesser of (a) the number of the New Equity Interests elected to be purchased by such Eligible Claimant and (b) a number of the New Equity Interests determined by dividing the amount of the funds received on account by the Per Share Purchase Price.

The cash paid to the Subscription Agent in accordance with these Rights Offering Procedures (and with respect to the Backstop Parties, the Backstop Commitment Agreement) will be deposited and held by the Subscription Agent in a segregated account held in an agreed upon financial institution until distributed in connection with the settlement of the Rights Offering on the Effective Date.  The Subscription Agent may not use such cash for any other

purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. The cash held by the Subscription Agent hereunder shall not be deemed part of the Debtors' bankruptcy estates.

6.      **Transfer Restriction; Revocation**

The Subscription Rights are not detachable from the Allowed Claims and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the New Equity Interests, the SLTL Claims and any related claims) (collectively, "***transfer*** or "***transferred***"), except that an Eligible Claimant that is a party to the Backstop Commitment Agreement may transfer any portion or all of its Subscription Rights separate and independent from its Allowed Claim to a Related Fund (as defined in the Backstop Commitment Agreement).

Any transfer or assignment following the Subscription Record Date of the corresponding Allowed Claim (except, with respect to (i) the settlement of Allowed Claims held on the Subscription Record Date or (ii) Allowed Claims held by an Eligible Claimant that is a party to the Backstop Commitment Agreement in accordance with the Backstop Commitment Agreement) shall void the Subscription Right, and neither such Eligible Claimant nor the purported transferee will receive any New Equity Interests otherwise purchasable on account of such transferred Subscription Rights.

However, in connection with the exercise of the Subscription Rights, the person exercising such Subscription Rights shall have the right to designate the receipt of the New Equity Interests to another person that is a Related Fund, an Accredited Investor or a custodian (such person shall deliver an IRS Form W-9 or appropriate IRS Form W-8, as applicable) by completing Exhibit A to the Rights Offering Subscription Form. Any such designation and delivery of New Equity Interests shall be subject to compliance with applicable securities laws relating to the transfer of restricted securities.

Once an Eligible Claimant has properly exercised its Subscription Rights, subject to the terms and conditions of the Subscription Agreement and the Backstop Commitment Agreement in the case of any Backstop Party, such exercise will be irrevocable.

7.      **Return of Payment**

If the Rights Offering is not consummated, any cash paid to the Subscription Agent will be returned, without interest, to the applicable Eligible Claimant as soon as reasonably practicable, but in no event later than five Business Days after the date on which the Rights Offering is terminated.

8.      **Settlement of the Rights Offering and Distribution of the New Equity Interests**

The Debtors intend that the New Equity Interests will be issued on or as soon as practicable after the effective date of the Plan directly to the Eligible Claimants and/or to any Related Fund, Accredited Investor or custodian that an Eligible Claimant so designates in the Rights Offering Subscription Form in accordance with Section 6 above.

9.      **Fractional Shares**

No fractional rights or New Equity Interests will be issued in the Rights Offering. All share allocations (including each Eligible Claimant's New Equity Interests) will be calculated and rounded down to the nearest whole share.  No consideration shall be provided in lieu of fractional shares that are rounded down.

10.     **Validity of Exercise of Subscription Rights**

All questions concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights will be determined in good faith by the Debtors and, if necessary, subject to a final and binding determination by the Bankruptcy Court. The Debtors may waive or reject any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, the purported exercise of any Subscription Rights. Subscription Agreements will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in good faith.

*Before exercising any Subscription Rights, Eligible Claimants should read the Disclosure Statement and the Plan for information relating to the Debtors and the risk factors to be considered.*

11.     **Modification of Procedures**

With the prior written consent of the Required Backstop Parties, the Debtors reserve the right to modify these Rights Offering Procedures, or adopt additional procedures consistent with these Rights Offering Procedures, to effectuate the Rights Offering and to issue the New Equity Interests; *provided*, *however*, that the Debtors shall provide prompt written notice to each Eligible Claimant of any material modification to these Rights Offering Procedures made after the Subscription Commencement Date. In so doing, and subject to the consent of the Required Backstop Parties, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith are necessary and appropriate to effectuate and implement the Rights Offering and the issuance of the New Equity Interests. Nothing in this paragraph shall be construed so as to permit the Debtors to modify the terms of any executed and delivered Subscription Agreement without the consent of the Eligible Claimant that is a party thereto.

The Debtors may undertake procedures to confirm that each participant in the Rights Offering is in fact an Eligible Claimant, including, but not limited to, requiring additional certifications by such participant to that effect and other diligence measures, if any, as the Debtors deem reasonably necessary.

12.     **Inquiries and Transmittal of Documents; Subscription Agent**

10

The Rights Offering Instructions attached hereto should be read carefully and strictly followed by the Eligible Claimants.

Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone numbers: 917-460-0913 (international) or 855-631-5346 (domestic, toll free) or via email to fieldwoodsubscription@primeclerk.com with "Fieldwood Energy Inc. Rights Offering" in the subject line.

The risk of non-delivery of all documents and payments to the Subscription Agent is on the Eligible Claimants electing to exercise its Subscription Rights and not the Debtors or the Subscription Agent.

## FIELDWOOD ENERGY INC.

### RIGHTS OFFERING INSTRUCTIONS FOR ELIGIBLE CLAIMANTS

**Terms used and not defined herein or in the Subscription Agreement shall have the meaning assigned to them in the Plan.**

**To elect to participate in the Rights Offering, you must follow the instructions set out below:**

1.      **Insert** the principal amount of the Allowed Claims that you held as of the Subscription Record Date in Item 1 of your Rights Offering Subscription Form.

2.      **Confirm** whether you are a Backstop Party pursuant to the representation in Item 3 of your Rights Offering Subscription Form.

3.      **Confirm** whether you are an Eligible Holder pursuant to the representation in Item 4 of your Rights Offering Subscription Form.

4.      **Complete** the calculation in Item 2a of your Rights Offering Subscription Form, which calculates the maximum number of New Equity Interests available for you to purchase. Such amount must be rounded down to the nearest whole share.

5.      **Complete** the calculation in Item 2b of your Rights Offering Subscription Form, which calculates the Aggregate Purchase Price for the New Equity Interests that you elect to purchase.

6.      **Complete** the wire refund information requested in Item 6, which will be used by the Subscription Agent in the event a refund is due.

7.      **Complete** Item 7 and provide the information needed for the registration of the New Equity Interests. If you are designating a Related Fund, other party that is an Accredited Investor or a custodian to receive any (or all) of your New Equity Interests, please complete Exhibit A to the Rights Offering Subscription Form.

8.      **Read, complete, and sign** the certification in Item 8 of your Rights Offering Subscription Form.

9.      **Read and countersign** the Subscription Agreement. Such execution shall indicate your acceptance and approval of the terms and conditions set forth therein.

10.     **Read, complete, and sign** an IRS Form W-9 if you are a U.S. person. If you are a non-U.S. person, read, complete, and sign an appropriate IRS Form W-8. These forms may be obtained from the IRS at its website: www.irs.gov.

11.     **Return** your signed Subscription Agreement and Rights Offering Subscription Form

12

(with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent prior to the Subscription Expiration Deadline either via email (in PDF or other standard format) to fieldwoodsubscription@primeclerk.com or to the following physical address via first class mail, hand delivery, or overnight mail:

> **Fieldwood Energy Inc. Rights Offering Processing**
> **c/o Prime Clerk, LLC**
> **830 Third Avenue, 3rd Floor**
> **New York, NY 10022**

12. **Arrange for full payment** of the Aggregate Purchase Price by wire transfer of immediately available funds, calculated in accordance with Item 5 of your Rights Offering Subscription Form.  An Eligible Claimant that is not a Backstop Party should follow the payment instructions as provided in the Rights Offering Subscription Form. An Eligible Claimant that is a Backstop Party should follow the payment instructions in the written notice delivered by the Debtors to the Backstop Parties in accordance with the Backstop Commitment Agreement (a "***Backstop Funding Notice***").

> **The Subscription Expiration Deadline is 5:00 p.m. New York City Time on March 14, 2018.**
>
> **Eligible Claimants that are not Backstop Parties should follow the delivery and payment instructions provided in the Rights Offering Subscription Form. Eligible Claimants that are Backstop Parties should follow the payment instructions in the Backstop Funding Notice.**
>
> **Eligible Claimants that are not Backstop Parties must deliver the appropriate funding directly to the Subscription Agent no later than the Subscription Expiration Deadline. Eligible Claimants that are Backstop Parties must deliver the appropriate funding directly to the Subscription Agent no later than the Backstop Funding Deadline.**

WEIL:\96428839\8\45327.0003

## <u>EXHIBIT J</u>
## GOVERNANCE TERM SHEET

Attached.

**Fieldwood Holdings LLC Chapter 11 Restructuring**

**Corporate Governance Term Sheet**

**This term sheet is not an offer with respect to any securities or a solicitation of acceptances of a Chapter 11 Plan within the meaning of Section 1125 of the U.S. Bankruptcy Code of 1986 (the "*Bankruptcy Code*"). Any such offer or solicitation will comply with all applicable securities laws and provisions of the Bankruptcy Code. Nothing contained in this term sheet shall be an admission of fact or liability or, until the occurrence of the agreement effective date on the terms described herein and in the RSA (defined below), deemed binding on any of the parties hereto.**

This term sheet ("*Term Sheet*") describes the post-effective corporate governance in connection with the restructuring (the "*Restructuring*") of Fieldwood Holdings LLC, a Delaware limited liability company ("*Fieldwood*"). This Term Sheet is not binding, is subject to material change and is being distributed for discussion purposes only. This Term Sheet is not a commitment to provide financing or engage in any transaction.

Capitalized terms used in this Term Sheet but not defined herein shall have the meanings set forth in the Restructuring Support Agreement, dated February 14, 2018 (the "*RSA*").

| | |
|---|---|
| **Reorganized Issuer** | Fieldwood Energy Inc., a Delaware corporation (the "*Company*") |
| **Classes of Stock** | One class of common stock (the "*Common Stock*"). |
| **Board of Directors** | Initial board (the "*New Board*") to consist of seven directors, (i) one director shall be the CEO, (ii) three directors to be selected by Riverstone (as defined in the Backstop Agreement) (the "*Sponsor*"), (iii) two directors to be selected by the Specified Stockholders (as defined below) and (iv) one director to be selected by Franklin Resources, Inc. or one of its affiliates (collectively, "*Franklin*") who is an employee of Franklin. All decisions of the New Board may be taken by a simple majority of the directors. |
| | The size of the New Board shall be established as seven. Pursuant to the stockholders agreement, all holders of common stock will agree to vote their shares to elect as director: |
| | <ul><li>the individual then serving as chief executive officer of the Company;</li></ul> |
| | <ul><li>(I) so long as Barings LLC, Brown University, Eaton Vance Management, Halcyon Capital Management LP, Highland Capital Management, L.P., Invesco Senior Secured Management, Inc., Mudrick Capital Management, L.P., and Symphony Asset Management LLC (collectively, the "*Specified Stockholders*") collectively hold at least 15% of the Common Stock outstanding at emergence, two directors nominated by the holders of a majority of the common stock held by the Specified Stockholders and (II) so long as the Specified Stockholders collectively hold more than 5% but less than 15% of the Common Stock outstanding at emergence, one director nominated by the holders of a majority of the common stock held by the Specified Stockholders;</li></ul> |
| | <ul><li>(I) so long as the Sponsor holds at least 25% of the Common Stock</li></ul> |

outstanding at emergence, three directors nominated by the Sponsor, (II) so long as the Sponsor holds at least 15% but less than 25% of the Common Stock outstanding at emergence, two directors nominated by the Sponsor, and (III) so long as the Sponsor holds at least 5% but less than 15% of the Common Stock outstanding at emergence, one director nominated by the Sponsor;

- so long as Franklin holds at least 25% of the aggregate amount of loans and commitments under the Exit First Lien Term Facility of the Company, one director nominated by Franklin who is an employee of Franklin; and

- in the event Franklin holds less than 25% of the aggregate amount of loans and commitments under the Exit First Lien Term Facility of the Company and so long as the Specified Stockholders collectively hold at least 5% of the Common Stock outstanding at emergence, one director (who shall be independent and a non-employee of the Company, the Sponsor, any Specified Stockholder or any affiliate of the foregoing) proposed by the Sponsor (so long as the Sponsor holds at least 5% of the Common Stock outstanding at emergence) and approved by the holders of a majority of the Common Stock held by the Specified Stockholders.

Stockholders will agree to vote to remove any director that has been designated by a party at the direction of the designating party. Any vacancies on the New Board caused by the resignation, removal, death or incapacity of any director designated by any designating party shall be filled only by an individual designated by the respective designating party. For the avoidance of doubt, when a party no longer has the right to designate a seat, such seat will be filled by a majority vote of all stockholders, other than the seat to be filled by the board member designated by Franklin in accordance with the provisions above.

The Specified Stockholders shall be entitled to appoint a single board observer so long as they collectively hold at least 5% of the Common Stock outstanding at emergence.

The rights to designate members of the New Board and board observers shall not be transferrable by the Sponsor or a Specified Stockholder; *provided, however,* that the Sponsor or a Specified Stockholder may transfer all or any of its board designation rights in connection with a sale of all or substantially all of the Common Stock held at emergence by the Sponsor or such Specified Stockholder (or pursuant to which all or potentially all of the Common Stock held by the such party at emergence would have been transferred but for the exercise of tagalong rights).

| **Stockholder Consent Rights** | The Company shall not, and shall not permit any of its subsidiaries to: |

- enter, amend or renew an agreement with (i) any affiliate of the Company or (ii) any owner of 5 % or more of the Common Stock, or an affiliate of such owner (a "***Related Party***"), excluding any agreement, amendment or renewal pursuant to a compensation and benefits agreement with a director, officer or other employee of the Company and any of its subsidiaries entered into in the ordinary course of business (and other similar, customary exclusions for intra-company matters) (a "***Related Party Agreement***"), unless such agreement, amendment or

renewal is approved by the holders of a majority of the Common Stock other than the Related Party and any of its affiliates; or

- amend any of the organizational documents of the Company or any of its subsidiaries in a manner that is materially and disproportionately adverse to one or more holders of Common Stock unless approved by such holder(s) of Common Stock.

The Company shall not, and shall not permit any of its subsidiaries to:

- amend any of the organizational documents of the Company in any manner, or any of the organizational documents its subsidiaries in any material manner, unless approved by (i) a majority of all holders of the Common Stock and (ii) a majority of all holders of Common Stock other than Sponsor or any of its affiliates.

So long as the Sponsor holds at least 35% of the Common Stock outstanding, the Company shall not, and shall not permit any of its subsidiaries to, take any of the following actions without the approval of the Sponsor:

- during the two-year period following the emergence (the "**Consent Period**"), consummate a Sale Event (as defined below);
- at any time following the Consent Period, consummate a Sale Event other than any Sale Event that results in a price per share of Common Stock at least equal to the one implied by the Plan equity valuation, plus an 8% IRR;
- consummate a public offering pursuant to a registration statement filed with the SEC (other than a Qualified IPO (as defined below) based upon a price per share of Common Stock at least equal to the one implied by the Plan equity valuation plus an 8% IRR);
- prior to a Qualified IPO, a listing of the Common Stock on a national securities exchange or over-the-counter market (other than an OTC Pink quotation) or registration of the Common Stock under the Exchange Act;
- hiring or termination of the CEO or CFO;
- change the size of the New Board;
- acquire or dispose of any assets in each case involving consideration payable or receivable by the Company or its subsidiaries in excess of $100 million (except for a Sale Event);
- (i) Any payment or declaration of any dividend or other distribution or (ii) entering into any recapitalization transaction or incurring indebtedness, in each case, the primary purpose of which is to pay a dividend; or
- Entering into any joint venture arrangements in excess of $100mm in committed liabilities.

The Sponsor shall be permitted to transfer its stockholder consent rights in connection with a sale of all or substantially all of the Common Stock held by Sponsor at emergence (or pursuant to which all or substantially all of the Common Stock held by the Sponsor at emergence would have been transferred but for the exercise of tag-along rights by Key Holders).

| | |
|---|---|
| **Preemptive Rights** | Each holder of shares of Common Stock in excess of 0.5% of the Common Stock then outstanding (each, a "**Key Holder**") will, collectively with its affiliates (including any funds managed by such Key Holder or its affiliates), have the right to participate on a *pro rata* basis in any issuance by the Company of any capital stock or securities exchangeable or exercisable for or convertible into its |

| | |
|---|---|
| | capital stock, except for Excluded Issuances (for the avoidance of doubt, a Key Holder may allocate its aggregate preemptive rights among its affiliates, including any funds managed by such Key Holder or its affiliates, in its sole discretion).  "**Excluded Issuances**" means (x) Common Stock that is issued as consideration as part of a bona fide acquisition by the Company (but not, for the avoidance of doubt, in an equity financing transaction to raise funds to finance any such acquisition); (y) employee equity awards or capital stock issued upon the exercise, conversion or exchange of outstanding securities; and (z) any SEC-registered public offering following a Qualified IPO.  For the avoidance of doubt, a stockholder shall not be deemed to own 0.5% or less of the Common Stock then outstanding solely due to dilution by virtue of Excluded Issuances. |
| **Transfer Restrictions** | The Company shall use commercially reasonable efforts to have the Common Stock admitted to quotation on the OTC Pink market – No information tier as soon as practicable following emergence, but in any event no earlier than 60 days following emergence.<br><br>The Common Stock will be freely transferrable, subject to the following restrictions:<br><br>• the number of holders of record shall not exceed the number that would trigger the requirements for the Company to become required to file with the Securities and Exchange Commission (the "**SEC**") under the Exchange Act of 1934, as amended (the "**Exchange Act**");<br><br>• no transfers that do not comply with U.S. federal or state securities laws or other applicable securities law; and<br><br>• transferees must become parties to the stockholders agreement.<br><br>There will be no rights of first refusal over transfers by shareholders in favor of either the Company or other shareholders (including the Sponsor). |
| **Drag-Along Rights** | Following the Consent Period, if requested by the holders of a majority of the outstanding Common Stock in connection with a Sale Event[1] (the applicable stockholders entitled to initiate such Sale Event, the "**Dragging Holders**"), all holders of Common Stock shall be required to sell their Common Stock on the same terms and the same per-interest consideration as the Dragging Holders and, if a stockholder vote is required, vote in favor of such transaction and waive all appraisal or dissenter rights in connection therewith; *provided, however*, that if the Sponsor is not a Dragging Holder, and at such time the Sponsor holds at least 35% of the Common Stock, the Sponsor shall not be required to sell its Common Stock or vote in favor of such transaction unless the Sale Event results in a price per share of Common Stock at least equal to the one implied by the Plan equity value plus an 8% IRR. |
| **Tag-Along Rights** | Key Holders will have tag-along rights for a transfer or series of related transfers by the Sponsor for more than 10% of any of the outstanding Common Stock; *provided* such tag-along rights shall not apply to (x) a transfer as part of an |

---

[1]    "**Sale Event**" means: (i) A merger or consolidation (other than one in which holders of the voting power of the Company own a majority by voting power of the outstanding shares of the surviving or acquiring corporation); (ii) a sale, lease, transfer, exclusive license or other disposition of all or substantially all of the assets of the Company; ((i) or (ii), a "**Deemed Liquidation Event**"); or (iii) a transaction or series of related transactions in which a person, or a group of related persons, acquires from stockholders of the Company shares of capital stock representing more than fifty percent (50%) of the outstanding voting power of the Company.

| | |
|---|---|
| | underwritten public offering pursuant to an SEC registration statement for which piggyback registration rights apply, (y) a transfer to any affiliate of the Sponsor, including any fund managed by the investment manager or advisor of the Sponsor or an affiliate thereof, or (z) pursuant to the drag-along rights. |
| **Information Rights/Sale Support Rights** | The Company to (i) provide any Key Holder that is not a competitor with annual and quarterly financial statements, including a "short form" MD&A, (ii) hold a quarterly earnings call with such Key Holders in connection with the delivery of the financial statements, and (iii) subject to applicable securities laws and customary confidentiality obligations, make available disclosure to Key Holders and prospective acquirers of Common Stock from Key Holders (that are not competitors of the Company, as reasonably determined by the Company pursuant to a process to be agreed between the parties hereto pursuant to the definitive documentation) comparable to any disclosure required to be delivered to lenders under any credit agreement.<br><br>In furtherance of the foregoing, so long as the Company is not required to file public reports with the SEC, the Company shall use commercially reasonable efforts to assist any Key Holder with a transfer of its Common Stock subject to applicable to securities laws and customary confidentiality obligations, providing reasonable access to its financial and operating data and any other information reasonably appropriate for a proposed transferee  (that is not a competitor of the Company, as reasonably determined by the Company pursuant to a process to be agreed between the parties hereto pursuant to the definitive documentation) to conduct a reasonable and customary due diligence review.  For the avoidance of doubt, such information shall be limited to the information required to be provided in the immediately preceding paragraph. |
| **Automatic Termination of Stockholders Agreement Upon IPO** | If the Company, subject to the Stockholder Consent Rights described above, consummates (i) an underwritten, SEC-registered initial public offering  of Common Stock with gross primary proceeds of at least $250 million (any such offering immediately following which the Common Stock is quoted or  listed for trading on the Nasdaq or NYSE, a "***Qualified IPO***"), or (ii) any other SEC-registered initial public offering  of Common Stock, and in the case of (i) or (ii) immediately following such offering the Common Stock is quoted or listed for trading on the Nasdaq or NYSE, the board designation rights, stockholder consent rights, preemptive rights, drag-along rights, tag-along rights, information rights and sale support rights shall automatically terminate (through the automatic termination of the Stockholders Agreement at such time). |
| **Registration Rights** | As will be provided in a registration rights agreement, all Key Holders will have customary shelf registration rights, demand and piggyback rights following an initial public offering or other Exchange Act registration. Demand rights will be tied to minimum ownership and proceeds thresholds, as well as a maximum number of exercises. |
| **Exclusive Forum** | Charter and bylaws to designate Delaware as exclusive forum for stockholder litigation. |
| **Stockholders Agreement** | All holders of the Common Stock shall be party to the Stockholders Agreement as a precondition to receiving any of the Common Stock. |

## EXHIBIT K
## FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS

This Joinder Agreement to the Restructuring Support Agreement, dated as of February 14, 2018 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), by and among the Company (as defined in the Agreement), and, among others, the holders of the principal amounts outstanding under the [Prepetition RBTL Loans/Prepetition FLTL Loans/Prepetition FLLO Term Loans/Prepetition Second Lien Term Loans/Prepetition Sponsor Second Lien Term Loans] (together with their respective successors and permitted assigns, the "Consenting Creditors" and each, a "Consenting Creditor") is executed and delivered by _____ (the "Joining Party") as of [●].  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.    Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2.    Representations and Warranties.  With respect to [the aggregate principal amount of Prepetition RBTL Loans/Prepetition FLTL Loans/Prepetition FLLO Term Loans/Prepetition Second Lien Term Loans/Prepetition Sponsor Second Lien Term Loans], in each case, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in Section 9 of the Agreement to each other Party to the Agreement.

3.    Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[CONSENTING CREDITOR]**


By:_____
Name:
Title:


**<u>CONSENTING CREDITOR</u>**

[●]

By: [●]

Name: [●]

Title: [●]



Principal Amount of Prepetition FLTL Loans:  $_____

Principal Amount of Prepetition RBTL Loans:  $_____

Principal Amount of Prepetition FLLO Term Loans:  $_____

Principal Amount of Prepetition Second Lien Term Loans:   $_____

Principal Amount of Prepetition Sponsor Second Lien Term Loans:   $_____



<u>Notice Address</u>:
[●]



Fax: [●]
Attention: [●]
Email: [●]

Acknowledged:

**[●]**

By:_____
Name:
Title:

**<u>EXHIBIT L</u>**
**DIP COMMITMENTS**

Intentionally Omitted

## SCHEDULE 1

**Restructuring Subsidiaries**

| |
|---|
| Dynamic Offshore Resources NS, LLC |
| Fieldwood Energy LLC |
| Fieldwood Holdings LLC |
| Fieldwood Energy Inc. |
| Fieldwood Energy Offshore LLC |
| Fieldwood Onshore LLC |
| Fieldwood SD Offshore LLC |
| FW GOM Pipeline, Inc. |
| GOM Shelf LLC |
| Bandon Oil and Gas GP, LLC |
| Bandon Oil and Gas, LP |
| Fieldwood Energy SP LLC |
| Galveston Bay Pipeline LLC |
| Galveston Bay Processing LLC |

**Exhibit B**

**Notice of Entry of Confirmation Order and Occurrence of Effective Date**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| FIELDWOOD ENERGY LLC, *et al.*, | § § | Case No. 18-30648 (DRJ) |
| | § § | (Jointly Administered) |
| Debtors.[1] | § § | |

NOTICE OF (I) ENTRY OF ORDER
(I) APPROVING DEBTORS' DISCLOSURE STATEMENT
AND (II) CONFIRMING PREPACKAGED CHAPTER 11 PLAN
OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS

TO ALL CREDITORS, INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST:

PLEASE TAKE NOTICE that on April 2, 2018, the Honorable David R. Jones, United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), entered the *Order (I) Approving the Debtors' Disclosure Statement and Confirming Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (D.I. [●]) (the "**Confirmation Order**") confirming the *Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (D.I. 36) (as modified,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Holdings LLC (9264); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

amended, and including all supplements, the "**Plan**")[2] and approving the *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors*, (D.I. 34) (the "**Disclosure Statement**") of the above captioned debtors (the "**Debtors**").

      **PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on [●], 2018.

      **PLEASE TAKE FURTHER NOTICE** that Copies of the Plan and the Disclosure Statement may be obtained free of charge by (i) visiting the website maintained by the Debtors' voting agent, Prime Clerk LLC (the "**Voting Agent**"), at http://cases.primeclerk.com/fieldwood (ii) calling the Voting Agent at 855-631-5346 (domestic) or 917-460-0913 (international), or (iii) sending an electronic mail message to fieldwoodballots@PrimeClerk.com with "Fieldwood" in the subject line. Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at https://www.pacer.gov/. Please note that a PACER password and login are required to access documents via PACER.

      **PLEASE TAKE FURTHER NOTICE** that the Bankruptcy Court has approved certain discharge, release, exculpation, injunction, and related provisions in Article X of the Plan.

      **PLEASE TAKE FURTHER NOTICE** that the Plan and the provisions thereof are binding on the Debtors, the Reorganized Debtors, any holder of a Claim against, or Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or

---

[2] Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Interest of such holder is impaired under the Plan and whether or not such holder or entity voted to accept the Plan.

Dated:   [●], 2018
         Houston, Texas

                                          _/s/_ _____

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:  Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  Matt.Barr@weil.com
Email:  Ray.Schrock@weil.com
Email:  Jessica.Liou@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

3